1 | ROBERT V. PRONGAY (#270796)
    rprongay@glancylaw.com
2 | EX KANO S. SAMS II (#192936)
    esams@glancylaw.com
3 | CHARLES LINEHAN (#307439)
    clinehan@glancylaw.com
4 | PAVITHRA RAJESH (#323055)
    prajesh@glancylaw.com
5 | **GLANCY PRONGAY & MURRAY LLP**
    1925 Century Park East, Suite 2100
6 | Los Angeles, California 90067
    Telephone: (310) 201-9150
7 | Facsimile: (310) 201-9160

8 | *Attorneys for Lead Plaintiff*
    *Scot S. Cook*

9

10

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

11

12

13 | MARK CULLEN, individually and on behalf of all others similarly situated,

14 | Plaintiff,

15 | v.

16 | RYVYL INC. F/K/A GREENBOX POS, BEN ERREZ, FREDI NISAN, J DREW BYELICK, BENJAMIN CHUNG, EF HUTTON F/K/A KINGWOOD CAPITAL MARKETS, A DIVISION OF BENCHMARK INVESTMENTS, INC. and R.F. LAFFERTY & CO.,

20 | Defendants.

---

Case No. 3:23-cv-00185-GPC-WVG

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

21

22

23

24

25

26

27

28

Plaintiff Scot S. Cook ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Ryvyl Inc. ("Ryvyl" or the "Company"), formerly known as Greenbox POS ("Greenbox"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a securities class action brought on behalf of all persons and/or entities who: (1) purchased or otherwise acquired the Company's securities pursuant or traceable to the Registration Statement, Prospectus, and Offering Documents (collectively "Registration Statement") issued in connection with the Company's Initial Public Offering ("IPO") held on or about January 29, 2021, seeking to pursue remedies under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"); and (2) purchased or otherwise acquired the Company's securities between January 29, 2021 and January 20, 2023, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.    Ryvyl is a crypto company focused on developing, marketing and selling blockchain-based payment solutions. Ryvyl conducted an IPO in which it sold 4,150,000 shares at $10.50 per share.

3.    Throughout the Class Period, and in connection with the IPO effected by means of the Registration Statement, Defendants made materially false and misleading statements and/or failed to disclose that: (1) Ryvyl misrepresented its serious issues with its internal controls; (2) Ryvyl's financial statements for December 31, 2021 through and including interim periods ended September 30, June 30, and March 31, 2022 contained errors resulting in overstatements of

revenue, assets, and stockholders' equity and understatements of losses; (3) as a result, Ryvyl would need to restate its previously issued financial statements for those periods; and (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

4.    On January 20, 2023, the Company announced that its previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31, 2022 should no longer be relied upon and had to be restated. The Company also identified additional internal control weaknesses and a remediation plan.

5.    On this news, Ryvyl's share price fell 14.63% to close at $0.70 per share on January 23, 2023, damaging investors. As a result of Defendants' acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.    The claims alleged herein arise under, and pursuant to, Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2) and 77o), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

7.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. §77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8.    This Court has jurisdiction over Defendants named herein because Defendants had sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(d) and Section 22(a) of the Securities Act (15 U.S.C. §77v(a)) because a significant portion of Defendants' actions and the subsequent damages took place within this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b)-(d) and Section 27 of the Exchange Act (15 U.S.C. §78aa) because the alleged misstatements and subsequent damages occurred within this District.

10.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone and other communications, and the facilities of a national securities exchange.  Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of the Company's securities in this District.

**PARTIES**

11.    As set forth in the previously filed certification which is incorporated herein by reference (Doc. 7-4), Plaintiff purchased or otherwise acquired the Company's securities pursuant or traceable to the Company's Registration Statement and during the Class Period and has been damaged thereby.

12.    Defendant Ryvyl (formerly known as GreenBox) is incorporated in Nevada and maintains an office in San Diego, California, 92108.  Ryvyl stock began trading on the NASDAQ on February 17, 2021, under the ticker symbol "RVYL."

13.    Defendant Ben Errez ("Errez") has served as the Company's Chairman and Co-Founder since 2017.

14.    Defendant Fredi Nisan ("Nisan") has served as the Company's Chief Executive Officer ("CEO") and Co-Founder since 2017.

15.    Defendant J Drew Byelick ("Byelick") has served as the Company's Chief Financial Officer ("CFO") since August 2022.

AMENDED CLASS ACTION COMPLAINT

16.     Defendant Benjamin Chung ("Chung") served as the Company's CFO from May 2021 until August 2022.

17.     Defendants Errez, Nisan, Byelick, and Chung are collectively referred to herein as the "Individual Defendants."

18.     Defendants Ryvyl, Errez, Nisan, Byelick, and Chung are collectively referred to herein as the "Exchange Act Defendants."

19.     As senior executive officers and/or directors of the Company, the Individual Defendants were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company, including the Company's business, finances, products, markets, and present and future business prospects.  Moreover, the Individual Defendants had access to the Company's internal corporate documents, participated in conversations and management and/or board of directors' meetings and committees thereof, and had connections with other corporate officers, directors, and employees.

20.     The Individual Defendants are liable as direct participants in the wrongs alleged herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" and had the power and influence to cause the Company to engage in the unlawful conduct alleged.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

21.     Because of their positions within the Company, the Individual Defendants controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided

with copies of the Company's reports and SEC filings alleged to be misleading herein, prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

22.    As senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose securities were, and are, governed by the federal securities law – the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's securities would be based upon truthful and accurate information.    The Individual Defendants' misrepresentations and omissions violated these specific requirements and obligations.

23.    Defendant EF Hutton f/k/a Kingswood Capital Markets, a division of Benchmark Investments, Inc. ("EF Hutton"), is a stock brokerage firm that acted as an underwriter of the Company's Offering.    EF Hutton's address is 590 Madison Avenue, 39th Floor, New York, NY, 10022.

24.    Defendant R.F. Lafferty & Co. ("R.F. Lafferty") is an investment brokerage firm that acted as an underwriter of the Company's Offering.    R.F. Lafferty's address is 40 Wall Street, 29th Floor, New York, NY, 10005.

25.    Defendants EF Hutton and R.F. Lafferty are collectively referred to herein as the "Underwriter Defendants."

26.    The Underwriter Defendants are investment banking firms that specialize in, among other things, underwriting public offerings of securities.    The Underwriter Defendants served as the underwriters of the IPO and shared substantial fees from the IPO collectively.    Additionally, the Underwriter Defendants arranged a roadshow prior to the IPO during which they, and representatives from the

Company, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects.

