1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK CULLEN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RYVYL INC. F/K/A GREENBOX POS, BEN ERREZ, FREDI NISAN, J DREW BYELICK, BENJAMIN CHUNG, EF HUTTON F/K/A KINGSWOOD CAPITAL MARKETS, A DIVISION OF BENCHMARK INVESTMENTS, INC., AND R.F. LAFFERTY & CO.,<br><br>Defendants. | Case No.  3:23-cv-0185-GPC-SBC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS; ORDER GRANTING AND DENYING IN PART MOTIONS FOR JUDICIAL NOTICE**<br><br>**[ECF Nos. 40, 41, 53, 54, 62]**<br><br>**ORDERING DENYING AS MOOT MOTIONS FOR AN EXTENSION OF TIME TO FILE**<br><br>**[ECF No. 69, 70]** |

## <u>Introduction</u>

Before the Court are three motions to dismiss Plaintiffs' class action securities fraud amended complaint ("AC") against RYVYL, Inc. ("Ryvyl"), its officers, and the underwriters of the relevant public offering (collectively "Defendants").  ECF No. 33 at 4-5.  According to the AC, the class includes those "who purchased or otherwise acquired the Company's securities pursuant or traceable to the Company's Registration Statement and during the Class Period and ha[ve] been damaged," ECF No. 33 at 4 ¶ 11.

1

Defendants EF Hutton of Benchmark Investments, Inc., and R.F. Lafferty & Co. (the "Underwriter Defendants") filed a motion to dismiss and an accompanying motion for judicial notice on August 14, 2023.  ECF No. 40.  On the same date, Ryvyl officers Ben Errez, Chairman and Co-Founder, Fredi Nisan, Chief Executive Officer ("CEO"), and Benjamin Chung, Chief Financial Officer ("CFO") from May 2021 to August 2022 ("the Ryvyl Defendants") also filed a motion to dismiss and an accompanying motion for judicial notice.  ECF No. 41.  Defendant Drew Byelick, CFO from August 2022 to March 2023 filed a pro se motion to dismiss and request for judicial notice on August 23, 2023.[1]  ECF Nos. 53-54.  Plaintiffs filed one omnibus Response, ECF No. 58, and a notice of supplemental authority, ECF No. 59, and each group of Defendants replied, ECF Nos. 60-62.  In their Reply, the Underwriter Defendants also moved for judicial notice.  ECF No. 62-1.

The parties then notified the Court of their plan to mediate and pro se Defendant Byelick requested permission to re-file his motion to dismiss with counsel if mediation failed, which the Court granted.  ECF Nos. 64-65.  On February 22, 2024, the parties informed the Court that mediation was unsuccessful.  ECF No. 68.  Soon after, Defendant Byelick requested an extension of time to re-file his motion, seemingly without counsel. ECF Nos. 69-70.

The Court finds the matter is appropriate for decision on the papers and will not set a new hearing date.  The Court GRANTS the motions to dismiss by the Underwriter Defendants and Defendant Byelick.  ECF Nos. 40, 52.  The Court GRANTS in part and DENIES in part the motion to dismiss by the Ryvyl Defendants.  ECF No. 41.  The Court GRANTS the Plaintiffs leave to amend as to all Defendants and counts.  The Court GRANTS the motions for judicial notice, ECF Nos. 40-3, 41-3, 54, except the

---

[1] The Court refers to Errez, Nisan, Chung, and Byelick as the "Individual Defendants."

2

Underwriter Defendants' second motion for judicial notice, which it GRANTS in part and DENIES in part, ECF No. 62-1.  Finally, the Court DENIES as moot Defendant Byelick's motions for an extension of time to file.  ECF Nos. 69-70.

## Background

Ryvyl is a cryptocurrency company "that develops, markets, and sells blockchain-based payment solutions," which allow customers to pay businesses with cryptocurrency and businesses to receive cryptocurrency when customers pay with credit or debit cards. ECF No. 33 at 7-8 ¶¶ 31-32, 9-10 ¶ 39.  The company generates revenue from "payment processing services, licensing fees, and equipment sales," though payment processing, for which Ryvyl gets a percentage of each transaction, is Ryvyl's primary source of revenue. *Id.* at 8-9 ¶¶ 34-35.  As of late 2022, the company had 110 full-time employees.  *Id.* at 10 ¶ 40.

In January and February 2021, Ryvyl filed a Registration Statement, an amendment, and a Prospectus with the SEC announcing a public offering ("the Offering").  *Id.* at 10 ¶ 41; ECF No. 41-2 Exhibits 1-3.  The Court will refer to these documents as the "Registration Documents."  Defendants EF Hutton and R.F. Lafferty & Co. were underwriters for the Offering.  The Supreme Court has explained the underwriter's role:

> Typically, when a company [makes a public offering] it issues new shares pursuant to a registration statement.  That registration statement is filed with the SEC and made available to the public.  Investment banks underwrite the offering, usually by buying these new registered shares at a negotiated price and then selling them to investors at a higher price.  In this way, underwriters often carry the risk of loss should they fail to sell the shares at a profit.

*Slack Techs., LLC v. Pirani*, 598 U.S. 759, 763 (2023).

In the Offering, Ryvyl, through the Underwriters, offered over 4 million shares at $10.50 per share.  *Id.*  The Prospectus stated that the offering was expected to close "on or about February 19, 2021."  ECF No. 40-2 at 97.  Prior to the Offering, Ryvyl had over

33 million shares of common stock outstanding.[2]  *Id.* at 98.  Within the Registration Documents filed with the SEC, Defendants stated that their consolidated financial statements were prepared in compliance with United States generally accepted accounting principles ("U.S. GAAP") and provided a variety of risk disclosures, which made general statements about the risk of the future of the company.  ECF No. 33 at 10-12 ¶ 42; ECF No. 41-2 at 16, 21, 23, 31.  Lead Plaintiff Scot S. Cook purchased Ryvyl shares on a number of dates between February 17, 2021 and November 29, 2021.  ECF No. 7-4 at 3.  He made five purchases on February 23, 2023, including one purchase for $10.50 per share, the Offering price.  *Id.*

Ryvyl released interim quarterly financial reports in 2021 and 2022 on May 21, 2021 (for 1Q21), August 21, 2021 (for 2Q21), November 15, 2021 (for 3Q21), May 16, 2022 (for 1Q22), August 15, 2022 (for 2Q22), and November 21, 2022 (for 3Q22).  *Id.* at 24 ¶ 90, 26 ¶ 93, 26 ¶ 95, 28 ¶ 100, 29 ¶ 10, 30 ¶ 106.  It also released an annual report for 2021 on March 31, 2022.  *Id.* at 27 ¶ 97.  In each of these reports it listed Ryvyl's net revenue, net loss, total assets, and stockholders' equity.  *Id.* at 25 ¶ 91, 26 ¶ 94, 27 ¶¶ 96, 98, 28 ¶ 101, 29 ¶ 104, 30 ¶ 107.  And accompanying each report, CEO Nisan and CFO Chung certified, pursuant to the Sarbanes-Oxley Act ("SOX Certifications"), that the reports were true and disclosed any "significant deficiencies and material weaknesses" in Ryvyl's internal financial controls.[3]  *Id.* at 26 ¶¶ 92, 93, 95, 27 ¶ 97, 28 ¶ 100, 29 ¶ 103, 30 ¶ 106.  The 2021 annual report and the interim reports for 2022 also explicitly stated

---

[2] The AC calls the Offering an Initial Public Offering, ECF No. 33 at 10 ¶ 41, but the Prospectus filed with the SEC, of which the Court takes judicial notice, *see infra*, states that over 33 million shares of common stock were outstanding before the Offering, ECF No. 40-2 at 98.

[3] The last of these reports, the 2022 Quarter 3 report was signed by CEO Nisan and CFO Byelick, who had replaced Chung as CFO.  ECF No. 33 at 30 ¶ 106.

4

that the disclosure controls and procedures were effective and had undergone no changes. *Id.* at 27 ¶ 99, 28 ¶ 102, 29 ¶ 105, 30 ¶ 108.

Then, on January 20, 2023, Ryvyl announced that, upon internal discussions and discussions with a new accounting firm, its previously issued financial statements for the three interim quarters in 2021 and 2022 and the 2021 annual report should not be relied upon and needed to be restated. ECF No. 33 at 13-14 ¶ 45, 34-35 ¶ 118. It also "reassess[ed] its [prior] conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and . . . determined that one or more material weaknesses exist in the Company's internal control including a material weakness related to accounting for certain complex business transactions." *Id.* at 34-35 ¶ 118. Ryvyl's share price dropped over 14% that day. *Id.* at 35 ¶ 119. CFO Byelick resigned about six weeks later, soon after receiving a retroactive salary bump and bonus. *Id.* at 35-36 ¶¶ 120, 122. In June 2023, Ryvyl notified the SEC that it was at risk of being delisted by NASDAQ, subject to a hearing, for failing to meet the minimum stock price for six months. *Id.* at 38 ¶ 126.

