ROBERT V. PRONGAY (#270796)
  rprongay@glancylaw.com
EX KANO S. SAMS II (#192936)
  esams@glancylaw.com
CHARLES LINEHAN (#307439)
  clinehan@glancylaw.com
PAVITHRA RAJESH (#323055)
  prajesh@glancylaw.com
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiff*
*Scot S. Cook*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK CULLEN, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>        v.<br><br>RYVYL INC. F/K/A GREENBOX POS, BEN ERREZ, FREDI NISAN, AND BENJAMIN CHUNG,<br><br>            Defendants. | Case No. 3:23-cv-00185-GPC-WVG<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Scot S. Cook ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Ryvyl Inc. ("Ryvyl" or the "Company"), formerly known as Greenbox POS ("Greenbox"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.    This is a securities class action brought on behalf of all persons and/or entities who purchased or otherwise acquired the Company's securities between May 13, 2021 and January 20, 2023, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.    Ryvyl is a crypto company focused on developing, marketing, and selling blockchain-based payment solutions.    Throughout the Class Period, Defendants made materially false and misleading statements and/or misleading half-truths that: (1) Ryvyl misrepresented its serious issues with its internal controls; (2) Ryvyl's financial statements contained errors resulting in overstatements of revenue, assets, and stockholders' equity and understatements of losses; (3) as a result, Ryvyl would need to restate its previously issued financial statements; and (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

3.    On January 20, 2023, the Company announced that its previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31,

2022 should no longer be relied upon and had to be restated. The Company also identified additional internal control weaknesses and a remediation plan. On this news, Ryvyl's share price fell 14.63% to close at $0.70 per share on January 23, 2023, damaging investors.

4.    Additionally, on March 26, 2024, the Company filed its Form 10-K for the period ending December 31, 2023 ("2023 Form 10-K"). Within the 2023 Form 10-K, the Company stated the following:

> During the preparation of its 2022 Annual Report, the Company determined that it had not appropriately accounted for certain historical transactions under GAAP. In accordance with the SEC's Staff Accounting Bulletin ("SAB") 99, Materiality, and SAB 108, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements, the Company evaluated the materiality of the errors from qualitative and quantitative perspectives, individually and in aggregate, and concluded that the errors were material to the Consolidated Statements of Operations for the quarters ending March 31, 2021, June 30, 2021, September 30, 2021, March 31, 2022, June 30, 2022, and September 30, 2022, and for the annual period ending December 31, 2021. Based on this evaluation, on January 13, 2023, the Company's Audit Committee, with the concurrence of management, concluded that the Company's previously issued consolidated financial statements for the aforementioned periods would need to be restated and could no longer be relied upon. The Company has restated the impacted financial statements for each of these periods and presented the effects of the restatement adjustments in its 2022 Annual Report.

5.    Also within the 2023 Form 10-K, the Company stated the following:

*Material Weakness in Internal Control over Financial Reporting*

> In connection with their evaluation for the year ended December 31, 2023, management identified a material weakness in internal control over financial reporting resulting from not having a complete process in place to fully reconcile the transactions between its operating system (a Company-developed platform) and its general ledger system, at the individual transaction level, which hampers the Company's ability to timely and accurately identify differences that may require adjustment to its consolidated financial statements. As a result, we did not maintain effective controls over the reconciliation of transactions between the Company's operating system and its general ledger system, at the individual transaction level.

6.    As a result of Defendants' acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiff and other Class members have suffered significant losses and damages.

2

SECOND AMENDED CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

7.    The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

9.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

10.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

**PARTIES**

11.    As set forth in the previously filed certification which is incorporated herein by reference (Doc. 7-4), Plaintiff purchased or otherwise acquired the Company's securities during the Class Period and has been damaged thereby.

12.    Defendant Ryvyl (formerly known as GreenBox) is incorporated in Nevada and maintains an office in San Diego, California, 92108.  Ryvyl stock began trading on the NASDAQ on February 17, 2021, under the ticker symbol "RVYL."

13.    Defendant Ben Errez ("Errez") has served as the Company's Chairman and Co-Founder since 2017.  Ben Errez served as Chairman of the Company's Board of Directors ("Board"), Executive Vice President, Principal Financial Officer and Principal Accounting Officer.  Since 2017, Errez served as a principal of the GreenBox Business.

14.    Defendant Fredi Nisan ("Nisan") has served as the Company's Chief Executive Officer ("CEO") and Co-Founder since 2017.  Fredi Nisan served as a

SECOND AMENDED CLASS ACTION COMPLAINT

Director and as the Company's CEO since July 2017, and has been a principal of the Company since August 2017.

15.    Defendant Benjamin Chung ("Chung") served as the Company's Chief Financial Officer ("CFO") from April 21, 2021 until August 2022.  On April 26, 2021, the Company filed with the SEC a Form 8-K stating that "[o]n April 21, 2021, the Board of Directors (the 'Board') of GreenBox POS (the 'Company') appointed Mr. Benjamin Chung as the Company's Chief Financial Officer."  CFO Chung previously served as the founder and managing partner at Benjamin & Ko, a public accounting and consulting firm.  CFO Chung also served as an Audit Manager at Ernst & Young and PricewaterhouseCooper.  CFO Chung is a certified public accountant.

16.    Defendants Errez, Nisan, and Chung are collectively referred to herein as the "Individual Defendants."  The Company and the Individual Defendants are referred to herein collectively as "Defendants."

17.    As senior executive officers and/or directors of the Company, the Individual Defendants were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company, including the Company's business, finances, products, markets, and present and future business prospects.  Moreover, the Individual Defendants had access to the Company's internal corporate documents, participated in conversations and management and/or board of directors' meetings and committees thereof, and had connections with other corporate officers, directors, and employees.

18.    The Individual Defendants are liable as direct participants in the wrongs alleged herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" and

had the power and influence to cause the Company to engage in the unlawful conduct alleged. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

19.   Because of their positions within the Company, the Individual Defendants controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and SEC filings alleged to be misleading herein, prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

20.   As senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose securities were, and are, governed by the federal securities law – the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions violated these specific requirements and obligations.

