1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7                  SOUTHERN DISTRICT OF CALIFORNIA

8   | MARK CULLEN, Individually and on | **Case No.  3:23-cv-0185-GPC-SBC** |
    behalf of all others similarly situated,

9                                    Plaintiff,     **ORDER GRANTING IN PART AND**
                                                    **DENYING IN PART MOTION TO**
10  v.                                              **DISMISS SECOND AMENDED**
                                                    **COMPLAINT; ORDER GRANTING**
11  RYVYL INC. F/K/A GREENBOX POS,                  **IN PART AND DENYING IN PART**
    BEN ERREZ, FREDI NISAN, AND                     **DEFENDANTS' REQUEST FOR**
12  BENJAMIN CHUNG,                                 **JUDICIAL NOTICE**
                                    Defendants.
13                                                  **[ECF Nos. 85, 85-6]**
14
15
16                          <u>**Introduction**</u>
17          Before the Court is Defendants' motion to dismiss Plaintiffs' class action securities
18   fraud second amended complaint ("SAC") against RYVYL, Inc. ("Ryvyl") and three of
19   its present and former officers: Ben Errez, Fredi Nisan, and Benjamin Chung.[1]  The
20   purported class includes those "who purchased or otherwise acquired the Company's
21   securities between May 13, 2021 and January 20, 2023, inclusive ("Class Period"). SAC
22   ¶ 1.  After a previous motion to dismiss was granted in part and denied in part, *see* ECF
23   No. 71, the Plaintiffs timely filed a two-count SAC, ECF No. 80.  Defendants then moved
24   to dismiss both counts.  ECF No. 85.
25   _____
26
27   [1] The Court refers to Errez, Nisan, and Chung as the "Individual Defendants."
                                        1
28                                                                    23-CV-0185-GPC-SBC

For the reasons set forth below, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss.  The Court GRANTS in part and DENIES in part Defendants' request for judicial notice.

### Factual Background

Ryvyl is a cryptocurrency company "that develops, markets, and sells blockchain-based payment solutions," which allow customers to pay businesses with cryptocurrency and businesses to receive cryptocurrency when customers pay with credit or debit cards.  SAC ¶¶ 21-22, 29.  The company generates revenue from "payment processing services, licensing fees, and equipment sales," though payment processing, for which Ryvyl gets a percentage of each transaction, is Ryvyl's primary source of revenue.  SAC ¶¶ 24-25.  As of late 2022, the company had 110 full-time employees.  SAC ¶ 30.

Ryvyl released interim quarterly financial reports in 2021 and 2022 on May 13, 2021 (for 1Q21), August 12, 2021 (for 2Q21), November 15, 2021 (for 3Q21), May 16, 2022 (for 1Q22), August 15, 2022 (for 2Q22), and November 21, 2022 (for 3Q22).  SAC ¶¶ 31, 34, 36, 42, 45, 50.  It also released an annual report for 2021 on March 31, 2022.  SAC ¶ 38.  Each of these reports listed Ryvyl's net revenue, net loss, total assets, and total stockholders' equity.  SAC ¶¶ 33, 35, 37, 39, 43, 46, 51.  And accompanying each of these reports, CEO Nisan and CFO Chung certified, pursuant to the Sarbanes-Oxley Act ("SOX Certifications"), that the reports were true and disclosed any "significant deficiencies and material weaknesses" in Ryvyl's internal financial controls.[2]  SAC ¶¶ 31-32, 34, 36, 38, 42, 45, 50.  The 2021 annual report and the interim reports for 2022 also explicitly stated that the disclosure controls and procedures were effective and had undergone no changes.  SAC ¶¶ 40, 44, 47, 52.

---

[2] The SOX Certification for the 2022 third quarter report was signed by CEO Nisan and CFO Byelick, who had replaced Chung as CFO.  SAC ¶ 50.

2

On January 20, 2023, Ryvyl announced that, after internal discussions and discussions with a new accounting firm, it had concluded that its previously issued financial statements for the three interim quarters in 2021 and 2022 and the 2021 annual report should not be relied upon and needed to be restated.  SAC ¶ 53.  It also "reassess[ed] its [prior] conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and . . . determined that one or more material weaknesses exist in the Company's internal control including a material weakness related to accounting for certain complex business transactions." *Id.* Ryvyl's share price dropped over 14% that day.  SAC ¶ 75.

On April 22, 2022, amid these events, Ryvyl announced that it had dismissed its previous accounting firm and engaged a new accounting firm in its place. SAC ¶ 41.  On August 22, 2022, Ryvyl announced that Chung had resigned as CFO and that J. Drew Byelick had replaced him.[3]  SAC ¶ 48.  Chairman Errez and CEO Nisan remain with the company in their respective positions to this day.  SAC ¶¶ 13-14.  None of the Individual Defendants—or none of Ryvyl's senior management, executives, or officers, for that matter—are alleged to have sold the company's stock during the Class Period.  *See* SAC (absence).

Plaintiffs filed their original complaint on February 1, 2023, promptly after Ryvyl's January 2023 announcement.  ECF No. 1.  On June 30, 2023, after the Court appointed lead plaintiff and counsel, ECF No. 20, the Plaintiffs filed an amended complaint ("AC") asserting five causes of action under the Securities Act of 1933 and Securities Exchange Act of 1934.  ECF No. 33.  Initially, Plaintiffs brought their claims against Ryvyl, several of Ryvyl's present and former officers, and two underwriters.  *See*

---

[3] Byelick was formerly a defendant in this matter but has since been dismissed without prejudice.  *See* ECF No. 78.

ECF No. 33.  The Defendants, in three separate groups, moved to dismiss the AC.  ECF Nos. 40, 41, 53.  On March 1, 2024, the Court granted in part and denied in part the motions to dismiss, and granted Plaintiffs leave to amend.  *Cullen v. RYVYL Inc.*, 2024 WL 898206, at *20 (S.D. Cal. Mar. 1, 2024).  The Court dismissed the claims against the underwriters and Byelick.  *Id.*  As to Ryvyl and the Individual Defendants, the Court granted the motions to dismiss in part and denied them in part.  *Id.*  Plaintiffs timely filed an amended complaint.  ECF No. 80.  The SAC now asserts only two causes of action against Ryvyl and the remaining Individual Defendants:

(I)     Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 ("Section 10(b)") against Ryvyl and the Individual Defendants for making false or misleading material statements in connection with the sale of any security registered on a national exchange, SAC ¶¶ 101-06; and

(II)    Section 20(a) of the Securities Exchange Act ("Section 20(a)") against the Individual Defendants for controlling persons who violated Section 10(b), SAC ¶¶ 107-11.

