ROBERT V. PRONGAY (#270796)
  rprongay@glancylaw.com
EX KANO S. SAMS II (#192936)
  esams@glancylaw.com
CHARLES LINEHAN (#307439)
  clinehan@glancylaw.com
PAVITHRA RAJESH (#323055)
  prajesh@glancylaw.com
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiff*
*Scot S. Cook*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK CULLEN and SCOT S. COOK, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> RYVYL INC. F/K/A GREENBOX POS, BEN ERREZ, FREDI NISAN, AND BENJAMIN CHUNG, <br><br> Defendants. | Case No. 3:23-cv-00185-GPC-SBC <br><br> **THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Scot S. Cook ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Ryvyl Inc. ("Ryvyl" or the "Company"), formerly known as Greenbox POS ("Greenbox"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, the accounts of former employees of the Company, and other information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action brought on behalf of all persons and/or entities who purchased the Company's securities between May 13, 2021 and January 20, 2023, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Ryvyl is a crypto company focused on developing, marketing, and selling blockchain-based payment solutions. Throughout the Class Period, Defendants made materially false and misleading statements and/or misleading half-truths regarding: (1) Defendants' misrepresentation of Ryvyl's serious issues with its internal controls; (2) the Company's financial statements, which contained errors resulting in overstatements of revenue, assets, and stockholders' equity and understatements of losses; (3) Ryvyl's need to restate its previously issued financial statements; and (4) Defendants' statements about the Company's business, operations, and prospects, which were materially false and misleading and/or lacked a reasonable basis at all relevant times.

3. On January 20, 2023, the Company announced that its previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31,

1

THIRD AMENDED CLASS ACTION COMPLAINT

2022 should no longer be relied upon and had to be restated. The Company also identified additional internal control weaknesses and a remediation plan. On this news, Ryvyl's share price fell 14.63% to close at $0.70 per share on January 23, 2023, damaging investors.

4. Additionally, on March 26, 2024, the Company filed its Form 10-K for the period ending December 31, 2023 ("2023 Form 10-K"). Within the 2023 Form 10-K, the Company stated the following:

> During the preparation of its 2022 Annual Report, the Company determined that it had not appropriately accounted for certain historical transactions under GAAP. In accordance with the SEC's Staff Accounting Bulletin ("SAB") 99, Materiality, and SAB 108, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements, the Company evaluated the materiality of the errors from qualitative and quantitative perspectives, individually and in aggregate, and concluded that the errors were material to the Consolidated Statements of Operations for the quarters ending March 31, 2021, June 30, 2021, September 30, 2021, March 31, 2022, June 30, 2022, and September 30, 2022, and for the annual period ending December 31, 2021. Based on this evaluation, on January 13, 2023, the Company's Audit Committee, with the concurrence of management, concluded that the Company's previously issued consolidated financial statements for the aforementioned periods would need to be restated and could no longer be relied upon. The Company has restated the impacted financial statements for each of these periods and presented the effects of the restatement adjustments in its 2022 Annual Report.

5. Within the 2023 Form 10-K, the Company also stated the following:

*Material Weakness in Internal Control over Financial Reporting*

THIRD AMENDED CLASS ACTION COMPLAINT

In connection with their evaluation for the year ended December 31, 2023, management identified a material weakness in internal control over financial reporting resulting from not having a complete process in place to fully reconcile the transactions between its operating system (a Company-developed platform) and its general ledger system, at the individual transaction level, which hampers the Company's ability to timely and accurately identify differences that may require adjustment to its consolidated financial statements. As a result, we did not maintain effective controls over the reconciliation of transactions between the Company's operating system and its general ledger system, at the individual transaction level.

6.     As a result of Defendants' misrepresentations and half-truths, and the precipitous decline in the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

10.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

THIRD AMENDED CLASS ACTION COMPLAINT

**PARTIES**

11.    As set forth in the previously filed certification which is incorporated herein by reference (Doc. 7-4), Plaintiff purchased the Company's securities during the Class Period and has been damaged thereby.

12.    Defendant Ryvyl (formerly known as GreenBox) is incorporated in Nevada and maintains an office in San Diego, California, 92108.  Ryvyl stock began trading on the NASDAQ on February 17, 2021, under the ticker symbol "RVYL."

13.    Defendant Ben Errez ("Errez") has served as the Company's Chairman and Co-Founder since 2017.  Errez has served as Chairman of the Company's Board of Directors ("Board"), Executive Vice President, Principal Financial Officer and Principal Accounting Officer.  Since 2017, Chairman Errez served as a principal of the GreenBox Business.  Prior to GreenBox, Chairman Errez formed the start-up IHC Capital, serving as Principal Consultant from 2004 to 2015, advising small-cap companies on commerce, security, reliability and privacy.  From 1991 to 2004 Chairman Errez served as Software Development Lead for the Microsoft International Product Group and as Executive Representative of Microsoft Office.

14.    Defendant Fredi Nisan ("Nisan") has served as the Company's Chief Executive Officer ("CEO") and Co-Founder since 2017.  CEO Nisan served as a Director and as the Company's CEO since July 2017, and has been a principal of the Company since August 2017.  In 2016, CEO Nisan founded Firmness, LLC ("Firmness") and created "QuickCitizen," a software program for client onboarding for law firms specializing in immigration issues.  Prior to Firmness, CEO Nisan launched Brava POS in 2010 and served as President until 2015, providing point of sale systems and management software for specialty retail companies.

15.    Defendant Benjamin Chung ("Chung") served as the Company's Chief Financial Officer ("CFO") from April 21, 2021 until August 2022.  On April 26, 2021, the Company filed a Form 8-K with the SEC stating that "[o]n April 21, 2021, the Board of Directors (the 'Board') of GreenBox POS (the 'Company') appointed

4
THIRD AMENDED CLASS ACTION COMPLAINT

Mr. Benjamin Chung as the Company's Chief Financial Officer."  CFO Chung previously served as the founder and managing partner at Benjamin & Ko, a public accounting and consulting firm.  CFO Chung also served as an Audit Manager at Ernst & Young and PricewaterhouseCoopers and has additional auditing experience across various firms, including BDO, Big 5 Sporting Goods, and Franklin Wireless Corporation.  CFO Chung also served as International Controller and CFO for American Apparel, Inc, a retail company that was publicly traded on NYSE.  CFO Chung also obtained extensive experience in auditing for both private and public companies, SEC reporting, and due diligence transactions, including post-merger integration. CFO Chung also served as an Audit Partner for BDO Korea and previously represented BDO USA.  CFO Chung is a certified public accountant.

16.    Defendants Errez, Nisan, and Chung are collectively referred to herein as the "Individual Defendants."  The Company and the Individual Defendants are referred to herein collectively as "Defendants."

17.    As senior executive officers and/or directors of the Company, the Individual Defendants were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company, including the Company's business, finances, products, markets, and present and future business prospects.  Moreover, the Individual Defendants had access to the Company's internal corporate documents, participated in conversations and management and/or board of directors' meetings and committees thereof, and had connections with other corporate officers, directors, and employees.

18.    The Individual Defendants are liable as direct participants in the wrongs alleged herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" and

had the power and influence to cause the Company to engage in the unlawful conduct alleged.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

19.    Because of their positions within the Company, the Individual Defendants controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and SEC filings alleged to be misleading herein, prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

20.    As senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose securities were, and are, governed by the federal securities law – the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions violated these specific requirements and obligations.

## BACKGROUND

21.    Ryvyl is a crypto company that develops, markets, and sells blockchain-based payment solutions.  The Company's core focus is to develop and monetize disruptive blockchain-based applications, integrated within an end-to-end suite of financial products, capable of supporting a multitude of industries.  The Company's proprietary, blockchain-based systems are designed to facilitate, record,

1  and store a virtually limitless volume of tokenized assets, representing cash or data,

2  on a secured, immutable blockchain-based ledger.