27.    The Underwriter Defendants also obtained an agreement from the Company and the Individual Defendants that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  Specifically, the Registration Statement provides that the Company has "agreed to indemnify the several underwriters against certain liabilities, including certain liabilities under the Securities Act.  If [the Company is] unable to provide this indemnification, [the Company has] agreed to contribute to payments the underwriters may be required to make in respect of those liabilities."

28.    Representatives of the Underwriter Defendants also assisted the Company and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of the Company, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants to engage in the IPO.  During their purported "due diligence," the Underwriter Defendants had continual access to internal, confidential, and current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

29.    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

30.    The Company, the Individual Defendants, and the Underwriter Defendants are referred to herein collectively as "Defendants."

## BACKGROUND

31.    Ryvyl is a crypto company that develops, markets, and sells blockchain-based payment solutions.  The Company's core focus is to develop and

monetize disruptive blockchain-based applications, integrated within an end-to-end suite of financial products, capable of supporting a multitude of industries. The Company's proprietary, blockchain-based systems are designed to facilitate, record, and store a virtually limitless volume of tokenized assets, representing cash or data, on a secured, immutable blockchain-based ledger.

32.     The Company was formerly known as ASAP Expo, Inc ("ASAP"), and was incorporated in the state of Nevada on April 10, 2007. On January 4, 2020, PubCo and GreenBox POS LLC, a Washington limited liability company ("PrivCo"), entered into an asset purchase agreement to memorialize a verbal agreement entered into on April 12, 2018, by and among PubCo (the buyer) and PrivCo (the seller). On April 12, 2018, pursuant to the verbal agreement, the Company acquired PrivCo's blockchain gateway and payment system business, point of sale system business, delivery business and kiosk business, bank and merchant accounts, as well as all intellectual property related thereto (the "GreenBox Business"). As consideration for the GreenBox Business, on April 12, 2018, the Company assumed PrivCo's liabilities that had been incurred in the normal course of the GreenBox Business. On May 3, 2018, the Company formally changed its name to GreenBox POS. LLC, then subsequently changed its name to GreenBox POS on December 13, 2018. On October 13, 2022, GreenBox POS changed its name to RYVYL Inc.

33.     The Company claims that payment processing in the blockchain world only requires recording a ledger without the movement of money. According to Ryvyl, secure tokens are used where users need an immediate transaction in a safe, private, and secure environment, and where traditional banks may not work effectively, like cross-border transactions or in under-banked verticals.

34.     The Company claims to generate revenue from payment processing services, licensing fees, and equipment sales.

35.    According to Ryvyl, payment processing revenue can come from merchant services, banking services, issuing, foreign exchange ("FX"), and ACH programs.  The Company claims that payment processing revenue is based on a percentage of each transaction's value and/or upon fixed amounts specified per each transaction or service and is recognized as such transactions or services are performed.  Ryvyl states that payment processing revenue is the Company's primary source of revenue.  When a merchant makes a sale, according to the Company, the process of receiving the payment card information, engaging its banks to transfer the proceeds to the merchant's account via digital gateways, and recording the transaction on a blockchain ledger are the activities for which Ryvyl gets to collect fees.

36.    The Company claims that licensing revenue is paid in advance and is recorded as unearned income, which is amortized monthly over the period of the licensing agreement.

37.    According to Ryvyl, equipment revenue is generated from the sale of POS products, which is recognized when goods are shipped.

38.    The Company has three main products that are utilized by its customers: (1) a QuickCard Payment System, which Ryvyl claims is a comprehensive physical and virtual payment card processing management system including software that facilitates on- and off-ramp e-wallet management; (2) the Coyni Platform, which the Company touts as featuring a digital currency that is backed on a 1:1 ratio to the U.S. Dollar, supported by its blockchain technology, and offering custodial assurance by utilizing its stablecoin and unique blockchain technology in a closed-loop ecosystem, allowing for flexibility; and (3) POS Solutions, which Ryvyl claims is its complete end-to-end Point of Sale solution, comprising both software and hardware.

39.    When consumers use credit or debit cards to pay for transactions with merchants who use Ryvyl's ecosystem, the transaction starts with the consumer

purchasing tokens from the Company.  The tokens are purchased or granted directly from the merchant's terminals or mobile app (or from the Company's website) and are immediately available for transactions.  The issuance of tokens is accomplished when the Company loads a virtual wallet with a token, which then transfers credits to the merchant's wallet on a dollar-for-dollar basis, after which the merchant releases its goods or services to the consumer.  According to Ryvyl, these transfers take place instantaneously and seamlessly, allowing the transaction experience to seem like any other ordinary credit or debit card transaction to the consumer and merchant.

40.    As of December 31, 2022, the Company had approximately 110 full-time employees.

## SECURITIES ACT CLAIMS

41.    On January 29, 2021, the Company filed with the SEC a Registration Statement on Form S-1, which in combination with a February 10, 2021 amendment on Form S-1/A, declared effective on February 12, 2021, and filed pursuant to Rule 424(b)(4), are collectively referred to as the Registration Statement and issued in connection with the IPO.  In the IPO, the Company sold 4,150,000 shares at $10.50 per share.  Defendants Nisan and Errez signed or authorized the signing of the Company's Registration Statement.

42.    Within the Registration Statement, Defendants represented the following:

*Our consolidated financial statements are prepared and presented in accordance with United States generally accepted accounting principles, or U.S. GAAP.  Our consolidated financial statements have been prepared on a basis consistent with our audited financial statements and include all adjustments, consisting of normal and recurring adjustments that we consider necessary for a fair presentation of the financial position and results of operations as of and for such periods*.

\* \* \*

*We have a limited operating history and may not be able to operate our business successfully or generate sufficient revenue to make or*

***sustain distributions to our shareholders. As a result, our management has identified and our auditors agreed that there is a substantial doubt about our ability to continue as a going concern.***

We became a public company and changed our business model in April 2018, and our current business has a relatively limited operating history. Historical results are not indicative of, and may be substantially different than, the results we achieve in the future. We cannot assure you that we will be able to operate our business successfully or implement our operating policies and strategies. The results of our operations depend on several factors, our success in attracting and retaining motivated and qualified personnel, the availability of adequate short and long-term financing, conditions in the financial markets, and general economic conditions. ***In addition, our future operating results and financial data may vary materially from the historical operating results and financial data as well as the pro forma operating results and financial data because of a number of factors, including costs and expenses associated with being a public company***.