Plaintiffs filed their original complaint promptly after the January 2023 announcement on February 1, 2023. ECF No. 1. After the Court appointed lead plaintiff and counsel, ECF No. 20, the Plaintiffs filed their AC on June 30, 2023, ECF No. 33. The AC asserts five causes of action:

(I)     Section 11 of the Securities Act of 1933 ("Section 11") against all Defendants for selling securities under a false or misleading registration statement, *id.* at 22;

(II)    Section 12(a)(2) of the Securities Act of 1933 ("Section 12(a)(2)") against all Defendants for offering or selling securities pursuant to a false or misleading prospectus, *id.* at 23;

(III)   Section 15 of the Securities Act of 1933 ("Section 15") against all Individual Defendants for controlling persons who violated Sections 11 and 12(a)(2), *id.* at 24;

(IV)    Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 ("Section 10(b)") against Ryvyl and the Individual Defendants for making false or misleading material statements in connection with the sale of any security registered on a national exchange; and

(V)    Section 20(a) of the Securities Exchange Act ("Section 20(a)") against the Individual Defendants for controlling persons who violated Section 10(b), *id.* at 42.

This Order refers to Counts I, II, and III as the "Securities Act Claims" and Counts IV and V as the "Exchange Act Claims." Underlying the Securities Act Claims is Plaintiffs' assertion that statements in the Registration Documents—specifically the risk disclosures—were materially false or misleading because they did not reveal that the risks had already come to fruition, as demonstrated by the January 2023 announcement and statements of some former employees about failures in accounting practices. ECF No. 33 at 13-16 ¶¶ 45-50.

Underlying the Exchange Act Claims is Plaintiffs' assertion that Defendants "engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities" when they released inaccurate financial data and verified that there were no internal control issues. *Id.* at 39 ¶ 127; *see also id.* at 31-34 ¶¶ 109-117, 39-40 ¶¶ 127-131, 41-42 ¶¶ 136-39. In addition to the January 2023 announcement, Plaintiffs rely primarily on the statements of confidential witnesses who allege variously that (i) the Individual Defendants misrepresented the Company's revenue, *id.* at 32 ¶ 111; (ii) CFO Chung was making up numbers and other Individual Defendants learned about it, *id.* at 32-33 ¶¶ 112-13; (iii) a staff accountant was told to enter inaccurate information, *id.* at 33-34 ¶¶ 115-16; and (iv) the company "was generating fake wires and keeping money that was meant to be transferred onward to other companies," *id.* at 34 ¶ 117. Plaintiffs do not allege the Exchange Act Claims against the Underwriter Defendants.

6

1    The Defendants move to dismiss each Count.

2    **Requests for Judicial Notice**

3    The Underwriter Defendants, the Ryvyl Defendants, and Defendant Byelick each

4    request that the Court take judicial notice of various SEC filings.  *See* ECF Nos. 40-2, 41-

5    2, 41-3, 54, 62-1 Exhibit 3.  In their second motion for judicial notice, accompanying

6    their Reply, the Underwriter Defendants also request that the Court take judicial notice of

7    a news article and a list of Ryvyl's historical daily stock prices.  ECF No. 62-1 Exhibits

8    1-2.  Plaintiffs do not object to any of these motions.  *See* ECF No. 58 (absence).

9    A court may take judicial notice of a fact or document when it "can be accurately

10   and readily determined from sources whose accuracy cannot be reasonably questioned."

11   Fed. R. Evid. 201(b)(2).

12   **I.   SEC Filings**

13   SEC filings are a matter of public record and therefore are the proper subject of

14   judicial notice.  *See Hammitt v. Lumber Liquidators, Inc.*, 19 F. Supp. 3d 989, 1004 (S.D.

15   Cal. 2014); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006); *Oklahoma*

16   *Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1349 (C.D. Cal. 2014).

17   The Court therefore GRANTS the Underwriter Defendants' first motion for judicial

18   notice, ECF No. 40-2, the Ryvyl Defendants' motion for judicial notice, ECF Nos. 41-2,

19   41-3, and Defendant Byelick's motion for judicial notice,[4] ECF No. 54.  It also GRANTS

20   the Underwriter Defendants' second motion for judicial notice as to Exhibit 3, ECF No.

21   62-1.  The Court notes that some of the SEC filings are extensively discussed and quoted

22   in the AC and it can take judicial notice of those filings for that reason as well.  *See*

23   *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

---

26   [4] The Court DENIES Defendant Byelick's request for a hearing on his motion for judicial
     notice.  ECF No. 54 at 4-5.

7

## II.   Historical Daily Stock Prices

The Underwriter Defendants also request judicial notice of the historical daily stock prices of Ryvyl shares from February 3, 2021 to March 10, 2021.  ECF No. 62-1 Exhibit 2.  Historical stock prices are not "subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  As a result, they are properly the subject of judicial notice.  *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008); *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1231-32 (C.D. Cal. 2015); *Oklahoma Firefighters Pension & Ret. Sys.*, 50 F. Supp. 3d at 1349.  The Court therefore GRANTS the Underwriter Defendants' request for judicial notice of Ryvyl's historical daily stock prices, ECF No. 62-1 Exhibit 2.

## III.   News Article

The Underwriter Defendants additionally request that the Court take judicial notice of an online article from GlobalNewswire stating the date on which the Offering closed.  ECF No. 62-1 Exhibit 1.  But unlike SEC filings and historical stock prices, "the accuracy of information in newspaper articles and press releases cannot be readily determined and/or can be reasonably questioned."  *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1028 (C.D. Cal. 2015).  "Courts [therefore] do not take judicial notice of newspaper articles for the truth of the contents of the articles," *Ali v. Intel Corp.*, No. 18-cv-03981, 2018 WL 5734673, at *3 (N.D. Cal. Oct. 31, 2018), but only for the limited purpose of indicating "what was in the public realm at the time." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

Here, the Underwriter Defendants request judicial notice of the article to establish the truth of its contents—the date on which the Offering closed.  ECF No. 62 at 8 n.3.  The Court may not take judicial notice of the article for this purpose.  *See Ali*, 2018 WL 5734673, at *3 (refusing to take judicial notice where the newspaper articles were offered

1  for the truth of their contents).  As such, the Court DENIES the request for judicial notice

2  of the GlobalNewswire article, ECF No. 62-1 Exhibit 1.

3  **Pleading Standards**

4  Defendants move to dismiss each count of the AC pursuant to Federal Rules of

5  Civil Procedure ("Rule") 9(b) and 12(b)(6) and the Private Securities Litigation Reform

6  Act of 1995 ("PSLRA").  ECF No. 40 at 1; ECF No. 41 at 1; ECF No. 53 at 1.

7  **I.    Rule 12(b)(6)**

8  To survive a motion to dismiss for failure to state a claim on which relief can be

9  granted under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible

10 on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The plaintiff must

11 plead sufficient facts to "raise a right to relief above the speculative level," *id.* at 555, and

12 the Court must be able to "draw the reasonable inference that the defendant is liable for

13 the misconduct charged," *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  On review of a

14 Rule 12(b)(6) motion, the Court accepts all facts alleged in the complaint as true and

15 draws all reasonable inferences in favor of the plaintiff.  *Newcal Indus., Inc. v. Ikon Off.*

16 *Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008).

17 **II.   Rule 9(b)**

18 Plaintiffs must also meet the particularity requirements of Rule 9(b) for actions

19 alleging fraud, including their Exchange Act Claims.  *Zucco Partners, LLC v. Digimarc*

20 *Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) ("This requirement has long been applied to

21 securities fraud complaints.").  To do so Plaintiffs "must state with particularity the

22 circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This means the

23 complaint must set forth "the time, place, and specific content of the false representations

24 as well as the identities of the parties to the misrepresentation," *Odom v. Microsoft Corp.*,

25 486 F.3d 541, 553 (9th Cir. 2007), "what is false or misleading about a statement, and

26 why it is false," *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009).

27

28

9

The parties dispute whether this heightened pleading standard also applies to the Securities Act Claims.  ECF No. 40-1 at 13-14; ECF No. 41-1 at 15; ECF No. 58 at 15-17.  The applicability of Rule 9(b) to the Securities Act Claims depends on whether the claims "sound in fraud."  *Rubke*, 551 F.3d at 1161; *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996).  Claims "sound in fraud" if, upon a close review of the language and structure of the complaint, "the complaint allege[s] a unified course of fraudulent conduct and rel[ies] entirely on the course of conduct as the basis of a claim."  *Rubke*, 551 F.3d at 1161 (citation and internal quotation marks omitted).  The Ninth Circuit has explained that Securities Act claims sound in fraud where "a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b)."  *Id.*  But where the plaintiffs "disclaim any allegations of fraud [and] . . . . have made an effort to plead a non-fraudulent basis for Section 11 liability . . . . Plaintiffs' claims under Section 11 are not subject to Fed. R. Civ. P. 9(b)'s particularity requirements."  *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 684 (9th Cir. 2005).  Still, this does not apply if the "gravamen of the complaint is fraud."  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012) ("a plaintiff's nominal efforts to disclaim allegations of fraud with respect to its section 11 claims are unconvincing where the gravamen of the complaint is fraud").