## BACKGROUND

21.   Ryvyl is a crypto company that develops, markets, and sells blockchain-based payment solutions. The Company's core focus is to develop and monetize disruptive blockchain-based applications, integrated within an end-to-end suite of financial products, capable of supporting a multitude of industries. The Company's proprietary, blockchain-based systems are designed to facilitate, record,

and store a virtually limitless volume of tokenized assets, representing cash or data, on a secured, immutable blockchain-based ledger.

22. The Company was formerly known as ASAP Expo, Inc ("ASAP"), and was incorporated in the state of Nevada on April 10, 2007. On January 4, 2020, PubCo and GreenBox POS LLC, a Washington limited liability company ("PrivCo"), entered into an asset purchase agreement to memorialize a verbal agreement entered into on April 12, 2018, by and among PubCo (the buyer) and PrivCo (the seller). On April 12, 2018, pursuant to the verbal agreement, the Company acquired PrivCo's blockchain gateway and payment system business, point of sale system business, delivery business and kiosk business, bank and merchant accounts, as well as all intellectual property related thereto (the "GreenBox Business"). As consideration for the GreenBox Business, on April 12, 2018, the Company assumed PrivCo's liabilities that had been incurred in the normal course of the GreenBox Business. On May 3, 2018, the Company formally changed its name to GreenBox POS. LLC, then subsequently changed its name to GreenBox POS on December 13, 2018. On October 13, 2022, GreenBox POS changed its name to RYVYL Inc.

23. The Company claims that payment processing in the blockchain world only requires recording a ledger without the movement of money. According to Ryvyl, secure tokens are used where users need an immediate transaction in a safe, private, and secure environment, and where traditional banks may not work effectively, like cross-border transactions or in under-banked verticals.

24. The Company claims to generate revenue from payment processing services, licensing fees, and equipment sales.

25. According to Ryvyl, payment processing revenue can come from merchant services, banking services, issuing, foreign exchange ("FX"), and ACH programs. The Company claims that payment processing revenue is based on a percentage of each transaction's value and/or upon fixed amounts specified per each

transaction or service and is recognized as such transactions or services are performed. Ryvyl states that payment processing revenue is the Company's primary source of revenue. When a merchant makes a sale, according to the Company, the process of receiving the payment card information, engaging its banks to transfer the proceeds to the merchant's account via digital gateways, and recording the transaction on a blockchain ledger are the activities for which Ryvyl gets to collect fees.

26.    The Company claims that licensing revenue is paid in advance and is recorded as unearned income, which is amortized monthly over the period of the licensing agreement.

27.    According to Ryvyl, equipment revenue is generated from the sale of POS products, which is recognized when goods are shipped.

28.    The Company has three main products that are utilized by its customers: (1) a QuickCard Payment System, which Ryvyl claims is a comprehensive physical and virtual payment card processing management system including software that facilitates on- and off-ramp e-wallet management; (2) the Coyni Platform, which the Company touts as featuring a digital currency that is backed on a 1:1 ratio to the U.S. Dollar, supported by its blockchain technology, and offering custodial assurance by utilizing its stablecoin and unique blockchain technology in a closed-loop ecosystem, allowing for flexibility; and (3) POS Solutions, which Ryvyl claims is its complete end-to-end Point of Sale solution, comprising both software and hardware.

29.    When consumers use credit or debit cards to pay for transactions with merchants who use Ryvyl's ecosystem, the transaction starts with the consumer purchasing tokens from the Company. The tokens are purchased or granted directly from the merchant's terminals or mobile app (or from the Company's website) and are immediately available for transactions. The issuance of tokens is accomplished when the Company loads a virtual wallet with a token, which then transfers credits

7

SECOND AMENDED CLASS ACTION COMPLAINT

to the merchant's wallet on a dollar-for-dollar basis, after which the merchant releases its goods or services to the consumer. According to Ryvyl, these transfers take place instantaneously and seamlessly, allowing the transaction experience to seem like any other ordinary credit or debit card transaction to the consumer and merchant.

30.    As of January 29, 2021, the Company had approximately 18 full-time employees. As of December 31, 2022, the Company had approximately 110 full-time employees.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

31.    On May 13, 2021, the Company filed with the SEC its first quarter report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 Report"). Attached to the 1Q21 Report were SOX certifications signed by Defendants Nisan and Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

32.    Specifically, Defendants Nisan and Chung certified the following through their SOX certifications:

I, [Fredi Nisan and Benjamin Chung], certify that:

1.    I have reviewed this Annual Report on Form 10-K for the fiscal year ended December 31, 2021 of GreenBox POS;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and

SECOND AMENDED CLASS ACTION COMPLAINT

internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

33. The Company reported a net revenue of $4,749,441 and a net loss of $13,329,432 in the 1Q21 Report. The Company also reported total assets of $53,029,116 and total stockholders' equity of $46,885,338.

9

SECOND AMENDED CLASS ACTION COMPLAINT

34.    On August 12, 2021, the Company filed with the SEC its first quarter report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were SOX certifications signed by Defendants Nisan and Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud that included the same representations as set forth above in ¶32.

35.    The Company reported a net revenue of $6,379,179 and a net loss of $13,368,992 in the 2Q21 Report.   The Company also reported total assets of $54,139,293 and total stockholders' equity of $47,931,461.

36.    On November 15, 2021, the Company filed with the SEC its first quarter report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Report").   Attached to the 3Q21 Report were SOX certifications signed by Defendants Nisan and Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud that included the same representations as set forth above in ¶32.

37.    The Company reported a net revenue of $8,045,469 and a net loss of $19,418,747 in the 3Q21 Report.   The Company also reported total assets of $69,122,043 and total stockholders' equity of $56,510,762.

38.    On March 31, 2022, the Company filed with the SEC its 2021 Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report").   Attached to the 2021 Annual Report were SOX certifications signed by Defendants Nisan and Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud that included the same representations as set forth above in ¶32.

39.    The Company reported a net revenue of $26,304,502 and net loss of $26,453,512 in the 2021 Annual Report.  The Company also reported total assets of $115,690,180 and total stockholders' equity of $45,505,423.