Underlying these claims is Plaintiffs' assertion that Defendants "engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities" when they released inaccurate financial data and verified that there were no internal control issues.  SAC ¶ 93; *see also* SAC ¶¶ 53, 59-73, 93-97, 101-06.  In addition to the January 2023 announcement, Plaintiffs rely primarily on the statements of confidential witnesses who allege variously that (i) the Individual Defendants misrepresented the Company's revenue, SAC ¶ 61; (ii) CFO Chung was making up numbers, CEO Nisan learned about it, and CEO Nisan also oversaw many of Ryvyl's accounting responsibilities, SAC ¶¶ 67-68; (iii) a staff accountant was told to enter inaccurate information and suspected that Chairman Errez was changing numbers without supporting documentation to back it, SAC ¶¶ 70-71; and (iv) the company "was generating fake wires[,] keeping money that was meant to be transferred onward to other

companies," and that the Individual Defendants were informed of accounting issues and financial inaccuracies at weekly meetings, SAC ¶ 73.

Defendants move to dismiss each Count.  ECF No. 85.

## Requests for Judicial Notice

Defendants request that the Court take judicial notice of (1) a Form 10-K filed with the SEC, (2) an SEC order instituting proceedings against Ryvyl's former accounting firm, and (3) an SEC press release regarding the SEC order.  ECF No. 85-6; *see also* ECF Nos. 85-2, 85-3, 85-4, 85-5.  Plaintiffs briefly object to the request for judicial notice in a footnote of their opposition brief, arguing that "Defendants are improperly seeking judicial notice of documents . . . for the truth of the matter asserted."  ECF No. 89 at 18 n.5.

A court may take judicial notice of a fact or document when it "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(2).

## I.   Exhibit 1: Form 10-K

SEC filings are a matter of public record and therefore are the proper subject of judicial notice.  *See Hammitt v. Lumber Liquidators, Inc.*, 19 F. Supp. 3d 989, 1004 (S.D. Cal. 2014); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006); *Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1349 (C.D. Cal. 2014). The Court therefore GRANTS Defendants' request for judicial notice as to Exhibit 1. ECF No. 85-3.

The Form 10-K is also incorporated by reference because it is discussed extensively and quoted in the SAC.  SAC ¶¶ 38-40; *see Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

## II.   Exhibit 2: SEC Order

Defendants also request judicial notice of an SEC Order Instituting Public Administrative and Cease-and-Desist Proceedings Against BF Borgers.  ECF Nos. 85-4, 85-6.  "Courts can take judicial notice of SEC orders."  *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1232 (C.D. Cal. 2015) (taking judicial notice of an "SEC order instituting administrative cease and desist proceedings").

Based on Defendants' reference to this SEC order in its motion to dismiss, it appears that they seek judicial notice for the truth of the order's contents.  *See* ECF No. 85-1 at 5 n.1.  This is what Plaintiffs object to in their opposition.  ECF No. 89 at 18 n.5.  The Court acknowledges that the SEC order is subject to judicial notice but will not consider the order for the truth of the matters therein.  *See Aaron v. Aguirre*, 2007 WL 9777870, at *8 (S.D. Cal. June 12, 2007) ("the Court takes judicial notice of the existence of the SEC cease and desist order, but it may not take judicial notice as to the truth of matters recited within the order"); *cf. Lee v. City of L.A.*, 250 F.3d 668, 690 (9th Cir. 2001) ("when a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity") (internal citation and quotation marks omitted); *see also Press v. Primavera*, 685 F. Supp. 3d 216, 224 (S.D.N.Y. 2023) ("a court may take judicial notice of publicly filed documents, not offered for the truth of the matter asserted, but instead offered for other relevant reasons, such as to show that certain things were said in the press, and that assertions were made in lawsuits and regulatory filings") (internal quotation marks omitted) (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).

The Court thus GRANTS Defendants' request for judicial notice of the *existence* of the SEC order, but not for the truth of its contents.

23-CV-0185-GPC-SBC

**III.    Exhibit 3: SEC Press Release**

Defendants also seek judicial notice of an SEC press release regarding Exhibit 2, the SEC order.  ECF Nos. 85-5, 85-6.  The press release outlines the charges and the SEC's findings of law and fact.  *See* ECF No. 85-5.  Defendants directly quote the press release's summary of Exhibit 2 in their motion to dismiss.  ECF No. 85-1 at 5 n.1.  Plaintiffs object to judicial notice of the press release for the truth of its contents.  ECF No. 89 at 18 n.5.

Courts routinely take judicial notice of SEC press releases.  *See Resh v. China Agritech, Inc.*, 2019 WL 1055240, at *4 (C.D. Cal. Jan. 8, 2019); *Mehedi v. View, Inc.*, 2024 WL 3236706, at *5 (N.D. Cal. June 28, 2024); *In re Ethereummax Inv.*, 2023 WL 6787827, at *3 (C.D. Cal. June 6, 2023); *Whitsitt v. Allen & Assocs., LLC*, 2013 WL 12071675, at *2 (W.D. Wash. Oct. 4, 2013); *see also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004) (taking judicial notice of publicly available press releases).  The Court thus GRANTS Defendants' request for judicial notice, but not for the truth of the press release's contents.  *See Ethereummax*, 2023 WL 6787827, at *3 (taking judicial notice of SEC press release but only of the fact that the SEC "made certain statements in the press or took certain actions," and not for the truth of the matters asserted).

## Legal Standards

Defendants move to dismiss both counts of the SAC pursuant to Federal Rules of Civil Procedure ("Rule") 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  ECF No. 85-1.

**I.    Rule 12(b)(6)**

To survive a motion to dismiss for failure to state a claim on which relief can be granted under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The plaintiff must

1  plead sufficient facts to "raise a right to relief above the speculative level," *id.* at 555, and

2  the Court must be able to "draw the reasonable inference that the defendant is liable for

3  the misconduct charged," *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  On review of a

4  Rule 12(b)(6) motion, the Court accepts all facts alleged in the complaint as true and

5  draws all reasonable inferences in favor of the plaintiff.  *Newcal Indus., Inc. v. Ikon Off.*

6  *Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008).

7  **II.    Rule 9(b)**

8       Plaintiffs must also meet the particularity requirements of Rule 9(b) for their

9  Exchange Act Claims, which allege fraud.  *Zucco Partners, LLC v. Digimarc Corp.*, 552

10  F.3d 981, 990 (9th Cir. 2009) ("This requirement has long been applied to securities

11  fraud complaints.").  To meet Rule 9(b)'s requirements, Plaintiffs "must state with

12  particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This

13  means the complaint must set forth "the time, place, and specific content of the false

14  representations as well as the identities of the parties to the misrepresentation," *Odom v.*

15  *Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007), "what is false or misleading about a

16  statement, and why it is false," *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th

17  Cir. 2009).

18  **III.    PSLRA**

19       The PSLRA independently creates a heightened pleading standard for a Section

20  10(b) claim.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007).

21  Specifically, it requires the complaint to "specify each statement alleged to have been

22  misleading" and the "reasons why the statement is misleading," and "state with

23  particularity facts giving rise to a strong inference that the defendant acted with the

24  required state of mind."  15 U.S.C. § 78u-4(b)(1)-(2)(A).