3      22.    The Company was formerly known as ASAP Expo, Inc ("ASAP"), and

4  was incorporated in the state of Nevada on April 10, 2007. On January 4, 2020,

5  PubCo and GreenBox POS LLC, a Washington limited liability company

6  ("PrivCo"), entered into an asset purchase agreement to memorialize a verbal

7  agreement entered into on April 12, 2018, by and among PubCo (the buyer) and

8  PrivCo (the seller). On April 12, 2018, pursuant to the verbal agreement, the

9  Company acquired PrivCo's blockchain gateway and payment system business,

10  point of sale system business, delivery business and kiosk business, bank and

11  merchant accounts, as well as all intellectual property related thereto (the

12  "GreenBox Business"). As consideration for the GreenBox Business, on April 12,

13  2018, the Company assumed PrivCo's liabilities that had been incurred in the

14  normal course of the GreenBox Business. On May 3, 2018, the Company formally

15  changed its name to GreenBox POS. LLC, then subsequently changed its name to

16  GreenBox POS on December 13, 2018. On October 13, 2022, GreenBox POS

17  changed its name to RYVYL Inc.

18      23.    The Company claims that payment processing in the blockchain world

19  only requires recording a ledger without the movement of money. According to

20  Ryvyl, secure tokens are used where users need an immediate transaction in a safe,

21  private, and secure environment, and where traditional banks may not work

22  effectively, like cross-border transactions or in under-banked verticals. The

23  Company claims to generate revenue from payment processing services, licensing

24  fees, and equipment sales.

25      24.    According to Ryvyl, payment processing revenue can come from

26  merchant services, banking services, issuing, foreign exchange ("FX"), and ACH

27  programs. The Company claims that payment processing revenue is based on a

28  percentage of each transaction's value and/or upon fixed amounts specified per each

transaction or service and is recognized as such transactions or services are performed. Ryvyl states that payment processing revenue is the Company's primary source of revenue. When a merchant makes a sale, according to the Company, the process of receiving the payment card information, engaging its banks to transfer the proceeds to the merchant's account via digital gateways, and recording the transaction on a blockchain ledger are the activities for which Ryvyl gets to collect fees.

25. The Company claims that licensing revenue is paid in advance and is recorded as unearned income, which is amortized monthly over the period of the licensing agreement.

26. According to Ryvyl, equipment revenue is generated from the sale of POS products, which is recognized when goods are shipped.

27. The Company has three main products that are utilized by its customers: (1) a QuickCard Payment System, which Ryvyl claims is a comprehensive physical and virtual payment card processing management system including software that facilitates on- and off-ramp e-wallet management; (2) the Coyni Platform, which the Company touts as featuring a digital currency that is backed on a 1:1 ratio to the U.S. Dollar, supported by its blockchain technology, and offering custodial assurance by utilizing its stablecoin and unique blockchain technology in a closed-loop ecosystem, allowing for flexibility; and (3) POS Solutions, which Ryvyl claims is its complete end-to-end Point of Sale solution, comprising both software and hardware.

28. When consumers use credit or debit cards to pay for transactions with merchants who use Ryvyl's ecosystem, the transaction starts with the consumer purchasing tokens from the Company. The tokens are purchased or granted directly from the merchant's terminals or mobile app (or from the Company's website) and are immediately available for transactions. The issuance of tokens is accomplished when the Company loads a virtual wallet with a token, which then transfers credits

to the merchant's wallet on a dollar-for-dollar basis, after which the merchant releases its goods or services to the consumer.  According to Ryvyl, these transfers take place instantaneously and seamlessly, allowing the transaction experience to seem like any other ordinary credit or debit card transaction to the consumer and merchant.  The Company's platform serves as the settlement engine for financial institutions, using digitally encrypted keys to verify, secure, and record details of transactions. The blockchain-based platform allows the Company to log immense volumes of immutable transaction records in real time.

29.    As of January 29, 2021, the Company had approximately 18 full-time employees.  As of December 31, 2022, the Company had approximately 110 full-time employees.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

30.    On May 13, 2021, the Company filed with the SEC its first quarter report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 Report"). Attached to the 1Q21 Report were certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by CEO Nisan and CFO Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

31.    Specifically, CEO Nisan and CFO Chung certified the following through their SOX certifications:

I, [Fredi Nisan and Benjamin Chung], certify that:

1.    I have reviewed this Annual Report on Form 10-K for the fiscal year ended December 31, 2021 of GreenBox POS;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

9

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

THIRD AMENDED CLASS ACTION COMPLAINT

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

32. The Company reported a net revenue of $4,749,441 and a net loss of $13,329,432 in the 1Q21 Report. The Company also reported total assets of $53,029,116 and total stockholders' equity of $46,885,338.

33. On June 10, 2021, the Company held a conference call for analysts and investors. Chairman Errez and Jonathan Miller, the Company's Vice President of Business Development, participated in the call. During the call, Chairman Errez stated the following:

Recording high margin revenues that also scale forward into the token infrastructure and further improve by it. The ISO, independent

11

THIRD AMENDED CLASS ACTION COMPLAINT

sales organization sales model reduces marketing and client acquisition costs, ***and much improved board staffing has been completed as was beefing up our own executive staffs with tenured CFO, CEO and other executives***. And then the Board approved share buyback is in full swing. We have already executed on that and much like all of you, who continue to believe in the company have gained quite a bit by utilizing this strategy. The two most senior executives of the company are Fredi and myself. We are the original Co-Founders and still have our original positions with the company, and expect that to continue with the many years to come.

34.   On August 3, 2021, the Company held a conference call for analysts and investors.  Chairman Errez and CFO Chung participated in the call.  During the call, Chairman Errez stated the following when responding to a specific question posed:

> Looking for the next question. Has the revenues from generation three have been growing at a similar pace as previous quarter?
>
> So we haven't yet released the numbers for Q2, but those are due and will be released in a separate conversation, proceeded by another PR, specifically discussing Q2 revenues. ***I can tell you that Q2 has been better than Q1. And Q1 was pretty impressive***. And I would leave it at that because none of that has been discussed publicly as of yet.

35.   On August 12, 2021, the Company filed with the SEC its first quarter report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were SOX certifications signed by CEO Nisan and CFO Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud that included the same representations as set forth above in ¶31.

12

THIRD AMENDED CLASS ACTION COMPLAINT

36.    The Company reported a net revenue of $6,379,179 and a net loss of $13,368,992 in the 2Q21 Report.  The Company also reported total assets of $54,139,293 and total stockholders' equity of $47,931,461.

37.    On November 15, 2021, the Company filed with the SEC its first quarter report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Report").  Attached to the 3Q21 Report were SOX certifications signed by CEO Nisan and CFO Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud that included the same representations as set forth above in ¶31.

38.    The Company reported a net revenue of $8,045,469 and a net loss of $19,418,747 in the 3Q21 Report.  The Company also reported total assets of $69,122,043 and total stockholders' equity of $56,510,762.

39.    On March 31, 2022, the Company filed with the SEC its 2021 Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report").  Attached to the 2021 Annual Report were SOX certifications signed by CEO Nisan and CFO Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud that included the same representations as set forth above in ¶31.

40.    The Company reported a net revenue of $26,304,502 and net loss of $26,453,512 in the 2021 Annual Report.  The Company also reported total assets of $115,690,180 and total stockholders' equity of $45,505,423.

41.    The 2021 Annual Report downplayed the serious issues with the Company's internal controls.  The 2021 Annual Report stated in relevant part:

***Controls and Procedures***

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial

13

THIRD AMENDED CLASS ACTION COMPLAINT

Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this report. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, as of December 31, 2021, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.***

Changes in Internal Control Over Financial Reporting

There have been ***no changes in our internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act or in other factors that materially affected or are reasonably likely to materially affect our internal controls and procedures over financial reporting during the fourth quarter of the year ended December 31, 2021.***

42. On April 22, 2022, the Company filed a Form 8-K with the SEC announcing that "[e]ffective April 19, 2022, GreenBox POS (the 'Company') dismissed BF Borgers CPA, PC ('BF Borgers') as the Company's independent registered public accounting firm. The decision to dismiss BF Borgers was approved by the Company's Audit Committee." The Company stated further that "[e]ffective April 19, 2022, the Company engaged Simon & Edward, LLP ('Simon & Edward') as the Company's new independent registered public accounting firm."

THIRD AMENDED CLASS ACTION COMPLAINT

43.    On May 16, 2022, the Company filed with the SEC its first quarter report on Form 10-Q for the period ended March 31, 2022 (the "1Q22 Report"). Attached to the 1Q22 Report were SOX certifications signed by CEO Nisan and CFO Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud that included the same representations as set forth above in ¶31.