* * *

***Our financial statements may be materially affected if our estimates prove to be inaccurate as a result of our limited experience in making critical accounting estimates.***

Financial statements prepared in accordance with GAAP require the use of estimates, judgments, and assumptions that affect the reported amounts. Actual results may differ materially from these estimates under different assumptions or conditions. These estimates, judgments, and assumptions are inherently uncertain, and, if they prove to be wrong, then we face the risk that charges to income will be required. In addition, because we have limited to no operating history and limited experience in making these estimates, judgments, and assumptions, the risk of future charges to income may be greater than if we had more experience in these areas. Any such charges could significantly harm our business, financial condition, results of operations, and the price of our securities.

* * *

***If we fail to comply with the rules and regulations under the Sarbanes-Oxley Act, our operating results, our ability to operate our business and investors' views of us may be harmed.***

Section 404 of the Sarbanes-Oxley Act requires public companies to conduct an annual review and evaluation of their internal controls. ***Ensuring that we have adequate internal financial and accounting controls and procedures in place so that we can produce accurate financial statements on a timely basis is a costly and time-consuming effort that will need to be evaluated frequently***. As of December 31, 2019, the Company's Principal Executive Officer and Principal Financial and Accounting Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures were not effective to provide reasonable assurance that information that it is

required to disclose in reports that the Company files with the SEC is recorded, processed, summarized, and reported within the time periods specified by the Exchange Act rules and regulations. ***Our failure to maintain the effectiveness of our internal controls in accordance with the requirements of the Sarbanes-Oxley Act could have a material adverse effect on our business. We could lose investor confidence in the accuracy and completeness of our financial reports, which could have an adverse effect on the price of our Common Stock***. In addition, our efforts to comply with the rules and regulations under the Sarbanes Oxley or new or changed laws, regulations, and standards may differ from the activities intended by regulatory or governing bodies due to ambiguities related to practice. Regulatory authorities may investigate transactions disclosed in our "*Management's Discussion and Analysis of Financial Condition and Results of Operations*," and if legal proceedings are initiated against us, it may harm our business.

43.    On February 18, 2021, the Company filed with the SEC the Final Prospectus for the Offering on Form 424B4, which forms part of the Registration Statement.  Within the Final Prospectus, Defendants included the same statements noted above.

44.    The statements contained in ¶¶42-43 were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations and prospects.  For instance, Defendants' representations that "[w]e have a limited operating history and may not be able to operate our business successfully or generate sufficient revenue to make or sustain distributions to our shareholders," that "our management has identified and our auditors agreed that there is a substantial doubt about our ability to continue as a going concern," that "our future operating results and financial data may vary materially from the historical operating results and financial data as well as the pro forma operating results and financial data because of a number of factors, including costs and expenses associated with being a public company," that "[o]ur financial statements may be materially affected if our estimates prove to be inaccurate as a result of our limited experience in making critical accounting estimates," that "[i]f we fail to comply with the rules and regulations under the Sarbanes-Oxley Act, our operating results, our ability to operate our business and investors' views of us may

be harmed," that "[e]nsuring that we have adequate internal financial and accounting controls and procedures in place so that we can produce accurate financial statements on a timely basis is a costly and time-consuming effort that will need to be evaluated frequently," and that "[o]ur failure to maintain the effectiveness of our internal controls in accordance with the requirements of the Sarbanes-Oxley Act could have a material adverse effect on our business" were false and misleading because, as the accounts of the Company's former employees demonstrate as alleged herein, these purported risks had already materialized and the magnitude of such risks were far greater than Defendants portrayed. Indeed, as alleged herein based upon the accounts of the Company's former employees, Ryvyl's numbers were inaccurate (including the Company's quarterly financial statements and year-end financial statements), and the Company had failed to follow proper accounting procedures and practices.

45. Additionally, on January 20, 2023, the Company filed a Form 8-K with the SEC in which it announced the following:

> **Based on discussions between the audit committee (the "Audit Committee") of the board of directors of RYVYL Inc. (the "Company") and the Company's new independent registered public accounting firm, Simon & Edward, LLP ("Simon & Edward"), the Company concluded on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31, 2022 (collectively the "Previously Issued Financial Statements"), and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon. It is expected that the restatement of the financial statements for the annual and interim periods referred to above will result in decreases to total revenue, increased net losses, decreases to total assets, and decreased total stockholders' equity.**

> **The Audit Committee of the Company and its management concluded that the Company's Previously Issued Financial Statements should be restated to correct the aforementioned financial statements and that, accordingly, such Previously Issued Financial Statements should no longer be relied upon to that extent. Related press releases, investor presentations or other communications describing the Company's financial statements for these periods should no longer be relied upon to that extent.**

*The Company anticipates filing the restatements of the Previously Issued Financial Statements as soon as practicable. The Company plans on filing the restated financial statements in its Annual Report on Form 10-K for the year ended December 31, 2022 and in any other filings that may be necessary or appropriate.*

*In connection with such restatements, the Company has reassessed its conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and has determined that one or more material weaknesses exist in the Company's internal control including a material weakness related to accounting for certain complex business transactions. The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. As a result of the material weakness, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022.*

46. The accounts of former Company employees further demonstrate the false and misleading nature of the Registration Statement, particularly Defendants' representations that the Company's "consolidated financial statements are prepared and presented in accordance with United States generally accepted accounting principles, or U.S. GAAP" and that the Company's "consolidated financial statements have been prepared on a basis consistent with our audited financial statements and include all adjustments, consisting of normal and recurring adjustments that we consider necessary for a fair presentation of the financial position and results of operations as of and for such periods." CW2 served as a Marketing Specialist, Marketing Manager, and Project Manager at Ryvyl from August 2021 to February 2023. CW2 stated that Ryvyl was a small company, that everyone talked, and that there was a series of events that led the Company to hire CFO Byelick.