Here, the complaint disclaims allegations of fraud and makes an effort to plead a non-fraudulent basis of liability under the Securities Act.  *See* ECF No. 33 at 22 ¶ 72 ("With respect to this Count [I], Plaintiff expressly disclaims all allegations that could be construed as alleging fraud or intentional misconduct."); ECF No. 33 at 23 ¶ 80 (same for Count II).  The AC states that Defendants had a duty to exercise reasonable care to investigate and should have known of the misstatements in the Registration Documents.  ECF No. 33 at 17 ¶ 54 ("As directors and/or officers of the Company . . . , each of the Individual Defendants had a duty to conduct a thorough due diligence investigation . . . .

Accordingly, the Company and the Individual Defendants are strictly liable and/or negligent[.]"); *id.* at 18 ¶ 59 ("[T]he Underwriter Defendants should have known of adverse, undisclosed information . . . and the materially inaccurate, misleading, and incomplete statements and omissions contained within the Registration Statement[.]"); *id.* at 22 ¶ 75, 23 ¶ 82.

Nonetheless, Plaintiffs incorporate these allegations into their claims of fraud under the Exchange Act against Ryvyl and the Individual Defendants.  ECF No. 33 at 24 at ¶ 89 ("Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein, including the allegations regarding the materially misleading statements and omissions concerning the Company's Registration Statement."); *id.* at 41 ¶ 135.  Thus, they explicitly include the same conduct alleged as to the Registration Statement in both the Securities Act and Exchange Act Claims—as "a unified course of fraudulent conduct." *Rubke*, 551 F.3d at 1161 (citation omitted).  And "[i]t is the conduct pled that matters—not necessarily the words with which plaintiffs artfully seek to allege their claims." *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1068 (N.D. Cal. 2010).  Accordingly, Rule 9(b) applies to the Securities Act Claims as to Ryvyl and the Individual Defendants.

But this incorporation of claims does not exist as to the Underwriter Defendants because the Underwriter Defendants are not alleged to have violated the Exchange Act. ECF No. 33 at 41-42.  Nowhere does the AC suggest that the Underwriter Defendants engaged in fraud of any kind, only that they failed to conduct a due diligence investigation.  *See id.* (absence).  Therefore, Plaintiffs need not meet the heightened pleading standard of Rule 9(b) for the Underwriter Defendants.  *See In re Surebeam Corp. Sec. Litig.*, No. 03-cv-1721, 2005 WL 5036360, at *7 (S.D. Cal. Jan. 3, 2005) (applying Rule 9(b) to a Section 11 claim for defendants also accused of fraud but not for underwriter defendants against whom only negligence claims were made); *see also In re*

*Velti PLC Sec. Litig.*, No. 13-cv-03889, 2015 WL 5736589, at \*15 (N.D. Cal. Oct. 1, 2015).

## III.   PSLRA

The PSLRA independently creates a heightened pleading standard for the Section 10(b) claim. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). Specifically, it requires the complaint to "specify each statement alleged to have been misleading" and the "reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2)(A).

## IV.   What the Court Will Consider

Although the general rule prohibits the Court from considering extrinsic evidence in reviewing a motion to dismiss, it may consider matters that are properly subject to judicial notice. *Tellabs*, 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *Zucco*, 552 F.3d at 989 ("[R]eview [of a Rule 12(b)(6) motion] is generally limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of which we may take judicial notice."). Accordingly, the Court will consider the AC and the SEC filings and historical stock prices of which it took judicial notice. The Court treats the factual allegations in the complaint as true, *see Tellabs*, 551 U.S. at 326, but it is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing Inc.,* 143 F.3d 1293, 1295-96 (9th Cir. 1998).

**Count I: Section 11**

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, "provides a cause of action to any person who buys a security issued under a materially false or misleading registration statement." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013). As an initial matter, the Underwriter Defendants and the Ryvyl Defendants argue that Count I should be dismissed with prejudice because Plaintiffs do not have statutory standing to bring a Section 11 claim. ECF No. 40-1 at 14, 26; ECF No. 41-1 at 29-30. The Court agrees.

A plaintiff has statutory standing under Section 11 only if they purchased shares directly in the offering made pursuant to the misleading registration statement or can show that their shares are traceable to that same offering. *Id.*; *Slack Techs.*, 598 U.S. at 768. To show this, "plaintiffs . . . need to prove that the shares they purchased came from the pool of shares issued in the . . . offering, rather than from the pool of previously issued shares." *Century Aluminum Co.*, 729 F.3d at 1106. The Ninth Circuit has held that a conclusory statement saying as much—that plaintiffs "purchased . . . common stock directly traceable to the Company's Secondary Offering"—does not plausibly demonstrate traceability to the applicable offering where a company has issued shares under multiple offerings. *Id.* at 1107-08 (so holding under Rule 12(b)(6)).

Here, the AC makes almost the same statement: that "Plaintiff purchased the Company's securities pursuant to or traceable to the Registration Statement." ECF No. 33 at 22. Because the Ninth Circuit has explicitly held that this is conclusory, Plaintiffs instead argue that Lead Plaintiff Cook purchased shares at the Offering price during the Offering period and that this is enough to show that Cook purchased shares subject to the Offering. ECF No. 58 at 23. District courts in the Ninth Circuit are divided on this. One explained that "[g]iven the volume of other shares on the market from the prior offering, even alleging that someone bought shares on the day of the . . . 2021 Offering at the

1  offering price is inadequate to establish statutory standing at this stage, due to a

2  significant possibility that the shares purchased originated from the prior offering but

3  were being traded at the secondary offering price." *Jedrzejczyk v. Skillz Inc.*, No. 21-cv-

4  03450, 2022 WL 2441563, at \*7 (N.D. Cal. July 5, 2022); *see also Thomas v. Magnachip*

5  *Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1055 (N.D. Cal. 2016).  But other courts

6  have held that such allegations are adequate on a motion to dismiss.  *See Special*

7  *Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109,

8  1114-15 (E.D. Cal. 2017); *In re CytRx Corp. Sec. Litig.*, No. cv-141956, 2015 WL

9  5031232, at \*15 (C.D. Cal. July 13, 2015).

10       The Court does not take a side in this debate because the AC and incorporated

11  documents do not allege that Cook purchased shares during the Offering period.  ECF

12  No. 33 (absence).  The AC and incorporated documents note *only* that Cook purchased

13  shares at the Offering price of $10.50 on February 23, 2021.  *See* ECF Nos. 7-4 at 3-4;

14  *see also* ECF No. 33 at 4 ¶ 11 (incorporating ECF No. 7-4).  The AC does not allege that

15  February 23 was within the Offering period, and SEC filings inconclusively suggest that

16  it was not.  Trading for the Offering was scheduled to begin on February 17, 2021, and

17  the Prospectus filed with the SEC states that "[t]he underwriters expect to deliver the

18  securities against payment . . . on or about February 19, 2021"—indicating that they

19  expected to sell the shares by that date.  ECF No. 62-1 at 15.

20       Given that the Offering of around 4 million shares occurred when there were

21  already over 33 million shares on the market, ECF No. 40-2 at 98, alleging only that

22  Cook purchased shares at the Offering price, and not even directly in the Offering, does

23  not show "that the shares [Plaintiffs] purchased came from the pool of shares issued in

24  the . . . offering, rather than from the pool of previously issued shares."  *Century*

25  *Aluminum*, 729 F.3d at 1106.  In a similar situation, in which the plaintiffs alleged

14

purchasing shares at the time of the offering but not at the offering price, the Ninth Circuit held that:

> [P]laintiffs' shares could have come from the . . . offering, but the "obvious alternative explanation" is that they could instead have come from the pool of previously issued shares. Plaintiffs' allegations are consistent with their shares having come from either source. When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are "merely consistent with" their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*. Here, plaintiffs' allegations remain stuck in "neutral territory" because they do not tend to exclude the possibility that their shares came from the pool of previously issued shares.

*Id.* at 1108. Thus, alleging only that Lead Plaintiff Cook purchased shares at the Offering price, on a date that may be outside the Offering period, does not do enough to exclude the possibility that Cook purchased from the 33 million pre-existing shares at the Offering price. *See also Jedrzejczyk*, 2022 WL 2441563, at *7 (holding that allegations of purchasing at the offering price in the offering period were insufficient).