40.    The 2021 Annual Report downplayed the serious issues with the Company's internal controls.  The 2021 Annual Report stated in relevant part:

***Controls and Procedures***

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this report. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, as of December 31, 2021, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.***

***Changes in Internal Control Over Financial Reporting***

There have been ***no changes in our internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act or in other factors that materially affected or are reasonably likely to materially affect our internal controls and procedures over financial reporting during the fourth quarter of the year ended December 31, 2021.***

41.    On April 22, 2022, the Company filed a Form 8-K with the SEC announcing that "[e]ffective April 19, 2022, GreenBox POS (the 'Company') dismissed BF Borgers CPA, PC ('BF Borgers') as the Company's independent registered public accounting firm. The decision to dismiss BF Borgers was approved by the Company's Audit Committee."  The Company stated further that "[e]ffective April 19, 2022, the Company engaged Simon & Edward, LLP ('Simon & Edward') as the Company's new independent registered public accounting firm."

42.    On May 16, 2022, the Company filed with the SEC its first quarter report on Form 10-Q for the period ended March 31, 2022 (the "1Q22 Report").

Attached to the 1Q22 Report were SOX certifications signed by Defendants Nisan and Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud that included the same representations as set forth above in ¶32.

43.    The Company reported a net revenue of $4,895,526, and a net loss of $21,315,987 in the 1Q22 Report.   The Company also reported total assets of $84,350,603 and total stockholders' equity of $23,361,142.

44.    The 1Q22 Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls:

**Controls and Procedures**

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, as of March 31, 2022, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.***

There were ***no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the three months ended March 31, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

45.    On August 15, 2022, the Company filed with the SEC its second quarter report on Form 10-Q for the period ended June 30, 2022 (the "2Q22 Report").   Attached to the 2Q22 Report were SOX certifications signed by Defendants Nisan and Chung attesting to the accuracy of financial reporting, the

SECOND AMENDED CLASS ACTION COMPLAINT

disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud that included the same representations as set forth above in ¶32.

46.    The Company reported a net revenue of $6,965,578 three months ended June 30, 2022 and $10,905,902 six months ended June 30, 2022, and a net loss of $10,410,085 three months ended June 30, 2022 and $10,905,902 six months ended June 30, 2022 in the 2Q22 Report.  The Company also reported total assets of $139,781,295 and total stockholders' equity of $39,949,337.

47.    The 2Q22 Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls:

**Controls and Procedures**

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, as of June 30, 2022, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.***

There were ***no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the three and six months ended June 30, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

48.    On August 22, 2022, the Company filed a Form 8-K with the SEC in which it announced that "[o]n August 16, 2022, Mr. Benjamin Chung resigned as Chief Financial Officer of GreenBox POS (the 'Company'), effective immediately. On August 16th, Mr. J. Drew Byelick was appointed the Company's Chief Financial

SECOND AMENDED CLASS ACTION COMPLAINT

Officer, effective immediately."  From June 2022 to August 2022, Byelick had served as Senior Vice President of Finance of the Company.

49.    Shortly after J. Drew Byelick became CFO, the Company tasked CFO Byelick to interact with Simon & Edwards – the Company's new independent registered public accounting firm.  The Company's Board had requested Simon & Edwards to perform a re-audit of the Company's financial results for the year ending December 31, 2021.  Additionally, the Company's Board also had requested that Simon & Edwards begin to review the sufficiency of the Company's internal controls.

50.    On November 21, 2022, the Company filed with the SEC its third quarter report on Form 10-Q for the period ended September 30, 2022 (the "3Q22 Report").  Attached to the 3Q22 Report were SOX certifications signed by Defendants Nisan and Byelick attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud that included the same representations as set forth above in ¶32.

51.    The Company reported a net revenue of $10,629,691 three months ended September 30, 2022 and $22,490,824 nine months ended September 30, 2022, and a net loss of $15,170,277 three months ended September 30, 2022 and $26,076,181 nine months ended September 30, 2022 in the 3Q22 Report.  The Company also reported total assets of $122,401,080 and total stockholders' equity of $34,705,946.

52.    The 3Q22 Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls:

**Controls and Procedures**

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as

defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, as of September 30, 2022, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.***

There were ***no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the three and nine months ended September 30, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

53.    The statements contained in ¶¶31-52 were materially false and misleading. On January 20, 2023, the Company filed a Form 8-K with the SEC in which it announced the following:

***Based on discussions between the audit committee (the "Audit Committee") of the board of directors of RYVYL Inc. (the "Company") and the Company's new independent registered public accounting firm, Simon & Edward, LLP ("Simon & Edward"), the Company concluded on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31, 2022 (collectively the "Previously Issued Financial Statements"), and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon. It is expected that the restatement of the financial statements for the annual and interim periods referred to above will result in decreases to total revenue, increased net losses, decreases to total assets, and decreased total stockholders' equity.***

***The Audit Committee of the Company and its management concluded that the Company's Previously Issued Financial Statements should be restated to correct the aforementioned financial statements and that, accordingly, such Previously Issued Financial Statements should no longer be relied upon to that extent. Related press releases, investor presentations or other communications describing the Company's financial statements for these periods should no longer be relied upon to that extent.***

***The Company anticipates filing the restatements of the Previously Issued Financial Statements as soon as practicable. The Company***

SECOND AMENDED CLASS ACTION COMPLAINT

*plans on filing the restated financial statements in its Annual Report on Form 10-K for the year ended December 31, 2022 and in any other filings that may be necessary or appropriate.*

*In connection with such restatements, the Company has reassessed its conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and has determined that one or more material weaknesses exist in the Company's internal control including a material weakness related to accounting for certain complex business transactions. The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. As a result of the material weakness, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022.*

54.    Additionally, on August 10, 2023, the Company filed a Form 10-K/A with the SEC for the year ended December 31, 2022 ("2022 Form 10-K/A"). Within the 2022 Form 10-K/A, the Company stated the following:

*Based on discussions between the audit committee (the "Audit Committee") of the board of directors of RYVYL Inc. (the "Company") and the Company's new independent registered public accounting firm, Simon & Edward, LLP ("Simon & Edward"), the Company concluded on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31, 2022 (collectively the "Previously Issued Financial Statements"), and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon.*

*The Audit Committee of the Company and its management concluded that the Company's Previously Issued Financial Statements should be restated to correct the aforementioned financial statements and that, accordingly, such Previously Issued Financial Statements should no longer be relied upon to that extent. Related press releases, investor presentations or other communications describing the Company's financial statements for these periods should no longer be relied upon to that extent.*

This Annual Report on Form 10-K for the year ended December 31, 2022 provides restated quarterly data for the quarters ended March 31, 2021, June 30, 2021, September 30, 2021, March 31, 2022, June 30, 2022 and September 30, 2022.