25

26

27

28

## IV.     What the Court Will Consider

Although the general rule prohibits the Court from considering extrinsic evidence in reviewing a motion to dismiss, it may consider matters that are properly subject to judicial notice.  *Tellabs*, 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *Zucco*, 552 F.3d at 989 ("[R]eview [of a Rule 12(b)(6) motion] is generally limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of which we may take judicial notice.").  Accordingly, the Court will consider the SAC and the SEC filings and historical stock prices of which it has taken judicial notice of through this point.  *See supra* at 5 (Exhibit 1); *see also Cullen*, 2024 WL 898206, at *3-4 (taking judicial notice of various other SEC filings, as well as historical daily stock prices).  The Court will also consider the SEC order (Exhibit 2) and SEC press release (Exhibit 3) attached as exhibits to the Declaration of Sean T. Prosser ("Prosser Declaration"), but not for the truth of the matters asserted therein.  *See* ECF Nos. 85-2, 85-3, 85-4, 85-5.

The Court treats the factual allegations in the complaint as true, *see Tellabs*, 551 U.S. at 326, but it is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998).

## DISCUSSION

## I.   Count I: Section 10(b) and SEC Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may

prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5, which is promulgated under Section 10(b), makes it "unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c); *Zucco*, 552 F.3d at 989-90.

To plead a primary violation of SEC Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Zucco*, 552 F.3d at 990 (internal quotation marks and citation omitted). In the Court's March 1, 2024 order on the motion to dismiss Plaintiffs' first amended complaint, it concluded that the remaining statements at issue in the SAC—the 2021 and 2022 financial reports—were false.[4] ECF No. 71 at 21-25. And here, Defendants only challenge whether Plaintiffs have adequately pled scienter. *See* ECF No. 85-1. Thus, the only remaining issue for the Court to resolve is whether Plaintiffs' allegations, as amended, are sufficient to plead scienter.

To be liable under Section 10(b) and SEC Rule 10b-5, a defendant must act with scienter, which "not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017). "Deliberate recklessness is an *extreme* departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (cleaned up).

---

[4] Defendants do not challenge this finding in their instant motion to dismiss.

Under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).  To determine whether a "strong inference" exists, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Tellabs*, 551 U.S. at 323-24.  A strong inference exists if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference."  *Id.* at 324.  Courts conduct a two-part inquiry when making this determination.  First, a court must "determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter.  *Zucco*, 552 F.3d at 992.  Second, if no allegations are sufficient on their own, a court must conduct a holistic review and decide "whether *all* of the facts, taken collectively, give rise to a strong inference of scienter."  *Tellabs*, 551 U.S. at 322-23 (emphasis in original).  As such, "a series of less precise allegations [can] be read together to meet the PSLRA requirement."  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

Plaintiffs largely rely on the statements of four confidential witnesses, which they claim support a strong inference of scienter.  ECF No. 89 at 7-12.  Plaintiffs also contend that the severity of the internal control problems, the Individual Defendants' SOX certifications, the Individual Defendants' "hands-on management style," CFO Chung's resignation, that the fraud related to Ryvyl's core operations, and the small size of the company support a strong inference of scienter when viewed holistically with the confidential witnesses' statements.  *Id.* at 15-20.  Defendants primarily respond by emphasizing their lack of motive to commit fraud and arguing that Plaintiffs' confidential witnesses are not credible or reliable, but Defendants also contend that Plaintiffs' other allegations are insufficient as well.  ECF 85-1 at 12-21.  In Defendants' view, the alleged facts support a more plausible and non-culpable explanation for the Company's

restatement—that the Defendants learned of previously unknown accounting issues and worked swiftly to remediate them.  *Id.* at 15.

### A. Confidential Witnesses

For a complaint to rely on confidential witnesses, the witnesses must first "be described with sufficient particularity to establish their reliability and personal knowledge."  *Zucco*, 552 F.3d at 995.  This requires plaintiff to provide "sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge."  *Id.*  "To determine whether the complaint has done so, we look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."  *Id.* (internal quotation marks and citation omitted).  If the witnesses are found to be reliable, the Court then assesses whether the witness' statements themselves are "indicative of scienter."  *Id.*

The Court will assess each confidential witness and their statements in turn.

### i.   CW1

CW1 worked as an HR Generalist at Ryvyl from June 2021 to February 2022. SAC ¶ 60.  Initially, CW1 was "an onboarding specialist, working with Ryvyl's programming terminals" and dispensaries; CW1 was privy to information regarding each dispensary's revenue generation in this role.  *Id.*  In July 2021, CW1's role shifted to coordinating meetings for Ryvyl's executives, onboarding new hires, and managing office equipment.  *Id.*  CW1 details how a member of the development team responsible for performing chargebacks trained CW1 on the company's chargebacks system, which reflected the volume of Ryvyl's incoming and outgoing transactions.  SAC ¶¶ 61-62. CW1 states that Chairman Errez and CEO Nisan misrepresented Ryvyl's revenue, as "based upon the volume information [CW1], the revenue was nowhere close to the

representations" they made.  *Id.*  Specifically, "the volumes that CW1 saw were nowhere close to the millions of dollars that the Company represented, and [] the volume was not even close to a million." SAC ¶ 62.  CW1 reported the issue to their boss, who did not know why the volume did not support Ryvyl's representations and ultimately informed CEO Nisan about the discrepancies.  *Id.*

To be sure, Plaintiffs have added more substance to CW1's statements in their SAC.  For instance, CW1 has described their role in the company and the training they received on chargebacks with specificity.  With this, the SAC adequately explains how CW1's position in the company and training on the job led them to believe that the volume of chargebacks did not support Ryvyl's revenue representations.  However, the SAC is still lacking in specifics on how, when, and to what extent Chairman Errez and CEO Nisan misrepresented Ryvyl's revenue.  While the SAC alleges that CW1's concerns were eventually communicated to CEO Nisan, this allegation alone— particularly without knowing CEO Nisan's role in the chargebacks system, when he was made aware of the issues, or what his response was—is insufficient to convince the Court that CW1's account is reliable such that it creates a strong inference of scienter.  *See Zucco*, 552 F.3d at 998 (finding that confidential witness statements did not establish "the witnesses' personal knowledge or reliability by recounting the particulars of the alleged transgressions").  Without more specific details regarding the Individual Defendants' involvements with the chargeback system, it is difficult to see how CW1's statements offer more than speculation about the chargeback volume they saw.

Thus, while the SAC provides sufficient details about CW1's position within the company, it still fails to provide details about CW1's personal knowledge of Defendants' misconduct.  And CW1's position as a human resources generalist alone is insufficient for the Court to deem CW1's statements reliable.  *See id.* at 996 (finding that a human resources employee, who "had no firsthand knowledge of the workings of the finance or

corporate departments," supplied no basis for his claim that high-level finance employees made certain decisions).  Accordingly, CW1's statements are not sufficiently reliable, nor do they provide any support for an inference of scienter.