44.    The Company reported a net revenue of $4,895,526, and a net loss of $21,315,987 in the 1Q22 Report.    The Company also reported total assets of $84,350,603 and total stockholders' equity of $23,361,142.

45.    The 1Q22 Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls:

**Controls and Procedures**

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, as of March 31, 2022, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal***

15

*accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.*

There were *no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the three months ended March 31, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

46.    On August 15, 2022, the Company filed with the SEC its second quarter report on Form 10-Q for the period ended June 30, 2022 (the "2Q22 Report").  Attached to the 2Q22 Report were SOX certifications signed by CEO Nisan and CFO Chung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud that included the same representations as set forth above in ¶31.

47.    The Company reported a net revenue of $6,965,578 three months ended June 30, 2022 and $10,905,902 six months ended June 30, 2022, and a net loss of $10,410,085 three months ended June 30, 2022 and $10,905,902 six months ended June 30, 2022 in the 2Q22 Report.  The Company also reported total assets of $139,781,295 and total stockholders' equity of $39,949,337.

48.    The 2Q22 Report again downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls:

**Controls and Procedures**

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities

16

THIRD AMENDED CLASS ACTION COMPLAINT

Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, as of June 30, 2022, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.***

There were ***no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the three and six months ended June 30, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

49.    On August 22, 2022, the Company filed a Form 8-K with the SEC in which it announced that "[o]n August 16, 2022, Mr. Benjamin Chung resigned as Chief Financial Officer of GreenBox POS (the 'Company'), effective immediately. On August 16th, Mr. J. Drew Byelick was appointed the Company's Chief Financial Officer, effective immediately." From June 2022 to August 2022, Byelick had served as Senior Vice President of Finance of the Company.

50.    Shortly after J. Drew Byelick ("Byelick") became CFO, the Company tasked CFO Byelick to interact with Simon & Edwards – the Company's new independent registered public accounting firm.  The Company's Board had requested Simon & Edwards to perform a re-audit of the Company's financial

17

results for the year ending December 31, 2021.  Additionally, the Company's Board also requested that Simon & Edwards begin to review the sufficiency of the Company's internal controls.

51.    On November 21, 2022, the Company filed with the SEC its third quarter report on Form 10-Q for the period ended September 30, 2022 (the "3Q22 Report").  Attached to the 3Q22 Report were SOX certifications signed by CEO Nisan and CFO Byelick attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud that included the same representations as set forth above in ¶31.

52.    The Company reported a net revenue of $10,629,691 three months ended September 30, 2022 and $22,490,824 nine months ended September 30, 2022, and a net loss of $15,170,277 three months ended September 30, 2022 and $26,076,181 nine months ended September 30, 2022 in the 3Q22 Report.  The Company also reported total assets of $122,401,080 and total stockholders' equity of $34,705,946.

53.    The 3Q22 Report also downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls:

**Controls and Procedures**

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financia Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, as of September 30, 2022, our disclosure controls and***

THIRD AMENDED CLASS ACTION COMPLAINT

*procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.*

There were *no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the three and nine months ended September 30, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

54.    Also on November 21, 2022, the Company held a conference call for analysts and investors.  Chairman Errez, CEO Nisan, and CFO Drew Byelick participated in the call, among others.  During the call, the Company represented the following:

Our Q3 revenue grew to a new company quarterly record, increasing by $2.6 million, or 32%, to $10.6 million for the first three months ended September 30, 2022, from $8 million for the first three months ended September 30, 2021. . . . The company recorded a net loss in the third quarter of 2022 of $15.2 million, or $0.32 per basic and diluted share, compared to a net loss of $6 million, or $0.14 per basic and diluted share, in the same quarter a year ago. The increase in net loss for the nine months and 03 ended September 30, 2022, was primarily due to the increases in research and development, interest and other expenses related to the $100 million note, general and

THIRD AMENDED CLASS ACTION COMPLAINT

administrative, payroll and payroll taxes, and professional fees as we continue to add staff and infrastructure related to our growth, offset by the favorable change in the fair value of derivative liability.

55.    The statements contained in ¶¶30-41, 43-48, and 51-54 were materially false and misleading.  On January 20, 2023, the Company filed a Form 8-K with the SEC in which it announced the following:

> ***Based on discussions between the audit committee (the "Audit Committee") of the board of directors of RYVYL Inc. (the "Company") and the Company's new independent registered public accounting firm, Simon & Edward, LLP ("Simon & Edward"), the Company concluded on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31, 2022 (collectively the "Previously Issued Financial Statements"), and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon. It is expected that the restatement of the financial statements for the annual and interim periods referred to above will result in decreases to total revenue, increased net losses, decreases to total assets, and decreased total stockholders' equity.***
>
> ***The Audit Committee of the Company and its management concluded that the Company's Previously Issued Financial Statements should be restated to correct the aforementioned financial statements and that, accordingly, such Previously Issued Financial Statements should no longer be relied upon to that extent. Related press releases, investor presentations or other communications***

*describing the Company's financial statements for these periods should no longer be relied upon to that extent.*

*The Company anticipates filing the restatements of the Previously Issued Financial Statements as soon as practicable. The Company plans on filing the restated financial statements in its Annual Report on Form 10-K for the year ended December 31, 2022 and in any other filings that may be necessary or appropriate.*

*In connection with such restatements, the Company has reassessed its conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and has determined that one or more material weaknesses exist in the Company's internal control including a material weakness related to accounting for certain complex business transactions. The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. As a result of the material weakness, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022.*

56.    Additionally, on August 10, 2023, the Company filed a Form 10-K/A with the SEC for the year ended December 31, 2022 ("2022 Form 10-K/A"). Within the 2022 Form 10-K/A, the Company stated the following:

*Based on discussions between the audit committee (the "Audit Committee") of the board of directors of RYVYL Inc. (the "Company") and the Company's new independent registered public accounting firm, Simon & Edward, LLP ("Simon & Edward"), the*

21

THIRD AMENDED CLASS ACTION COMPLAINT

*Company concluded on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31, 2022 (collectively the "Previously Issued Financial Statements"), and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon*.

*The Audit Committee of the Company and its management concluded that the Company's Previously Issued Financial Statements should be restated to correct the aforementioned financial statements and that, accordingly, such Previously Issued Financial Statements should no longer be relied upon to that extent. Related press releases, investor presentations or other communications describing the Company's financial statements for these periods should no longer be relied upon to that extent*.

This Annual Report on Form 10-K for the year ended December 31, 2022 provides restated quarterly data for the quarters ended March 31, 2021, June 30, 2021, September 30, 2021, March 31, 2022, June 30, 2022 and September 30, 2022.

We have not filed and do not intend to file amendments to our previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for the periods affected by the restatements of our consolidated financial statements. Accordingly, as disclosed in our Current Report on Form 8-K filed January 20, 2023, *the Company's previously issued financial statements for the periods from January 1, 2021 through September 30, 2022, including the Company's*

THIRD AMENDED CLASS ACTION COMPLAINT

*previously issued audited financial statements for the year ended December 31, 2021, should no longer be relied upon, nor should any related reports of our then independent registered public accounting firm, BF Borgers CPA, PC, nor any previously furnished or filed reports, earnings releases, guidance, investor presentations, or similar communications of the Company regarding these periods be relied upon.*

57.    Within the 2022 Form 10-K/A, the Company also provided the following descriptions of the significant adjustments to the Company's financial position and results of operations from the previously reported consolidated financial statements:

*Commissions Revenue* – The Company has recorded adjustments to reverse the recognition of certain commissions related to transactions processed under the Sky Financial portfolio. While the Company accrued for the commission revenues in Q4 of 2021 and Q1 of 2022 based on certain estimated data provided from the seller, such revenue figures cannot be subsequently supported with timely cash collection. While the Company is pursuing its payment entitlement, for prudent reasons, the reversals have been recorded in the restated financial results.

*Repurchases of Company Stock* – The Company has recorded adjustments to properly reflect certain transactions as the repurchase of the Company's stock. The transactions were previously recorded as either loans, or as a reduction to additional paid-in capital on the Company's balance sheet. The Company has also recorded an impairment charge of approximately $1.4 million related to a repurchase of Company stock.