47. Specifically, CW2 stated that CFO Byelick's predecessor, CFO Chung, required the Company to use his software as part of his deal, and that CFO Chung did not properly follow accounting procedures as a publicly traded company. CW2 stated further that CFO Chung created his own accounting software, that the

software was absolutely horrible, and that the Company should never have been using it. CW2 stated that CFO Chung was not doing his job, and that more people discovered this fact after CFO Chung's departure, including CFO Byelick and CW2. In fact, CW2 and CFO Byelick had numerous discussions about the improper accounting practices that existed at the Company as a result of CFO Chung's failures, which included improper accounting relating to revenue, debt, and depreciation value. CW2 stated that CFO Byelick acknowledged to CW2 that Ryvyl's numbers were inaccurate, including the Company's quarterly financial statements and year-end financial statements, and that the Company failed to follow proper accounting procedures.

48. CW2 also stated that the Company did not have enough personnel working in the accounting department to properly manage what they needed to do. CW2 indicated that there was a high degree of turnover in the accounting department, with the average time for personnel in the department being approximately three to five months. CW2 stated further that sometimes Ryvyl would rely upon its receptionist to perform financial and accounting work for the Company and that the receptionist was not qualified to perform financial and accounting work. CW2 stated that the Company assigned tasks such as expense reporting to the receptionist, and that the receptionist would ask CW2 how do to the work because the receptionist did not know how to do it.

49. Additionally, CW3 was a Staff Accountant at the Company from May 2022 to July 2022. CW3 stated that Ryvyl had family friends working in the Company's finance department. CW3 noted that R. Clay Gilreath ("Gilreath") worked as Senior Treasury Analyst and that Kineret Rubin ("Rubin") worked as Controller, and that Rubin was a family friend of Co-Founder and Chairman Errez. CW3 stated that Gilreath and Rubin told CW3 what information to enter into the system, including wires for other companies, and that a lot of the accounting for such wires was inaccurate. According to CW3, people from other companies began

to contact the Company to complain about not receiving the money to which they were entitled. CW3 stated further that Ryvyl's accounting department consisted solely of Gilreath, Rubin, Granados, CFO Chung, and CW3.

50. CW4 served as the Executive Assistant to both the Chairman of the Board Errez and Chief Operating Officer ("COO") Min Wei from February 2022 to July 2022. CW4 attended weekly meetings with CFO Chung (who attended many meetings remotely from South Korea), CEO Nisan, Co-Founder and Chairman Errez, Jacqueline Reynolds (a salesperson at the time) and Reid Granados, Ryvyl's former Director of Finance. CW4 confirmed that based upon CW4's attendance at weekly meetings with CEO Nisan, CFO Chung, Chairman Errez, and other Company executives, the Company's accounting, including accounting for wires that were received and sent to other companies, was inaccurate.

51. The Company's senior management, including the Individual Defendants, as executive officers and authorized representatives of the Company, participated in the solicitation and sale of the Company's securities to investors in the IPO. Additionally, the Company's senior management, including the Individual Defendants, were motivated to serve their own interests and those of the Company.

52. Specifically, the Individual Defendants, along with other Company senior executives, attended investor roadshow presentations and met with investment analysts and large investors prior to the IPO. In doing so, the Individual Defendants and other Company senior executives sought to persuade investors that the Company's securities were a worthy investment and to solicit investors to purchase the Company's securities in the IPO, all to further the financial interests of the Company.

53. In particular, each of the Individual Defendants: (1) directly participated in the management of the Company; (2) was directly involved in the day-to-day operations of the Company at the highest levels; (3) was privy to confidential proprietary information concerning the Company and its business and

operations; (4) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; (5) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; and/or (6) approved or ratified the misrepresentations alleged herein in violation of the federal securities laws.

54.     As directors and/or officers of the Company and as signatories to the Registration Statement, each of the Individual Defendants had a duty to conduct a thorough due diligence investigation of the Company's operations and to ensure that all of the statements in the Registration Statement were true and not misleading in any respect.  The Individual Defendants had the ability and duty to inquire into financial information related to the Company's material risks, business, and operations.  Accordingly, the Company and the Individual Defendants are strictly liable and/or negligent for misrepresentations alleged herein in connection with the Company's Registration Statement.

55.     Additionally, in connection with the IPO, the Underwriter Defendants drafted and disseminated the Registration Statement and were collectively paid in underwriting discounts and/or fees in connection therewith.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm alleged herein.

56.     The Underwriter Defendants participated in conducting and promoting the roadshow for the IPO.  The Underwriter Defendants' participation in, and their solicitation of offers in connection with, the IPO was motivated by their financial interests.  As the underwriters of the IPO, the Underwriter Defendants earned lucrative underwriting fees.

57.     Additionally, the Underwriter Defendants met with potential investors in the IPO and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects.  Moreover, as set forth herein, the Underwriter Defendants

1    failed to disclose material information required to be disclosed under the federal

2    securities laws and applicable regulations promulgated thereunder.

3         58.    The Underwriter Defendants also assisted the Company and the

4    Individual Defendants in planning the IPO.  The Underwriter Defendants purported

5    to investigate the business, operations, products, and plans of the Company, an

6    undertaking known as a "due diligence" investigation.  During their purported "due

7    diligence," the Underwriter Defendants had continual access to confidential

8    corporate information concerning the Company's business, financial condition,

9    products, plans, and prospects.

10        59.    In addition to having access to internal corporate documents, the

11   Underwriter Defendants and/or their agents, including their counsel, had access to

12   the Company's management, directors, and attorneys to determine: (1) the strategy

13   to best accomplish the IPO; (2) the terms of the IPO, including the price at which

14   the Company's securities would be sold; (3) the language to be used in the

15   Registration Statement; (4) what disclosures about the Company would be made in

16   the Registration Statement; and (5) what responses would be made to the SEC in

17   connection with its review of the Registration Statement.  As a result of such

18   constant contacts and communications between the Underwriter Defendants and the

19   Company's management, directors, and attorneys, at a minimum, the Underwriter

20   Defendants should have known of adverse, undisclosed information alleged herein

21   and the materially inaccurate, misleading, and incomplete statements and omissions

22   contained within the Registration Statement as detailed herein.

23        60.    The Underwriter Defendants caused the Registration Statement to be

24   filed with the SEC and declared effective in connection with the IPO so that

25   Defendants could offer to sell, and sell, the Company's securities to Plaintiff and the

26   members of the class pursuant or traceable to the Registration Statement.

27        61.    Section 11 of the Securities Act provides that underwriters are liable for

28   any false statements of material facts or the omission to state a material fact in a

registration statement. 15 U.S.C. § 77k(a)(5). Section 11 provides further that underwriters are liable for damages resulting from materially false misstatements contained in the Registration Statement.