Accordingly, Plaintiffs have not sufficiently alleged statutory standing to bring a claim under Section 11 and the Court GRANTS the motions to dismiss Count I. The Court grants Plaintiffs leave to amend to allege standing with more specificity. *See Mehedi v. View, Inc.*, No. 21-cv-06374, 2023 WL 3592098, at *7 (N.D. Cal. May 22, 2023) ("Because this is the first motion to dismiss, the Court will grant Plaintiff an opportunity to amend the Section 11 claim. But Plaintiff should only do so if it can properly allege traceability.").

## Count II: Section 12(a)(2)

Section 12(a)(2) of the Securities Act of 1933, imposes liability on those who "offer[] or sell[]" securities by means of false or misleading statements in the prospectus

"to the person purchasing such security."  15 U.S.C. § 77*l*(a)(2).  To establish liability under Section 12, plaintiff must show that they purchased the security directly from defendant or that defendant solicited their purchase for defendant's own financial gain. *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988).  The Ninth Circuit has referred to this as "the express privity requirement of Section 12" and explained that "a plaintiff must have purchased the security directly from the issuer of the prospectus." *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999).  Therefore, "[a] plaintiff establishes standing to sue under Section 12 by showing she purchased its shares in a public offering, as opposed to the secondary market." *Mehedi*, 2023 WL 3592098, at *11 (citation omitted); *CytRx Corp.*, 2015 WL 5031232, at *14 (collecting cases).

The Underwriter Defendants contend that Plaintiffs lack statutory standing under Section 12(a)(2) because Plaintiffs do not allege that they purchased their shares from Defendants in the Offering.  ECF No. 40-1 at 17-18.  Plaintiffs do not specifically mention Section 12(a)(2) standing in their Response, instead seeming to collapse the Section 11 and Section 12(a)(2) standing analyses.  ECF No. 58 at 22-23.  Nor do any Defendants address Section 12(a)(2) in their Replies.  *See* ECF No. 62 at 7-11; ECF No. 61 at 15; ECF No. 60.  Although Section 11 and Section 12(a)(2) standing are similar, "[s]tanding under Section 12(a)(2) is more restrictive than under Section 11." *Boilermakers Nat. Annuity Tr. Fund v. WaMu Mortg. Pass Through Certificates, Series AR1*, 748 F. Supp. 2d 1246, 1253 (W.D. Wash. 2010); *see also CytRx Corp.*, 2015 WL 5031232, at *14-15 (finding Section 11 standing but not Section 12(a)(2) standing).

"Here, Plaintiff has not alleged that it purchased its shares in a public offering." *Mehedi*, 2023 WL 3592098, at *11 (holding that plaintiff therefore failed to show standing).  Alleging that Cook purchased shares "pursuant to or traceable to the Registration Statement" and that "[b]y means of a defective Registration Statement, Defendants promoted and sold securities to Plaintiff" is too conclusory, ECF No. 33 at

16

1    22-23 ¶¶ 74, 81.  *See Boilermakers Nat. Annuity Tr. Fund*, 748 F. Supp. 2d at 1253-54

2    (holding that alleging that a purchase was "traceable to" or "pursuant to" a registration

3    statement was insufficient to show standing); *Lowthorp v. Mesa Air Grp. Inc.*, No. cv-20-

4    00648, 2021 WL 3089118, at *13 (D. Ariz. July 22, 2021) (same); *In re Century*

5    *Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 976 (N.D. Cal. 2010) (same).

6        For the same reasons discussed above, that Cook purchased some shares at the

7    Offering price is not enough to make it plausible that Cook purchased directly from

8    Defendants in the Offering.  In fact, the case on which Plaintiffs primarily rely, which

9    found statutory standing under Section 11, held that the same facts were insufficient to

10   allege Section 12(a)(2) standing.  *CytRx Corp.*, 2015 WL 5031232, at *14-15; ECF No.

11   58 at 23.  *CytRx Corp* explained that allegations that plaintiffs purchased "pursuant to

12   and/or traceable to the Secondary Offering" are "wishy-washy allegations . . . insufficient

13   to demonstrate that Plaintiffs have Section 12 standing—either the [Plaintiffs] purchased

14   shares directly from one of the Section 12 Defendants in the Secondary Offering or they

15   did not."  *Id.*  "If the [plaintiff] did in fact purchase stock directly from the [offering], it

16   should have said so."  *Lowthorp*, 2021 WL 3089118, at *13.

17       Accordingly, the Court GRANTS Defendants' motions to dismiss Count II.  In

18   case Plaintiffs can allege that Cook purchased shares directly from a Defendant in the

19   Offering, the Court grants leave to amend.  *See Mehedi*, 2023 WL 3592098, at *7.

## Count III: Section 15

21       Count III alleges Section 15 liability against the Individual Defendants for

22   "control[ling] any person liable" under Sections 11 or 12, 15 U.S.C § 77o.  ECF No. 33 at

23   24.  Because Section 15 requires a Section 11 or 12 violation and because the Court holds

24   that Plaintiffs have not sufficiently alleged statutory standing to make out a Section 11 or

25   12 claim, the Court GRANTS the motions to dismiss Count III.  *See, e.g.*, *In re Vocera*

*Commc'ns, Inc. Sec. Litig.*, No. c-13-3567, 2015 WL 603208, at *3 (N.D. Cal. Feb. 11, 2015).

### **Count IV: Section 10(b) & SEC Rule 10b-5**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"  15 U.S.C. § 78j(b).  SEC Rule 10b-5, promulgated under Section 10(b), clarifies that "[i]t shall be unlawful for any person, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5; *Zucco*, 552 F.3d at 989.

"To plead a primary violation of SEC Rule 10b-5, a complaint must allege 1) a material misrepresentation or omission by the defendant [falsity]; 2) scienter; 3) a connection between the misrepresentation or omission and the purchase or sale of a security; 4) reliance upon the misrepresentation or omission; 5) economic loss; and 6) loss causation."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation and internal quotation marks omitted).

## I.  **Falsity**

The particularity requirements of Rule 9(b) and the PSLRA require that the AC identify the statements creating the misrepresentation or omission and state why these statements are false or misleading or the facts causing the plaintiff to believe the statements are false or misleading.  *Zucco*, 552 F.3d at 990-91.  A false statement is one that a defendant knew to be false at the time.  *Khoja*, 899 F.3d at

1008.  A misleading statement is one that "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists," as viewed by a reasonable investor.  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017).  A statement may be literally true but still misleading if it omits material information.  *Khoja*, 899 F.3d at 1008-09.  Still, an omission is actionable "only when disclosure is 'necessary . . . to make the statements made, in light of the circumstances under which they were made, not misleading.'"  *Retail Wholesale & Dep't Store*, 845 F.3d at 1278 (quoting 17 C.F.R. § 240.10b–5(b)).

### a.  Statements in the Registration Documents

Plaintiffs allege that the Registration Documents contains seven statements that are misleading because they fail to reveal that the risks they disclose had already come to fruition.  ECF No. 58 at 20.

(1) Ryvyl's "consolidated financial statements are prepared and presented in accordance with United States generally accepted accounting principles, or U.S. GAAP";

(2) "[w]e have a limited operating history and may not be able to operate our business successfully or generate sufficient revenue to make or sustain distributions to our shareholders.  As a result, our management has identified and our auditors agreed that there is a substantial doubt about our ability to continue as a growing concern";

(3) "our future operating results and financial data may vary materially from the historical operating results and financial data as well as the pro forma operating results and financial data because of a number of factors, including costs and expenses associated with being a public company";

(4) "[o]ur financial statements may be materially affected if our estimates prove to be inaccurate as a result of our limited experience in making critical accounting estimates";

(5) "[i]f we fail to comply with the rules and regulations under the Sarbanes-Oxley Act, our operating results, our ability to operate our business and investors' views of us may be harmed";

(6) "[e]nsuring that we have adequate internal financial and accounting controls and procedures in place so that we can produce accurate financial statements on a timely basis is a costly and time-consuming effort that will need to be evaluated frequently"; and

(7) "[o]ur failure to maintain the effectiveness of our internal controls in accordance with the requirements of the Sarbanes-Oxley Act could have a material adverse effect on our business.  We could lose investor confidence in the accuracy and completeness of our financial reports, which could have an adverse effect on the price of our Common Stock."

ECF No. 33 at ¶ 42.

Plaintiffs contend that the January 2023 announcement of the need to restate 2021 and 2022 financial reports and the statements of confidential witnesses demonstrate that the risks mentioned above had already materialized.  ECF No. 58 at 18-20; *see In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("Risk disclosures that speak[] entirely of as-yet-unrealized risks and contingencies and do not alert[] the reader that some of these risks may already have come to fruition can mislead reasonable investors." (internal quotation marks and citation omitted)).  Defendants contend that Plaintiffs have not sufficiently alleged that any of the risks had occurred by the time the Registration Documents were filed.  ECF No. 41-1 at 17-19; ECF No. 40-1 at 19-22.  The Court agrees with Defendants; Plaintiffs have made no allegations dating to the time the Registration Documents were issued in January and February 2021.  ECF No. 33 at 10 ¶ 41.