We have not filed and do not intend to file amendments to our previously filed Annual Reports on Form 10-K or Quarterly Reports on

16

SECOND AMENDED CLASS ACTION COMPLAINT

Form 10-Q for the periods affected by the restatements of our consolidated financial statements. Accordingly, as disclosed in our Current Report on Form 8-K filed January 20, 2023, *the Company's previously issued financial statements for the periods from January 1, 2021 through September 30, 2022, including the Company's previously issued audited financial statements for the year ended December 31, 2021, should no longer be relied upon, nor should any related reports of our then independent registered public accounting firm, BF Borgers CPA, PC, nor any previously furnished or filed reports, earnings releases, guidance, investor presentations, or similar communications of the Company regarding these periods be relied upon.* Investors should rely only on the financial information and other disclosures, including the adjusted or restated financial information, included in this Form 10-K and subsequent filings, as applicable.

55.    Also within the 2022 Form 10-K/A, the Company provided the following descriptions of the significant adjustments to the Company's financial position and results of operations from the previously reported consolidated financial statements:

*Commissions Revenue* – The Company has recorded adjustments to reverse the recognition of certain commissions related to transactions processed under the Sky Financial portfolio. While the Company accrued for the commission revenues in Q4 of 2021 and Q1 of 2022 based on certain estimated data provided from the seller, such revenue figures cannot be subsequently supported with timely cash collection. While the Company is pursuing its payment entitlement, for prudent reasons, the reversals have been recorded in the restated financial results.

*Repurchases of Company Stock* – The Company has recorded adjustments to properly reflect certain transactions as the repurchase of the Company's stock. The transactions were previously recorded as either loans, or as a reduction to additional paid-in capital on the Company's balance sheet. The Company has also recorded an impairment charge of approximately $1.4 million related to a repurchase of Company stock.

*Gateway Bank Fees* – The Company's gateway banks charge the Company a fee for the processing of transactions. The Company accrues and expense related to this fee at the time of the transaction. The Company determined that for one of its gateway banks, it had not accrued the appropriate fee percentage, and has recorded adjustments to each of the periods being restated to record additional fees in the statement of operations and to reduce the net receivable due from the gateway bank.

*Charge-off of Accounts Receivable* – The Company has made adjustments to charge-off certain receivables due from gateway banks. Additionally, the Company has recorded adjustments to appropriately

17
SECOND AMENDED CLASS ACTION COMPLAINT

reflect the write-off of certain accounts receivable in the period in which the write-offs are most likely to be occurred under US GAAP.

*Merchant Liability* – When a merchant client makes a sale, the transaction is recorded on the Company's blockchain ledger. The Company records liability equal to the amount of sale, less processing fees, to reflect its obligation to the merchant. Based on reconciliation performed between its blockchain ledger and the Company's general ledger balances, the Company has recorded adjustments to change its merchant liability balances for each of the periods presented to properly reflect all liabilities incurred as of the end of each respective period being restated.

*Convertible Debt* – In November 2021, the Company entered into convertible debt with a face value of $100,000,000. The Company has made certain adjustments to reflect the debt modifications incurred to properly account for this convertible debt in each of the three quarters of 2022, including adjustments to the debt balance, interest expense, loss on extinguishment of debt, and accumulated accretion.

In addition, the Company has also recorded adjustments to make certain reclassifications on its balance sheet, to record the loss on extinguishment of debt, and to record fee income from merchants related to assessed fines and penalties.

56.    Additionally, the 2022 Form 10-K/A stated the following:

***In connection with such restatements, the Company has reassessed its conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and has determined that one or more material weaknesses existed in the Company's internal control including a material weakness related to accounting for certain complex business transactions.***

The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. ***As a result of the material weakness, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022.***

57.    On March 26, 2024, the Company filed its 2023 Form 10-K. Within the 2023 Form 10-K, the Company stated the following:

***During the preparation of its 2022 Annual Report, the Company determined that it had not appropriately accounted for certain historical transactions under GAAP. In accordance with the SEC's Staff Accounting Bulletin ("SAB") 99, Materiality, and SAB 108, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements, the Company evaluated the materiality of the errors from qualitative and***

*quantitative perspectives, individually and in aggregate, and concluded that the errors were material to the Consolidated Statements of Operations for the quarters ending March 31, 2021, June 30, 2021, September 30, 2021, March 31, 2022, June 30, 2022, and September 30, 2022, and for the annual period ending December 31, 2021. Based on this evaluation, on January 13, 2023, the Company's Audit Committee, with the concurrence of management, concluded that the Company's previously issued consolidated financial statements for the aforementioned periods would need to be restated and could no longer be relied upon.* The Company has restated the impacted financial statements for each of these periods and presented the effects of the restatement adjustments in its 2022 Annual Report.

58.    Also within the 2023 Form 10-K, the Company stated the following:

*Material Weakness in Internal Control over Financial Reporting*

*In connection with their evaluation for the year ended December 31, 2023, management identified a material weakness in internal control over financial reporting resulting from not having a complete process in place to fully reconcile the transactions between its operating system (a Company-developed platform) and its general ledger system, at the individual transaction level, which hampers the Company's ability to timely and accurately identify differences that may require adjustment to its consolidated financial statements. As a result, we did not maintain effective controls over the reconciliation of transactions between the Company's operating system and its general ledger system, at the individual transaction level.* A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our financial statements will not be prevented or detected on a timely basis.

*Remediation Plan*

*We have commenced measures to remediate the identified material weakness, including the implementation of an enhanced reconciliation preparation and review process, and improved reporting from the Company's operating system.*

59.    Thus, for all the reasons set forth above in ¶¶53-58, Defendants statements contained in ¶¶31-52 were materially false and misleading.