### ii.    CW2

CW2 worked "as a Marketing Specialist, Marketing Manager, and Project Manager at Ryvyl from August 2021 to February 2023."  SAC ¶ 64.  CW2 effectively led the marketing team: they managed communications, the website, and social media; worked with the sales team; implemented project management software; and obtained buy-ins from internal stakeholders.  *Id.*  CW2 alleges that CFO Chung failed to properly follow accounting standards, SAC ¶ 65, such as by implementing "improper accounting [procedures] relating to revenue, debt, and depreciation value," SAC ¶ 66.   Based apparently on the fact that Ryvyl is a small company where "everyone talk[s]," SAC ¶ 65, CW2 learned that CFO Chung required Ryvyl to use his "horrible" accounting software, which it "should never have been using," and Chung "was not doing his job." SAC ¶ 65.

CW2 also provides further details based on direct conversations they had with CFO Byelick, who replaced CFO Chung after his resignation.  SAC ¶ 66.  CW2 had "daily – if not weekly – conversations with CFO Byelick" in the office and while golfing with him, many of which revolved around CFO Chung's missteps in overseeing the accounting team.  *Id.*  After CFO Chung's departure, CFO Byelick discovered that "Chung was not doing his job," and that, had he properly performed his job, he "would have discovered that the Company's quarterly financial statements and year-end financial statements were incorrect because there was no way to logically arrive at the incorrect results."  SAC ¶ 67.  "CW2 stated that CFO Byelick acknowledged to CW2 that Ryvyl's numbers were made up . . . and that information was hidden and disguised."  SAC ¶ 67.

Based on these conversations, CW2 was "100% certain" that Ryvyl was manipulating numbers related to the financial statements. *Id.*

And, at the end of 2022, CW2 learned based on discussions with R. Clay Gilreath, a senior treasury analyst in the accounting department, that "CEO Nisan discovered that CFO Chung was making up numbers." *Id.* CW2 states that the accounting department had to audit Ryvyl's financial results every quarter because they consistently needed correcting. *Id.* CW2 further states that "CEO Nisan was a hands-on manager" who "participated in the day-to-day decisions" at Ryvyl and frequently oversaw the accounting department because of CFO Chung's infrequent attendance in the office. SAC ¶ 68. CW2 states that this accounting department was understaffed, had high turnover, and sometimes assigned accounting work to unqualified employees. SAC ¶ 69.

While the SAC sufficiently describes CW2's role and responsibilities at Ryvyl, many of CW2's statements fail to describe with particularity how and when CW2 learned of the "improper accounting practices" and what exactly those practices were. Most of the statements are vague hearsay, based on conversations with unidentified Ryvyl employees and allege only conclusory assertions of accounting issues. While hearsay is not automatically disqualified from consideration, it must be "sufficiently reliable, plausible, or coherent." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016); *Zucco*, 552 F.3d at 997 n.4. Here, CW2's statements based on discussions with undisclosed sources are not particular, reliable, or coherent enough. *Zucco*, 552 F.3d at 996 ("Some of the confidential witnesses were simply not positioned to know the information alleged, many report only unreliable hearsay, and others allege conclusory assertions of scienter").

However, CW2 does provide reliable statements based on direct conversations with both CFO Byelick and Gilreath. *See* SAC ¶¶ 66-68. Although no dates are provided for the conversations with CFO Byelick, CW2 states that they took place

frequently in the office and while golfing.  SAC ¶ 66.  CFO Byelick, as CFO Chung's successor, would reasonably have knowledge of Chung's accounting practices, and in such a small company, it is reasonable that Byelick would have discussed CFO Chung's practices with other employees.  The same can be said about CW2's conversations with Gilreath.  As a member of CFO Chung's accounting team, Gilreath has direct experience with Ryvyl's accounting practices and the expertise to provide plausible information regarding the practices.  These statements, which are based on conversations with Ryvyl employees who would be knowledgeable about the subject, are reliable.  *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772 (9th Cir. 2023) (finding that a confidential witness' conversations with specific employees who would be knowledgeable about the alleged conduct at issue were reliable).  While CW2's statements alone are not sufficient to support a strong inference of scienter, the Court will consider them in its holistic review.

### iii.   CW3

CW3 worked as a staff accountant at Ryvyl from May 2022 to July 2022.  SAC ¶ 70.  CW3 worked in the accounting department with Gilreath and Kineret Rubin, a family friend of Chairman Errez who worked as a Controller.  *Id.*  CW3 explains that Gilreath and Rubin were responsible for setting up Ryvyl's wires, many of which were fake.  SAC ¶¶ 70-71.  At bottom, CW3 alleges that Ryvyl was supposed to keep a percentage of its incoming money and transfer out the rest to other companies, but that Ryvyl instead made it seem "like it was making more money than it was."  SAC ¶ 70.

CW3 states that Ryvyl would keep money that was supposed to be transferred out to other companies, and companies would contact Ryvyl to complain about not receiving their money.  *Id.*  CW3 states that "Gilreath and Rubin told CW3 what information to enter into the system, including wires for other companies," and that they would tell CW3 "to just do what they said."  *Id.*  Ultimately, CW3 notified Gilreath and Rubin that

documentation did not support the numbers that CW3 was told to enter.  *Id.*  Gilreath and Rubin would assure CW3 that Chairman Errez "would negotiate [the numbers] on the backend" and that documentation would follow, *id.*, "but that never happened," SAC ¶ 71.  Chairman Errez, Gilreath, and Rubin would tell CW3 that numbers had changed based on conversations between Errez and the clients, but "CW3 saw no documentation to support" the purported changes.  *Id.*  CW3 further states that the accounting department consisted of only five employees: Gilreath, Rubin, Reid Granados (Ryvyl's former Director of Finance), CFO Chung, and CW3.  *Id.*

CW3's position in the accounting department during a portion of the Class Period gives them personal knowledge of Ryvyl's accounting practices at the relevant time.  While the detailed allegations regarding Gilreath and Rubin's accounting misconduct are specific and detailed, these do not shed much direct light on any of the Defendants' actions.   But CW3 also alleges direct communications with Chairman Errez, Gilreath, and Rubin, in which CW3 was informed of changes that they ultimately did not see supporting documentation for.  And CW3 had several conversations with Rubin—Chairman Errez's family friend—regarding actions that Errez was going to take.  However, CW's descriptions are somewhat vague.  They do not explain what numbers were changed, what documentation CW3 sought, why the wires are fake, or when any of these events occurred.  While these statements do tend to indicate scienter on Chairman Errez's—and therefore Ryvyl's—part, they are not specific enough to support a strong inference of scienter on their own.  Nonetheless, they are reliable statements because of CW3's position in the accounting department and will be considered in the Court's holistic review.  *See S. Ferry LP*, 542 F.3d at 784 ("Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter").

1

###### iv.    CW4

2   CW4 was an executive assistant to Chairman Errez and COO Min Wei from

3   February 2022 to July 2022.  SAC ¶ 72.  In this role, "CW4 attended weekly meetings

4   with CFO Chung (who attended many meetings remotely from South Korea), CEO

5   Nisan, Co-Founder and Chairman Errez," and other senior management.  *Id.*  CW4's

6   impression based on their attendance at these weekly meetings is that Ryvyl's

7   accounting, including for inter-company wires, was "inaccurate" and a "shit show."  SAC

8   ¶ 73.  CW4 confirmed that Ryvyl "was generating fake wires and keeping money that

9   was meant to be transferred onward to other companies," and specifically stated that,

10  around June 2022, "Controller Rubin sent fake wires without blinking any eye."  *Id.*

11  Further, CW4 stated that red flags regarding Ryvyl's accounting were raised during these

12  meetings.  *Id.*  Specifically, CW4 states that during a meeting that took place in March,

13  April, or May of 2022, COO Wei informed the meeting's participants that some of

14  Ryvyl's financial information was incorrect and that they needed to review it.  *Id.*  CW4

15  states "that CFO Chung agreed during that meeting that the information was incorrect."