THIRD AMENDED CLASS ACTION COMPLAINT

*Gateway Bank Fees* – The Company's gateway banks charge the Company a fee for the processing of transactions. The Company accrues and expense related to this fee at the time of the transaction. The Company determined that for one of its gateway banks, it had not accrued the appropriate fee percentage, and has recorded adjustments to each of the periods being restated to record additional fees in the statement of operations and to reduce the net receivable due from the gateway bank.

*Charge-off of Accounts Receivable* – The Company has made adjustments to charge-off certain receivables due from gateway banks. Additionally, the Company has recorded adjustments to appropriately reflect the write-off of certain accounts receivable in the period in which the write-offs are most likely to be occurred under US GAAP.

*Merchant Liability* – When a merchant client makes a sale, the transaction is recorded on the Company's blockchain ledger. The Company records liability equal to the amount of sale, less processing fees, to reflect its obligation to the merchant. Based on reconciliation performed between its blockchain ledger and the Company's general ledger balances, the Company has recorded adjustments to change its merchant liability balances for each of the periods presented to properly reflect all liabilities incurred as of the end of each respective period being restated.

*Convertible Debt* – In November 2021, the Company entered into convertible debt with a face value of $100,000,000. The Company has made certain adjustments to reflect the debt modifications incurred to properly account for this convertible debt in each of the three quarters of 2022, including adjustments to the debt balance, interest expense, loss on extinguishment of debt, and accumulated accretion.

THIRD AMENDED CLASS ACTION COMPLAINT

In addition, the Company has also recorded adjustments to make certain reclassifications on its balance sheet, to record the loss on extinguishment of debt, and to record fee income from merchants related to assessed fines and penalties.

58.    Additionally, the 2022 Form 10-K/A stated the following:

*In connection with such restatements, the Company has reassessed its conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and has determined that one or more material weaknesses existed in the Company's internal control including a material weakness related to accounting for certain complex business transactions.*

The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. *As a result of the material weakness, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022.*

59.    On March 26, 2024, the Company filed its 2023 Form 10-K.  Within the 2023 Form 10-K, the Company stated the following:

*During the preparation of its 2022 Annual Report, the Company determined that it had not appropriately accounted for certain historical transactions under GAAP. In accordance with the SEC's Staff Accounting Bulletin ("SAB") 99, Materiality, and SAB 108, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements, the*

25
THIRD AMENDED CLASS ACTION COMPLAINT

*Company evaluated the materiality of the errors from qualitative and quantitative perspectives, individually and in aggregate, and concluded that the errors were material to the Consolidated Statements of Operations for the quarters ending March 31, 2021, June 30, 2021, September 30, 2021, March 31, 2022, June 30, 2022, and September 30, 2022, and for the annual period ending December 31, 2021. Based on this evaluation, on January 13, 2023, the Company's Audit Committee, with the concurrence of management, concluded that the Company's previously issued consolidated financial statements for the aforementioned periods would need to be restated and could no longer be relied upon.* The Company has restated the impacted financial statements for each of these periods and presented the effects of the restatement adjustments in its 2022 Annual Report.

60.     Within the 2023 Form 10-K, the Company also stated the following:

*Material Weakness in Internal Control over Financial Reporting*

*In connection with their evaluation for the year ended December 31, 2023, management identified a material weakness in internal control over financial reporting resulting from not having a complete process in place to fully reconcile the transactions between its operating system (a Company-developed platform) and its general ledger system, at the individual transaction level, which hampers the Company's ability to timely and accurately identify differences that may require adjustment to its consolidated financial statements. As a result, we did not maintain effective controls over the reconciliation of transactions between the Company's operating system and its general ledger system, at the individual transaction level.* A material weakness is a deficiency, or a combination of deficiencies, in internal

THIRD AMENDED CLASS ACTION COMPLAINT

control over financial reporting such that there is a reasonable possibility that a material misstatement of our financial statements will not be prevented or detected on a timely basis.

*Remediation Plan*

**We have commenced measures to remediate the identified material weakness, including the implementation of an enhanced reconciliation preparation and review process, and improved reporting from the Company's operating system.**

61.    Additionally, Chairman Errez's statement above in ¶33 representing that "much improved board staffing has been completed as was beefing up our own executive staffs with tenured CFO, CEO and other executives" was misleading because it gave investors the impression that Ryvyl had adequate management, staff, and employees to sufficiently conduct the Company's operations when such was not the case.  For example, according to CW2 (who, as described more fully below, served as a Marketing Specialist, Marketing Manager, and Project Manager at Ryvyl from August 2021 to February 2023), the Company did not have enough personnel working in the accounting department to properly manage what they needed to do.  CW2 indicated that there was a high degree of turnover in the accounting department, with the average time for personnel in the department being approximately three to five months.  CW2 stated further that sometimes Ryvyl would rely upon its receptionist to perform financial and accounting work for the Company and that the receptionist was not qualified to perform financial and accounting work.  CW2 stated that the Company assigned tasks such as expense reporting to the receptionist, and that the receptionist would ask CW2 how do to the work because the receptionist did not know how to do it.

62.    Thus, for all the reasons set forth above in ¶¶55-61, Defendants statements contained in ¶¶30-41, 43-48, and 51-54, were materially false and misleading.

## DEFENDANTS ACTED WITH SCIENTER

63. During the Class Period, Defendants had both the motive and opportunity to commit fraud. Defendants also had actual knowledge of the misleading nature of the statements they made or acted with deliberate recklessness with respect to their misrepresentations. Thus, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period. The following information is a non-exclusive listing of examples of facts demonstrating Defendants' scienter during the Class Period.

### Defendants' Motivation to Use the Company's Inflated Stock Price as Currency for Acquisitions Supports a Strong Inference of Scienter

64. Defendants' desire to use the Company's inflated stock price as currency for the Company's acquisitions supports a strong inference of scienter. For instance, on August 3, 2021, the Company held a conference call for analysts and investors. Chairman Errez and CFO Chung participated in the call. During the call, Chairman Errez stated the following:

> *A few accretive acquisitions have occurred recently* that are worth mentioning in this context. *And I would say to everyone, please expect additional strategic acquisitions as time goes by. We have a few more*.
>
> *The first that we should mention is probably Transact Europe, a very large licensed entity*. This transaction is pending regulatory approval, and it is a key licensing asset for expansions into Europe. Management compensation tied to processing volume hurdles that go from $100 million of new business per month, all the way to $1 billion of new business per month. *This transaction is amazingly accretive to both the Coyni and the GreenBox mothership*.

*Second acquisition that we are going to be discussing today is the ChargeSavvy, LLC*. Most of you are familiar with it. ChargeSavvy was an acquisition that closed on the 10th of July. We targeted that closing for June and missed it by about 10 days. *As a result, our revenues accrued on this acquisition, which are substantial, will be recorded as Q3 revenues and not Q2*.

*Lastly, I would like to mention Northeast Merchant Services. This was an acquisition that we finished a couple of months ago*, completed that with an acquisition of Bank Identification Number, which allows GreenBox to underwrite its own risk profile. And retail processing portfolio that has two interesting properties. *One is that it adds about $145 million in annual processing volume to GreenBox and adds an additional approximately $1.1 million in net income*. These figures are not yet in our annual guidance as 2021 projections that we published.

65. Additionally, on November 17, 2021, EF Hutton issued an analyst report entitled "GBOX: Initiating With a Buy Rating and $10 Price Target." Within the report, EF Hutton stated the following:

*Recent acquisitions coupled with strong underlying organic growth should allow GBOX to sustain triple digit sales growth, more than doubling revenues in 2022 to $83.5M*. Assuming a 5x sales multiple, which is a discount to larger and more established processing peers, we see upside to $10.

66. Further, on December 9, 2021, the Company held a conference call for analysts and investors. Chairman Errez, CEO Nisan, and CFO Chung were on the call, among others. During the call, Vanessa Luna, the Company's Chief Operating Officer, stated the following:

*So a lot of the acquisitions, the highly strategic acquisitions have been a credit to the bottom line*. And when we target these acquisitions not only for the basis of what we're looking to achieve whether that be licensing, capabilities in terms of expansion to support the type of volume that we're looking to produce, the first step in that is sustainability, *which we have successfully done since the acquiring of both Northeast Merchant Services and ChargeSavvy and with the future and anticipated acquisitions that we have -- have been coming*. So sustainability which we have done, and then integration into our current and existing ecosystems to fundamentally allow for growth. *I think these are still fresh and new, so as we are in the beginning stages of the completion of the acquisition and what we intend to do, I think we've, like I said a little earlier in my statement, laid the foundation for the next phase of these acquisitions, which would be growth potential for the company*.