62. In the area of selling securities to investors and performing a reasonable due diligence investigation, underwriters are often referred to as "gatekeepers." As gatekeepers, underwriters must ***independently*** verify all material facts in the offering documents, including, but not limited to, the Registration Statement. This due diligence process must be rigorous and thorough, with professional skepticism to be applied. Underwriters cannot merely accept the views of a company or its management or auditors at face value. Rather, underwriters must take an ***adverse*** role to the issuer during the diligence process. Indeed, underwriters must make sufficient inquiries, obtain and analyze various information concerning all aspects of the issuer's business, and follow-up with more work as appropriate depending upon what is learned and what "red flags" may arise.

63. Furthermore, underwriters control both what information is contained within offering documents and also the dissemination of that information to potential investors. In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering." (emphasis added). Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. Accordingly, underwriters, such as the Underwriters Defendants here, had ultimate control over the contents and dissemination of the Company's Registration Statement.

64. As alleged herein, the Underwriter Defendants failed to conduct a reasonable due diligence investigation regarding the Company's IPO and the

statements contained within the Registration Statement. Accordingly, the Underwriter Defendants' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm alleged herein. Thus, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Registration Statement.

### CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and/or entities who: (1) purchased or otherwise acquired the Company's securities pursuant or traceable to the Registration Statement issued in connection with the Company's IPO seeking to pursue remedies under Sections 11, 12(a)(2), and 15 of the Securities Act; and (2) purchased or otherwise acquired the Company's securities during the Class Period seeking to pursue remedies under the Exchange Act and SEC Rule 10b-5 promulgated thereunder. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

66.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

AMENDED CLASS ACTION COMPLAINT

67.     Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws alleged herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts constituted violations of the federal securities laws;

(b)     whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)     whether the price of the Company's common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

AMENDED CLASS ACTION COMPLAINT

# COUNT I

## Violation of Section 11 of the Securities Act Against All Defendants

71.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

72.    With respect to this Count, Plaintiff expressly disclaims all allegations that could be construed as alleging fraud or intentional misconduct.  Accordingly, this Count is based solely upon claims of strict liability and/or negligence.

73.    For the reasons alleged above, the Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

74.    Plaintiff purchased the Company's securities pursuant to or traceable to the Registration Statement.

75.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

76.    By reason of the conduct herein alleged, Defendants violated, and/or controlled a person who violated, Section 11 of the Securities Act.

77.    Plaintiff and the Class have sustained damages.  The value of the Company's securities has declined substantially subsequent to, and as a result of, Defendants' violations.

78.    At the time of their purchases of the Company's securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Additionally, less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based to the time that Plaintiff commenced this action, and

1  less than three years has elapsed between the time that the securities upon which this
2  Count is brought were offered to the public and the time Plaintiff commenced this
3  action.

### COUNT II

**Violation of Section 12(a)(2) of the Securities Act Against All Defendants**

6  79.    Plaintiff repeats and realleges each and every allegation contained
7  above as though set forth in full herein.

8  80.    With respect to this Count, Plaintiff expressly disclaims all allegations
9  that could be construed as alleging fraud or intentional misconduct.  Accordingly,
10  this Count is based solely upon claims of strict liability and/or negligence.

11  81.    By means of the defective Registration Statement, Defendants
12  promoted and sold securities to Plaintiff and other members of the Class.

13  82.    The Registration Statement for the IPO contained untrue statements of
14  material fact and failed to disclose material facts as detailed above.  Defendants
15  owed Plaintiff and the other members of the Class who purchased the Company's
16  securities pursuant to the Registration Statement the duty to make a reasonable and
17  diligent investigation of the statements contained in the Registration Statement to
18  ensure that such statements were true and that there was no omission to state a
19  material fact required to be stated in order to make the statements contained therein
20  not misleading.  Defendants, in the exercise of reasonable care, should have known
21  of the misstatements and omissions contained in the Registration Statement as set
22  forth above.

23  83.    Plaintiff did not know, nor in the exercise of reasonable diligence could
24  Plaintiff have known, of the misstatements and omissions contained in the
25  Registration Statement at the time Plaintiff acquired the Company's securities.

26  84.    As a result of the conduct alleged herein, Defendants violated Section
27  12(a)(2) of the Securities Act.  As a direct and proximate result of such violations,
28  Plaintiff and the other members of the Class who purchased the Company's

securities pursuant to the Registration Statement sustained substantial damages in connection with their purchases. Accordingly, Plaintiff and the other members of the Class who hold the Company's securities issued pursuant to the Registration Statement have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

## COUNT III

**Violation of Section 15 of the Securities Act Against the Individual Defendants**

85.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

86.    With respect to this Count, Plaintiff expressly disclaims all allegations that could be construed as alleging fraud or intentional misconduct.

87.    The Individual Defendants were controlling persons of the Company by virtue of their positions as directors and/or senior officers of the Company. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of the Company.

88.    The Individual Defendants were each participants in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged above based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process that allowed the IPO to be completed.

## EXCHANGE ACT CLAIMS

89.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein, including the allegations regarding the materially misleading statements and omissions concerning the Company's Registration Statement.

90.    On May 13, 2021, the Company filed with the SEC its first quarter report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 Report").

Attached to the 1Q21 Report were SOX certifications signed by Defendants Nisan and Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

91.    Specifically, Defendants Nisan and Chung certified the following through their SOX certifications:

I, [Fredi Nisan and Benjamin Chung], certify that:

1.    I have reviewed this Annual Report on Form 10-K for the fiscal year ended December 31, 2021 of GreenBox POS;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.    Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

92.    The Company reported a net revenue of $4,749,441 and a net loss of $13,329,432 in the 1Q21 Report.   The Company also reported total assets of $53,029,116 and total stockholders' equity of $46,885,338.

93.    On August 12, 2021, the Company filed with the SEC its first quarter report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were SOX certifications signed by Defendants Nisan and Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud that included the same representations as set forth above in ¶91.

94.    The Company reported a net revenue of $6,379,179 and a net loss of $13,368,992 in the 2Q21 Report.   The Company also reported total assets of $54,139,293 and total stockholders' equity of $47,931,461.

95.    On November 15, 2021, the Company filed with the SEC its first quarter report on Form 10-Q for the period ended September 30, 2021 (the "3Q21

Report"). Attached to the 3Q21 Report were SOX certifications signed by Defendants Nisan and Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud that included the same representations as set forth above in ¶91.