The 2023 restatement of Ryvyl's financial statements does not demonstrate anything about the Registration Documents because the Registration Documents depended on financial statements from 2019 and 2020, which were *not* restated.

*See* ECF No. 41-1 at 18.  In fact, Statement 1 above—that consolidated financial statements are prepared in accordance with U.S. GAAP—refers to the consolidated financial statements from 2019 and 2020.  ECF No. 33 at 10 ¶ 42 (AC); ECF No. 41-2 at 16.

The statements of the confidential witnesses are also unhelpful because it is not apparent that any of their information dates to January and February 2021.  *See* ECF No. 40-1 at 22 & n.7; ECF No. 41-1 at 18.  None of the confidential witnesses were employed by Ryvyl until June 2021 at the earliest, over five months after the Registration Documents were issued.  ECF No. 33 at 10 ¶ 41, 31 ¶ 110.  It is not even evident from the AC that most of the Ryvyl staff whose behavior the confidential witnesses discuss were employed at Ryvyl at the time the Registration Documents were issued.  *Id.* at 5 ¶ 16 (CFO Chung started in May 2021); *id.* at 4 ¶ 15 (CFO Byelick started in August 2022); *see generally id.* (absence of mention when Gilreath, Rubin, or "the receptionist" worked at Ryvyl).

Accordingly, the AC has not alleged with sufficient particularity that the statements in the Registration Documents were false or misleading.[5]  The Court therefore does not address Defendants' argument that some of these statements are protected by the PSLRA's safe harbor for forward-looking statements.  ECF No. 41-1 at 19-21; ECF No. 40-1 at 23-24; ECF No. 58 at 20-22.

### b.  Statements in the 2021-2022 Financial Reports

Plaintiffs also allege that Ryvyl and the Individual Defendants made a series of false or misleading statements in the financial reports they issued for 2021 and 2022.

---

[5] Because Plaintiffs have failed to allege facts suggesting that the statements in the Registration Documents are false or misleading, their notice of supplemental authority showing that risk disclosures are actionable is of no help to them.  ECF No. 59 at 2 (including *In re Facebook, Inc. Sec. Litig.*, 84 F.4th 844 (9th Cir. 2023)).

1  ECF No. 58 at 24-26.  The Ryvyl Defendants do not respond to any of these arguments.[6]
2  ECF No. 41-1, 61 (absence).

3       First, Plaintiffs allege that Ryvyl and its officers "misrepresented the Company's
4  net revenue, net loss, total assets, and total stockholders' equity" in their financial
5  statements in 2021 and 2022.  ECF No. 58 at 24.  ECF No. 33 at 26 ¶¶ 92, 95, 27 ¶¶ 96,
6  98, 28 ¶¶ 101, 29 ¶ 104, 30 ¶ 107.  The Court agrees.  On January 20, 2023, Ryvyl
7  announced that "the Company's previously issued financial statements as of December
8  31, 2021, for within the year ended December 31, 2021 and as of and for the interim
9  periods ended September 30, June 30 and March 31, 2022 . . . can no longer be relied
10  upon" and that "[t]he Audit Committee of the Company and its management concluded
11  that [these statements] should be restated."  ECF No. 33 at 34-35 ¶ 118.  The AC
12  therefore sufficiently alleges that the financial data in those statements is false or
13  misleading.  *See In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001)
14  ("[T]he existence of restated financial results is sufficient to support plaintiffs' belief that
15  the statements were misstated."); *see also Johnson v. Costco Wholesale Corp.*, No. c-18-
16  1611, 2019 WL 6327580, at *13 (W.D. Wash. Nov. 26, 2019) ("Other courts agree that
17  later public disclosures may indicate the falsity of earlier disclosures.").  *But see In re*
18  *Atlas Mining Co., Sec. Litig.*, 670 F. Supp. 2d 1128, 1134 (D. Idaho 2009).

19       Second, Plaintiffs assert that the SOX certifications accompanying each of the
20  2021 and 2022 financial statements were false because they stated that the statements
21  disclosed "[a]ll significant deficiencies and material weaknesses in the design or
22  operation of internal control over financial reporting which are reasonably likely to

---

25  [6] Defendant Byelick's papers focus on scienter but note that Byelick did not start as CFO
26  of Ryvyl until August 2022, and therefore was not at Ryvyl for all but one of the alleged
27  misstatements.  See ECF No. 60 at 11-13.

adversely affect the registrant's ability to record, process, summarize and report financial information."  ECF No. 58 at 24; ECF No. 33 at 26 ¶ 91, 26 ¶¶ 93, 95, 27 ¶ 97, 28 ¶ 100, 29 ¶ 103, 30 ¶ 106.  The January 20, 2023 announcement stated that:

> [T]he Company has reassessed its conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and has determined that *one or more material weaknesses exist in the Company's internal control* including a material weakness related to accounting for certain complex business transactions.  The Company expects to report one or more material weaknesses as of December 31, 2021 as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions.  *As a result of the material weakness, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022.*

ECF No. 33 at 35 ¶ 118 (emphasis added); ECF No. 58 at 24-25.  This language sufficiently alleges that the SOX certifications that all material internal control issues were disclosed was false for the annual report for 2021 and the interim reports in 2022.  *See Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1160 (W.D. Wash. 2006) ("The Court concludes that the Complaint adequately alleges that the . . . [SOX] certifications for third quarter 2002 through third quarter 2004 were false or misleading based on the disclosure in 2005 that there were material weaknesses in [the company's] internal controls and procedures.").[7]  Because the

---

[7] *See also Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1024 (N.D. Cal. 2020) (holding that a SOX certification "attesting to the accuracy of the reports, the disclosure of any weakness or change in the company's internal controls over financial reporting" was false or misleading where in fact the internal controls were deteriorating); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("For these certifications to have any substance, signatories to the certifications must be held accountable for the statements."). *But see In re Silicon Storage Tech., Inc., Sec. Litig.*,

January 2023 announcement does not mention internal controls for the interim 2021 reports, the Court holds that Plaintiffs have not alleged with sufficient particularity that the SOX certifications accompanying the financial statements for the periods ending March 2021, June 2021, and September 2021 were false or misleading.

Third, and relatedly, Plaintiffs assert that the following statement in the 2021 annual report and the 2022 interim reports regarding financial controls and procedures is misleading:

> [The CEO and CFO] ha[ve] concluded that, as of December 31, 2021, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us . . . is processed . . . and recorded within the time periods specified in the rules and forms of the SEC[.]
> . . .
> There have been no changes in our internal controls over financial reporting . . . or in other factors that materially affected or are reasonably likely to materially affect our internal controls and procedures[.]

ECF No. 33 at 27 ¶ 99, 28 ¶ 102, 29 ¶ 105, 30 ¶ 108; ECF No. 58 at 25.  For the same reasons discussed above, the January 2023 announcement, ECF No. 33 at 35 ¶ 118, shows that this statement is false.  *See Limantour*, 432 F. Supp. 2d at 1160 (holding that a later disclosure of a material weakness in internal controls showed that an earlier public statement was false or misleading); *Johnson*, 2019 WL 6327580, at *13 ("later public disclosures may indicate the falsity of earlier disclosures").

In sum, the Court holds the AC has not alleged that the statements in the Registration Documents or the SOX certifications accompanying the 2021 interim

No. C-05-0295, 2007 WL 760535, at *17 (N.D. Cal. Mar. 9, 2007) (holding that SOX certifications are not actionable).

24

1   financial reports were false or misleading.  But it has adequately alleged that the

2   financial data in the 2021 and 2022 interim reports and in the 2021 annual report,

3   the SOX certifications accompanying the 2021 annual report and the 2022 interim

4   reports, and the statement regarding internal controls in the 2021 annual report and

5   the 2022 interim reports are false or misleading.

6   **II.   Scienter**

7          To be liable under Section 10(b), Defendants must have acted with an "intent to

8   deceive, manipulate, or defraud," or with deliberate recklessness.  *City of Dearborn*

9   *Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir.

10  2017).  "[D]eliberate recklessness is an extreme departure from the standards of ordinary

11  care . . . which presents a danger of misleading buyers or sellers that is either known to

12  the defendant or is so obvious that the actor must have been aware of it."  *Schueneman v.*

13  *Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (internal quotation marks and

14  citations omitted).

15         The PSLRA requires that a complaint must, "with respect to each act or omission

16  alleged to violate this chapter, state with particularity facts giving rise to a *strong*

17  *inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-

18  4(b)(2)(A) (emphasis added).  Thus, the complaint needs to show "a nexus between the

19  wrongful behavior and Individual Defendants' knowledge."  *Curry v. Yelp Inc.*, 875 F.3d

20  1219, 1228 (9th Cir. 2017).  A "strong inference" of scienter exists where upon

21  considering the "plausible, nonculpable explanations for the defendant's conduct," "a

22  reasonable person would deem the inference of scienter cogent and at least as compelling

23  as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at

24  310.  The inquiry is a holistic one, reviewing all the facts alleged collectively.  *Id.*  As

25  such, "a series of less precise allegations [can] be read together to meet the PSLRA

26  requirement."  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  "In

27

28

sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326.