## THE ACCOUNTS OF FORMER COMPANY EMPLOYEES

60.    The accounts of former Company employees further demonstrate the false and misleading nature of Defendants' statements and that Defendants acted with scienter. For instance, CW1 served as HR Generalist at the Company from June 2021 to February 2022. CW1 started at the Company as an onboarding

specialist, working with Ryvyl's programming terminals. In that role, CW1 went to dispensaries and programmed terminals that clients would use to swipe their credit or debit cards. CW1 would then create their files on the back end, which would enable CW1 to determine how much revenue the dispensary was generating. In July 2021, CW1's role shifted into HR, and CW1 booked all the meetings between Ryvyl's executives and the Company's new hires. In this role, CW1 coordinated meetings with the Company's CEO, CFO, and all the various departments. CW1 also performed background checks for the Company's new hires and handled all the paperwork for the new hires and for the Company's existing employees. Additionally, CW1 managed all of the Company's office equipment, including laptops and keyboards, as well as tested the Company's terminals to ensure that transactions were processed correctly.

61.    CW1 stated that Co-Founder and Chairman Errez and CEO Nisan misrepresented the Company's revenue. CW1 knew that the statements were wrong because there was no volume for the Company's merchants to support the claimed revenue. CW1 stated further that CW1 knew about the Company's volume because CW1 was trained on the Company's system for chargebacks, which represented the volume for anything that would come into Ryvyl and everything that the Company paid out.

62.    CW1 stated that when CW1 served as an onboarding specialist, Itamar Green ("Green") worked in the development team and that Green would perform the chargebacks. CW1 stated that Green trained CW1 as a backup to perform the chargebacks if Green was unable to do so. CW1 stated further that Green taught CW1 how to identify the Company's chargebacks, as well as the volume for all the Company's merchants for anything that would come into Ryvyl and everything that the Company paid out, and that the information looked like a bank statement. CW1 stated that based upon the volume information, the revenue was nowhere close to the representations that Chairman Errez and CEO Nisan made regarding the

SECOND AMENDED CLASS ACTION COMPLAINT

Company's revenue.  Specifically, CW1 stated that the volumes that CW1 saw were nowhere close to the millions of dollars that the Company represented, and that the volume was not even close to a million.  CW1 reported the issue to CW1's boss, Viviana Estrada, but Estrada did not know why the Company's representations were not supported by the volume information that CW1 discovered.  CW1 also said that Green informed CEO Nisan about the discrepancies that CW1 discovered between the representations that Chairman Errez and CEO made regarding the Company's revenue and the volume information that CW1 observed.

63.    Additionally, CW1 stated that many of the Company's customers complained about getting charges from companies that they did not recognize, such as a mattress company, and that the charges would originate from Ryvyl's system. CW1 learned that Ryvyl implemented this system as a roundabout process for cannabis-related charges.  CW1 stated that CW1 would discuss the situation with CW1's boss and other management at the Company, including Dan Nusinovich, the Company's head of development and the brother of CEO Nisan, but that the Company's management failed to address the issue.

64.    CW2 served as a Marketing Specialist, Marketing Manager, and Project Manager at Ryvyl from August 2021 to February 2023.  CW2 performed numerous duties at Ryvyl, which together amounted to acting as a marketing team lead. Specifically, CW2 managed communications and the website, and also conducted social media outreach and worked closely with the Company's sales team. According to CW2, the team that CW2 managed handled any external-facing communications for the Company.  Additionally, throughout CW2's tenure, CW2 implemented project-management software and obtained buy-ins from internal stakeholders.

65.    CW2 stated that Ryvyl was a small company, that everyone talked, and that there was a series of events that led the Company to hire CFO Byelick. Specifically, CW2 stated that CFO Byelick's predecessor, CFO Chung, required the

Company to use his software as part of his deal, and that CFO Chung did not properly follow accounting procedures as a publicly traded company.  CW2 stated further that CFO Chung created his own accounting software, that the software was absolutely horrible, and that the Company should never have been using it.  CW2 stated that CFO Chung was not doing his job, and that more people discovered this fact after CFO Chung's departure, including CFO Byelick and CW2.

66.    Indeed, CW2 and CFO Byelick had numerous discussions about the improper accounting practices that existed at the Company because of CFO Chung's failures, which included improper accounting relating to revenue, debt, and depreciation value.  CW2 stated that CW2 had daily – if not weekly – conversions with CFO Byelick and that CW2 had a good working relationship with CFO Byelick.  CW2 stated that CW2 and CFO Byelick spoke about these issues primarily in the office together, and also spoke occasionally while golfing together.

67.    CW2 stated that CFO Byelick acknowledged to CW2 that Ryvyl's numbers were made up (including the Company's quarterly financial statements and year-end financial statements), that the Company failed to follow proper accounting procedures, and that information was hidden and disguised.  CW2 stated that based upon CW2's conversations with CFO Byelick, CW2 was 100% certain that the Company was manipulating numbers related to the Company's quarterly financial statements and year-end financial statements.  CW2 stated that CW2 believes that CFO Byelick became aware of the accounting improprieties around the time that CFO Byelick started, and that the more CFO Byelick investigated, the more accounting improprieties he discovered.  CW2 also stated that CFO Byelick informed CW2 that had CFO Chung followed the correct accounting process, CFO Chung would have discovered that the Company's quarterly financial statements and year-end financial statements were incorrect because there was no way to logically arrive at the incorrect results.

SECOND AMENDED CLASS ACTION COMPLAINT

68.    For example, CW2 stated that at the end of 2022, CW2 had discussions with other Company employees regarding CFO Chung's failure to implement and follow proper accounting procedures at the Company and CW2 learned that CEO Nisan discovered that CFO Chung was making up numbers.  CW2 learned this information by speaking with personnel in the Company's accounting department, including R. Clay Gilreath ("Gilreath"), who served as a Senior Treasury Analyst. According to CW2, personnel in the accounting department had to perform an audit of the Company's financial results every quarter during CW2's tenure because the quarterly filings were always incorrect and always had to be amended.  CW2 also stated that CEO Nisan was a hands-on manager and participated in the day-to-day decisions at the Company, and that CEO Nisan oversaw many of the accounting responsibilities at the Company because of the lack of time that CFO Chung spent in the office.