16  *Id.*

17  In its prior order, the Court found CW4 to be a reliable witness because of their

18  presence at executive meetings, where Ryvyl's accounting and financial inaccuracies

19  were sometimes discussed.  *Cullen*, 2024 WL 898206, at *16; *see Cutler v. Kirchner*, 696

20  F. App'x 809, 815 (9th Cir. 2017) (considering the statements of a confidential witness

21  who participated in quarterly meetings with the executive board and reported on what

22  was presented at the meetings).  The Court also noted that while CW4 did not provide

23  sufficient details in the AC, they were uniquely positioned to do so considering their

24  attendance at these executive meetings.  *Cullen*, 2024 WL 898206, at *19 n.10.  In the

25  SAC, CW4 now states that red flags regarding the inaccurate and disorganized state of

26  Ryvyl's accounting were raised at these meetings and corroborates some of CW3's

27

28

1   statements by stating that Rubin "sent fake wires" around June 2022.  CW4 also states

2   that between March and May of 2022, COO Wei informed the participants that some of

3   Ryvyl's financials were incorrect, CFO Chung agreed that some financial information

4   was incorrect, and the participants were told to review the information.[5]

5          While these allegations tend to show that the Defendants were aware of accounting

6   issues at Ryvyl, there is an equally compelling, innocent explanation for these

7   allegations.  Ryvyl dismissed its former accounting firm and engaged a new accounting

8   firm in April 2022, SAC ¶41, dismissed CFO Chung in August 2022, SAC ¶ 48, and

9   announced restatements to its previous financial statements in January 2023, SAC ¶ 53.

10  As currently pled, CW4's statements indicate that the Defendants were made aware of the

11  accounting issues and immediately began working to fix them.  As such, the Court is not

12  convinced that CW4's statements support a strong inference of scienter on their own.

13  However, the Court will consider these statements in its holistic review.[6]

14

15

16  [5] While the Court assumes that all three Individual Defendants were present at this
    specific meeting based on the allegation that CW4 attended weekly meetings with them,

17  the SAC fails to allege this specifically.  *See* SAC ¶ 73.

18  [6] Defendants labor over the fact that the CWs' employment periods were in some cases

19  brief, and in other cases, did not coincide with the dates on which some of the alleged
    misstatements were made.  *See* ECF No. 85-1 at 16-17.  Although the Ninth Circuit has

20  discounted confidential witnesses who were not employed during the time period in

21  question, *Zucco*, 552 F.3d at 996-97, it has also noted that there is no rule that
    confidential witnesses must have been employed during the class period at all, let alone

22  for the whole time, *see In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir.

23  2017) (considering statements of a confidential witness who was not employed during the
    class period).  *See also Roberts v. Zuora, Inc.*, 2020 WL 2042244 (N.D. Cal. Apr. 28,

24  2020) ("[t]hat none of the CWs was employed at Zuora during the *entire* Class Period

25  does not in itself render their statements unreliable") (citing *Quality Sys.*, 865 F.3d at
    1145); *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018) (finding that CW

26  accounts "from before the class period [are] relevant because [they] can confirm what a

27  defendant should have known during the class period") (internal quotation marks and

28

19

## B. Severity of Internal Control Problems and SOX Certifications

Plaintiffs repeat their prior argument that "defendants' alleged failure to maintain an effective control environment, and their attestations to the contrary, supports a strong inference of scienter." *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1027-28 (N.D. Cal. 2020); *see also Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *7 (N.D. Cal. July 26, 2017). The Court again finds that Ryvyl's announcement of "one or more material weaknesses . . . in the Company's internal control," SAC ¶ 53, after consistently certifying that there were no internal control problems in the financial statements at issue, SAC ¶¶ 31-32, 36, 38, 40, 42, 44-45, 47, 50, 52, supports the inference that "defendants were aware of matters relevant to their certifications or recklessly failed to make themselves aware." *Mulderrig*, 492 F. Supp. 3d at 1028. These certifications "are part of a broader picture from which a court may, at the initial pleading stage, infer a compelling claim of scienter." *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016). However, they are not enough to create a strong inference of scienter on their own. *See Zucco*, 552 F.3d at 1004 (noting that allowing SOX certifications to create an inference of scienter on their own would "eviscerate the pleading requirements for scienter set forth in the PSLRA").

## C. Individual Defendants' "Hands-on" Management Style

Plaintiffs argue that allegations of Individual Defendants' "hands-on management style" supports an inference of scienter. ECF No. 89 at 16-17. CW2 states that CEO Nisan was a hands-on manager, participated in day-to-day decisions at Ryvyl, and "oversaw many of the accounting responsibilities" at Ryvyl because CFO Chung was

---

citation omitted). Defendants also attach importance to the fact that the CWs were only low-level employees. *Id.* at 17. However, they cite no case law to support this proposition directly. *See* ECF No. 85-1 at 17-18; ECF No. 90 at 3-4.

1  often out-of-office.  SAC ¶ 68.  Further, Plaintiffs allege that Ryvyl's board, which

2  Chairman Errez and CEO Nisan sat on, tasked CFO Byelick with working with Simon &

3  Edwards to re-audit its internal controls.  SAC ¶¶13-14.  In a more attenuated way,

4  Errez's and Nisan's membership on the Board highlights their involvement in the

5  relevant decisions.

6        "General allegations of defendants' hands-on management style [and] their

7  interaction with other officers and employees," without more, are insufficient to support a

8  strong inference of scienter.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005),

9  *abrogated on other grounds by Tellabs*, 551 U.S. at 315-18.  Courts have found scienter

10  in situations where there are "specific allegations of direct involvement in the production

11  of false accounting statements and reports," *Daou*, 411 F.3d at 1023, or where "top

12  executives' admittedly detail-oriented management style led to a reasonable inference

13  that the top executives were aware of significant accounting regularities," *id.* (discussing

14  *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir.

15  2004)).