67.     Additionally, on December 16, 2021, Taglich Brothers issued an Initial Research Report regarding the Company.  The report stated the following:

We anticipate transaction volume growth occurring through acquisitions of global customer portfolios and the subsequent onboarding to the company's Gen3 platform that will enable large scale transaction volume throughput, as well as organic growth of new merchant customers.  *In 2021, the company acquired ChargeSavvy and Northeast Merchant Services which drove a near fourteen-fold increase in transaction volume to $540 million in 3Q21 compared to the year-ago period*.  *A key growth driver to increase transaction volume and manage risk on the company's Gen3 platform was acquiring Northeast Merchant Services* which, in addition to a merchant customer base, obtained a bank identification number (BIN)

that enables GBOX to act as an acquiring bank (a BIN helps merchants evaluate and assess their payment card transactions) that provides the ability to seamlessly onboard customers.

*While the company is waiting for regulatory bank approval with regards to its pending acquisition of Transact Europe, it has a revenue sharing and licensing cooperation agreement in place that enables GreenBox to leverage key licensing assets and recognize processing volume starting in 4Q21.* This acquisition, combined with GBOX's technology platform, provides the opportunity to fill a void left after one of Europe's payment processors (Wirecard) left the market.   The expectation is that Transact Europe will experience organic growth as the existing management team will be eligible for significant earn-outs as transaction volume milestones are achieved.

68.     Moreover, on April 11, 2022, Taglich Brothers issued a Research Report – Update.  The report stated the following:

We anticipate transaction volume growth occurring through acquisitions of global customer portfolios and the subsequent onboarding to the company's Gen3 platform that will enable large scale transaction volume throughput, as well as organic growth of new merchant customers.  *In 2021, the company acquired ChargeSavvy and Northeast Merchant Services.  A key growth driver in order to increase transaction volume and enable risk management was acquiring Northeast Merchant Services which, in addition to providing a merchant customer base was obtained a bank identification number (BIN)*. The BIN enables GBOX to act as an acquiring bank (a BIN helps merchants evaluate and assess their payment card transactions) that provides the ability to seamlessly onboard customers.

THIRD AMENDED CLASS ACTION COMPLAINT

*In 1Q22, the company completed the acquisitions of Roark Holdings, a United Kingdom based licensed payment institution, and Transact Europe, an EU regulated electronic money institution. It also acquired a portfolio of merchant accounts from Sky Financial*.

69.    Thus, Defendants were motivated to artificially inflate the Company's stock price to fuel the acquisitions that they touted were critical for the Company's growth and large-scale transaction volume throughput.

### The Company's Motivation to Comply with its Debt Covenants Supports a Strong Inference of Scienter

70.    Defendants' misstatements of the Company's financial results to ensure compliance with the Company's debt covenants also adds to the strong inference of scienter alleged.  For instance, on April 4, 2022, EF Hutton issued an analyst report entitled "GBOX: Processing Volume Ramp Remains Strong; Reiterate Buy Rating and $10 Price Target."  The report stated the following:

*Subsequent to the end of the quarter, GBOX amended the structure of its $100M convertible to forestall certain triggers that would have been detrimental to equity holders. Importantly, while the convertible price was dropped from $15/share to $12/share, GBOX avoided a toxic acceleration feature that could have resulted in as much as 30% of the underlying instrument go into the money at a floor price of $1.67/share. Management signaled during the conference call that covenants related to minimum processing volumes of $750M for 1Q22 had been achieved, which should go a long way toward ensuring that extraordinary dilution does not occur*. While modest tail risk in the convert remains, (out of the money, due date November 2023), *we believe that management has its arms around the situation and continued execution on the processing side of the business should result in a positive outcome*.

71.    Similarly, on August 29, 2022, Taglich Brothers issued a Research Report – Update.  The report stated the following:

> ***On August 17, 2022, GBOX announced an agreement to restructure and amend the terms on its 8% $100 million convertible note. The amended agreement calls for the maturity date to be extended to November 5, 2024 from November 5, 2023***. Additionally, interest payments will be issued in common stock unless written notice is given that interest will be paid in cash. For consideration, the investor is supposed to convert $500,000 of principal of the note into shares of common stock. The investor is expected to receive approximately 495,000 shares of common stock as at a conversion price of $1.02 per share. The agreement includes each conversion not being in excess of $4.5 million of principal on each applicable conversion date with the conversion price equal to the lesser of $2.40 per share or 97.5% of the adjustment price as of such applicable conversion date.

72.    As a result, Defendants were motivated to make false and misleading statements to investors to forestall the Company's default of its debt obligations.

## The Accounts of Former Company Employees
## Support a Strong Inference of Scienter

73.    The accounts of former Company employees further demonstrate the false and misleading nature of Defendants' statements and that Defendants acted with scienter.  For instance, CW1 served as HR Generalist at the Company from June 2021 to February 2022.  CW1 started at the Company as an onboarding specialist, working with Ryvyl's programming terminals.  In that role, CW1 went to dispensaries and programmed terminals that clients would use to swipe their credit or debit cards.  CW1 would then create their files on the back end, which would enable CW1 to determine how much revenue the dispensary was generating.  In July 2021, CW1's role shifted into HR, and CW1 booked all the meetings between

Ryvyl's executives and the Company's new hires.  In this role, CW1 coordinated meetings with the Company's CEO, CFO, and all the various departments.  CW1 also performed background checks for the Company's new hires and handled all the paperwork for the new hires and for the Company's existing employees. Additionally, CW1 managed all the Company's office equipment, including laptops and keyboards, as well as tested the Company's terminals to ensure that transactions were processed correctly.  CW1 also scheduled team-building activities for the Company and, at the time, scheduled COVID testing for Company employees.

74.    CW1 stated that Co-Founder and Chairman Errez and CEO Nisan misrepresented the Company's revenue.  CW1 knew that the statements were wrong because there was no volume for the Company's merchants to support the claimed revenue.  CW1 stated further that CW1 knew about the Company's volume because CW1 was trained on the Company's system for chargebacks, which represented the volume for anything that would come into Ryvyl and everything that the Company paid out.

75.    CW1 stated that when CW1 served as an onboarding specialist, Itamar Green ("Green") worked in the development team and that Green would perform the chargebacks.  At the time, Green served as a senior risk analyst.  CW1 believes that the training that CW1 had with Green occurred in the end of June 2021 or the beginning of July 2021.  CW1 stated that when management called for chargebacks, it would appear on Green's screen.  CW1 stated that Green trained CW1 as a backup to perform the chargebacks if Green was unable to do so.  CW1 stated further that Green taught CW1 how to identify the Company's chargebacks, as well as the volume for all the Company's merchants for anything that would come into Ryvyl and everything that the Company paid out, and that the information looked like a bank statement.  CW1 stated that based upon the volume information, the revenue was nowhere close to the representations that Chairman Errez and CEO Nisan made regarding the Company's revenue.  Specifically, CW1 stated that the volumes that

CW1 saw were nowhere close to the millions of dollars that the Company represented, and that the volume was not even close to a million.  CW1 reported the issue to CW1's boss, Viviana Estrada, but Estrada did not know why the Company's representations were not supported by the volume information that CW1 discovered. CW1 also said that Green informed CEO Nisan about the discrepancies that CW1 discovered between the representations that Chairman Errez and CEO made regarding the Company's revenue and the volume information that CW1 observed. CW1 stated further that CW1 knew that CEO Nisan knew about the chargebacks affecting the Company's revenue because Green repeatedly confronted CEO Nisan about the issue in CEO Nisan's office.  CW1 stated that Green and CEO Nisan had weekly meetings during which Green told CEO Nisan about the discrepancies, and Green told CW1 about Green's conversations with CEO Nisan.

76.     Additionally, CW1 stated that many of the Company's customers complained about getting charges from companies that they did not recognize, such as a mattress company, and that the charges would originate from Ryvyl's system. CW1 learned that Ryvyl implemented this system as a roundabout process for cannabis-related charges.  CW1 stated that CW1 would discuss the situation with CW1's boss and other management at the Company, including Dan Nusinovich, the Company's head of development and the brother of CEO Nisan, but that the Company's management failed to address the issue.  CW1 stated further that CW1 noticed red flags and took the issues to CW1's manager.   CW1 said that management told CW1 not to worry about the issues.