96. The Company reported a net revenue of $8,045,469 and a net loss of $19,418,747 in the 3Q21 Report. The Company also reported total assets of $69,122,043 and total stockholders' equity of $56,510,762.

97. On March 31, 2022, the Company filed with the SEC its 2021 Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were SOX certifications signed by Defendants Nisan and Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud that included the same representations as set forth above in ¶91.

98. The Company reported a net revenue of $26,304,502 and net loss of $26,453,512 in the 2021 Annual Report. The Company also reported total assets of $115,690,180 and total stockholders' equity of $45,505,423.

99. The 2021 Annual Report downplayed the serious issues with the Company's internal controls. The 2021 Annual Report stated in relevant part:

**Controls and Procedures**

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this report. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, as of December 31, 2021, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our***

*principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.*

***Changes in Internal Control Over Financial Reporting***

There have been ***no changes in our internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act or in other factors that materially affected or are reasonably likely to materially affect our internal controls and procedures over financial reporting during the fourth quarter of the year ended December 31, 2021.***

100.  On May 16, 2022, the Company filed with the SEC its first quarter report on Form 10-Q for the period ended March 31, 2022 (the "1Q22 Report"). Attached to the 1Q22 Report were SOX certifications signed by Defendants Nisan and Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud that included the same representations as set forth above in ¶91.

101.  The Company reported a net revenue of $4,895,526, and a net loss of $21,315,987 in the 1Q22 Report.  The Company also reported total assets of $84,350,603 and total stockholders' equity of $23,361,142.

102.  The 1Q22 Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls:

**Controls and Procedures**

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, as of March 31, 2022, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our***

*management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.*

*There were **no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the three months ended March 31, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

103.   On August 15, 2022, the Company filed with the SEC its second quarter report on Form 10-Q for the period ended June 30, 2022 (the "2Q22 Report").   Attached to the 2Q22 Report were SOX certifications signed by Defendants Nisan and Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud that included the same representations as set forth above in ¶91.

104.   The Company reported a net revenue of $6,965,578 three months ended June 30, 2022 and $10,905,902 six months ended June 30, 2022, and a net loss of $10,410,085 three months ended June 30, 2022 and $10,905,902 six months ended June 30, 2022 in the 2Q22 Report.   The Company also reported total assets of $139,781,295 and total stockholders' equity of $39,949,337.

105.   The 2Q22 Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls:

**Controls and Procedures**

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, as of June 30, 2022, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and***

> *reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.*
>
> There were *no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the three and six months ended June 30, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

106.  On November 21, 2022, the Company filed with the SEC its third quarter report on Form 10-Q for the period ended September 30, 2022 (the "3Q22 Report").    Attached to the 3Q22 Report were SOX certifications signed by Defendants Nisan and Byelick attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud that included the same representations as set forth above in ¶91.

107.  The Company reported a net revenue of $10,629,691 three months ended September 30, 2022 and $22,490,824 nine months ended September 30, 2022, and a net loss of $15,170,277 three months ended September 30, 2022 and $26,076,181 nine months ended September 30, 2022 in the 3Q22 Report.    The Company also reported total assets of $122,401,080 and total stockholders' equity of $34,705,946.

108.  The 3Q22 Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls:

> **Controls and Procedures**
>
> Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10-Q. *Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded*

*that, as of September 30, 2022, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.*

There were *no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the three and nine months ended September 30, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

109.    The statements in ¶¶90-108 were false and misleading.  As Ryvyl announced on January 20, 2023, the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31, 2022 should no longer be relied upon and had to be restated.  The Company also identified additional internal control weaknesses and a remediation plan that rendered the Exchange Act Defendants' previous statements regarding the Company's internal controls false and misleading.

110.    Additionally, the accounts of former Company employees further demonstrate the false and misleading nature of the Exchange Act Defendants' statements and that the Exchange Act Defendants acted with scienter.  CW1 served as HR Generalist at the Company from June 2021 to February 2022.  CW1 stated that many of the Company's customers would complain about getting charges from companies that they did not recognize, such as a mattress company, and that the charges would originate from Ryvyl's system.  CW1 learned that Ryvyl implemented this system as a roundabout process for cannabis-related charges. CW1 stated that CW1 would discuss the situation with CW1's boss and other management at the Company, including Dan Nusinovich, the Company's head of

development and the brother of CEO Nisan, but that the Company's management failed to address the issue.

111.   CW1 stated further that Co-Founder and Chairman Errez and CEO Nisan misrepresented the Company's revenue.  CW1 knew that the statements were wrong because there was no volume to support the claimed revenue.  CW1 stated further that CW1 knew about the Company's volume because CW1 was trained on the Company's system for chargebacks, which represented the volume for anything that would come into Ryvyl and everything that the Company paid out.  CW1 stated that based upon the volume information, the revenue was nowhere close to the representations that Chairman Errez and CEO Nisan made regarding the Company's revenue.

112.   Additionally, CW2 stated that Ryvyl was a small company, that everyone talked, and that there was a series of events that led the Company to hire CFO Byelick.  Specifically, CW2 stated that CFO Byelick's predecessor, CFO Chung, required the Company to use his software as part of his deal, and that CFO Chung did not properly follow accounting procedures as a publicly traded company.  CW2 stated further that CFO Chung created his own accounting software, that the software was absolutely horrible, and that the Company should never have been using it.  CW2 stated that CFO Chung was not doing his job, and that more people discovered this fact after CFO Chung's departure, including CFO Byelick and CW2.  CW2 and CFO Byelick had numerous discussions about the improper accounting practices that existed at the Company as a result of CFO Chung's failures, which included improper accounting relating to revenue, debt, and depreciation value.  CW2 stated that CFO Byelick acknowledged to CW2 that Ryvyl's numbers were made up (including the Company's quarterly financial statements and year-end financial statements), that the Company failed to follow proper accounting procedures, and that information was hidden and disguised.  CW2 stated that based upon CW2's conversations with CFO Byelick, CW2 was 100% certain that the

Company was manipulating numbers related to the Company's quarterly financial statements and year-end financial statements. CW2 stated that CW2 believes that CFO Byelick became aware of the accounting improprieties around the time that CFO Byelick started, and that the more CFO Byelick investigated, the more accounting improprieties he discovered.