Plaintiffs primarily rely on the statements of their confidential witnesses to allege that the Defendants acted intentionally or with deliberate recklessness in making the statements found to be false or misleading above. ECF No. 58 at 27-30. They also ask the Court to consider in its holistic review the severity of the internal control problems, the false SOX certifications, the resignations of CFO Byelick and the next interim CFO, that the fraud related to Ryvyl's core operations, and the small size of the company. *Id.* at 30-34. The Ryvyl Defendants respond to each of these allegations specifically but more generally suggest that "the more logical inference is that such [accounting errors and misrepresentations about internal controls] were inadvertent, and that the Company reported them to shareholders when a new auditor determined that errors had been made." ECF No. 41-1 at 29.

### a. Confidential Witnesses

To rely on confidential witnesses, a complaint must provide "sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge." *Zucco*, 552 F.3d at 995. "To determine whether the complaint has done so, we look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* (internal quotation marks and citation omitted). Then, "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.*

1    The Court assesses the reliability and personal knowledge of each of the

2    confidential witnesses in turn.

3        **i. CW1**

4        CW1 worked as an HR Generalist at Ryvyl from June 2021 to February 2022 and

5    states that Chairman Errez and CEO Nisan misrepresented Ryvyl's revenue.  ECF No. 33

6    at 31-32 ¶¶ 110-11.  CW1 reports that they knew this because they "w[ere] trained on the

7    Company's system for chargebacks, which represented the volume for anything that

8    would come into Ryvyl and everything that the Company paid out" and that "there was

9    no volume to support the claimed revenue."  *Id.* at 32 ¶ 111.

10       The Court finds that this allegation does not provide a sufficient basis for CW1's

11   personal knowledge and reliability.  *See Zucco*, 552 F.3d at 997 ("The lack of detail in

12   CW5's allegations . . . further support the conclusion that CW5's allegations are not

13   reliable enough[.]").  There is no description of the HR Generalist position, and nor does

14   the AC explain why an HR Generalist would have knowledge of the company's

15   chargebacks.  *See* ECF No. 33 at 31-32 ¶¶ 110-11 (absence).  And while the AC alleges

16   that CW1 was trained on the Company's system for chargebacks, there is no explanation

17   how this training permitted CW1 to conclude that "there was no volume to support the

18   claimed revenue."  ECF No. 33 at 32 ¶ 111.  The AC provides no specifics on the volume

19   of chargebacks, or how, when, or to what extent Chairman Errez and CEO Nisan

20   misrepresented revenue.  *Id.*

21       The AC therefore fails to provide sufficient details about CW1's position which

22   would provide a basis for attributing facts reported by CW1 to their personal knowledge.

23   *See Zucco*, 552 F.3d at 996 ("Some of the confidential witnesses were simply not

24   positioned to know the information alleged.").  Accordingly, CW1's "vague and

25   incomplete statement hardly supports a claim that the individual defendants" acted with

26

27                                        27

28                                                              23-CV-0185-GPC-SBC

1  sufficient scienter.  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051,

2  1063 (9th Cir. 2014).

3           **ii.  CW2**

4           CW2 worked at Ryvyl from August 2021 until February 2023 and, among other

5  positions, worked as a Marketing Manager and Project Manager.  ECF No. 33 at 14 ¶ 46.

6  CW2 alleges that CFO Chung used improper accounting practices "related to revenue,

7  debt, and depreciation value" and required the Company to use his own deficient

8  accounting software.  The AC states that CW2 "had numerous discussions [with Byelick]

9  about the improper accounting practices that existed at the Company as a result of

10  Chung's failures."  *Id.* at 14-15 ¶ 47.  "CFO Byelick acknowledged to CW2 that Ryvyl's

11  numbers were made up (including the Company's quarterly financial statements and

12  year-end financial statements), that the Company failed to follow proper accounting

13  procedures, and that information was hidden or disguised."  *Id.* at 32 ¶ 112.  CW2

14  believes Byelick became aware of the issues around the time that he started and

15  discovered more issues over time, *id.*, and "CW2 learned that CEO Nisan discovered that

16  CFO Chung was making up numbers" "at the end of 2022," *id.* at 33 ¶ 113.  In addition,

17  CW2 reported that the accounting department had high turnover and was asking

18  unqualified employees to assist with accounting tasks.  *Id.* at 15 ¶ 48, 33 ¶ 114.

19           The AC does not describe a Marketing Manager's or Project Manager's duties and

20  responsibilities or explain how and when CW2 learned about the "improper accounting

21  practices."  *Id.* at 32-33 ¶¶ 112-14.  Nor does it state what the "improper accounting

22  practices" were.  *Id.*  Moreover, CW2's statements are hearsay and generally lack

23  particularity.  Although being based in hearsay is not fatal, *Lloyd v. CVB Fin. Corp.*, 811

24  F.3d 1200, 1208 (9th Cir. 2016), hearsay statements must be particular enough to be

25  "sufficiently reliable, plausible, or coherent," *Zucco*, 552 F.3d at 997 n.4.  And CW2 does

26  not report when, how, or in what capacity CW2 spoke to CFO Byelick.  *See Nguyen v.*

27

28

1   *Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020) ("The central problem with the

2   information attributable to CW1 is that it lacks any detail.").

3        Nonetheless, CW2 references direct conversations with Byelick and particular

4   statements Byelick made about Chung, Byelick's predecessor as CFO. *Id.* at 32 ¶ 112.

5   Although more detail would be helpful, these allegations are concrete and specific; and it

6   is reasonable that Byelick would discuss his predecessor's accounting practices with

7   other employees.  As such, the Court holds that while CW2's statements are insufficient

8   to demonstrate scienter, the Court will consider CW2's discussions with Byelick in its

9   holistic review.

10          **iii.   CW3**

11        CW3 was a Staff Accountant at Ryvyl from May to July 2022. *Id.* at 15 ¶ 49.

12   CW3 reported that the Senior Treasury Analyst and Controller, who was a family friend

13   of Chairman Errez, told CW3 to enter inaccurate information into the system, "including

14   wires for other companies." *Id.* at 15 ¶ 49, 34 ¶ 116.  Specifically CW3 explained that

15   "money came into Ryvyl and that the Company was supposed to wire it out to other

16   companies and take a percentage, but that the Company was making it seem like it was

17   making much more money than it was. . . . [And] that a lot of the wires that the Company

18   was generating were fake, and that Ryvyl was keeping money in its accounts that was

19   meant to be transferred onward to other companies." *Id.* at 33-34 ¶ 115.  When CW3

20   raised the discrepancies with the Senior Treasury Analyst and Controller, they "told CW3

21   to just do what they said." *Id.*  CW3 further stated that "people from other companies

22   began to contact the Company to complain about not receiving money to which they were

23   entitled." *Id*. at 14-15 ¶ 49.  According to CW3, the accounting department consisted of

24   only five people, including CW3, the Senior Treasury Analyst, the Controller, and CFO

25   Chung. *Id.* at 34 ¶ 116.

26

27

28

CW3's personal accounting experience at Ryvyl during the class period gives them personal knowledge about Ryvyl's accounting practices from May to July 2022 and contains enough detail to be reliable.  Still, CW3 does not allege having personal knowledge of Individual Defendants' scienter—just knowledge of the allegedly fraudulent acts of the Senior Treasury Analyst and Controller, the latter of whom was a family friend of Chairman Errez.  CW3's statements therefore cannot create an inference of scienter alone.  Nonetheless, because the statements are reliable, the Court will consider them in its holistic review.  *See S. Ferry LP*, 542 F.3d at 784 ("Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter.")

### iv.  CW4

CW4 worked as an executive assistant to Chairman Errez and Chief Operating Officer Min Wei (not a Defendant) from February to July 2022, and attended weekly meetings with CFO Chung, CEO Nisan, Chairman Errez, and other high-level staff.  *Id.* at 16 ¶ 50.  "Based upon CW4's attendance at weekly meetings with CEO Nisan, CFO Chung, Chairman Errez . . . , the Company's accounting, including accounting for wires that were received and sent to other companies, was inaccurate."  *Id.*  CW4 also "confirmed that the Company was generating fake wires and keeping money that was meant to be transferred onward."  *Id.* at 34 ¶ 117.  But the AC does not specify how CW4 knows that information.  *Id.*

The AC sufficiently alleges that CW4 was personally present at meetings in which Defendants were also present and at which it was noted that Ryvyl's accounting was inaccurate.  *See Cutler v. Kirchner*, 696 F. App'x 809, 815 (9th Cir. 2017) (considering the statements of a confidential witness who participated in quarterly meetings with the executive board and reported on what was presented at the meetings).  And it makes sense for an executive assistant to be present at regular executive meetings.