69.    CW2 also stated that the Company did not have enough personnel working in the accounting department to properly manage what they needed to do. CW2 indicated that there was a high degree of turnover in the accounting department, with the average time for personnel in the department being approximately three to five months.  CW2 stated further that sometimes Ryvyl would rely upon its receptionist to perform financial and accounting work for the Company and that the receptionist was not qualified to perform financial and accounting work.  CW2 stated that the Company assigned tasks such as expense reporting to the receptionist, and that the receptionist would ask CW2 how do to the work because the receptionist did not know how to do it.

70.    CW3 was a Staff Accountant at the Company from May 2022 to July 2022.  CW3 stated that Ryvyl had family friends working in the Company's finance department.  CW3 noted that Gilreath worked as Senior Treasury Analyst and Kineret Rubin ("Rubin") worked as Controller, and that Rubin was a family friend of Co-Founder and Chairman Errez.  CW3 stated that Gilreath and Rubin told CW3

SECOND AMENDED CLASS ACTION COMPLAINT

what information to enter into the system, including wires for other companies. CW3 said that money came into Ryvyl and that the Company was supposed to wire it out to other companies and take a percentage, but that the Company was making it seem like it was making much more money than it was. CW3 stated that a lot of the wires that the Company was generating were fake, and that Ryvyl was keeping money in its accounts that was meant to be transferred onward to other companies. According to CW3, people from other companies began to contact the Company to complain about not receiving the money to which they were entitled. CW3 stated that CW3 would show Gilreath and Rubin that documentation did not support the numbers that Gilreath and Rubin demanded to be entered into the system, but that Gilreath and Rubin told CW3 to just do what they said. CW3 stated that Gilreath and Rubin would have Co-Founder and Chairman Errez renegotiate it on the back end and that paperwork would subsequently follow, but that never occurred.

71.    CW3 stated further that after CW3 entered the information onto the system, CW3 would go back several days later to ask for documentation to support the changes and that Gilreath claimed that he would upload the documentation into the system, but that never happened. CW3 stated that Gilreath and Rubin were responsible for setting up the wires, and that Chairman and Co-Founder Errez, Senior Treasury Analyst Gilreath and Controller Rubin would inform CW3 that the numbers had changed based upon conversations that Chairman Errez had with clients. CW3 stated, however, that CW3 saw no documentation to support the changes that Errez, Gilreath, and Rubin were purporting to make. CW3 stated further that Ryvyl's accounting department consisted solely of Gilreath, Rubin, Reid Granados ("Granados," Ryvyl's former Director of Finance), CFO Chung, and CW3.

72.    CW4 served as the Executive Assistant to both Chairman Errez and Chief Operating Officer ("COO") Min Wei ("Wei") from February 2022 to July 2022. CW4 attended weekly meetings with CFO Chung (who attended many

meetings remotely from South Korea), CEO Nisan, Co-Founder and Chairman Errez, Jacqueline Reynolds (a salesperson at the time), and former Director of Finance Granados.

73.    CW4 confirmed that based upon CW4's attendance at weekly meetings with CEO Nisan, CFO Chung, Chairman Errez, and other Company executives, the Company's accounting, including accounting for wires that were received and sent to other companies, was inaccurate.  In fact, CW4 stated that based upon CW4's participation in weekly meetings with the Company's executives, the Company's accounting was a "shit show."  CW4 confirmed that the Company was generating fake wires and keeping money that was meant to be transferred onward to other companies.  For instance, around June 2022, CW4 recalled that Controller Rubin sent fake wires without blinking any eye.  CW4 stated further that red flags regarding the Company's accounting were absolutely raised during the executive meetings.  For example, CW4 stated that COO Wei informed participants at a meeting in March, April, or May of 2022 that some of the information regarding the Company's financials was incorrect and that the participants needed to review it.  CW4 said that CFO Chung agreed during that meeting that the information was incorrect.

## THE TRUTH BEGINS TO EMERGE

74.    On January 20, 2023, the Company filed a Form 8-K with the SEC in which it announced the following:

> *Based on discussions between the audit committee (the "Audit Committee") of the board of directors of RYVYL Inc. (the "Company") and the Company's new independent registered public accounting firm, Simon & Edward, LLP ("Simon & Edward"), the Company concluded on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31, 2022 (collectively the "Previously Issued Financial Statements"), and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon. It is expected that the restatement of the*

*financial statements for the annual and interim periods referred to above will result in decreases to total revenue, increased net losses, decreases to total assets, and decreased total stockholders' equity.*

*The Audit Committee of the Company and its management concluded that the Company's Previously Issued Financial Statements should be restated to correct the aforementioned financial statements and that, accordingly, such Previously Issued Financial Statements should no longer be relied upon to that extent. Related press releases, investor presentations or other communications describing the Company's financial statements for these periods should no longer be relied upon to that extent.*

*The Company anticipates filing the restatements of the Previously Issued Financial Statements as soon as practicable. The Company plans on filing the restated financial statements in its Annual Report on Form 10-K for the year ended December 31, 2022 and in any other filings that may be necessary or appropriate.*

*In connection with such restatements, the Company has reassessed its conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and has determined that one or more material weaknesses exist in the Company's internal control including a material weakness related to accounting for certain complex business transactions. The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. As a result of the material weakness, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022.*

75.    On this news, Ryvyl's share price fell 14.63% to close at $0.77 per share on January 23, 2023, damaging investors.

**POST CLASS PERIOD EVENTS**

76.    On March 8, 2023, the Company filed a Form 8-K with the SEC in which it announced that "[o]n March 2, 2023, Mr. J. Drew Byelick resigned as Chief Financial Officer of RYVYL Inc. (the "Company"), effective immediately."

77.    On March 14, 2023, the Company filed a Form 8-K with the SEC in which it announced that "[o]n March 8, 2023, RYVYL Inc. (the "Company") appointed Mary Lay Hoitt as the Company's Interim Chief Financial Officer, effective as of March 9th."