16        Here, the allegations regarding Chairman Errez's and CEO Nisan's involvement

17  with the board are not sufficient to show scienter.  Plaintiffs do not allege that Errez and

18  Nisan were directly involved in the accounting decisions, just that they outsourced

19  Ryvyl's auditing.  And, in fact, the allegation that they directed a re-audit with a new

20  accounting firm cuts against an inference of scienter.  However, CW2's newly added

21  statements that CEO Nisan was a hands-on manager, involved in day-to-day decisions,

22  and oversaw many accounting responsibilities during CFO Chung's (allegedly frequent)

23  absences support Plaintiffs' position.  *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704

24  F.3d 694, 710 (9th Cir. 2012) (finding that executives who were "hands-on managers

25  with respect to operational details and financial statements" would have been "on notice"

26  of accounting issues).  To be clear, Plaintiffs do not allege, and CW2 does not state, that

27   

28   

CEO Nisan was directing or even aware of fraudulent accounting practices, and thus these allegations cannot support a strong inference of scienter on their own.  *See, e.g., Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1078 (C.D. Cal. 2012) (Plaintiffs' "vague" allegations that CEO-defendant was a "hands on manager," and that defendants "directly participated in" management and were "directly involved in day-to-day operations" were insufficient to establish an inference of scienter on their own). Nonetheless, the Court will consider these allegations to weigh in favor of scienter in its holistic review.

### D. Resignations

Plaintiffs argue that CFO Chung's resignation, which occurred five months before Ryvyl announced its restatements, SAC ¶¶ 3, 48, 74, supports a strong inference of scienter.  ECF No. 89 at 17-18.  Defendants dispute whether officer resignations on their own can indicate scienter.  ECF No. 85-1 at 23.

"Where a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of restatement's issuance itself in order for a resignation to be strongly indicative of scienter."  *Zucco*, 552 F.3d at 1002.  Here, Chung resigned on August 16, 2022—four months after Ryvyl dismissed its old accounting firm and five months before the restatements were announced.  SAC ¶¶ 41, 48, 53.  However, the allegations surrounding Chung's departure are not specific enough to show that any of the other Defendants suspected that Chung committed fraud, or that suspected fraud was the reason for his resignation.  Absent more particularized allegations, it seems that Chung resigned "because the errors that lead [sic] to the restatement occurred on his watch or because he failed adequately to supervise his department."  *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002); *see also Zucco*, 552 F.3d at 1002 ("[a]bsent allegations that the resignation at issue was

23-CV-0185-GPC-SBC

uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances, the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling" as the innocent inference).  While "the resignations here are not so numerous or suspicious as to raise" a strong inference of scienter, *Zucco*, 552 F.3d at 1002, Chung's resignation nonetheless "adds one more piece to the scienter puzzle," *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (internal quotation marks and citation omitted).  The Court will thus consider the resignation in its holistic review.

### E.  Core Operations Inference and the Small Size of the Company

Plaintiffs contend that "[t]he facts alleged . . . support a strong inference of scienter because they relate to the Company's core operations," specifically "Ryvyl's payment processing revenue, which is the Company's primary source of revenue."  ECF No. 89 at 18-19.  In conjunction with this, Plaintiffs also argue that Ryvyl's small size—between 18 and 110 full-time employees during the Class Period—supports a strong inference of scienter.  *Id.* at 19.  These combine to form the argument that the Individual Defendants must have known of the accounting and financial issues because they were so central to such a small company.

The core operations inference allows a court to "consider a senior executive's role in the company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue.  This includes consideration of the executive's access to the information, and, whether, given the importance of the information, it would be absurd to suggest that management was without knowledge of the matter."  *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) (internal quotation marks and citations omitted).  Here, Ryvyl's business allegedly revolves around "blockchain-based payment solutions."  SAC ¶ 21.  Of Ryvyl's three sources of

revenue, payment processing revenue is its primary source of revenue, SAC ¶¶ 24-25. The alleged accounting issues involved charging third parties incorrectly, failing to pay third parties, and generating fake wires.  SAC ¶¶63, 70, 73.  Thus, the allegations at issue relate to the accounting of payment processing revenue.  And Ryvyl's small size makes it more likely that the Individual Defendants knew of the issues, which concerned its core operations.  *See Curry v. Hansen Med., Inc.*, 2012 WL 3242447, at *11 (N.D. Cal. Aug. 10, 2012) (finding scienter where defendants were executives of a "small company, with less than 200 employees, focused on selling only one product"); *see also Patel v. Axesstel, Inc.*, 2015 WL 631525, at *11 (S.D. Cal. Feb. 13, 2015) (finding that "it would be absurd to think that the CEO and CFO of a company with just thirty-five employees, of whom only ten are involved in sales," which the issues related to, would be unaware of the issues).  The Court thus finds that Plaintiffs' allegations will support a finding of scienter in its holistic review, but that they are not sufficient to create the inference on their own.

The core operations inference is most applicable to CFO Chung and CEO Nisan. Chung and Nisan signed off on the false or misleading information in the 2021 and 2022 financial statements and certified that Ryvyl had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."  SAC ¶¶ 31-32; *see also* SAC ¶¶ 34, 36, 38, 40, 42, 44-45, 47, 50, 52, 67. Chung was Ryvyl's CFO during the relevant time period, SAC ¶ 15, and, according to CW3, he headed an accounting team which consisted of only five employees, SAC ¶ 71. According to CW2, "Nisan oversaw many of the accounting responsibilities at the Company because of the lack of time that CFO Chung spent in the office."  SAC ¶ 68. CW4 corroborates this statement by indicating that Chung attended many weekly meetings remotely because he was in South Korea.  SAC ¶ 72.  As such, CEO Nisan was likely knowledgeable about Ryvyl's accounting processes, at least enough so that he was

willing to sign off on the financial statements.[7]  With CFO Chung and CEO Nisan both overseeing the small accounting team to different degrees, being responsible for ensuring proper internal controls, and certifying that such controls were in place, it would be absurd to suggest that Chung and Nisan were unaware of the accounting problems.  *See Alphabet*, 1 F.4th at 706.  Accordingly, this inference weighs strongly in favor of finding that Chung and Nisan were deliberately reckless or acted intentionally.

### F. Lack of Motive to Commit Fraud

Defendants argue that there are "no facts indicating that any Individual Defendant took any specific actions to commit or benefit from the alleged fraud or that they even had any motive to do so."  ECF No. 85-1 at 12-13.  In particular, the Court notes that "Plaintiffs do not allege that any Individual Defendant sold stock during the class period."  *Id.* at 13.  It is true that "a lack of stock sales can detract from a scienter finding."  *Webb*, 884 F.3d at 856.  But allegations of stock sales "are not a sine qua non for raising such an inference," especially where "other allegations in the complaint raise a strong inference of scienter."  *Alphabet*, 1 F.4th at 707; *see also No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("[T]he lack of stock sales by a defendant is not dispositive as to scienter.").  Accordingly, the Court will consider the lack of any alleged motive—financial or otherwise—for the Individual Defendants to commit fraud as weighing against a finding of scienter in its holistic review.

---

[7] The Court finds it notable that CEO Nisan signed off on the financial statements and made certifications as to them, while Chairman Errez did not.  *See* SAC ¶¶ 31-32, 34, 36, 38, 40, 42, 44-45, 47, 50, 52, 67.

25

### G. Holistic Review[8]

While none of Plaintiffs' allegations are sufficient to create a strong inference of scienter on their own, the Court will review the allegations holistically to determine whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323.  When conducting the holistic review, the Court must "take into account plausible opposing inferences" that weigh against a finding of scienter. *Id.*  Where "a set of allegations . . . create[s] an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco*, 552 F. 3d at 1006.