77.     CW2 served as a Marketing Specialist, Marketing Manager, and Project Manager at Ryvyl from August 2021 to February 2023.  CW2 performed numerous duties at Ryvyl, which together amounted to acting as a marketing team lead. Specifically, CW2 managed communications and the website, and also conducted social media outreach and worked closely with the Company's sales team. According to CW2, the team that CW2 managed handled any external-facing

THIRD AMENDED CLASS ACTION COMPLAINT

communications for the Company.  Additionally, throughout CW2's tenure, CW2 implemented project-management software and obtained buy-ins from internal stakeholders.

78.     CW2 stated that Ryvyl was a small company, that everyone talked, and that there was a series of events that led the Company to hire CFO Byelick. Specifically, CW2 stated that CFO Byelick's predecessor, CFO Chung, required the Company to use his software as part of his deal, and that CFO Chung did not properly follow accounting procedures as a publicly traded company.  CW2 stated further that CFO Chung created his own accounting software, that the software was absolutely horrible, and that the Company should never have been using it.  CW2 stated that CFO Chung was not doing his job, and that more people discovered this fact after CFO Chung's departure, including CFO Byelick and CW2.

79.     Indeed, CW2 and CFO Byelick had numerous discussions about the improper accounting practices that existed at the Company because of CFO Chung's failures, which included improper accounting relating to revenue, debt, and depreciation value.  CW2 stated that CW2 had daily – if not weekly – conversions with CFO Byelick and that CW2 had a good working relationship with CFO Byelick.  CW2 stated that CW2 and CFO Byelick spoke about these issues primarily in the office together, and also spoke occasionally while golfing together.

80.     CW2 stated that CFO Byelick acknowledged to CW2 that Ryvyl's numbers were made up (including the Company's quarterly financial statements and year-end financial statements), that the Company failed to follow proper accounting procedures, and that information was hidden and disguised.  CW2 stated that based upon CW2's conversations with CFO Byelick, CW2 was 100% certain that the Company was manipulating numbers related to the Company's quarterly financial statements and year-end financial statements.  CW2 stated that CFO Byelick made statements constantly throughout CW2's tenure that convinced CW2 that the Company was manipulating numbers related to its quarterly and year-end financial

THIRD AMENDED CLASS ACTION COMPLAINT

statements.  CW2 stated that CW2 believes that CFO Byelick became aware of the accounting improprieties around the time that CFO Byelick started, and that the more CFO Byelick investigated, the more accounting improprieties he discovered. CW2 also stated that CFO Byelick informed CW2 that had CFO Chung followed the correct accounting process, CFO Chung would have discovered that the Company's quarterly financial statements and year-end financial statements were incorrect because there was no way to logically arrive at the incorrect results.

81.    For example, CW2 stated that at the end of 2022, CW2 had discussions with other Company employees regarding CFO Chung's failure to implement and follow proper accounting procedures at the Company and CW2 learned that CEO Nisan discovered that CFO Chung was making up numbers.  CW2 learned this information by speaking with personnel in the Company's accounting department, including R. Clay Gilreath ("Gilreath"), who served as a Senior Treasury Analyst. According to CW2, personnel in the accounting department had to perform an audit of the Company's financial results every quarter during CW2's tenure because the quarterly filings were always incorrect and always had to be amended.  CW2 also stated that CEO Nisan was a hands-on manager and participated in the day-to-day decisions at the Company, and that CEO Nisan oversaw many of the accounting responsibilities at the Company because of the lack of time that CFO Chung spent in the office.  Additionally, CW2 described CFO Chung as "reckless," "incompetent," and "conniving."  CW2 stated that CFO Chung was hardly ever in the office, and only showed up at the end of quarters or when an audit team was on site. Otherwise, according to CW2, CFO Chung was never around.

82.    CW2 also stated that the Company did not have enough personnel working in the accounting department to properly manage what they needed to do. CW2 indicated that there was a high degree of turnover in the accounting department, with the average time for personnel in the department being approximately three to five months.  CW2 stated further that sometimes Ryvyl

would rely upon its receptionist to perform financial and accounting work for the Company and that the receptionist was not qualified to perform financial and accounting work.  CW2 stated that the Company assigned tasks such as expense reporting to the receptionist, and that the receptionist would ask CW2 how do to the work because the receptionist did not know how to do it.

83.    CW3 was a Staff Accountant at the Company from May 2022 to July 2022.  CW3 has a master's degree in accounting.  CW3 stated that Ryvyl had family friends working in the Company's finance department.  CW3 noted that Gilreath worked as Senior Treasury Analyst and Kineret Rubin ("Rubin") worked as Controller, and that Rubin was a family friend of Co-Founder and Chairman Errez. When asked whether the Company's management deliberately misled shareholders regarding Ryvyl's accounting irregularities or whether they had made a good faith error, CW3 responded by stating "it wasn't a mistake – they purposely did that." CW3 stated that Gilreath and Rubin told CW3 what information to enter into the system, including wires for other companies.  CW3 said that money came into Ryvyl and that the Company was supposed to wire it out to other companies and take a percentage, but that the Company was making it seem like it was making much more money than it was.  CW3 stated that a lot of the wires that the Company was generating were fake, and that Ryvyl was keeping money in its accounts that was meant to be transferred onward to other companies.  According to CW3, people from other companies began to contact the Company to complain about not receiving the money to which they were entitled.  CW3 stated that CW3 would show Gilreath and Rubin that documentation did not support the numbers that Gilreath and Rubin demanded to be entered into the system, but that Gilreath and Rubin told CW3 to just do what they said.  CW3 stated that Gilreath and Rubin would have Co-Founder and Chairman Errez renegotiate it on the back end and that paperwork would subsequently follow, but that never occurred.  CW3 reiterated that "it was purposely done – they knew exactly what they were doing."

THIRD AMENDED CLASS ACTION COMPLAINT

84.    CW3 stated further that after CW3 entered the information onto the system, CW3 would go back several days later to ask for documentation to support the changes and that Gilreath claimed that he would upload the documentation into the system, but that never happened.  CW3 stated that Gilreath and Rubin were responsible for setting up the wires, and that Chairman and Co-Founder Errez, Senior Treasury Analyst Gilreath and Controller Rubin would inform CW3 that the numbers had changed based upon conversations that Chairman Errez had with clients.  CW3 stated, however, that CW3 saw no documentation to support the changes that Errez, Gilreath, and Rubin were purporting to make. CW3 stated further that Ryvyl's accounting department consisted solely of Gilreath, Rubin, Reid Granados ("Granados," Ryvyl's former Director of Finance), CFO Chung, and CW3.  CW3 stated further that when CFO Byelick became aware of the issues with the wires, CFO Byelick began having weekly meetings with Gilreath and Rubin about the issue.  During one meeting, CFO Byelick, Gilreath, and Rubin were not aware that CW3 was still in the office.  During the meeting, CW3 overheard CFO Byelick stating to Gilreath and Rubin that "you can't allow this to go on; this can't keep happening."  CW3 spoke to CW4 regarding these issues, and CW4 confirmed to CW3 that the accounting irregularities that CW3 described were, in fact, occurring based upon CW4's knowledge.

85.    CW4 served as the Executive Assistant to both Chairman Errez and Chief Operating Officer ("COO") Min Wei ("Wei") from February 2022 to July 2022.  CW4 attended weekly meetings with CFO Chung (who attended many meetings remotely from South Korea), CEO Nisan, Co-Founder and Chairman Errez, Jacqueline Reynolds (a salesperson at the time), and former Director of Finance Granados.  CW4 stated that it was a running joke that CFO Chung was "still in Korea" and that his work was never done.

86.    CW4 confirmed that based upon CW4's attendance at weekly meetings with CEO Nisan, CFO Chung, Chairman Errez, and other Company executives, the

Company's accounting, including accounting for wires that were received and sent to other companies, was inaccurate. In fact, CW4 stated that based upon CW4's participation in weekly meetings with the Company's executives, the Company's accounting was a "shit show." CW4 confirmed that the Company was generating fake wires and keeping money that was meant to be transferred onward to other companies. For instance, around June 2022, CW4 recalled that Controller Rubin sent fake wires without blinking any eye. CW4 stated further that red flags regarding the Company's accounting were absolutely raised during the executive meetings. For example, CW4 stated that COO Wei informed participants at a meeting in March, April, or May of 2022 that some of the information regarding the Company's financials was incorrect and that the participants needed to review it. CW4 said that CFO Chung agreed during that meeting that the information was incorrect. CW4 also spoke to CW3 regarding the fake wires that the Company sent, and CW3 confirmed the misconduct that CW4 experienced.