113. For example, CW2 stated that at the end of 2022, CW2 had discussions with other Company employees regarding CFO Chung's failure to implement and follow proper accounting procedures at the Company and CW2 learned that CEO Nisan discovered that CFO Chung was making up numbers.

114. CW2 also stated that the Company did not have enough personnel working in the accounting department to properly manage what they needed to do. Additionally, CW2 indicated that there was a high degree of turnover in the accounting department, with the average time for personnel in the department being approximately three to five months. CW2 stated further that sometimes Ryvyl would rely upon its receptionist to perform financial and accounting work for the Company and that the receptionist was not qualified to perform financial and accounting work. CW2 stated that the Company assigned tasks such as expense reporting to the receptionist, and that the receptionist would ask CW2 how do to the work because the receptionist did not know how to do it.

115. Further, CW3 stated that Ryvyl had family friends working in the Company's finance department. CW3 noted that Gilreath worked as Senior Treasury Analyst and Rubin worked as Controller, and that Rubin was a family friend of Co-Founder and Chairman Errez. CW3 stated that Gilreath and Rubin told CW3 what information to enter into the system, including wires for other companies. CW3 said that money came into Ryvyl and that the Company was supposed to wire it out to other companies and take a percentage, but that the Company was making it seem like it was making much more money than it was. CW3 stated that a lot of the wires that the Company was generating were fake, and

that Ryvyl was keeping money in its accounts that was meant to be transferred onward to other companies. According to CW3, people from other companies began to contact the Company to complain about not receiving the money to which they were entitled. CW3 stated that CW3 would show Gilreath and Rubin that documentation did not support the numbers that Gilreath and Rubin demanded to be entered into the system, but that Gilreath and Rubin told CW3 to just do what they said. CW3 stated that Gilreath and Rubin would have Co-Founder and Chairman Errez renegotiate it on the back end and that paperwork would subsequently follow, but that never occurred.

116. CW3 stated further that after CW3 entered the information onto the system, CW3 would go back several days later to ask for documentation to support the changes and that Gilreath claimed that he would upload the documentation into the system, but that never happened. CW3 stated that Gilreath and Rubin were responsible for setting up the wires. CW3 stated further that Ryvyl's accounting department consisted solely of Gilreath, Rubin, Granados, CFO Chung, and CW3.

117. Additionally, CW4 stated that based upon CW4's participation in weekly meetings with the Company's executives, the Company's accounting was a "shit show." CW4 attended weekly meetings with CFO Chung (who attended many meetings remotely from South Korea), CEO Nisan, Co-Founder and Chairman Errez, Jacqueline Reynolds (a salesperson at the time) and Reid Granados, Ryvyl's former Director of Finance. CW4 confirmed that the Company was generating fake wires and keeping money that was meant to be transferred onward to other companies.

## THE TRUTH BEGINS TO EMERGE

118. On January 20, 2023, the Company filed a Form 8-K with the SEC in which it announced the following:

> *Based on discussions between the audit committee (the "Audit Committee") of the board of directors of RYVYL Inc. (the "Company") and the Company's new independent registered public*

*accounting firm, Simon & Edward, LLP ("Simon & Edward"), the Company concluded on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31, 2022 (collectively the "Previously Issued Financial Statements"), and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon. It is expected that the restatement of the financial statements for the annual and interim periods referred to above will result in decreases to total revenue, increased net losses, decreases to total assets, and decreased total stockholders' equity.*

*The Audit Committee of the Company and its management concluded that the Company's Previously Issued Financial Statements should be restated to correct the aforementioned financial statements and that, accordingly, such Previously Issued Financial Statements should no longer be relied upon to that extent. Related press releases, investor presentations or other communications describing the Company's financial statements for these periods should no longer be relied upon to that extent.*

*The Company anticipates filing the restatements of the Previously Issued Financial Statements as soon as practicable. The Company plans on filing the restated financial statements in its Annual Report on Form 10-K for the year ended December 31, 2022 and in any other filings that may be necessary or appropriate.*

*In connection with such restatements, the Company has reassessed its conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and has determined that one or more material weaknesses exist in the Company's internal control including a material weakness related to accounting for certain complex business transactions. The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. As a result of the material weakness, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022.*

119.  On this news, Ryvyl's share price fell 14.63% to close at $0.77 per share on January 23, 2023, damaging investors.

## POST CLASS PERIOD EVENTS

120.  On March 8, 2023, the Company filed a Form 8-K with the SEC in which it announced that "[o]n March 2, 2023, Mr. J. Drew Byelick resigned as Chief Financial Officer of RYVYL Inc. (the "Company"), effective immediately."

121.   On March 14, 2023, the Company filed a Form 8-K with the SEC in which it announced that "[o]n March 8, 2023, RYVYL Inc. (the "Company") appointed Mary Lay Hoitt as the Company's Interim Chief Financial Officer, effective as of March 9th."

122.   On March 21, 2023, the Company filed a Form 8-K with the SEC in which it announced the following:

*Salary Increases*

On February 16, 2023, at a meeting of the Compensation Committee (the "Committee") of the Board of Directors of RYVYL Inc., (the "Company"), the Committee approved the following material compensatory plan, contract or arrangement: salary increases, retroactive to January 1, 2023, for each of Mr. Min Wei, the Chief Operating Officer of the Company and Mr. James D. Byelick, the Chief Financial Officer of the Company at the time of the Committee's approval (Mr. Byelick resigned on March 2, 2023).

Messrs. Wei and Byelick each had their base salaries increased to $320,000. On February 28, 2023, the Company paid a total gross amount reflecting the salary increase and retroactive payment of $15,833.36 to Mr. Wei and $18,958.34 to Mr. Byelick.

*Bonus Compensation Plan*

On March 15, 2023, the Committee approved, pursuant to a unanimous written consent, the following material compensatory plan, contract or arrangement: a performance-based award of $160,000 to Mr. Wei pursuant to the previously disclosed bonus compensation plan. Mr. Wei is eligible for a discretionary performance-based award (the "Award") of $160,000, to be paid in two installments. Two-thirds of the Award is payable upon the completion of all of the following: (a) the Company's restatement of its financial statements for the fiscal year ended December 31, 2021; (b) the Company's restatement of its financial statements for the period ended September 30, 2022; (c) the Company's restatement of financial statements for the period ended June 30, 2022; (d) the Company's restatement of its financial statements for the period ended March 31, 2022, and (e) the Company filing its Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K). The remaining one-third of the Award is payable on the forty-fifth (45th) day following the filing of the 2022 10-K unless the staff of the Securities and Exchange Commission (the "SEC Staff") sends a comment letter with regard to their review of the restated financials or the 2022 10-K. In such a situation, the remaining one-third will be payable following the SEC Staff's completion of their review.