However, the AC does not describe what CW4's duties as an executive assistant were.  Did they include taking minutes or memorializing the discussions regarding inaccurate accounting?  CW4's statements are vague as to who said what and how the information regarding the inaccurate accounting was conveyed at the meetings.  What were the responses of attendees to the information regarding the improper accounting?  The AC fails to answer these questions or provide detailed information which is directly demonstrative of Chung's, Nisan's, and Errez's scienter.  While CW4's statements are lacking in details to alone support an inference of scienter, the Court will consider them in its holistic review below.[8]

**b.  Severity of Internal Control Problems & SOX Certifications**

Plaintiffs argue that "defendants' alleged failure to maintain an effective control environment, and their attestations to the contrary, [including in SOX certifications,] supports a strong inference of scienter."  *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1027-28 (N.D. Cal. 2020); *see also Bielousov v. GoPro, Inc.*, No. 16-cv-06654, 2017 WL 3168522, at *7 (N.D. Cal. July 26, 2017).  That Ryvyl announced "one or more material weaknesses . . . in the Company's internal control," ECF No. 33 at 35 ¶ 118, after

---

[8] The Ryvyl Defendants also argue the CW3's and CW4's statements should not be considered because they worked at Ryvyl in low-level positions for very short periods of time, three months for CW3 and six months for CW4, and were not working there when most of the alleged misstatements were made.  ECF No. 41-1 at 25.  Although the Ninth Circuit has discounted confidential witnesses who were not employed during the time period in question, *Zucco*, 552 F.3d at 996-97, it has also noted that there is no rule that confidential witnesses must have been employed during the class period at all, let alone for the whole time, *see In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (considering statements of a confidential witness who was not employed during the class period).  CW3 and CW4 were employed during the class period, simply for short periods of time and in somewhat lower-level positions, ECF No. 33 at 2 ¶ 1, 15 ¶ 49, 16 ¶ 50, and the Ryvyl Defendants do not explain why this matters or cite any such authority.  ECF No. 41-1 at 27-28.

certifying the lack of internal control problems throughout 2021 and 2022, ECF No. 33 at 26 ¶ 91, 26 ¶¶ 93, 95, 27 ¶ 97, 28 ¶ 100, 29 ¶ 103, 30 ¶ 106, supports the inference that "defendants were aware of matters relevant to their certifications or recklessly failed to make themselves aware." *Mulderrig*, 492 F. Supp. 3d at 1028.  To be clear, this is only a minor part of the puzzle, and does not create an inference of scienter on its own.  *See* ECF No. 61 at 12; *see Zucco*, 552 F.3d at 1003-04 ("Boilerplate language in . . . required certifications under Sarbanes-Oxley section 302(a) . . . add nothing substantial to the scienter calculus.").

### c.  Resignations

The Court agrees with the Ryvyl Defendants that Byelick's resignation, followed by the replacement of the interim CFO does not support an inference of scienter.  *See* ECF No. 41-1 at 28.  Although resignation of a company officer can bolster allegations of fraud, *see, e.g.*, *Bielousov*, 2017 WL 3168522, at *6, "the resignations at issue here are not so numerous or suspicious as to raise such an inference." *Zucco*, 552 F.3d at 1002. "Where a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of restatement's issuance itself." *Id.*  Byelick resigned about six weeks after the announcement that Ryvyl would need to restate its financial reports, ECF No. 33 at 34 ¶ 118 (announcement on January 20, 2023); 35 ¶ 120 (Byelick resigned on March 2, 2023), and Plaintiffs have not refuted the reasonable assumption that Byelick resigned as a result of the restatement.  Further, the replacement of interim CFO Mary Lay Hoitt on June 6, 2023 does not implicate the allegedly false or misleading statements because her replacement occurred over half a year after the last alleged misstatement and months after Ryvyl announced the restatement.  *See* ECF No. 33 at 36 ¶ 121, 38 ¶ 125.

### d. Core Operations Inference & the Small Size of the Company

Plaintiffs also argue that the "facts alleged . . . support a strong inference of scienter because they relate to the Company's core operations," explaining that "many of Plaintiff's allegations focus upon issues related to Ryvyl's payment processing revenue, which is the Company's primary source of revenue." ECF No. 58 at 33. They relatedly contend that the small size of the company—110 full-time employees, ECF No. 33 at 10 ¶ 40—means that it is unlikely that senior management would not have discovered the problems. ECF No. 58 at 33-34. Both of these arguments suggest that the Individual Defendants simply must have known of the accounting issues and allegedly fake transactions.

The core operations inference allows a court to "consider a senior executive's role in the company . . . . include[ing] consideration of the executive's access to the information, and whether, given the importance of the information, it would be absurd to suggest that management was without knowledge of the matter." *Alphabet*, 1 F.4th at 706. The AC makes limited allegations about the importance of Ryvyl's payment process system, stating only that it is Ryvyl's "primary source of revenue." ECF No. 33 at 9 ¶ 35. But the small size of the company and that the alleged fraud implicates Ryvyl's primary source of revenue, ECF No. 33 at 15-16 ¶¶ 49-50, 33-34 ¶¶ 115-17, makes it more likely that the Individual Defendants knew what was happening. *See, e.g.*, *Curry v. Hansen Med., Inc.*, No. c-09-5094, 2012 WL 3242447, at *11 (N.D. Cal. Aug. 10, 2012) (finding scienter where defendants were executives of a "small company, with less than 200 employees, focused on selling only one product"). As such, the Court finds that these allegations provide some support for the inference of scienter as to the Individual Defendants, though they do not create the inference on their own.

These principles provide especially strong support for the assertion that Chung acted with at least deliberate recklessness in signing off on the false or misleading

financial data in the 2021 and 2022 financial statements, ECF No. 33 at 26 ¶¶ 92, 95, 27 ¶¶ 96, 98, 28 ¶¶ 101, 29 ¶ 104, 30 ¶ 107, and certifying that Ryvyl had disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting." *Id.* at 26 ¶ 91, 26 ¶¶ 93, 95, 27 ¶ 97, 28 ¶ 100, 29 ¶ 103, 30 ¶ 106. Chung was the CFO and according to CW3, only five employees, including Chung and CW3, worked in the accounting division. *Id.* at 34 ¶ 116. Furthermore, the allegations of wrongdoing have to do with improper accounting, specifically charging third parties incorrectly under a different name, not paying third parties money they were entitled to, and generating fake wires. *Id*. at 31 ¶ 110, 33 ¶ 115. Given Chung's role as CFO and his responsibility to maintain proper internal controls, it would be "absurd" to suggest that Chung was unaware of the accounting problems. *See Alphabet*, 1 F.4th at 706. As such, these considerations strongly suggest the finding that Chung was deliberately reckless or acted intentionally.

### e.  Lack of Stock Sales

The Ryvyl Defendants highlight that Plaintiffs do not allege that any Individual Defendant sold stock during the class period, which suggests that these Defendants did not act intentionally or with deliberate recklessness. ECF No. 41-1 at 22; *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) ("[W]e have recognized that a lack of stock sales can detract from a scienter finding."). "Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). Nonetheless, the Court understands this factor to slightly support the innocent inference of no scienter.

### f.  Holistic Review

The allegations of the CWs, the SOX certifications, the core operations inference, and the small size of the company are each individually insufficient to create a strong

inference of scienter.  However, the Court engages in a holistic inquiry, reviewing the complaint in its entirety, to determine whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter.  *Tellabs*, 551 U.S. at 323.  When conducting the holistic review, the Court must "take into account plausible opposing inferences" that weigh against a finding of scienter.  *Id.*  Where "a set of allegations . . . create[s] an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation."  *Zucco*, 552 F. 3d at 1006.

In the instant case, Plaintiffs contend that Defendants "engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities" when they released inaccurate financial data and verified that there were no internal control issues.  ECF No. 33 at 39 ¶ 127; *see also id.* at 31-34 ¶¶ 109-117, 39-40 ¶¶ 127-131, 41-42 ¶¶ 136-39.  The Ryvyl Defendants argue that the innocent explanation—that the accounting errors were inadvertent and disclosed to the public upon discovery—is much more compelling.  ECF No. 41-1 at 29.

The CWs point to internal accounting problems that existed during 2022.  Both CW3 and CW4, who worked at Ryvyl between February and July 2022, reported that the company was generating fake wires and keeping money that was meant to be transferred.  ECF No. 33 at 15-16 ¶¶ 49-50, 33-34 ¶¶ 115, 117.  CW2 also alleged that CFO Chung used improper accounting practices "related to revenue, debt and depreciation value."  *Id.* at 32 ¶ 112.  That these three CWs corroborate each other regarding fake wires and improper accounting practices supports the reliability of all three statements.  *See In re Extreme Networks, Inc. Sec. Litig.*, No. 15-cv-04883, 2018 WL 1411129, at *27 (N.D. Cal. Mar. 21, 2018) ("The Court credits that the CWs corroborate each other with respect to what was going on internally at [the company], which further supports the reliability of their statements.").  That there were accounting problems cannot be disputed.  The

question is whether the Individual Defendants were aware of them and made the false or misleading statements anyway.