SECOND AMENDED CLASS ACTION COMPLAINT

78.    On March 21, 2023, the Company filed a Form 8-K with the SEC in which it announced the following:

*Salary Increases*

On February 16, 2023, at a meeting of the Compensation Committee (the "Committee") of the Board of Directors of RYVYL Inc., (the "Company"), the Committee approved the following material compensatory plan, contract or arrangement: salary increases, retroactive to January 1, 2023, for each of Mr. Min Wei, the Chief Operating Officer of the Company and Mr. James D. Byelick, the Chief Financial Officer of the Company at the time of the Committee's approval (Mr. Byelick resigned on March 2, 2023).

Messrs. Wei and Byelick each had their base salaries increased to $320,000. On February 28, 2023, the Company paid a total gross amount reflecting the salary increase and retroactive payment of $15,833.36 to Mr. Wei and $18,958.34 to Mr. Byelick.

*Bonus Compensation Plan*

On March 15, 2023, the Committee approved, pursuant to a unanimous written consent, the following material compensatory plan, contract or arrangement: a performance-based award of $160,000 to Mr. Wei pursuant to the previously disclosed bonus compensation plan. Mr. Wei is eligible for a discretionary performance-based award (the "Award") of $160,000, to be paid in two installments. Two-thirds of the Award is payable upon the completion of all of the following: (a) the Company's restatement of its financial statements for the fiscal year ended December 31, 2021; (b) the Company's restatement of its financial statements for the period ended September 30, 2022; (c) the Company's restatement of financial statements for the period ended June 30, 2022; (d) the Company's restatement of its financial statements for the period ended March 31, 2022, and (e) the Company filing its Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K). The remaining one-third of the Award is payable on the forty-fifth (45th) day following the filing of the 2022 10-K unless the staff of the Securities and Exchange Commission (the "SEC Staff") sends a comment letter with regard to their review of the restated financials or the 2022 10-K. In such a situation, the remaining one-third will be payable following the SEC Staff's completion of their review.

79.    On March 31, 2023, the Company filed a Form 12b-25 with the SEC in which it stated the following:

RYVYL Inc. (the "Company") is unable, without unreasonable effort or expense, to file its Annual Report on Form 10-K for the year ended December 31, 2022 (the "Annual Report") by the March 31, 2023 filing date applicable to smaller reporting companies for the reasons discussed in this Form 12b-25.

As disclosed in the Company's Current Report on Form 8-K filed on January 20, 2023, management and the Audit Committee of the Board

27

SECOND AMENDED CLASS ACTION COMPLAINT

of Directors (the "Audit Committee") of the Company determined on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021, and as of and for the interim periods ended September 30, June 30, and March 31, 2022 (collectively the "Previously Issued Financial Statements"), should be restated and can no longer be relied upon, and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon. **The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. As a result, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022**.

80.    On June 6, 2023, the Company filed a Form 8-K with the SEC in which it announced that "[o]n June 1, 2023, RYVYL Inc. (the "Company") appointed Gene Jones as the Company's Interim Chief Financial Officer, effective as of June 1, 2023 replacing Mary Lay Hoitt who left the Company on the same day."

81.    On August 10, 2023, the Company filed its 2022 Form 10-K/A with the SEC for the year ended December 31, 2022.  Within the 2022 Form 10-K/A, the Company stated the following:

Based on discussions between the audit committee (the "Audit Committee") of the board of directors of RYVYL Inc. (the "Company") and the Company's new independent registered public accounting firm, Simon & Edward, LLP ("Simon & Edward"), the Company concluded on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31, 2022 (collectively the "Previously Issued Financial Statements"), and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon.

The Audit Committee of the Company and its management concluded that the Company's Previously Issued Financial Statements should be restated to correct the aforementioned financial statements and that, accordingly, such Previously Issued Financial Statements should no longer be relied upon to that extent. Related press releases, investor presentations or other communications describing the Company's financial statements for these periods should no longer be relied upon to that extent.

This Annual Report on Form 10-K for the year ended December 31, 2022 provides restated quarterly data for the quarters ended March 31, 2021, June 30, 2021, September 30, 2021, March 31, 2022, June 30, 2022 and September 30, 2022.

We have not filed and do not intend to file amendments to our previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for the periods affected by the restatements of our consolidated financial statements. Accordingly, as disclosed in our Current Report on Form 8-K filed January 20, 2023, the Company's previously issued financial statements for the periods from January 1, 2021 through September 30, 2022, including the Company's previously issued audited financial statements for the year ended December 31, 2021, should no longer be relied upon, nor should any related reports of our then independent registered public accounting firm, BF Borgers CPA, PC, nor any previously furnished or filed reports, earnings releases, guidance, investor presentations, or similar communications of the Company regarding these periods be relied upon. Investors should rely only on the financial information and other disclosures, including the adjusted or restated financial information, included in this Form 10-K and subsequent filings, as applicable.

82.    Also within the 2022 Form 10-K/A, the Company provided the following descriptions of the significant adjustments to the Company's financial position and results of operations from the previously reported consolidated financial statements:

***Commissions Revenue*** – The Company has recorded adjustments to reverse the recognition of certain commissions related to transactions processed under the Sky Financial portfolio. While the Company accrued for the commission revenues in Q4 of 2021 and Q1 of 2022 based on certain estimated data provided from the seller, such revenue figures cannot be subsequently supported with timely cash collection. While the Company is pursuing its payment entitlement, for prudent reasons, the reversals have been recorded in the restated financial results.

***Repurchases of Company Stock*** – The Company has recorded adjustments to properly reflect certain transactions as the repurchase of the Company's stock. The transactions were previously recorded as either loans, or as a reduction to additional paid-in capital on the Company's balance sheet. The Company has also recorded an impairment charge of approximately $1.4 million related to a repurchase of Company stock.

***Gateway Bank Fees*** – The Company's gateway banks charge the Company a fee for the processing of transactions. The Company accrues and expense related to this fee at the time of the transaction. The Company determined that for one of its gateway banks, it had not accrued the appropriate fee percentage, and has recorded adjustments to each of the periods being restated to record additional fees in the

statement of operations and to reduce the net receivable due from the gateway bank.

***Charge-off of Accounts Receivable*** – The Company has made adjustments to charge-off certain receivables due from gateway banks. Additionally, the Company has recorded adjustments to appropriately reflect the write-off of certain accounts receivable in the period in which the write-offs are most likely to be occurred under US GAAP.