Plaintiffs contend that Defendants "engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities" when they released inaccurate financial data and verified that there were no internal control issues.  SAC ¶ 93; *see also* SAC ¶¶ 60-73, 93-97, 102-06.  The Defendants, however, argue that the benign explanation—that the "errors were inadvertent" and they "reported them to shareholders promptly after the new auditor determined errors had been made," ECF No. 85-1 at 24—is more compelling than an inference of scienter.

The confidential witnesses' statements combine to show that accounting issues existed during 2022.  CW2's statements indicate that Ryvyl was implementing improper accounting procedures, hiding information, and "making up numbers."  SAC ¶¶ 67-68.  CW3 and CW4 both report that Ryvyl was sending out fake wires and withholding money that was meant to be transferred to other companies.  SAC ¶¶ 70-71, 73.

---

[8] Defendants argue that Plaintiffs' allegations regarding post-class period events, *see* SAC ¶¶76-86, do not support an inference of scienter.  ECF No. 85-1 at 23-24.  Plaintiffs' opposition brief does not respond to this argument and the allegations generally do not appear to be relevant to the issue of scienter.  Accordingly, the Court will not consider these allegations in its analysis.

Moreover, CW3 reports entering information into the system at Gilreath and Rubin's direction, and that Gilreath and Rubin, along with Chairman Errez, assured CW3 of supporting documentation for the numbers, which CW3 never saw.  SAC ¶¶ 70-71.  The statements of these three CWs from different levels and positions at the company corroborate each other, which supports the reliability of the statements.  *See In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *27 (N.D. Cal. Mar. 21, 2018) ("The Court credits that the CWs corroborate each other with respect to what was going on internally at [the company], which further supports the reliability of their statements."); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015) (finding corroborating CW statements reliable enough to support an inference of scienter).

Plaintiffs must still allege that the Defendants knew of the accounting issues and subsequently either intended to make the false statements or made them with deliberate recklessness.  At the outset, the Court notes two of its earlier findings.  First, the Court previously found that "Plaintiffs have not alleged scienter as to any of the Defendants for the alleged misstatements prior to 2022."  *Cullen*, 2024 WL 898206, at *11.  Plaintiffs have not pled any additional allegations in the SAC that suggest any of the Defendants had scienter regarding the statements in any of the 2021 interim reports.  Thus, the Court again finds that the allegations do not support a strong inference of scienter as to the alleged misstatements prior to 2022.  Second, the Court previously found that Plaintiffs sufficiently alleged that CFO Chung and Ryvyl acted with scienter regarding the 2021 annual report and the first two 2022 interim reports and the accompanying SOX certifications.[9]  *Id.* at *19.  The Court found that Chung, as CFO, must have known of the

_____

[9] As the Court previously noted, these are the only statements and certifications that were produced during Chung's tenure at Ryvyl.  *Cullen*, 2024 WL 898206, at *19 n.9.

accounting problems (some of which were directly attributed to him), that his subordinates directed fraudulent practices, and that he was present at meetings in which the fraudulent accounting practices were discussed.  *Id.*  And it is now further alleged that CFO Chung agreed that there was inaccurate financial data being generated at an executive meeting between March and May of 2022.  SAC ¶ 73.  The Court sees no reason to disturb its previous finding, and therefore DENIES the motion to dismiss as to Chung and Ryvyl for these statements.

The Court also previously found that the allegations were not sufficient to show that CEO Nisan and Chairman Errez acted with scienter, as they were not alleged to be involved in the misconduct and a benign explanation was therefore more compelling than an inference of scienter.  *Cullen*, 2024 WL 898206, at *19.  The SAC has bolstered its allegations that Nisan and Errez acted with scienter.  The Court will thus conduct another holistic review as to Nisan and Errez.

As to Nisan, there are now allegations that lead to an inference that he was aware of the accounting problems throughout 2022, and before the Restatements.  CW4 states that Nisan was present at meetings between February and August of 2022 where Ryvyl's executives raised concerns about inaccurate accounting, fake wires, missed transfers, and other "red flags."  SAC ¶¶ 72-73.  And COO Wei and CFO Chung specifically confirmed that Ryvyl had inaccurate financial information at a meeting between March and May of 2022, where they told other executives to review the company's financial information.  SAC ¶ 73.  Moreover, CW2 now states that Nisan oversaw many of Ryvyl's accounting responsibilities throughout 2022 because of CFO Chung's frequent absences.  SAC ¶ 69.  CW2 also states that CEO Nisan learned that CFO Chung was making up numbers at the end of 2022.  SAC ¶ 68.  When considered alongside the small size of the accounting department and Ryvyl writ large, the severity of the internal control problems, the SOX Certifications, that the fraud involved Ryvyl's primary source of revenue, the timing of

CFO Chung's resignation, and the lack of stock sales, it can be strongly inferred that Nisan acted either intentionally or with deliberate recklessness when he approved the false statements.

The innocent explanation for Nisan's alleged conduct is still somewhat plausible. He was informed of the accounting issues at a meeting between March and May of 2022, SAC ¶ 73, and learned that CFO Chung was making up numbers at the end of 2022, SAC ¶ 68. Ryvyl dismissed its former accounting firm and engaged a new accounting firm in April 2022, SAC ¶ 41, dismissed CFO Chung in August 2022, SAC ¶ 48, and announced restatements to its previous financial statements in January 2023, SAC ¶ 53. This timeline of events could suggest that Nisan learned of the accounting issues and worked with other executives at Ryvyl to fix them as soon as he learned of them. However, based on Nisan's alleged overseeing of the accounting department while being informed of accounting issues at meetings, it is equally as plausible to suggest that he knew he was approving false or misleading statements throughout 2022. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1183 (9th Cir. 2009) ("Viewing the [complaint] as a whole, the inference of scienter is cogent and at least as compelling as any plausible non-culpable explanation for Appellees' conduct") (internal quotation marks omitted) (citing *Tellabs*, 551 U.S. at 324).

As to Errez, CW4 states that Errez was present at the same meetings between February and August of 2022 where accounting issues were raised and Ryvyl's executives were told to review the company's financial information. SAC ¶¶ 72-73. And CW3 now states that Gilreath and Rubin assured them that Errez would "renegotiate" on the backend so that the numbers they told CW3 to enter would be accurate. SAC ¶ 70. CW3 also states that Errez, Gilreath, and Rubin assured them that numbers had changed based on Errez's conversations with clients, but that CW3 saw no documentation to support the changes. SAC ¶ 71. But the accounting issues are not "so deficient as to

1   amount to an egregious refusal to see the obvious or to investigate the doubtful." *Stein v.*
2   *Bridgepoint Educ., Inc.*, 2020 WL 3250596, at *13 (S.D. Cal. June 15, 2020) (quoting
3   *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011)).
4   And while the SAC suggests perhaps some involvement in vaguely suspicious accounting
5   "renegotiations," the extent of Errez's knowledge of wrongdoing or the specifics of the
6   issues are not known.  Errez's alleged involvement is also not corroborated by other
7   confidential witnesses or allegations.  When these facts are considered holistically with
8   the severity of the internal control problems, Errez's position on Ryvyl's board of
9   directors, that the fraud involved Ryvyl's primary sources of revenue, the timing of CFO
10  Chung's resignation, and Errez's lack of stock sales, the Court finds that the allegations
11  are not sufficient to support a strong inference of scienter.  While the allegations indicate
12  that Errez could have been vaguely involved, they are not specific enough, and the
13  innocent explanation is far more compelling.  *See Webb*, 884 F.3d at 855-56 (while the
14  allegations gave the court "pause" and indicated that "all was not right at the helm," they
15  did not "give rise to an inference of scienter that is at least as compelling as the inference
16  of an honest mistake").