87.    Thus, the facts based upon the accounts of the CWs further support a strong inference of scienter.

**The Severity of the Company's Problems with Internal Controls Supports a Strong Inference of Scienter**

88.    The severity of the Company's internal control problems also supports a strong inference of scienter. Here, Defendants admitted, among other things, that:

> **Based on discussions between the audit committee (the "Audit Committee") of the board of directors of RYVYL Inc. (the "Company") and the Company's new independent registered public accounting firm, Simon & Edward, LLP ("Simon & Edward"), the Company concluded on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the**

THIRD AMENDED CLASS ACTION COMPLAINT

*interim periods ended September 30, June 30 and March 31, 2022 (collectively the "Previously Issued Financial Statements"), and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon.*

89.    Within the 2022 Form 10-K/A, the Company also provided the following descriptions of the significant adjustments to the Company's financial position and results of operations from the previously reported consolidated financial statements:

*Commissions Revenue* – The Company has recorded adjustments to reverse the recognition of certain commissions related to transactions processed under the Sky Financial portfolio. While the Company accrued for the commission revenues in Q4 of 2021 and Q1 of 2022 based on certain estimated data provided from the seller, such revenue figures cannot be subsequently supported with timely cash collection. While the Company is pursuing its payment entitlement, for prudent reasons, the reversals have been recorded in the restated financial results.

*Repurchases of Company Stock* – The Company has recorded adjustments to properly reflect certain transactions as the repurchase of the Company's stock. The transactions were previously recorded as either loans, or as a reduction to additional paid-in capital on the Company's balance sheet. The Company has also recorded an impairment charge of approximately $1.4 million related to a repurchase of Company stock.

*Gateway Bank Fees* – The Company's gateway banks charge the Company a fee for the processing of transactions. The Company accrues and expense related to this fee at the time of the transaction.

THIRD AMENDED CLASS ACTION COMPLAINT

The Company determined that for one of its gateway banks, it had not accrued the appropriate fee percentage, and has recorded adjustments to each of the periods being restated to record additional fees in the statement of operations and to reduce the net receivable due from the gateway bank.

*Charge-off of Accounts Receivable* – The Company has made adjustments to charge-off certain receivables due from gateway banks. Additionally, the Company has recorded adjustments to appropriately reflect the write-off of certain accounts receivable in the period in which the write-offs are most likely to be occurred under US GAAP.

*Merchant Liability* – When a merchant client makes a sale, the transaction is recorded on the Company's blockchain ledger. The Company records liability equal to the amount of sale, less processing fees, to reflect its obligation to the merchant. Based on reconciliation performed between its blockchain ledger and the Company's general ledger balances, the Company has recorded adjustments to change its merchant liability balances for each of the periods presented to properly reflect all liabilities incurred as of the end of each respective period being restated.

*Convertible Debt* – In November 2021, the Company entered into convertible debt with a face value of $100,000,000. The Company has made certain adjustments to reflect the debt modifications incurred to properly account for this convertible debt in each of the three quarters of 2022, including adjustments to the debt balance, interest expense, loss on extinguishment of debt, and accumulated accretion.

In addition, the Company has also recorded adjustments to make certain reclassifications on its balance sheet, to record the loss on

extinguishment of debt, and to record fee income from merchants related to assessed fines and penalties.

90.    Additionally, the 2022 Form 10-K/A stated the following:

*In connection with such restatements, the Company has reassessed its conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and has determined that one or more material weaknesses existed in the Company's internal control including a material weakness related to accounting for certain complex business transactions*.

The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. *As a result of the material weakness, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022.*

91.    Thus, the severity of these issues related to the Company's internal controls supports a strong inference of scienter.

**The Core Operations Inference and the Small Size of the Company Support a Strong Inference of Scienter**

92.    The core operations inference and the Company's small size also bolster the strong inference of scienter alleged.  As alleged herein in further detail, the Company's core focus is to develop and monetize disruptive blockchain-based applications, integrated within an end-to-end suite of financial products, capable of supporting a multitude of industries.  The Company's proprietary, blockchain-based systems are designed to facilitate, record, and store a virtually limitless volume of

43

tokenized assets, representing cash or data, on a secured, immutable blockchain-based ledger.  Additionally, payment processing revenue is the Company's primary source of revenue.   Moreover, as of January 29, 2021, the Company had approximately 18 full-time employees, and as of December 31, 2022, the Company had approximately 110 full-time employees.   These facts, therefore, add to the strong inference of scienter alleged.

**The Content and Context of Defendants' Misrepresentations**

**Supports a Strong Inference of Scienter**

93.    The content and context of Defendants' false and misleading statements also bolster the strong inference of scienter alleged.  For example, on August 3, 2021, the Company held a conference call for analysts and investors.  Chairman Errez and CFO Chung participated in the call.   During the August 3, 2021 conference call, Chairman Errez stated the following when responding to a specific question posed:

> Looking for the next question. Has the revenues from generation three have been growing at a similar pace as previous quarter?
>
> So we haven't yet released the numbers for Q2, but those are due and will be released in a separate conversation, proceeded by another PR, specifically discussing Q2 revenues. ***I can tell you that Q2 has been better than Q1. And Q1 was pretty impressive***. And I would leave it at that because none of that has been discussed publicly as of yet.

94.    Chairman Errez's response reflected knowledge of the Company's revenue results for 1Q21 and 2Q21.  Indeed, Chairman Errez even made qualitative comparisons in his response between the results for 1Q21 and those for 2Q21.  Thus, the content and context of Chairman Errez's misrepresentations regarding the Company's revenues in 1Q21 and 2Q21 – in which Chairman Errez responded to a specific question and falsely claimed that the Company's revenue results in 1Q21 were "pretty impressive" and that revenue results for 2Q21 were "better than Q1" –

44

THIRD AMENDED CLASS ACTION COMPLAINT

demonstrate that Chairman Errez acted with knowledge or with deliberate recklessness regarding the falsity of these misrepresentations.

### Defendants' Hands-On Management Style
### Supports a Strong Inference of Scienter

95.    Facts demonstrating that Defendants were hands-on managers with respect to operational details and financial statements further support a strong inference of scienter.  Here, CW2 stated that CEO Nisan was a hands-on manager and participated in the day-to-day decisions at the Company, and that CEO Nisan oversaw many of the accounting responsibilities at the Company because of the lack of time that CFO Chung spent in the office.  Additionally, shortly after CFO Byelick assumed that position, the Company tasked CFO Byelick to interact with Simon & Edwards – the Company's new independent registered public accounting firm.  The Company's Board had requested Simon & Edwards to perform a re-audit of the Company's financial results for the year ending December 31, 2021.  Additionally, the Company's Board also requested that Simon & Edwards begin to review the sufficiency of the Company's internal controls.  Chairman Errez and CEO Nisan both served as members of the Company's Board.  Thus, these facts further support a strong inference of scienter.

### CFO Chung's Resignation and the Company's Firing of its Auditor
### Bolster the Strong Inference of Scienter Alleged

96.    CFO Chung's resignation and the Company's firing of its auditor also bolster the strong inference of scienter alleged.  On April 22, 2022, the Company announced that "[e]ffective April 19, 2022, GreenBox POS (the 'Company') dismissed BF Borgers CPA, PC ('BF Borgers') as the Company's independent registered public accounting firm. The decision to dismiss BF Borgers was approved by the Company's Audit Committee."  The Company stated further that "[e]ffective April 19, 2022, the Company engaged Simon & Edward, LLP ('Simon & Edward') as the Company's new independent registered public accounting firm."

97.     Additionally, on August 22, 2022, the Company announced that "[o]n August 16, 2022, Mr. Benjamin Chung resigned as Chief Financial Officer of GreenBox POS (the 'Company'), effective immediately.  On August 16th, Mr. J. Drew Byelick was appointed the Company's Chief Financial Officer, effective immediately."  Thus, CFO Chung's resignation occurred less than four months after the Company fired its independent registered public accounting firm, and only a few months before the Company announced that it had to restate its financial statements. Thus, these facts further support a strong inference of scienter.