123.   On March 31, 2023, the Company filed a Form 12b-25 with the SEC in which it stated the following:

RYVYL Inc. (the "Company") is unable, without unreasonable effort or expense, to file its Annual Report on Form 10-K for the year ended December 31, 2022 (the "Annual Report") by the March 31, 2023 filing date applicable to smaller reporting companies for the reasons discussed in this Form 12b-25.

As disclosed in the Company's Current Report on Form 8-K filed on January 20, 2023, management and the Audit Committee of the Board of Directors (the "Audit Committee") of the Company determined on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021, and as of and for the interim periods ended September 30, June 30, and March 31, 2022 (collectively the "Previously Issued Financial Statements"), should be restated and can no longer be relied upon, and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon. The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. As a result, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022.

The Company's review and restatement of the Previously Issued Financial Statements ("Restated Previously Issued Financial Statements"), including the determination of all required adjustments thereto, and the compiling of required information to complete the Annual Report, is ongoing. Additionally, the Company's current independent registered public accounting firm, Simon & Edward, LLP, requires additional time to complete its audit of the financial statements for the periods ended December 31, 2021 and December 31, 2022 to be incorporated in the Annual Report.

The Company is working diligently to complete and file the Annual Report and the Restated Previously Issued Financial Statements as soon as practicable. The Company expects to complete the preparation and filing of the Annual Report on or before April 17, 2023 (the first business day after the fifteenth calendar day following the prescribed due date).

124.   On May 15, 2023, the Company filed a Form 12b-25 with the SEC in which it stated the following:

RYVYL Inc. (the "Registrant") was unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the period ended March 31, 2023 (the "Quarterly Report") by the May 15, 2023 filing date applicable to smaller reporting companies due to a delay experienced by the Registrant in completing its financial statements and other disclosures in the Quarterly Report. As a result, the Registrant is still in the process of compiling required information

to complete the Quarterly Report and its independent registered public accounting firm requires additional time to complete its review of the financial statements for the period ended March 31, 2023 to be incorporated in the Quarterly Report. The Registrant anticipates that it will file the Quarterly Report no later than the fifth calendar day following the prescribed filing date.

125.   On June 6, 2023, the Company filed a Form 8-K with the SEC in which it announced that "[o]n June 1, 2023, RYVYL Inc. (the "Company") appointed Gene Jones as the Company's Interim Chief Financial Officer, effective as of June 1, 2023 replacing Mary Lay Hoitt who left the Company on the same day."

126.   On June 13, 2023, the Company filed a Form 8-K with the SEC in which it stated the following:

As previously reported, on December 5, 2022, RYVYL Inc. (the "Company") received a deficiency letter (the "Notice") from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company that, based upon the closing bid price of the Company's common stock, par value $0.001 per share ("Common Stock"), for the last 30 consecutive business days, the Company is not currently in compliance with the requirement to maintain a minimum bid price of $1.00 per share for continued listing on The Nasdaq Capital Market, as set forth in Nasdaq Listing Rule 5550(a)(2) (the "Minimum Bid Requirement"). The Company was granted 180 calendar days, or until June 5, 2023, to regain compliance with the Minimum Bid Price Requirement.

On June 7, 2023, the Listing Qualifications Staff of Nasdaq (the "Staff") provided notice to the Company (the "Nasdaq Notice") that the Company has not regained compliance with Rule 5550(a)(2) and is not eligible for a second 180 calendar day compliance period as the Company does not comply with the minimum $5,000,000 stockholder's equity requirement for initial listing on the Nasdaq Capital Market.

The Company intends to submit a plan to regain compliance to the Nasdaq Hearings Panel as part of the hearing process, which compliance plan may include conducting a reverse stock split if necessary to regain compliance with Rule 5550(a)(2). The hearing request will stay any suspension or delisting action pending the completion of the hearing and the expiration of any additional extension period granted by the Panel following the hearing. Nasdaq compliance rules determine that if a company's appeal is denied or if it fails to regain compliance with Nasdaq's listing standards during any additional compliance period granted by the Staff, the Company's common stock will be subject to delisting from the Nasdaq Capital Market.

**LOSS CAUSATION**

127.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities.  Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's securities by failing to disclose, and misrepresenting, the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's securities declined significantly as the prior artificial inflation dissipated from the Company's stock price.

128.   As a result of the purchases of the Company's securities during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws.  Defendants' false and misleading statements had the intended effect, and caused, the Company's securities to trade at artificially inflated levels throughout the Class Period.

129.   By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects.  As the truth regarding the Company was revealed to the market, the price of the Company's securities fell significantly.  These declines removed the inflation from the price of the Company's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

130.   The declines in the price of the Company's securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in the Company's securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

AMENDED CLASS ACTION COMPLAINT

131.   The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

132.   At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a)   The Company's securities met the requirements for listing, and was listed and actively traded on, NASDAQ, a highly efficient, electronic stock market;

(b)   As a regulated issuer, the Company filed periodic public reports with the SEC and NASDAQ;

(c)   The Company regularly communicated with public investors through established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

133.   As a result of the foregoing, the market for the Company's securities promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's stock.  Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

134.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision.  Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**COUNT IV**

**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5
Promulgated Thereunder Against the Exchange Act Defendants**

135.  Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

136.  During the Class Period, the Exchange Act Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading.  These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

137.  The Exchange Act Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to

state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

138.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities.    Plaintiff and the Class would not have purchased the Company's securities at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

139.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT V

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

140.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

141.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.    By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

AMENDED CLASS ACTION COMPLAINT

142.   The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein.   The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.   Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

143.   The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

144.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D.   Such other and further relief as the Court may deem just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  June 30, 2023                **GLANCY PRONGAY & MURRAY LLP**

By:    *s/ Ex Kano S. Sams II*
Robert V. Prongay
Ex Kano S. Sams II
Charles Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

*Attorneys for Lead Plaintiff Scot S. Cook*

AMENDED CLASS ACTION COMPLAINT

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On June 30, 2023, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 30, 2023, at Los Angeles, California.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II