As an initial matter, Plaintiffs have not alleged scienter as to any of the Defendants for the alleged misstatements prior to 2022.  CW2's statements about his conversations with Byelick could not have occurred before Byelick started at Ryvyl in August 2022. ECF No. 33 at 4 ¶ 15.  CW4 did not start working at Ryvyl until February 2022, *id.* at 16 ¶ 50, and so the meetings which CW4 attended with Defendants could not have taken place before then.  And CW3 similarly did not start at Ryvyl until May 2022.  *Id.* at 15 ¶ 49.  Without the confidential witness statements, the remaining allegations are insufficient to show that the Ryvyl Defendants acted intentionally or with deliberate recklessness.  Thus, Plaintiffs have not shown that Defendants had scienter regarding the statements in the Registration Documents or in any of the 2021 interim reports.

However, as to the later false or misleading statements attributable to him, the AC sufficiently alleges scienter for Chung.  Given the nature of the alleged fraud—false and misleading accounting—Chung's role as CFO, the tiny size of the accounting division, and the statements of the CWs, Chung must have known of these accounting problems. CW2 relayed concrete statements by Byelick, Chung's successor as CFO, that Chung engaged in improper accounting.  ECF No. 33 at 32 ¶ 112.  CW3 described how Chung's subordinates in a five-person department directed CW3 to enter inaccurate financial data, even after CW3 objected.  *Id.* at 33-34 ¶ 115.  And CW4 stated that CW4 attended meetings, which Chung also attended, in which the accounting problems and allegedly fraudulent practices were discussed.  *Id.* at 34 ¶ 117.  Considering these allegations together, it is absurd for Chung to suggest that he was uninformed.  Having been aware of these problems, Chung's certifications of the data in the financial reports and that the accounting practices were sound were made with the required scienter.  The Court therefore concludes that the AC sufficiently alleges scienter as to Chung and therefore as

23-CV-0185-GPC-SBC

to Ryvyl for the financial data and statements regarding internal controls in the 2021 annual report and the first two 2022 interim financial reports and the accompanying SOX certifications.[9]  The Court thus DENIES the motion to dismiss as to Chung and Ryvyl for these statements.

As to Errez and Nisan, there is nothing to suggest that they were involved in designing the internal accounting problems and the allegations that they were aware of the nature or extent of the problems prior to the Restatement are not as compelling as the innocent allegation—that they learned of the problem in late 2022 and then issued the Restatement.  *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (holding that Plaintiffs must allege scienter with respect to each individual defendant).  CW4 suggests that they were at meetings in which the accounting problems were discussed, but these statements lack sufficient detail to hold much weight on their own.  *Id.* at 34 ¶ 117.  CW3 also states that Errez "would have" worked out accounting issues on the back end but does not state Errez had any knowledge of wrongdoing.  *Id.* at 34 ¶ 115.  And the severity of the internal control problems, the SOX certifications, that the fraud involved Ryvyl's primary source of income, and the small size of the company are not enough to overcome the strength of the opposing innocent inference.

The innocent inference is supported by CW2's statement that, at the end of 2022, Nisan discovered that Chung was making up numbers.  *Id.* at 33 ¶ 113.  The final alleged false or misleading statement was issued on November 21, 2022 and the Restatement was issued in January 2023, *id.* at 30 ¶ 106, 34 ¶ 118, so CW2's allegation suggests that Nisan did *not* act with scienter.  Additionally, Ryvyl engaged third party technical accounting

---

[9] The Court does not find scienter as to Chung for any content in the third quarter 2022 report or its accompanying SOX certification because the report was issued after Chung left Ryvyl.  *See id.* at 30 ¶ 106 (3Q22 report filed on November 21, 2022); *id.* at 5 ¶ 16 (Chung served as CFO until August 2022).

experts to support proper accounting for complex accounting transactions in the latter half of 2022. *Id*. at 14 ¶ 45. And finally, the Individual Defendants did not sell shares during the class period. In view of the foregoing, the Court finds that the allegations creating an inference of scienter as to Nisan and Errez are not as "cogent and compelling" as the alternative innocent explanation that the accounting errors and related statements were inadvertent. *See Tellabs*, 551 U.S. at 310. Accordingly, the Court will GRANT the motion to dismiss Count IV as to Nisan and Errez with leave to amend.[10]

Plaintiffs also have not sufficiently alleged scienter as to Defendant Byelick. Byelick was not present at the meetings with CW4 and did not start working as CFO at Ryvyl until after CW3 and CW4 had left the company. ECF No. 33 at 4 ¶ 15, 15 ¶ 49, 16 ¶ 50. In addition, after Byelick arrived at Ryvyl in August 2022, the Company retained third party technical accounting experts to commence remediation efforts to address financial issues which led to the January 2023 Restatement. *Id*. at 14 ¶ 45. And the remaining allegations are not enough to show that he acted with the appropriate scienter as to the alleged misstatements, only one of which was issued after he started as CFO. *Id.* at 4 ¶ 15 (Byelick started in August 2022); *id.* at 30 ¶ 106 (3Q22 report filed on November 21, 2022); *see* ECF No. 53 at 1, 2, 47. The Court with therefore GRANT the motion to dismiss Count IV as to Byelick with leave to amend.

The Court therefore GRANTS the motion to dismiss Count IV without prejudice as to Defendants Errez, Nisan, and Byelick, and as to Defendants Chung and Ryvyl *only* for the alleged misstatements in the Registration Documents, the 2021 interim reports and accompanying SOX certifications, and the third quarter 2022 report and its

---

[10] Given that CW4 was present at meetings with Nisan and Errez where accounting problems were raised and discussed, CW4 is in the unique position to provide additional details to the second amended complaint as to the what, when, where and how the accounting problems were raised and addressed.

23-CV-0185-GPC-SBC

accompanying SOX certification.  The Court DENIES the motion to dismiss as to Defendants Chung and Ryvyl for the alleged misstatements in the 2021 annual report and the first two 2022 interim reports with accompanying SOX certifications.  The Court GRANTS Plaintiffs leave to amend as to all Defendants.  *See Zucco*, 552 F.3d at 989 (noting that denying leave to amend is "improper unless it is clear that the complaint could not be saved by any amendment." (citation omitted)).

### Count V: Section 20(a)

Finally, Plaintiffs allege a violation of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).  ECF No. 33 at 42.  Section 20(a) makes "defendant employee of a corporation who has violated the securities laws . . . jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator."  *Zucco*, 552 F.3d at 990.  "[A]t the motion to dismiss stage, allegations about an individual's title and duties have been found to be sufficient to establish control." *Mueller v. San Diego Ent. Partners, LLC*, No. 16-cv-2997, 2017 WL 3387732, at *6 (S.D. Cal. Aug. 7, 2017) (collecting cases).  The parties have allocated no more than two sentences to this argument in their briefs and assume that the Section 20(a) claim rises and falls with Count IV, the Section 10(b) claim.  *See* ECF No. 41-1 at 29; ECF No. 58 at 34 n.12.

As discussed above, Plaintiffs have shown a primary violation of Section 10(b) as to Ryvyl, the only element of this claim that the Ryvyl Defendants challenge, ECF No. 41-1 at 29.  Because the Ryvyl Defendants do not move to dismiss Count V on the ground that the Individual Defendants are not "control persons," *id.*, the Court DENIES the motion to dismiss Count V as to Defendants Nisan, Errez, and Chung.

Although Defendant Byelick does not address Section 20(a), ECF Nos. 53, 60 (absence), the violations of Section 10(b) found by the Court—based on scienter as to

Chung—occurred before Byelick started with Ryvyl. ECF No. 33 at 4 ¶ 15 (Byelick started in August 2022); ECF No. 33 at 29 ¶ 103 (2Q22 report filed on August 15, 2022). Because Byelick could not be a control person before he started at Ryvyl, the Court GRANTS the motion to dismiss Count V with leave to amend as to Byelick.

## Conclusion

Accordingly, the Court GRANTS the motions to dismiss by the Underwriter Defendants and Defendant Byelick. The Court GRANTS in part and DENIES in part the motion to dismiss by the Ryvyl Defendants. The Court GRANTS the Plaintiffs leave to amend on all counts as to all Defendants. If Plaintiffs choose to amend, they must file the amended complaint within 30 days of the date of this Order.

The Court GRANTS the motions for judicial notice, except the Underwriter Defendants' second motion for judicial notice, which it GRANTS in part and DENIES in part.

Because the Court dismisses the complaint entirely as to Defendant Byelick, it DENIES as moot his motions for an extension of time to file additional briefing.

**IT IS SO ORDERED.**

Dated: March 1, 2024

Hon. Gonzalo P. Curiel
United States District Judge

40

23-CV-0185-GPC-SBC