***Merchant Liability*** – When a merchant client makes a sale, the transaction is recorded on the Company's blockchain ledger. The Company records liability equal to the amount of sale, less processing fees, to reflect its obligation to the merchant. Based on reconciliation performed between its blockchain ledger and the Company's general ledger balances, the Company has recorded adjustments to change its merchant liability balances for each of the periods presented to properly reflect all liabilities incurred as of the end of each respective period being restated.

***Convertible Debt*** – In November 2021, the Company entered into convertible debt with a face value of $100,000,000. The Company has made certain adjustments to reflect the debt modifications incurred to properly account for this convertible debt in each of the three quarters of 2022, including adjustments to the debt balance, interest expense, loss on extinguishment of debt, and accumulated accretion.

In addition, the Company has also recorded adjustments to make certain reclassifications on its balance sheet, to record the loss on extinguishment of debt, and to record fee income from merchants related to assessed fines and penalties.

83.     Additionally, the 2022 Form 10-K/A stated the following:

In connection with such restatements, the Company has reassessed its conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and has determined that one or more material weaknesses existed in the Company's internal control including a material weakness related to accounting for certain complex business transactions.

The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. As a result of the material weakness, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022.

84.     On October 19, 2023, the Company filed a Form 8-K with the SEC in which it announced that "[e]ffective as of October 16, 2023 (the 'Effective Date'), Gene Jones resigned as Interim Chief Financial Officer of RYVYL Inc. (the

SECOND AMENDED CLASS ACTION COMPLAINT

'Company'). On the Effective Date, the Company appointed George Oliva as Chief Financial Officer of the Company, effective immediately."

85. On March 26, 2024, the Company filed its 2023 Form 10-K. Within the 2023 Form 10-K, the Company stated the following:

> During the preparation of its 2022 Annual Report, the Company determined that it had not appropriately accounted for certain historical transactions under GAAP. In accordance with the SEC's Staff Accounting Bulletin ("SAB") 99, Materiality, and SAB 108, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements, the Company evaluated the materiality of the errors from qualitative and quantitative perspectives, individually and in aggregate, and concluded that the errors were material to the Consolidated Statements of Operations for the quarters ending March 31, 2021, June 30, 2021, September 30, 2021, March 31, 2022, June 30, 2022, and September 30, 2022, and for the annual period ending December 31, 2021. Based on this evaluation, on January 13, 2023, the Company's Audit Committee, with the concurrence of management, concluded that the Company's previously issued consolidated financial statements for the aforementioned periods would need to be restated and could no longer be relied upon. The Company has restated the impacted financial statements for each of these periods and presented the effects of the restatement adjustments in its 2022 Annual Report.

86. Also within the 2023 Form 10-K, the Company stated the following:

*Material Weakness in Internal Control over Financial Reporting*

> In connection with their evaluation for the year ended December 31, 2023, management identified a material weakness in internal control over financial reporting resulting from not having a complete process in place to fully reconcile the transactions between its operating system (a Company-developed platform) and its general ledger system, at the individual transaction level, which hampers the Company's ability to timely and accurately identify differences that may require adjustment to its consolidated financial statements. As a result, we did not maintain effective controls over the reconciliation of transactions between the Company's operating system and its general ledger system, at the individual transaction level. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our financial statements will not be prevented or detected on a timely basis.

*Remediation Plan*

> We have commenced measures to remediate the identified material weakness, including the implementation of an enhanced reconciliation preparation and review process, and improved reporting from the Company's operating system.

## CLASS ACTION ALLEGATIONS

87.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and/or entities who purchased or otherwise acquired the Company's securities during the Class Period seeking to pursue remedies under the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

88.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

89.    Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws alleged herein.

90.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

91.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)  whether Defendants' acts constituted violations of the federal securities laws;

(b)  whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)  whether the price of the Company's securities was artificially inflated during the Class Period; and

(d)  to what extent the members of the Class have sustained damages and the proper measure of damages.

92.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Additionally, there will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

93.  During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities. Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's securities by failing to disclose, and misrepresenting, the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's securities declined significantly as the prior artificial inflation dissipated from the Company's stock price.

94.  As a result of the purchases of the Company's securities during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws. Defendants' false and misleading

statements had the intended effect, and caused, the Company's securities to trade at artificially inflated levels throughout the Class Period.

95.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects.  As the truth regarding the Company was revealed to the market, the price of the Company's securities fell significantly.  These declines removed the inflation from the price of the Company's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

96.    The declines in the price of the Company's securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in the Company's securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.

97.    The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

98.    At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a)    The Company's securities met the requirements for listing, and was listed and actively traded on, NASDAQ, a highly efficient, electronic stock market;

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC and NASDAQ;

SECOND AMENDED CLASS ACTION COMPLAINT

(c)    The Company regularly communicated with public investors through established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

99.    As a result of the foregoing, the market for the Company's securities promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's stock.  Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

100.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision.  Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-

35

looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### Promulgated Thereunder Against Defendants

101. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

102. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading. These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

103. To the extent that the claims alleged herein are based upon the omission of information, such omissions were made in connection with the misrepresentations and misleading half-truths alleged herein and were not based upon pure omissions.

104. Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

105. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities. Plaintiff and the Class would not have purchased the Company's securities at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

106.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

107.   Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

108.   The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

109.   The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein.   The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.   Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

SECOND AMENDED CLASS ACTION COMPLAINT

110.  The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

111.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

1   DATED:  April 30, 2024            **GLANCY PRONGAY & MURRAY LLP**

2
                                      By:    *s/ Ex Kano S. Sams II*
3                                     Robert V. Prongay
4                                     Ex Kano S. Sams II
                                      Charles Linehan
5                                     Pavithra Rajesh
6                                     1925 Century Park East, Suite 2100
                                      Los Angeles, California 90067
7                                     Telephone:  (310) 201-9150
8                                     Facsimile:  (310) 201-9160
                                      Email:  rprongay@glancylaw.com
9
10                                    *Attorneys for Lead Plaintiff Scot S. Cook*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On April 30, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 30, 2024.


*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II