17          The Court therefore GRANTS the motion to dismiss Count I without prejudice as
18  to Defendant Errez, and as to Defendants Chung, Nisan, and Ryvyl *only* for the alleged
19  misstatements in the 2021 interim reports and accompanying SOX certifications, and
20  additionally as to Defendant Chung for the alleged misstatements in the third quarter
21  2022 report and its accompanying SOX certification.  The Court DENIES the motion to
22  dismiss as to Defendants Chung, Nisan, and Ryvyl for the alleged misstatements in the
23  2021 annual report, the first two 2022 interim reports, and their accompanying SOX
24  certifications.  And the Court DENIES the motion to dismiss as to Defendants Nisan and
25  Ryvyl for the alleged misstatements in the 2022 third quarter report and its accompanying
26  SOX certification.  The Court GRANTS Plaintiffs leave to amend as to all Defendants.

27
28

1    *See Zucco*, 552 F.3d at 989 (denying leave to amend is "improper unless it is clear that

2    the complaint could not be saved by any amendment") (internal citation omitted).

3    **II.   Count II: Section 20(a)**

4         Plaintiffs also allege a violation of Section 20(a) of the Securities Exchange Act of

5    1934, 15 U.S.C. § 78t(a).  ECF No. 89 at 20-21.  Section 20(a) makes "a defendant

6    employee of a corporation who has violated the securities laws . . . jointly and severally

7    liable to the plaintiff, as long as the plaintiff demonstrates a primary violation of federal

8    securities law and that the defendant exercised actual power or control over the primary

9    violator."  *Zucco*, 552 F.3d at 990 (internal quotation marks and citations omitted).

10        The parties dedicate very little space in their briefs to this issue.  Defendants argue

11   that Plaintiffs fail to allege specific facts showing each Individual Defendants' actual

12   exercise of power over Ryvyl.  ECF No. 85-1.  Plaintiffs argue that the Court already

13   denied the motion to dismiss the Section 20(a) claims, and that Defendants have waived

14   their arguments by not advancing them in their first motion to dismiss.  ECF No. 89 at

15   20-21.  Further, Plaintiffs argue that they need not show "culpable participation" and that

16   whether the Individual Defendants are control persons is a fact-intensive matter not

17   suitable for resolution at the pleading stage.  *Id.* at 21.

18        As an initial matter, the Court notes that it only denied the motion to dismiss the

19   Section 20(a) claims in its previous order because the Defendants did not move to dismiss

20   "on the ground that the Individual Defendants are not 'control persons.'"  *Cullen*, 2024

21   WL 898206, at *20.  However, contrary to Plaintiffs' assertions, Defendants have not

22   waived their arguments that they are not control persons.  Federal Rule of Civil

23   Procedure 12(h)(2) allows the defense of failure to state a claim upon which relief can be

24   granted to be raised as late as trial, which means it cannot have been waived at the

25   pleadings stage.  *See Wilson-Combs v. Cal. Dep't of Consumer Affs.*, 555 F. Supp. 2d

26   1110, 1113 n.3 (N.D. Cal. 2008) ("under Rule 12(g), a party does not waive a ground for

27

28

moving to dismiss for failure to state a claim by not including that ground in an earlier motion to dismiss") (quoting *In re Harmonic, Inc., Sec. Litig.*, 2006 WL 3591148, at *12 (N.D. Cal. Dec. 11, 2006)); *see also Hamana v. Kholi*, 2011 WL 5077614, at *1 (S.D. Cal. Oct. 25, 2011) (same).  Therefore, the Court will consider the merits of Defendants' newly raised arguments.

As discussed above, Plaintiffs have shown a primary violation of Section 10(b) as to Ryvyl.  The only question is whether the Individual Defendants are "control persons." "Whether a defendant is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."  *Mueller v. San Diego Ent. Partners, LLC*, 2017 WL 3387732, at *6 (S.D. Cal. Aug. 7, 2017) (internal quotation marks omitted) (citing *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994), *overruled on other grounds by City of Dearborn Heights*, 856 F.3d at 605).  Plaintiffs need not show that the controlling person acted with scienter or even "culpably participated" in the alleged wrongdoing.  *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).  "[A]t the motion to dismiss stage, allegations about an individual's title and duties have been found to be sufficient to establish control."  *Mueller*, 2017 WL 3387732, at *6 (collecting cases).

Here, Plaintiffs have alleged that the Individual Defendants are all "senior executive officers and/or directors."  SAC ¶ 17; *see also* SAC ¶¶ 13-20.  Plaintiffs have alleged that CFO Chung oversaw the accounting department from which the misconduct emanated, SAC ¶ 71, that CEO Nisan was a "hands-on manager" involved in day-to-day decisions and who, at times, also oversaw the accounting department, SAC ¶ 68, that Errez was on Ryvyl's board of directors when it directed an accounting re-audit, SAC ¶¶ 13-14, 49, and that he was involved in "renegotiating" financial figures, SAC ¶¶ 70-71.  Plaintiffs allege that, because of their positions at Ryvyl, the Individual Defendants were

able to—and did—control the conduct of Ryvyl's business and the "contents of its reports, press releases, and presentations to securities analysts."  SAC ¶¶ 18-19.  And they "had the ability and opportunity to prevent" the issuance of false or misleading reports and SEC filings.  SAC ¶ 19; *see In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1031-32 (S.D. Cal. 2005) (finding sufficient control persons allegations where defendants were the CEO and chairman of the company, "had the authority to control the company's reports, press releases, and presentations to security analysts," and had the ability to prevent issuance of false reports and press releases).

In sum, the Plaintiffs allege that the Individual Defendants held senior executive positions at Ryvyl and, by nature of those positions, could—and, in various respects, did—control Ryvyl's actions.  The SAC thus sufficiently alleges that the Individual Defendants are control persons.  Accordingly, the Court DENIES the motion to dismiss Count II.

### Conclusion

The Court GRANTS in part and DENIES in part the motion to dismiss.  The Court GRANTS the Plaintiffs leave to amend on all counts as to all Defendants.  If Plaintiffs choose to amend, they must file an amended complaint within 20 days of the date of this Order.

The Court GRANTS in part and DENIES in part Defendants' request for judicial notice.

**IT IS SO ORDERED.**

Dated:  October 21, 2024

Hon. Gonzalo P. Curiel
United States District Judge

23-CV-0185-GPC-SBC