98.     When viewed collectively as required, all these facts support a strong inference of scienter.

### THE TRUTH BEGINS TO EMERGE

99.     On January 20, 2023, the Company filed a Form 8-K with the SEC in which it announced the following:

> ***Based on discussions between the audit committee (the "Audit Committee") of the board of directors of RYVYL Inc. (the "Company") and the Company's new independent registered public accounting firm, Simon & Edward, LLP ("Simon & Edward"), the Company concluded on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31, 2022 (collectively the "Previously Issued Financial Statements"), and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon. It is expected that the restatement of the financial statements for the annual and interim periods referred to***

*above will result in decreases to total revenue, increased net losses, decreases to total assets, and decreased total stockholders' equity.*

*The Audit Committee of the Company and its management concluded that the Company's Previously Issued Financial Statements should be restated to correct the aforementioned financial statements and that, accordingly, such Previously Issued Financial Statements should no longer be relied upon to that extent. Related press releases, investor presentations or other communications describing the Company's financial statements for these periods should no longer be relied upon to that extent.*

*The Company anticipates filing the restatements of the Previously Issued Financial Statements as soon as practicable. The Company plans on filing the restated financial statements in its Annual Report on Form 10-K for the year ended December 31, 2022 and in any other filings that may be necessary or appropriate.*

*In connection with such restatements, the Company has reassessed its conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and has determined that one or more material weaknesses exist in the Company's internal control including a material weakness related to accounting for certain complex business transactions. The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. As a result of the material weakness, the Company's management concluded its disclosure*

1  *controls and procedures were not effective as of December 31, 2021,*

2  *and September 30, June 30, and March 31, 2022.*

3  100.  On this news, Ryvyl's share price fell 14.63% to close at $0.77 per

4  share on January 23, 2023, damaging investors.

5  **POST CLASS PERIOD EVENTS**

6  101.  On March 31, 2023, the Company filed a Form 12b-25 with the SEC in

7  which it stated the following:

8      RYVYL Inc. (the "Company") is unable, without unreasonable

9      effort or expense, to file its Annual Report on Form 10-K for the year

10     ended December 31, 2022 (the "Annual Report") by the March 31,

11     2023 filing date applicable to smaller reporting companies for the

12     reasons discussed in this Form 12b-25.

13     As disclosed in the Company's Current Report on Form 8-K

14     filed on January 20, 2023, management and the Audit Committee of the

15     Board of Directors (the "Audit Committee") of the Company

16     determined on January 13, 2023 that the Company's previously issued

17     financial statements as of December 31, 2021, for the year ended

18     December 31, 2021, as of and for the interim periods within the year

19     ended December 31, 2021, and as of and for the interim periods ended

20     September 30, June 30, and March 31, 2022 (collectively the

21     "Previously Issued Financial Statements"), should be restated and can

22     no longer be relied upon, and the related audit report of the Company's

23     previous independent registered public accounting firm, BF Borgers

24     CPA, PC, can no longer be relied upon. ***The Company expects to***

25     ***report one or more material weaknesses as of December 31, 2021, as***

26     ***well as its related remediation efforts including having engaged, as of***

27     ***August 2022, third party technical accounting experts to support***

28     ***proper accounting for complex accounting transactions. As a result,***

48

THIRD AMENDED CLASS ACTION COMPLAINT

*the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022*.

102.   On August 10, 2023, the Company filed its 2022 Form 10-K/A with the SEC for the year ended December 31, 2022, in which the Company stated that its Previously Issued Financial Statements and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, could no longer be relied upon.  Additionally, the 2022 Form 10-K/A stated the Company "has determined that one or more material weaknesses existed in the Company's internal control including a material weakness related to accounting for certain complex business transactions," that "[t]he Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions," and that "[a]s a result of the material weakness, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022."

103.   On March 26, 2024, the Company filed its 2023 Form 10-K.  Within the 2023 Form 10-K, the Company admitted that it had not appropriately accounted for certain historical transactions under Generally Accepted Accounting Principles ("GAAP"), and that the Company's previously issued financial statements would have to be restated.  Ryvyl further admitted within the Company's 2023 Form 10-K that it "did not maintain effective controls over the reconciliation of transactions between the Company's operating system and its general ledger system, at the individual transaction level" and that it had "commenced measures to remediate the identified material weakness, including the implementation of an enhanced reconciliation preparation and review process, and improved reporting from the Company's operating system."

THIRD AMENDED CLASS ACTION COMPLAINT

1

## CLASS ACTION ALLEGATIONS

2    104.   Plaintiff brings this action as a class action pursuant to Rules 23(a) and

3    23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and/or

4    entities who purchased the Company's securities during the Class Period seeking to

5    pursue remedies under the Exchange Act and SEC Rule 10b-5 promulgated

6    thereunder.   Excluded from the Class are Defendants and their families, the officers

7    and directors of the Company, at all relevant times, members of their immediate

8    families and their legal representatives, heirs, successors or assigns, and any entity

9    in which Defendants have, or had, a controlling interest.

10    105.   The members of the Class are so numerous that joinder of all members

11    is impracticable.   Throughout the Class Period, the Company's securities were

12    actively traded on NASDAQ.   While the exact number of Class members is

13    unknown to Plaintiff at this time and can only be ascertained through appropriate

14    discovery, Plaintiff believes that there are hundreds or thousands of members in the

15    proposed Class.   Record owners and other members of the Class may be identified

16    from records maintained by the Company or its transfer agent and may be notified

17    of the pendency of this action by mail, using the form of notice similar to that

18    customarily used in securities class actions.

19    106.   Plaintiff's claims are typical of the claims of the members of the Class,

20    since all members of the Class are similarly affected by Defendants' wrongful

21    conduct in violation of the federal securities laws alleged herein.

22    107.   Plaintiff will fairly and adequately protect the interests of the members

23    of the Class and has retained counsel competent and experienced in class action and

24    securities litigation.

25    108.   Common questions of law and fact exist as to all members of the Class

26    and predominate over any questions solely affecting individual members of the

27    Class.   Among the questions of law and fact common to the Class are:

28

THIRD AMENDED CLASS ACTION COMPLAINT

(a)     whether Defendants' acts constituted violations of the federal securities laws;

(b)     whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)     whether the price of the Company's securities was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

109.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

110.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities.  Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's securities by failing to disclose, and misrepresenting, the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's securities declined significantly as the prior artificial inflation dissipated from the Company's stock price.

111.   As a result of the purchases of the Company's securities during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws.  Defendants' false and misleading

statements had the intended effect, and caused, the Company's securities to trade at artificially inflated levels throughout the Class Period.

112. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's securities fell significantly. These declines removed the inflation from the price of the Company's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

113. The declines in the price of the Company's securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in the Company's securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.

114. The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

115. At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a) The Company's securities met the requirements for listing, and was listed and actively traded on, NASDAQ, a highly efficient, electronic stock market;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC and NASDAQ;

THIRD AMENDED CLASS ACTION COMPLAINT

(c)    The Company regularly communicated with public investors through established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

116.  As a result of the foregoing, the market for the Company's securities promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's stock.  Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

117.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision.  Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-

looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### Promulgated Thereunder Against Defendants

118.   Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

119.   During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading.  These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary to make the statements made, considering the circumstances under which they were made, not misleading.

120.   To the extent that the claims alleged herein are based upon the omission of information, such omissions were made in connection with the misrepresentations and misleading half-truths alleged herein and were not based upon pure omissions.

121.   Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

122.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities.   Plaintiff and the Class would not have purchased the Company's securities at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

THIRD AMENDED CLASS ACTION COMPLAINT

123. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

124. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

125. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

126. The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein. The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected. Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

127. The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

128. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 12, 2024

**GLANCY PRONGAY & MURRAY LLP**

By:   *s/ Ex Kano S. Sams II*
Robert V. Prongay
Ex Kano S. Sams II
Charles Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  rprongay@glancylaw.com

*Attorneys for Lead Plaintiff Scot S. Cook*

THIRD AMENDED CLASS ACTION COMPLAINT

## <u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On November 12, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 12, 2024.


*/s/ Ex Kano S. Sams II*
Ex Kano S. Sams II