# EXHIBIT 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 10-Q

---

(MARK ONE)

X QUARTERLY REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended June 30, 2025

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT

For the transition period from _____ to _____

Commission file number: 001-34294

# RYVYL INC.
(Exact name of small business issuer as specified in its charter)

| **Nevada** | **22-3962936** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification Number) |

| **3131 Camino Del Rio North, Suite 1400** **San Diego, CA** | **92108** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**(619) 631-8261**
(Registrant's telephone number, including area code)

(Former name or former address, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, $0.001 par value | RVYL | The Nasdaq Stock Market LLC (Nasdaq Capital Market) |

Check whether the issuer (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes X No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                        Accelerated filer ☐
Non-accelerated filer X                                          Smaller reporting company X
                                                                  Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No X

As of August 12, 2025, the Registrant had 31,342,011 shares of common stock, $0.001 par value per share, outstanding.

---

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **PART I Consolidated Financial Information** | | |
| Item 1. | Financial Statements | 1 |
| | Condensed Consolidated Balance Sheets as of June 30, 2025 (unaudited) and December 31, 2024 | 1 |
| | Condensed Consolidated Statements of Operations and Comprehensive Income for the Three Months and Six Months Ended June 30, 2025 (unaudited) and 2024 (unaudited) | 2 |
| | Condensed Consolidated Statements of Changes in Stockholders' Equity for the Three Months and Six Months Ended June 30, 2025 (unaudited) and 2024 (unaudited) | 3 |
| | Condensed Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2025 (unaudited) and 2024 (unaudited) | 5 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | 6 |

| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 32 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 40 |
| Item 4. | Controls and Procedures | 40 |

**PART II Other Information**

| Item 1. | Legal Proceedings | 41 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 44 |
| Item 3. | Defaults Upon Senior Securities | 45 |
| Item 4. | Mine Safety Disclosures | 45 |
| Item 5. | Other Information | 45 |
| Item 6. | Exhibits | 45 |
| Signatures | | 46 |

i

Table of Contents

**PART I - FINANCIAL INFORMATION**

**ITEM 1. FINANCIAL STATEMENTS**

**RYVYL INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
*(In thousands, except share and per share data)*

| | June 30, 2025 | December 31, 2024 |
|---|---|---|
| | *(Unaudited)* | |
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash | $ 210 | $ 2,599 |
| Restricted cash | 14,770 | 89,432 |
| Accounts receivable, net of allowance for credit losses of $309 and $142, respectively | 888 | 1,076 |
| Cash due from gateways, net of allowance of $152 and $34, respectively | - | 88 |
| Prepaid and other current assets | 764 | 2,189 |
| Total current assets | 16,632 | 95,384 |
| **Non-current Assets:** | | |
| Property and equipment, net | 135 | 165 |
| Goodwill | - | 18,856 |
| Intangible assets, net | 1,560 | 1,802 |
| Operating lease right-of-use assets, net | 2,035 | 3,425 |
| Other assets | 240 | 2,644 |
| Total non-current assets | 3,970 | 26,892 |
| **Total assets** | $ 20,602 | $ 122,276 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current Liabilities:** | | |
| Accounts payable | $ 5,170 | $ 3,515 |
| Accrued liabilities | 3,224 | 8,146 |
| Payment processing liabilities, net | 15,658 | 90,802 |
| Current portion of operating lease liabilities | 533 | 839 |
| Other current liabilities | 124 | 240 |
| Total current liabilities | 24,709 | 103,542 |
| Long term debt, net of debt discount | 613 | 17,363 |
| Operating lease liabilities, less current portion | 2,217 | 2,863 |
| Total liabilities | 27,539 | 123,768 |
| **Commitments and contingencies (Note 15)** | | |
| **Stockholders' Equity:** | | |
| Preferred stock, Series B, par value $0.01, 5,000,000 shares authorized; shares issued and outstanding 0 and 53,499 at June 30, 2025 and December 31, 2024, respectively | - | 1 |
| Common stock, par value $0.001, 100,000,000 shares authorized, shares issued and outstanding of 15,957,396 and 8,032,318 at June 30, 2025 and December 31, 2024, respectively | 16 | 8 |
| Additional paid-in capital | 183,618 | 179,157 |
| Accumulated other comprehensive income | - | (1,251) |
| Accumulated deficit | (190,571) | (179,407) |
| Total stockholders' deficit | (6,937) | (1,492) |
| **Total liabilities and stockholders' deficit** | $ 20,602 | $ 122,276 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

1

Table of Contents

**RYVYL INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**
*(In thousands, except share and per share data)*
*(Unaudited)*

| | Three Months Ended | Six Months Ended |
|---|---|---|

| | June 30, 2025 | June 30, 2024 | June 30, 2025 | June 30, 2024 |
|---|---:|---:|---:|---:|
| Revenue | $ 2,783 | $ 2,972 | $ 5,552 | $ 12,646 |
| Cost of revenue | 1,564 | 1,846 | 2,964 | 7,367 |
| Gross profit | 1,219 | 1,126 | 2,588 | 5,279 |
| **Operating expenses:** | | | | |
| Advertising and marketing | 2 | 16 | 5 | 33 |
| Research and development | 129 | 819 | 578 | 2,212 |
| General and administrative | 1,351 | 1,204 | 2,488 | 2,742 |
| Payroll and payroll taxes | 497 | 2,170 | 3,120 | 5,074 |
| Professional fees | 667 | 1,260 | 1,685 | 2,295 |
| Stock compensation expense | 441 | 182 | 496 | 406 |
| Depreciation and amortization | 159 | 507 | 241 | 998 |
| Impairment of goodwill | - | 6,675 | - | 6,675 |
| Impairment of intangible assets | 1,088 | - | 1,088 | - |
| Restructuring charges | 171 | 1,636 | 574 | 1,636 |
| Total operating expenses | 4,505 | 14,469 | 10,275 | 22,071 |
| **Loss from operations** | (3,286) | (13,343) | (7,687) | (16,792) |
| **Other income (expense):** | | | | |
| Interest expense | (523) | (125) | (1,752) | (153) |
| Accretion of debt discount | (22) | (797) | (150) | (1,705) |
| Changes in fair value of derivative liability | - | 14 | - | 14 |
| Derecognition expense on conversion of convertible debt | 176 | (69) | 176 | (69) |
| Other (expense) income | (21) | 49 | 26 | 99 |
| Total other expense, net | (390) | (928) | (1,700) | (1,814) |
| Loss from continuing operations before income taxes | (3,676) | (14,271) | (9,387) | (18,606) |
| Provision for income taxes | 164 | 177 | 305 | 166 |
| Net loss from continuing operations | (3,840) | (14,448) | (9,692) | (18,772) |
| (Loss) income from discontinued operations, net of tax | (4,568) | 2,337 | (1,472) | 3,971 |
| **Net loss** | $ (8,408) | $ (12,111) | $ (11,164) | $ (14,801) |
| **Comprehensive income statement:** | | | | |
| Net loss | $ (8,408) | $ (12,111) | $ (11,164) | $ (14,801) |
| Foreign currency translation gain (loss) | 149 | (174) | 1,250 | (619) |
| Total comprehensive loss | $ (8,259) | $ (12,285) | $ (9,914) | $ (15,420) |
| **Net loss per share:** | | | | |
| Basic and diluted | $ (0.80) | $ (1.88) | $ (1.19) | $ (2.39) |
| **Weighted average number of common shares outstanding:** | | | | |
| Basic and diluted | 10,561,893 | 6,438,409 | 9,409,076 | 6,205,492 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

2

Table of Contents

**RYVYL INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
*(In thousands, except share data)*
*(Unaudited)*

| | Common Stock Shares | Common Stock Amount | Preferred Stock Series B Shares | Preferred Stock Amount | Additional Paid In Capital | Other Accumulated Comprehensive Income (Loss) | Accumulated Deficit | Total Stockholders' Equity |
|---|---:|---:|---:|---:|---:|---:|---:|---:|
| **Balance at December 31, 2024** | 8,032,318 | $ 8 | 53,499 | $ 1 | $ 179,157 | $ (1,251) | $ (179,407) | $ (1,492) |
| Issuance of common stock under equity incentive plans | 15,760 | 0 | - | - | 55 | - | - | 55 |
| Common stock issued for conversion of Preferred B stock | 314,912 | 0 | (400) | - | - | - | - | - |
| Preferred B stock repurchases | - | - | (53,099) | (1) | 1 | - | - | - |
| Capital contributions | - | - | - | - | 9 | - | - | 9 |
| Net loss and comprehensive loss | - | - | - | - | - | 1,102 | (2,756) | (1,654) |
| Balance at March 31, 2025 | 8,362,990 | 8 | - | - | 179,222 | (149) | (182,163) | (3,082) |
| Issuance of common stock under equity incentive plans | 475,563 | 1 | - | - | 396 | - | - | 397 |
| Common stock issued for conversion of convertible debt | 7,118,843 | 7 | - | - | 3,956 | - | - | 3,963 |
| Stock-based compensation | - | - | - | - | 44 | - | - | 44 |
| Net loss and comprehensive loss | - | - | - | - | - | 149 | (8,408) | (8,259) |
| **Balance at June 30, 2025** | 15,957,396 | $ 16 | - | $ - | $ 183,618 | $ - | $ (190,571) | $ (6,937) |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

Table of Contents

| | Common Stock | | Preferred Stock Series B | | Additional Paid In Capital | Other Accumulated Comprehensive Income (Loss) | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance at December 31, 2023 | 5,996,948 | $ 6 | 55,000 | $ 1 | $ 175,664 | $ 401 | $ (152,581) | $ 23,491 |
| Issuance of restricted common stock under equity incentive plans | 6,333 | - | - | - | 119 | - | - | 119 |
| Issuance of restricted common stock under equity incentive plans | 14,443 | - | - | - | 93 | - | - | 93 |
| Issuance of common stock upon exercise of stock options | 6,218 | - | - | - | - | - | - | - |
| Shares forfeited | (22,455) | - | - | - | (100) | - | - | (100) |
| Net loss and comprehensive loss | - | - | - | - | - | (445) | (2,689) | (3,134) |
| Balance at March 31, 2024 | 6,001,487 | 6 | 55,000 | 1 | 175,777 | (44) | (155,270) | 20,470 |
| Issuance of restricted common stock under equity incentive plans | 42,659 | - | - | - | 279 | - | - | 279 |
| Issuance of common stock upon conversion of convertible debt | 169,220 | - | - | - | 240 | - | - | 240 |
| Issuance of common stock upon conversion of Series B preferred stock | 567,262 | 1 | (875) | - | (1) | - | - | - |
| Shares forfeited | (30,528) | - | - | - | (75) | - | - | (75) |
| Net loss and comprehensive loss | - | - | - | - | - | (174) | (12,111) | (12,285) |
| Balance at June 30, 2024 | 6,750,100 | $ 7 | 54,125 | $ 1 | $ 177,620 | $ (218) | $ (167,382) | $ 10,028 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

4

Table of Contents

**RYVYL INC.**
**CONDENSED CONSOLIDATED STATEMENT OF CASH FLOWS**
*(In thousands)*
*(Unaudited)*

| | Six Months Ended June 30, | |
|---|---|---|
| | 2025 | 2024 |
| **Cash flows from operating activities:** | | |
| Net loss | $ (11,164) | $ (14,801) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation and amortization expense | 337 | 1,235 |
| Noncash lease expense | 490 | 141 |
| Stock compensation expense | 496 | 406 |
| Accretion of debt discount | 150 | 1,705 |
| Derecognition upon conversion of convertible debt | (176) | 69 |
| Changes in fair value of derivative liability | - | (14) |
| Loss on sale of Ryvyl EU | 6,497 | - |
| Impairment of intangible assets | 1,088 | - |
| Impairment of goodwill | - | 6,675 |
| Restructuring charges | 574 | 1,636 |
| Changes in assets and liabilities: | | |
| Accounts receivable, net | 188 | 66 |
| Prepaid and other current assets | 829 | 445 |
| Cash due from gateways, net | 89 | 11,699 |
| Other assets | (91) | (299) |
| Accounts payable | 1,784 | 1,337 |
| Accrued and other current liabilities | (1,824) | (1,408) |
| Accrued interest | (18) | - |
| Payment processing liabilities, net | (2,395) | (6,197) |
| Net cash (used in) provided by operating activities | (3,146) | 2,695 |
| **Cash flows from investing activities:** | | |
| Purchases of property and equipment | (76) | (7) |
| Capitalized software development costs | (1,088) | (546) |
| Purchases of intangible assets | (145) | (92) |
| Cash transferred in connection with the sale of Ryvyl EU | (74,954) | - |
| Net cash used in investing activities | (76,263) | (645) |
| **Cash flows from financing activities:** | | |
| Repayments on convertible debt | (13,000) | - |
| Repayments on long-term debt | (6) | (9) |
| Proceeds from short-term note payable | 15,000 | - |
| Treasury stock purchases | - | (190) |

| | | |
|---|---:|---:|
| Net cash provided by (used in) financing activities | | |
| Effect of exchange rate changes on cash and restricted cash | 365 | (9) |
| | | |
| Net increase (decrease) in cash and restricted cash | (77,050) | 1,842 |
| Cash and restricted cash – beginning of period | 92,030 | 73,318 |
| **Cash and restricted cash – end of period** | $ 14,980 | $ 75,160 |
| | | |
| **Supplemental cash flow disclosures** | | |
| Cash paid during the period for: | | |
| Interest | $ 135 | $ - |
| Income taxes | $ 761 | $ 380 |
| | | |
| **Non-cash financing and investing activities:** | | |
| Convertible debt conversion to common stock | $ 4,000 | $ 200 |
| Convertible debt conversion to preferred stock | $ - | $ - |
| Interest accrual from convertible debt converted to common stock | $ 135 | $ - |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

5

Table of Contents

**RYVYL, INC.**
**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

### 1. Description of the Business and Basis of Presentation

**Organization**

RYVYL Inc. ("RYVYL") is a financial technology company that develops software platforms and tools that are focused on providing global payment acceptance and disbursement capabilities. RYVYL's strategy is rooted in our mission to transform the global payments landscape through technology-driven, customer-centric, and compliance-focused financial solutions. Our first-generation product, QuickCard, was originally developed to facilitate payment processing for predominantly cash-based businesses in certain niche high-risk business verticals. It was a comprehensive physical and virtual payment card processing management system that offered a cloud-based network interface, merchant management, and point-of-sale (POS) connectivity to facilitate noncash payment methods such as credit cards, debit cards and prepaid gift cards, and to subsequently disburse those funds electronically to merchants upon request. In early 2024, in response to evolving changes in the compliance environment and banking regulations, the Company began transitioning QuickCard to a fully virtual, app-based product. In mid-2024, the Company further transitioned its QuickCard product from a direct offering to a licensing model, whereby partners with more suitable compliance capabilities could license the platform from the Company and offer its payments processing capabilities in the same business verticals the Company previously served directly.

As the global fintech industry continues to evolve, it has become evident that there is a need for a fully integrated platform that can seamlessly support multiple types of offerings on a global scale. We believe our second-generation platform, NEMS Core, provides a compelling solution to fill that product void. As a dual-sided platform, NEMS Core is designed to support both acquiring and disbursement services within a unified infrastructure. This end-to-end platform enables businesses to seamlessly accept payments from customers while efficiently distributing funds to vendors, employees, and partners worldwide. Unlike traditional single-function payment systems that often face limitations in adapting to dynamic market demands, RYVYL's dual-sided platform offers a flexible, agile, and robust architecture. It streamlines the entire transaction lifecycle, from payment initiation to settlement, providing businesses with a competitive advantage in an increasingly interconnected and digital financial environment.

Prior to the sale of the Company's subsidiary, Ryvyl (EU) EAD ("Ryvyl EU"), which was effective June 1, 2025, the Company operated through two distinct business segments designed to meet the diverse and evolving needs of global markets. Our business was strategically structured around two primary geographic regions - Europe and North America - each offering complementary product and service portfolios that encompassed payment processing, treasury management, acquiring, issuing, and Electronic Money Institution ("EMI") services. This segmentation allowed RYVYL to deliver tailored, market-specific solutions while maintaining a cohesive global strategy that supports operational efficiency, regulatory compliance, and financial growth. As a result of the sale of Ryvyl EU, our operations are now solely conducted in North America.

In North America, the Company's focus is on expanding treasury management services, Bank Identification Number (BIN) sponsorship for credit card processing, and comprehensive payment solutions such as ACH and wire transfers. By leveraging third-party sponsorship arrangements alongside our technology, we are positioned to capture growth opportunities in key sectors, including e-commerce, fintech, and B2B payments.

*Name Change*

On May 3, 2018, PubCo formally changed its name to GreenBox POS LLC, then subsequently changed its name to GreenBox POS on December 13, 2018. On October 13, 2022, GreenBox POS changed its name to RYVYL Inc. ("RYVYL"). Unless the context otherwise requires, all references to "the Company," "we," "our", "us" and "PubCo" refer to RYVYL Inc. Additionally, unless the context otherwise requires, all references to "PrivCo" or the "Private Company" refer to GreenBox POS LLC, a limited liability company, formed in the state of Washington.

6

Table of Contents

### 2. Summary of Significant Accounting Policies

**Going Concern**

In February 2024, the Company stopped processing credit card payments on its QuickCard platform because our processing partner's bank informed them that they no longer wished to process payments for cannabis merchants. QuickCard was our first-generation product and was designed to address the needs of previously all-cash businesses. Although not limited to the cannabis industry, prior to discontinuing QuickCard, cannabis merchants made up a substantial majority of the platform's processing volume. In an effort to recover the loss of revenues, during the second quarter of 2024, the Company transitioned its QuickCard product from terminal-based to app-based processing. Subsequently, management determined that the app-based product was not a viable long-term solution for certain niche high-risk business verticals (including cannabis merchants) and made the decision to terminate the rollout of the app-based product in those specific business verticals.

In response to the discontinuation of QuickCard as a direct offering, during the third quarter of 2024, the Company began to offer a license of the platform, which it believes will enable it to serve the same customer base it previously served with the original product offering through a business partner with more suitable banking compliance capabilities.

Currently, the Company does not hold any active licensing agreements in place, and it continues to seek suitable business partners and licensing product application, during the second half of 2024, management executed a reorganization of the Company's business to better align with its revised strategy and cost structure. As a result of these changes as well as an increasingly uncertain business environment in the US, management expects the recovery of the loss of revenues resulting from the discontinuation of its QuickCard product to take longer than originally anticipated.

The decline in revenues resulting from the discontinuation of QuickCard has adversely impacted the Company's liquidity. Also, until recently, the Company had relied on the repatriation of profits from its European subsidiaries to cover some of its critical operating expenses, which it is no longer be able to do following the sale of Ryvyl EU, effective June 1, 2025. As a result, management has determined that its cash balance as of June 30, 2025, will not be sufficient to fund the Company's operations and capital needs for the next 12 months from the date of this Report and, unless we are able to raise additional capital, will only be sufficient to fund operations through approximately December 31, 2025. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The Company's ability to continue as a going concern is contingent upon the successful execution of management's intended plan over the next twelve months to improve its liquidity position, which includes, without limitation:

- raising additional capital through a variety of means, including private and public equity offerings and debt financings. The Company recently executed a successful capital raise (see Note 17, Subsequent Events), and continues to be actively engaged in discussions with multiple parties for additional funding opportunities;

- continued execution of its accelerated business development efforts to drive volumes in diversified business verticals with the Company's other products, including the recently launched licensing of the Company's payments processing platform in certain niche high-risk business verticals;

- continued implementation of cost control measures to more effectively manage spending and further right-sizing the organization, where appropriate;

Management has assessed that its intended plan described above, if successfully implemented, is appropriate and sufficient to address its liquidity shortfall and to provide funds to cover operations for the next 12 months from the date of the issuance of this Report. However, there can be no assurance that we will be successful in implementing our plan, that our projections of our future capital needs will prove accurate, or that any additional funding will be available on a timely manner, on favorable terms, or be sufficient to continue our operations. The condensed consolidated financial statements do not include any adjustments that might be necessary if the Company is unable to continue as a going concern.

7

Table of Contents

**Basis of Presentation and Consolidation**

The accompanying condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). All intercompany transactions and balances have been eliminated in the accompanying condensed consolidated financial statements.

**Unaudited Interim Financial Information**

Certain information and footnote disclosures normally included in the Company's annual audited financial statements and accompanying notes have been condensed or omitted in this accompanying interim consolidated financial statements and footnotes. Accordingly, the accompanying interim condensed consolidated financial statements included herein should be read in conjunction with the audited consolidated financial statements and accompanying notes included in the Company's Annual Report on Form 10-K for the year ended December 31, 2024, filed with the Securities and Exchange Commission ("SEC") on March 28, 2025 (the "2024 Annual Report").

In the opinion of management, these unaudited interim condensed consolidated financial statements include all adjustments and accruals, consisting only of normal, recurring adjustments that are necessary for a fair statement of the results of all interim periods reported herein. The results of the interim periods are not necessarily indicative of the results expected for the full fiscal year or any other interim period or any future year or period.

**Use of Estimates**

The preparation of the Company's consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the condensed consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. To the extent that there are material differences between these estimates and actual results, the Company's financial condition or operating results will be materially affected. The Company bases its estimates on current and past experience to the extent that historical experience is predictive of future performance, and other assumptions that the Company believes are reasonable under the circumstances. The Company evaluates these estimates on an ongoing basis.

8

Table of Contents

**Reclassification**

Certain prior year amounts have been reclassified for consistency with the current period presentation. These reclassifications had no effect on the reported financial position, results of operations or cash flows.

**Cash and Restricted Cash**

Cash consist of cash on hand and cash on deposit with banks. Restricted cash primarily consists of funds received from banking services clients, which has yet to be distributed to those clients' end customers at the end of the period.

**Payment Processing Liabilities**

Payment processing liabilities principally represent funds collected from banking services clients that have yet to be distributed to those clients' customers at the end of the period. These liabilities are secured by funds held in restricted cash accounts and are presented as restricted cash in the condensed consolidated balance sheets.

**Revenue Recognition**

Revenue is recognized when control of the promised goods or services is transferred to customers, in an amount that reflects the consideration the Company expects to be entitled to in exchange for those goods or services.

Historically, the Company generated the majority of its revenue from payment processing services. Payment processing services revenue was typically based on a percentage of the value of each transaction processed and/or upon fixed amounts specified for each transaction or service. The Company satisfied its performance obligations and, therefore,

recognized the processing fees as revenue at a point in time, upon the authorization of a merchant sale transaction. Following the sale, the Company's wholly owned subsidiary, Ryvyl EU, effective June 1, 2025, the Company primarily generates revenue from banking services, which primarily include incoming and outgoing ACH and wire transfer transactions, and fees earned from payment processing transactions where the Company arranges for the delivery of those services to the merchant by a payment processor. For banking services transactions, the Company typically charges specified fees on a per transaction basis, which may vary from customer to customer. The Company satisfies its performance obligation related to these transactions at a point in time, upon the authorization of the transaction in the Company's payments platform. For revenue earned from arranging for the delivery of payment processing services to merchants by a payment processor, the Company typically charges specified fees on a per transaction basis, a percentage share of the transaction amount, or a combination of both. The Company satisfies the performance obligation related to these transactions at a point in time, upon the authorization of the transaction in the payment processor's platform. Revenue from these transactions is recognized on a gross basis, as the Company has determined that it is the principal in the arrangements governing those transactions.

**Research and Development Costs**

Research and development costs primarily consist of salaries and benefits for research and development personnel and outsourced contracted services, as well as associated supplies and materials. These costs are expensed as incurred.

**Internal-use Software Development Costs**

Internal-use software development costs consist of the costs related to outsourced consultants who are directly associated with and who devote time to creating and enhancing internally developed software for the Company's platforms. Internal-use software development activities generally consist of three stages: (i) the preliminary project stage, (ii) the application development stage, and (iii) the postimplementation-operation stage. In accordance with ASC 350-40, *Internal Use Software*, costs incurred in the preliminary and postimplementation-operation stages of software development are expensed as incurred. Costs incurred in the application development stage, including significant enhancements and upgrades, are capitalized. Capitalized internal-use software development costs are included within intangible assets, net on the condensed consolidated balance sheets, and are amortized on a straight-line basis over an estimated useful life of three years upon the software or additional features being ready for their intended use.

9

Table of Contents

**Accounts Receivable, Net**

Accounts receivable primarily consist of amounts recorded in connection with the sale of payment processing terminals and related accessories. Accounts receivable are recorded at invoiced amounts, net of an allowance for credit losses, and do not bear interest. In accordance with Accounting Standards Update ("ASU") No. 2016-13, *Financial Instruments – Credit Losses (ASC 326): Measurement of Credit Losses on Financial Instruments ("ASU 2016-13"),* the Company measures its allowance for credit losses using an expected credit loss model that reflects the Company's current estimate of expected credit losses inherent in the enterprise and the accounts receivable balance. In determining the expected credit losses, the Company considers its historical loss experience, the aging of its accounts receivable balance, current economic and business conditions, and anticipated future economic events that may impact collectability. The Company reviews its allowance for credit losses periodically and, as needed, amounts are written-off when determined to be uncollectible. As of June 30, 2025, and December 31, 2024, the allowance for credit losses was immaterial.

**Prepaid Expenses and Other Current Assets**

Prepaid expenses and other current assets primarily consist of inventory, short term deposits, and prepaid property taxes required under existing lease arrangements.

**Property and Equipment, Net**

Property and equipment primarily consist of computer equipment and furniture and fixtures. Property and equipment are stated at historical cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets, which range from three to eight years. Expenditures for repairs and maintenance are charged to expense as incurred. For assets sold or otherwise disposed of, the cost and related accumulated depreciation are removed from the accounts, and any related gain or loss is reflected in income for the period.

**Fair Value Measurements**

The Company applies fair value accounting for assets and liabilities that are recognized or disclosed at fair value in the condensed consolidated financial statements on a recurring basis. Fair value is defined as the price received to sell an asset or paid to transfer a liability in the principal market for the asset or liability in an orderly transaction between market participants on the measurement date.

ASC Topic 820, *Fair Value Measurements,* establishes a three-level hierarchy priority for disclosure of assets and liabilities recorded at fair value. The ordering of priority reflects the degree to which objective prices in external active markets are available to measure fair value. The classification of assets and liabilities within the hierarchy is based on whether the inputs to the valuation methodology used for measurement are observable or unobservable. The Company utilizes valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs to the extent possible. The three levels in the hierarchy are as follows:

- Level 1 – Observable inputs, such as unadjusted quoted prices in active markets for identical assets or liabilities accessible to the reporting entity at the measurement date.

- Level 2 – Observable inputs other than Level 1 quoted prices, such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

- Level 3 – Unobservable inputs that cannot be directly corroborated by observable market data and that typically reflect management's estimate of assumptions that market participants would use in pricing the asset or liability.

The applicability of this guidance was limited to the Company's 8% Senior Convertible Note and related derivative liability, which were fully retired during the quarter ended June 30, 2025. As of December 31, 2024, the Company classified these liabilities as Level 3 of the fair value hierarchy, as fair values are estimated using models that use both observable (e.g., changes in market interest rates) and unobservable (e.g., changes in unobservable long-dated volatilities) inputs.

10

Table of Contents

**Goodwill and Intangible Assets**

ASC 350-20, *Intangibles—Goodwill and Other—Goodwill,* requires companies to assess goodwill for impairment annually or more frequently if indicators of impairment exist. Testing goodwill for impairment is performed at the reporting unit level, using a two-step test, and requires companies to compare the fair value of a reporting unit with its carrying amount, including goodwill. Goodwill is considered impaired if the carrying value of a reporting unit exceeds its fair value. ASC 350-20 also provides for an optional qualitative assessment for testing goodwill for impairment that enables companies to skip the two-step test if it is determined that it is more likely than not (i.e., a likelihood of greater than

50%) that the fair value of a reporting unit is greater than its carrying amount, then the Company perform a goodwill impairment test annually on December 31 or more frequently if events and circumstances indicate that the asset might be impaired. Following the sale of the Company's wholly owned subsidiary, Ryvyl EU, effective June 1, 2025, the Company no longer has any goodwill.

Intangible assets consist of acquired customer relationships and business intellectual properties. In accordance with ASC 350-30, *Intangibles—Goodwill and Other—General Intangibles Other than Goodwill*, the Company's intangible assets are amortized over their estimated useful lives, ranging from two to five years, using the straight-line method. Intangible assets amortized under ASC 350-30 must be reviewed for impairment when indicators of impairment are present, in accordance with ASC 360-10. Through April 30, 2025, the Company capitalized internal-use software development costs incurred in connection with the development of the European instance of its dual-sided platform, NEMS Core. Following the sale of Ryvyl EU, effective June 1, 2025, the Company halted any further development of the new platform instance. Additionally, the Company determined that all previously capitalized software development costs related to the new platform instances were not recoverable and recorded an impairment charge of $1.1 million during the quarter ended June 30, 2025.

### Leases

The Company leases office space under non-cancellable operating leases with various expiration dates. The Company determines whether an arrangement is a lease for accounting purposes at contract inception. Operating leases are recorded as right-of-use ("ROU") assets, which are included within noncurrent assets, and lease liabilities, which are included within current and noncurrent liabilities on our condensed consolidated balance sheets.

Operating lease ROU assets and operating lease liabilities are recognized at the lease commencement date based on the present value of the future lease payments over the lease term. ROU assets are based on the lease liability and are increased by prepaid lease payments and decreased by lease incentives received, where applicable. The interest rate used to determine the present value of the future lease payments is the Company's incremental borrowing rate because the interest rate implicit in the Company's leases is not readily determinable. The Company's incremental borrowing rate is estimated to approximate the interest rate that the Company would pay to borrow on a collateralized basis with similar terms and payments as the lease, and in economic environments where the leased asset is located. Certain leases require the Company to pay taxes, maintenance, and other operating expenses associated with the leased asset. Such amounts are not included in the measurement of the ROU assets and lease liabilities. These lease costs are recognized as lease expenses when incurred.

11

Table of Contents

The Company evaluates ROU assets related to leases for indicators of impairment whenever events or changes in circumstances indicate that the carrying amount of those assets may not be recoverable. When a decision has been made to exit a lease prior to the contractual term or to sublease that space, the Company evaluates the asset for impairment and recognizes the associated impact to the ROU asset and related expense, if applicable. The evaluation is performed at the asset group level initially and when appropriate, at the lowest level of identifiable cash flows, which is at the individual lease level. Undiscounted cash flows expected to be generated by the related ROU asset are estimated over the ROU asset's useful life. If the evaluation indicates that the carrying amount of the ROU asset may not be recoverable, any potential impairment is measured based upon the fair value of the related ROU asset or asset group as determined by appropriate valuation techniques. During the quarter ended June 30, 2025, the Company identified indicators of impairment for the ROU asset related to one of its operating leases, which indicated that the carrying value of the ROU asset may not be recoverable. Based on the Company's impairment analysis, management confirmed that the carrying value of the ROU asset was not recoverable and recorded an impairment charge of $0.5 million as of June 30, 2025.

### Foreign Currency

Assets and liabilities of our foreign subsidiaries are translated into the reporting currency using the exchange rates in effect on the condensed consolidated balance sheet dates. Equity accounts are translated at historical rates, except for the change in retained earnings during the period, which is the result of the income statement translation process. Revenue and expense accounts are translated using the weighted average exchange rate during the period. The cumulative translation adjustments associated with the net assets of foreign subsidiaries are recorded in accumulated other comprehensive income in the accompanying consolidated statements of stockholders' equity. Following the sale of the Company's wholly owned foreign subsidiary, Ryvyl EU, effective June 1, 2025, the Company is no longer exposed to changes in exchange rates that would impact its condensed consolidated balance sheets on a go forward basis.

### Stock Based Compensation

Stock-based compensation expense relates to restricted stock awards ("RSAs"), restricted stock units ("RSUs"), and stock options granted to employees and non-employee directors under the Company's equity incentive plans, which are measured based on the grant-date fair value. The fair value of RSAs and RSUs is determined by the closing price of the Company's common stock on the grant date. The fair value of stock options is estimated on the date of grant using the Black-Scholes-Merton option valuation model. Generally, stock-based compensation expense is recorded on a straight-line basis over the requisite service period. The Company accounts for forfeitures as they occur.

### Income Taxes

Income taxes are accounted for under the asset and liability method. Deferred income taxes are recognized for temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, net of operating loss carry forwards and credits, by applying enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is not more likely than not that some portion of or all the deferred tax assets will not be realized. Judgment is required in determining and evaluating income tax provisions and valuation allowances for deferred income tax assets. We recognize an income tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by tax authorities, based on the technical merits of the position.

Current income taxes are provided for in accordance with the laws of the relevant taxing authorities. As of June 30, 2025, and December 31, 2024, the Company has a full valuation allowance on its deferred tax assets.

12

Table of Contents

### Net Loss Per Share

The Company's basic net loss per share is computed by dividing the loss available to common shareholders by the weighted average number of common shares outstanding during the period without consideration of potentially dilutive securities. Diluted net loss per share is computed by dividing the net loss available to common shareholders by the weighted-average number of shares of common stock outstanding, adjusted for the dilutive effect of all potential shares of common stock. For the three and six-month periods ended June 30, 2025, and 2024, the Company's diluted net loss per share is the same as the basic net loss per share, since there are no common stock equivalents outstanding that would have a dilutive effect.

### Recently Adopted Accounting Pronouncements

In December 2023, the FASB issued ASU 2023-09, *Income Taxes (Topic 740): Improvements to Income Tax Disclosures* ("ASU 2023-09"). The amended guidance enhances income tax disclosures primarily related to the effective tax rate reconciliation and income taxes paid information. This guidance requires disclosure of specific categories in the effective tax rate reconciliation and further information on reconciling items meeting a quantitative threshold. In addition, the amended guidance requires disaggregating income taxes paid (net

of refunds received by federal, state, and foreign taxes. It also requires disaggregating individual jurisdictions in which income taxes paid (net of refunds received) is equal to or greater than 5 percent of total income taxes paid (net of refunds received). The amended guidance is effective for fiscal years beginning after December 15, 2024. The guidance can be applied either prospectively or retrospectively. The adoption of ASU 2023-09 will impact the Company's annual disclosures only.

**Recently Issued Accounting Pronouncements**

In December 2023, the FASB issued ASU 2023-08, *Intangibles – Goodwill and Other – Crypto Assets (Subtopic 350-60)*: *Accounting for and Disclosure of Crypto Assets*. This amended guidance requires fair value measurement of certain crypto assets each reporting period with the changes in fair value reflected in net income. The amendments also require disclosures of the name, fair value, units held, and cost bases for each significant crypto asset held and annual reconciliations of crypto asset holdings. The new guidance is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2024, with early adoption permitted. We are required to apply these amendments as a cumulative-effect adjustment to retained earnings as of the beginning of the fiscal year in which the guidance is adopted. The adoption of this guidance is not expected to have an impact on the Company's consolidated financial statements, as we currently do not hold any crypto assets.

In November 2024, the FASB issued ASU No. 2024-03, *Disaggregation of Income Statement Expenses* ("ASU 2024 03"), and in January 2025, the FASB issued ASU No. 2025-01, *Clarifying the Effective Date* ("ASU 2025-01"). The amendments are intended to enhance disclosures regarding an entity's costs and expenses by requiring additional disaggregated information disclosures about certain income statement expense line items. The amendments, as clarified by ASU 2025-01, are effective for fiscal years beginning after December 15, 2026, and interim periods within fiscal years beginning after December 15, 2027. Early adoption is permitted. The Company is currently evaluating the effect of adopting the new disclosure requirements.

**3. Discontinued Operations**

Pursuant to a stock purchase agreement (the "SPA") and a Termination Agreement (the "Termination Agreement"), both dated January 23, 2025, and entered into between the Company and a purchaser (the "Purchaser"), the Company and the Purchaser completed the sale of its wholly owned subsidiary Ryvyl EU, effective June 1, 2025, which comprised substantially all of the business previously reported under the Company's International reporting segment. Domiciled in Sofia, Bulgaria, Ryvyl EU is a European Union regulated electronic money institution that provides complete payment solutions by offering acquiring, issuing, banking services across Europe. Pursuant to the terms of the SPA and Termination Agreement, the Company received total consideration of $16.5 million, comprised of $15.0 million of short-term secured debt and a related $1.5 million of accrued interest (or termination fee), which were forgiven by the Purchaser in exchange for the acquisition of Ryvyl EU. The net assets of Ryvyl EU immediately prior to the closing of the sale were approximately $23.0 million and the Company recognized a loss on sale of approximately $6.5 million.

In accordance with ASC 205-20, *Presentation of Financial Statements - Discontinued Operations,* since the sale of Ryvyl EU met the held-for-sale criteria as of the second quarter of 2025 and the sale transaction was completed within the same quarter, historical assets and liabilities of Ryvyl EU have not been segregated and reported as discontinued operations in the condensed consolidated balance sheets for all historical periods presented. Pursuant to the same guidance, the income statement activity of Ryvyl EU has been segregated and reported as discontinued operations for all periods presented in the condensed consolidated income statements for all historical periods presented. Additionally, cash flows related to discontinued operations have not been segregated and are included in the condensed consolidated statement of cash flows for all periods presented.

13

Table of Contents

The results of operations from discontinued operations for the three and six months ended June 30, 2025, and 2024, consist of the following (in thousands):

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: |
| | | 2025 | | 2024 | | 2025 | | 2024 |
| Revenue | $ | 8,669 | $ | 8,928 | $ | 21,033 | $ | 16,028 |
| Cost of revenue | | (5,013) | | (5,305) | | (12,031) | | (9,527) |
| Advertising and marketing | | (15) | | - | | (45) | | - |
| General and administrative | | (340) | | (418) | | (744) | | (923) |
| Payroll and payroll taxes | | (570) | | (680) | | (1,830) | | (1,345) |
| Professional fees | | (3) | | - | | (51) | | - |
| Depreciation and amortization | | (45) | | (71) | | (96) | | (237) |
| Other (expense) income, net | | (519) | | 145 | | (634) | | 437 |
| Income from discontinued operations | | 2,164 | | 2,599 | | 5,602 | | 4,433 |
| Loss on sale of discontinued operations | | (6,497) | | - | | (6,497) | | - |
| Income from discontinued operations before income taxes | | (4,333) | | 2,599 | | (895) | | 4,433 |
| Provision for income taxes | | 235 | | 262 | | 577 | | 462 |
| (Loss) income from discontinued operations, net of tax | $ | (4,568) | $ | 2,337 | $ | (1,472) | $ | 3,971 |

Selected financial information related to cash flows from discontinued operations for the six months ended June 30, 2025, is as follows (in thousands):

| | Six Months Ended June 30, | | | |
| --- | ---: | ---: | ---: | ---: |
| | | 2025 | | 2024 |
| Depreciation of property and equipment | $ | 5 | $ | 142 |
| Amortization of intangible assets | $ | 91 | $ | 95 |
| Purchases of property and equipment | $ | 76 | $ | - |

14

Table of Contents

**4. Property and Equipment, Net**

The following table details property and equipment, less accumulated depreciation (in thousands):

| | June 30, 2025 | | December 31, 2024 | |
| --- | ---: | ---: | ---: | ---: |
| Computers and equipment | $ | 313 | $ | 499 |
| Furniture and fixtures | | 115 | | 121 |
| Improvements | | 186 | | 186 |
| Total property and equipment | | 614 | | 806 |

| | | |
|---|---|---|
| Less: accumulated depreciation | (179) | (641) |
| Net property and equipment | $ 135 | $ 165 |

Depreciation expense was $0.02 million and $0.05 million for the three months ended June 30, 2025, and 2024, respectively. Depreciation expense was $0.05 million and $0.1 million for the six months ended June 30, 2025, and 2024, respectively.

## 5. Goodwill

The following table summarizes goodwill activity for the six months ended June 30, 2025 (in thousands):

| | Amount |
|---|---|
| Goodwill – December 31, 2024 | $ 18,856 |
| Adjustments (1) | 1,724 |
| Goodwill disposed in connection with the sale of Ryvyl EU | (20,580) |
| Goodwill – June 30, 2025 | $ - |

(1) The adjustments to goodwill pertain to foreign currency translation adjustments, which totaled positive $1.7 million for the 5 months ended May 31, 2025, the date immediately preceding the completion of the sale of Ryvyl EU, June 1, 2025.

## 6. Intangible Assets, Net

The following tables detail intangible assets (in thousands):

| | Estimated Useful Life | June 30, 2025 | | | |
|---|---|---|---|---|---|
| | | Cost | Accumulated Amortization | Impairment Loss | Net |
| Customer relationships | 2-5 years | $ 6,545 | $ (3,517) | $ (3,028) | $ - |
| Business technology/IP | 5 years | 2,611 | (2,611) | - | - |
| Capitalized internal-use software | 3 years | 2,846 | (198) | (1,088) | 1,560 |
| Total intangible assets | | $ 12,002 | $ (6,326) | $ (4,116) | $ 1,560 |

| | Estimated Useful Life | December 31, 2024 | | | |
|---|---|---|---|---|---|
| | | Cost | Accumulated Amortization | Impairment Loss | Net |
| Customer relationships | 2-5 years | $ 7,737 | $ (4,709) | $ (3,028) | $ - |
| Business technology/IP | 5 years | 4,167 | (4,008) | - | 159 |
| Capitalized internal-use software | 3 years | 1,647 | (5) | - | 1,643 |
| Total intangible assets | | $ 13,551 | $ (11,750) | $ (3,028) | $ 1,802 |

Amortization expense was $0.1 million and $0.5 million for the three months ended June 30, 2025, and 2024, respectively. Amortization expense was $0.2 million and $0.9 million for the six months ended June 30, 2025, and 2024, respectively.

The estimated future amortization expense related to intangible assets as of June 30, 2025 is as follows (in thousands):

| Fiscal years: | Amount |
|---|---|
| 2025 (remainder) | $ 293 |
| 2026 | 586 |
| 2027 | 586 |
| 2028 | 95 |
| Thereafter | - |
| Total | $ 1,560 |

15

Table of Contents

## 7. Accrued Liabilities

The following table details the balance in accrued liabilities (in thousands):

| | June 30, 2025 | December 31, 2024 |
|---|---|---|
| Payroll related accruals | $ 432 | $ 2,613 |
| Accrued legal and professional fees | 999 | 886 |
| Accrued legal settlements | 917 | 2,467 |
| Accrued taxes | 189 | 110 |
| Accrued convertible note interest | - | 366 |
| Other accrued liabilities | 687 | 1,704 |
| Total accrued liabilities | $ 3,224 | $ 8,146 |

## 8. Note Payable

*Stock Purchase Agreement and Financing*

On January 23, 2025, in connection with the Company securing financing (the "Financing"), the Company entered into a stock purchase agreement (the "January 2025 SPA") with a purchaser (the "Purchaser"), which provides for the sale to the Purchaser of all of the issued and outstanding shares of capital stock (the "Ryvyl EU Shares") of the Company's indirect subsidiary domiciled in Bulgaria, Ryvyl (EU) EAD ("Ryvyl EU"), by Transact Europe Holdings EOOD, the Company's wholly owned subsidiary, also domiciled in Bulgaria ("Transact Europe") for an aggregate purchase price of $15.0 million (the "Financing Purchase Price"). Under the terms of the January 2025 SPA, the Company was required to use $13.0 million of the net proceeds raised in the Financing to pay the First Installment of the Repurchase Agreement.

On January 23, 2025, the Company, Transact Europe and the Purchaser also entered into a Termination Agreement (the "Termination Agreement"). Among other things, the

Termination Agreement provided the Company with the right to terminate the January 2025 SPA and the transactions contemplated therein, by paying the Purchaser $16.5 million on or before 90 days after the date of execution of the January 2025 SPA (April 23, 2025). If the January 2025 SPA is terminated as a result of such payment by the Company, the Ryvyl EU Shares will not be sold to the Purchaser and will be returned to Transact Europe and the January 2025 SPA will be void and of no further effect, except for some provisions that survive termination. In the event that the January 2025 SPA is not so terminated, then the Purchaser will close on its purchase of the Ryvyl EU Shares; provided, however, if the Purchaser is unable to close for any reason other than the Company's breach, including the inability to obtain any regulatory clearances required for such transfer, then the Company is liable for damages in the amount of $16.5 million. In the event that the Purchaser is unable to close on the transfer of the Ryvyl EU Shares, as a result of the Company's breach, then the Company is liable for damages in an amount equal to the appraised value of the Ryvyl EU Shares.

The Company analyzed the terms of the January 2025 SPA and Termination Agreement and determined that they should be accounted for together as a single transaction, as neither agreement would have been entered into without the other and the exercise of each party's rights under each agreement would result in the termination of each party's rights under the other agreement (i.e., the January 2025 SPA will be void and of no further effect if the Company exercises its termination rights under the Termination Agreement, and the Termination Agreement will be void and of no further effect in the event that the January 2025 SPA is not so terminated and the Purchaser closes on its purchase of the Ryvyl EU Shares). Further, the Company determined that the terms of the agreements, in particular the Company's unilateral termination right, were such that the Company would not be considered to have surrendered control of the Ryvyl EU Shares until the termination deadline passes and, therefore, the substance of the transaction effectively represented short-term secured debt (rather than a true sale), akin to a repurchase agreement in which a seller-borrower of securities sells those securities to a buyer-lender with an agreement to repurchase them at a stated price plus interest at a specified date or in specified circumstances, which would be accounted for as a collateralized borrowing, in accordance with ASC 860-30. As such, the Company accounted for the transaction as a secured borrowing by recognizing the Financing Purchase Price as cash in the accompanying condensed consolidated balance sheets, recording an obligation (liability) to return the cash to the Purchaser, and recognizing the difference between the Financing Purchase Price and $16.5 million termination payment as interest expense over the 90-day period from the date of execution of the January 2025 SPA to the termination deadline.

16

Table of Contents

*Modification Agreement*

On April 23, 2025, the Company, Transact Europe, and the Purchaser executed and entered into a modification agreement (the "Modification Agreement") which provides that, notwithstanding the terms of the Termination Agreement or the January 2025 SPA, the Purchaser will not take any actions to close on the purchase of the Ryvyl EU Shares before May 6, 2025, so that the Company and the Purchaser may attempt to enter into an alternative transaction in lieu of the securities purchase transaction under the January 2025 SPA. The Company has the right, at any time, on or before May 6, 2025, to extend this period, so that the Purchaser will not exercise such right to purchase the Ryvyl EU Shares, until May 27, 2025, in consideration for the Company's payment to the Purchaser of $0.75 million. This payment will be accounted for as additional interest on the secured borrowing from the date of payment to the termination deadline. All other terms of the January 2025 SPA and the Termination Agreement remain unchanged and in full force and effect.

On May 7, 2025, the Purchaser provided a letter of notice to the Company and Transact Europe, stating that due to the Company not exercising its right to terminate the SPA by payment to the Purchaser of $16.5 million within the time so prescribed by the Termination Agreement, and as the Company had not exercised its right to extend the period during which time the Purchaser agreed not to exercise its rights to close on the transaction per the Modification Agreement (the "Standstill Period"), the Company no longer had the right to terminate the SPA pursuant to the Termination Agreement, and the Standstill Period had expired. The Purchaser also notified the Company that notwithstanding the foregoing, they did not intend to take the final steps to close on the purchase of the Ryvyl EU Shares for a period of ten calendar days from and including the date of the letter, or until May 16, 2025. The parties continued discussions during this period. All other terms of the SPA and the Termination Agreement remained unchanged and in full force and effect. On May 14, 2025, the Purchaser notified the Company that it would proceed to take steps to acquire the Ryvyl EU Shares, and the Company issued a press release stating that the parties had ceased discussions to restructure the terms of the pre-funded asset sale of its Ryvyl EU subsidiary. The sale of Ryvyl EU was completed between the parties, effective June 1, 2025.

Since the $16.5 million owed to the Purchaser was effectively settled in full in exchange for the Purchaser acquiring Ryvyl EU, the amount was treated as the total consideration received by the Company for the sale of Ryvyl EU. Accordingly, the principal balance and accrued interest of $16.5 million were deemed fully repaid as of June 1, 2025, the date of the completion of the Ryvyl EU sale. See Note 3, *Discontinued Operations,* for additional information.

17

Table of Contents

## 9. Long-Term Debt, Net

The following table summarizes the Company's debt (in thousands):

| | June 30, 2025 | December 31, 2024 |
|---|---|---|
| $100,000,000 8% senior convertible note, due April 5, 2026 | $ - | $ 18,300 |
| Less: Unamortized debt discount | - | (1,555) |
| Net carrying value | - | 16,745 |
| | | |
| $149,900 Economic Injury Disaster Loan (EIDL), interest rate of 3.75%, due June 1, 2050 | 154 | 155 |
| $500,000 EIDL, interest rate of 3.75%, due May 8, 2050 | 469 | 475 |
| Total debt | 623 | 17,375 |
| | | |
| Less: current portion | (10) | (12) |
| Long-term debt, net | $ 613 | $ 17,363 |

**Senior Convertible Note**

On November 8, 2021, the Company sold and issued, in a registered direct offering, an 8% Senior convertible note, originally due November 3, 2023, and subsequently extended to April 5, 2025, in the aggregate original principal amount of $100 million (the "Note"). The Note had an original issue discount of sixteen percent (16%) resulting in gross proceeds of $84 million. The Note was sold pursuant to the terms of a Securities Purchase Agreement, dated November 2, 2021 (the "November 2021 SPA"), between the Company and the investor in the Note (the "Investor").

The Note was issued on November 8, 2021, pursuant to an indenture dated November 2, 2021 between us and Wilmington Savings Fund Society, FSB, as trustee (the "Base Indenture"), as supplemented by a first supplemental indenture thereto, dated November 2, 2021, relating to the Note (the "First Supplemental Indenture" and the Base Indenture as supplemented by the First Supplemental Indenture, the "First Indenture"). The terms of the Note include those provided in the First Indenture and those made part of the First Indenture by reference to the Trust Indenture Act.

*First Exchange Agreement*

On July 25, 2023, the Company entered into an Exchange Agreement (the "First Exchange Agreement") under which the Company and the Investor agreed to exchange (the "Series A Exchanges"), in two separate exchanges, an aggregate of $22.7 million of the outstanding principal and interest under the Note for 15,000 shares of a newly authorized series of preferred stock of the Company designated as Series A Preferred Convertible Stock (the "Series A Preferred Stock"), the terms of which are set forth in a Certificate of Designations of Rights and Preferences of Series A Convertible Preferred Stock of RYVYL Inc. (the "Series A Certificate of Designations"), which the Company filed with the Nevada Secretary of State prior to the initial issuance of the Series A Preferred Stock. The Series A Preferred Stock is further described in Note 9, *Convertible Preferred Stock*. As part of the First Exchange Agreement, the Company also agreed to allow for the conversion of up to an additional $9.0 million of principal (together with any accrued and unpaid interest thereon) of the Note at a conversion price equal to 97.5% of the lower of (x) the then in effect conversion price and (y) the lowest volume weighted average price of the Company's common stock during the five trading days immediately prior to such conversion; and the Investor agreed to waive any interest that would otherwise accrue on the Note during the period commencing on April 1, 2023 through, and including, December 31, 2023.

Table of Contents

On July 31, 2023, pursuant to the terms of the First Exchange Agreement, the Company closed the initial exchange (the "Initial Series A Exchange") and issued 6,000 shares of Series A Preferred Stock in exchange for $4.3 million of the outstanding principal balance of the Note and $1.7 million of accrued interest. Additionally, upon satisfaction of all applicable closing conditions, including, without limitation, the Company having obtained any stockholder approval required for the consummation of the transactions and the issuance of the common stock issuable upon the conversion of all of the shares of Series A Preferred Stock (unless waived by the applicable other party), in the final exchange (the "Final Series A Exchange"), the parties agreed to exchange the remaining $16.7 million of the outstanding principal balance subject to the Series A Exchanges for 9,000 shares of Series A Preferred Stock on a date mutually agreed to by the Company and the Investor. The Company determined that the parties' obligation to exchange the remaining $16.7 million of the outstanding principal balance subject to the Series A Exchanges for 9,000 shares of Series A Preferred Stock in the Final Series A Exchange represents an embedded conversion feature that does not require bifurcation and separate valuation because it would not meet the definition of a derivative, if freestanding, under ASC 815, *Derivatives and Hedging* ("*ASC 815*"), as net settlement could not be achieved.

The Company analyzed the changes made to the Note under the First Exchange Agreement under ASC 470-50 to determine if extinguishment accounting was applicable. Under ASC 470-50-40-10, a modification or an exchange that adds or eliminates a substantive conversion option as of the conversion date is always considered substantial and requires extinguishment accounting. Since the First Exchange Agreement added a substantive conversion option, the Company determined that extinguishment accounting was applicable. In accordance with the extinguishment accounting guidance, the Company recorded a loss on extinguishment of $1.3 million which represents the difference between (a) the fair value of the modified Note and the 6,000 shares of Series A Preferred Stock issued in the Initial Series A Exchange and (b) the carrying amount of the Note and the fair value of the bifurcated embedded derivative immediately prior to giving effect to the First Exchange Agreement.

*Second Exchange Agreement*

Under the terms of the First Exchange Agreement, a final closing was to be held upon which the Investor was to exchange an additional $16.7 million of principal of the Note into 9,000 shares of Series A Preferred Stock (the "Unissued Series A Preferred Stock") which shares of Unissued Series A Preferred Stock were convertible into shares of common stock, in accordance with the terms of the Series A Certificate of Designations.

On November 27, 2023, the Company entered into an Exchange Agreement (the "Second Exchange Agreement") with the Investor under which the Company and the Investor agreed to exchange (the "Series B Exchange"), (i) all of the existing shares of Series A Preferred Stock issued to the Investor in the Initial Series A Exchange, (ii) the right to exchange the shares of Unissued Series A Preferred Stock for an additional $16.7 million of principal of the Note, and (iii) $60.3 million of the outstanding principal under the Note for 55,000 shares of a newly authorized series of preferred stock of the Company designated as Series B Preferred Convertible Stock (the "Series B Preferred Stock," and collectively with the Series A Preferred Stock, the "Preferred Stock"),"), the terms of which are set forth in a Certificate of Designations of Rights and Preferences of Series B Convertible Preferred Stock of RYVYL Inc. (the "Series B Certificate of Designations"), which the Company filed with the Nevada Secretary of State prior to the initial issuance of any shares of Series B Preferred Stock. The Series B Preferred Stock is further described in Note 9, *Convertible Preferred Stock*. As additional consideration for the Series B Exchange, the Company has also agreed to make a cash payment to the Investor in the amount of $3.0 million. As part of the Second Exchange Agreement, the Investor also agreed to forbear from requiring the repayment of the Note (to the extent such repayment obligation arises solely as a result of the occurrence of the maturity date and not with respect to any event of default or redemption rights in the Note or pursuant to the Indenture (as such term is defined in the Second Exchange Agreement)) during the period commencing on November 5, 2024 through, and including, April 5, 2025; and to extend the waiver of payment of interest under the Note through July 1, 2024.

The Company analyzed the changes made to the Note under the Second Exchange Agreement under ASC 470-50 to determine if extinguishment accounting was applicable. Under ASC 470-50-40-10, a modification or an exchange that adds or eliminates a substantive conversion option as of the conversion date is always considered substantial and requires extinguishment accounting. Since the Second Exchange Agreement eliminated a substantive conversion option (the parties' obligation to exchange the remaining $16.7 million of outstanding principal balance subject to the Series A Exchange for 9,000 shares of Series A Preferred Stock in the Final Series A Exchange), the Company determined that extinguishment accounting was applicable. In accordance with the extinguishment accounting guidance, the Company recorded a loss on extinguishment of $22.5 million which represents the difference between (a) the fair value of the modified Note, the fair value of the 55,000 shares of Series B Preferred Stock issued in the Series B Exchange, and the $3.0 million cash payment made to the Investor, and (b) the carrying amount of the Note, the fair value of the bifurcated embedded derivative immediately prior to giving effect to the Second Exchange Agreement, and the fair value of the existing shares of Series A Preferred Stock issued to the Investor in the Initial Series A Exchange forfeited to the Company by the Investor.

Table of Contents

On November 29, 2023, the Company closed the Series B Exchange, pursuant to which the Company issued to the Investor 55,000 shares of Series B Convertible Preferred Stock and paid the Investor a cash payment in the amount of $3.0 million, in exchange for 6,000 shares of Series A Convertible Preferred Stock previously issued to the Investor, the right to exchange the shares of Unissued Series A Preferred Stock for an additional $16.7 million of principal of the Note, and the reduction of principal of the Note in the aggregate amount of $60.3 million.

*Forbearance Agreement*

On May 17, 2024, the Company entered into a Forbearance Agreement (the "Forbearance Agreement") with the Investor pursuant to which the Investor, in consideration for the Company's cash payment in the amount of $80,000 as an advance payment of a portion of the next interest payment, in the estimated amount of $380,000, due and payable under the Note on October 1, 2024, agreed to further forbear from requiring the repayment of the Note (to the extent such repayment obligation arises solely as a result of the occurrence of the maturity date and not with respect to any event of default or redemption rights in the Note or pursuant to the Indenture) during the period commencing on April 5, 2025 through, and including, April 5, 2026. The Company analyzed the changes made to the Note under the Forbearance Agreement under ASC 470-60 to determine if the transaction qualified as a troubled debt restructuring. For a debt restructuring to be considered troubled, the debtor must be experiencing financial difficulties and the creditor must have granted a concession. The Company considered the indicators of financial difficulties provided in ASC 470-60 and determined that one or more indicators were present at the time the Forbearance Agreement was entered into, such as the existence of substantial doubt about the Company's ability to continue as a going concern. Furthermore, the Company determined that the effective borrowing rate on the Note decreased as a result of the changes made to the Note under the Forbearance Agreement and, as such, the Investor granted a concession on the debt. As a result, the changes made to the Note under the Forbearance Agreement were accounted for as a troubled debt restructuring. However, no restructuring gain or corresponding adjustment to the carrying amount of the Note was recorded because the net carrying amount of the Note at the time the Forbearance Agreement was entered into was less than the total undiscounted future principal and interest payments of the restructured Note. The $80,000 cash payment made to the Investor in connection with the Forbearance Agreement was treated as a lender fee and expensed as incurred under the troubled debt restructuring model.

*Preferred Stock Repurchase and Note Repayment Agreement*

On January 23, 2025, the Company entered into a Preferred Stock Repurchase and Note Repayment Agreement (the "Repurchase Agreement") with the Investor, which provides for repayment of the outstanding balance of the Note. Pursuant to terms of the Repurchase Agreement, in consideration for an aggregate payment of $17.0 million by the Company to the Investor (the "Repurchase Price"), (i) the entire outstanding principal balance of the Note, including all accrued and unpaid interest, shall be deemed to have been paid and (ii) all outstanding shares of Series B Preferred Stock held by the Investor will be repurchased by the Company. The Repurchase Agreement provides for the payment of the Repurchase Price in two installments, the first in the amount of $13.0 million (the "First Installment"), which was paid on January 27, 2025. The second installment, in the amount of $4.0 million (the "Second Installment"), is due and payable on or before April 30, 2025 (the "Second Installment Date"), and the maturity date of the Note is advanced to such date. Upon the payment of the First Installment, all shares of Series B Preferred Stock held by the Investor were repurchased and the outstanding balance of the Note was reduced to $4.0 million.

The Repurchase Agreement further provides that, during the period from the payment of the First Installment until the Second Installment Date, no interest will accrue on the remaining balance of the Note and certain restrictive covenants under the Note will be temporarily waived. If the Company fails to make the Second Installment on or before the Second Installment Date, then interest will continue to accrue again on the outstanding balance of the Note and all other terms of the Note will also be restored as they were prior to the date the First Installment was paid. The Company did not make the second installment payment of $4.0 million by April 30, 2025.

The Company analyzed the changes made to the Note under the Repurchase Agreement under ASC 470-60 to determine if the transaction qualified as a troubled debt restructuring. For a debt restructuring to be considered troubled, the debtor must be experiencing financial difficulties and the creditor must have granted a concession. The Company considered the indicators of financial difficulties provided in ASC 470-60 and determined that one or more indicators were present at the time the Repurchase Agreement was entered into, such as the existence of substantial doubt about the Company's ability to continue as a going concern. Furthermore, the Company determined that the effective borrowing rate on the Note decreased as a result of the changes made to the Note under the Repurchase Agreement and, as such, the Investor granted a concession on the debt. As a result, the changes made to the Note under the Repurchase Agreement were accounted for as a troubled debt restructuring. However, no restructuring gain or corresponding adjustment to the carrying amount of the Note was recorded because the net carrying amount of the Note after giving effect to the payment of the First Installment was less than the total undiscounted future principal and interest payments of the restructured Note.

20

Table of Contents

During the year ended December 31, 2022, the Investor converted $8.55 million of the outstanding Note principal balance into 598,695 shares of the Company's common stock at a weighted average conversion price of $1.43. In addition, the Company paid the Investor $6.9 million in January 2022 in exchange for the cancellation of $6.0 million of the outstanding principal balance. During the year ended December 31, 2023, the Investor converted $1.65 million of the outstanding Note principal balance into 527,910 shares of the Company's common stock at a weighted average conversion price of $1.18. During the year ended December 31, 2024, the Investor converted $0.9 million of the outstanding Note principal balance into 823,294 shares of the Company's common stock at a weighted average conversion price of $1.10. During the three months ended June 30, 2025, the Investor converted the remaining $4.0 of the outstanding Note principal balance into 7,118,843 shares of the Company's common stock at a weighted average conversion price of $0.58.

*Ranking*

The Note is the senior unsecured obligation of the Company and not the financial obligation of our subsidiaries. Until such date as the principal amount of the Note is $5 million or less, all payments due under the Note will be senior to all other indebtedness of the Company and/or any of its subsidiaries.

*Maturity Date*

Under its original terms, unless earlier converted, or redeemed, the Note was to mature on November 3, 2023, the second anniversary of the issuance date, which we refer to herein as the "Maturity Date," subject to the right of the Investor to extend the date:

(i) if an event of default under the Note has occurred and is continuing (or any event shall have occurred and be continuing that with the passage of time and the failure to cure would result in an event of default under the Note) and

(ii) for a period of 20 business days after the consummation of a fundamental transaction if certain events occur.

We are required to pay, on the Maturity Date, all outstanding principal, accrued and unpaid interest and accrued and unpaid late charges on such principal and interest, if any.

As part of the Restructuring Agreement entered into with the Investor on August 16, 2022 (the "Restructuring Agreement"), the Company obtained a forbearance of the Maturity Date from November 5, 2023 to November 5, 2024. As part of the Second Exchange Agreement entered into with the Investor on November 27, 2023, the Company obtained a further forbearance of the Maturity Date from November 5, 2024 to April 5, 2025. As part of the Forbearance Agreement entered into with the Investor on May 17, 2024, the Company obtained a further forbearance of the Maturity Date from April 5, 2025 to April 5, 2026. Pursuant to the terms of the Repurchase Agreement entered into with the Investor on January 23, 2025, the Maturity Date was advanced to April 30, 2025 upon the payment of the First Installment on January 27, 2025.

21

Table of Contents

*Interest*

The Note bears interest at the rate of 8% per annum which (a) shall commence accruing on the date of issuance, (b) shall be computed on the basis of a 360-day year and twelve 30-day months and (c) shall be payable in cash quarterly in arrears on the first trading day of each calendar quarter or otherwise in accordance with the terms of the Note. If the holder elects to convert or redeem all or any portion of the Note prior to the Maturity Date, all accrued and unpaid interest on the amount being converted or redeemed will also be payable. If we elect to redeem all or any portion of the Note prior to the Maturity Date, all accrued and unpaid interest on the amount being redeemed will also be payable. The interest rate of the Note will automatically increase to 15% per annum upon the occurrence and continuance of an event of default (See "*Events of Default*" below).

Subject to the satisfaction of certain equity conditions, the terms of the Restructuring Agreement require the holder to voluntarily convert certain interest payments when due under the Note at 95% of the lower of (i) the then in effect conversion price and (ii) the lowest volume weighted average price of our common stock during the five trading days immediately prior to such conversion.

As part of the First Exchange Agreement, the Investor agreed to waive any interest that would otherwise accrue on the Note during the period commencing on April 1, 2023 through, and including, December 31, 2023. As part of the Second Exchange Agreement, the Investor agreed to extend the waiver of payment of interest under the Note through July 1, 2024. Pursuant to the terms of the Repurchase Agreement, no interest will accrue on the remaining balance of the Note during the period from the payment of the First Installment until the Second Installment Date.

*Late Charges*

The Company is required to pay a late charge of 18% on any amount of principal or other amounts that are not paid when due.

Case 3:23-cv-00185-GPC-SBC   Document 116-9   Filed 11/13/25   PageID.3025   Page 15 of 32

*Conversion*

Fixed Conversions at Option of Holder

The holder of the Note may convert all, or any part, of the outstanding principal and interest of the Note, at any time at such holder's option, into shares of our common stock at an initial fixed conversion price, which is subject to:

- proportional adjustment upon the occurrence of any stock split, stock dividend, stock combination and/or similar transactions; and

- full-ratchet adjustment in connection with a subsequent offering at a per share price less than the fixed conversion price then in effect.

Pursuant to the original terms of the Note, since during the fiscal quarter ending March 31, 2022, the Company (i) failed to process at least $750 million in transaction volume or (ii) had revenue that was less than $12 million, the Note's fixed conversion price then in effect exceeded the greater of (x) the Note's $1.67 floor and (y) 140% of the market price as of April 1, 2022 (the "Adjustment Measuring Price"), on April 1, 2022, the fixed conversion price automatically adjusted to the Adjustment Measuring Price.

As part of the Restructuring Agreement, the Company agreed to allow for the conversion of up to $4.5 million of principal (together with any accrued and unpaid interest thereon) of the Note at a conversion price equal to the lesser of (i) $2.40 and (ii) 97.5% of the lower of (x) the then in effect conversion price and (y) the lowest volume weighted average price of our common stock during the five trading days immediately prior to such conversion.

As part of the First Exchange Agreement, the Company agreed to allow for the conversion of up to an additional $9.0 million of principal (together with any accrued and unpaid interest thereon) of the Note at a conversion price equal to 97.5% of the lower of (x) the then in effect conversion price and (y) the lowest volume weighted average price of our common stock during the five trading days immediately prior to such conversion.

22

Table of Contents

*1-Year Alternate Optional Conversion*

At any time following the first anniversary of the issuance date of the Note, but only if the closing bid price of our common stock on the immediately prior trading day is less than $6.50, the holder of the Note shall have the option to convert, at such holder's option, pro rata, up to $30 million of the principal amount of the Note (in $250,000 increments) at the "alternate optional conversion price," which is equal to the lower of (i) the then in effect conversion price and (ii) the greater of (x).the Note's $1.67 floor price or (y) 98% of the market price on the conversion date.

*Alternate Event of Default Optional Conversion*

If an event of default has occurred under the Note, the holder may alternatively elect to convert the Note (subject to an additional 15% redemption premium) at the "alternate event of default conversion price" equal to the lesser of:

- the fixed conversion price then in effect; and

the greater of:

- the floor price; and

- 80% of the lowest volume weighted average price of our common stock during the five trading days immediately prior to such conversion.

*Beneficial Ownership Limitation*

The Note may not be converted, and shares of common stock may not be issued under the Note if, after giving effect to the conversion or issuance, the applicable holder of the Note (together with its affiliates, if any) would beneficially own in excess of 4.99% of the Company's outstanding shares of common stock, which is referred to herein as the "Note Blocker". The Note Blocker may be raised or lowered to any other percentage not in excess of 9.99% at the option of the applicable holder of the Note, except that any raise will only be effective upon 61 days' prior notice to us.

*Change of Control Redemption Right*

In connection with a change of control of the Company, the holder may require us to redeem in cash, all, or any portion, of the Notes at a 15% redemption premium to the greater of the face value, the equity value of our Common Stock underlying the Note, and the equity value of the change of control consideration payable to the holder of our Common Stock underlying the Note.

The equity value of our Common Stock underlying the Note is calculated using the greatest closing sale price of our Common Stock during the period immediately preceding the consummation or the public announcement of the change of control and ending the date the holder gives notice of such redemption.

The equity value of the change of control consideration payable to the holder of our common stock underlying the Note is calculated using the aggregate cash consideration and aggregate cash value of any non-cash consideration per share of our common stock to be paid to the holders of our common stock upon the change of control.

*Events of Default*

Under the terms of the First Supplemental Indenture, the events of default contained in the Base Indenture shall not apply to the Note. Rather, the Note contains standard and customary events of default including but not limited to: (i) the suspension from trading or the failure to list the Company's common stock within certain time periods; (ii) failure to make payments when due under the Notes; and (iii) bankruptcy or insolvency of the Company.

If an event of default occurs, the holder may require us to redeem all or any portion of the Note (including all accrued and unpaid interest and late charges thereon), in cash, at a 15% redemption premium to the greater of the face value and the equity value of the Company's common stock underlying the Note.

The equity value of the Company's common stock underlying the Note is calculated using the greatest closing sale price of the Company's common stock on any trading day immediately preceding such event of default and the date the Company makes the entire payment required.

*Company Optional Redemption Rights*

At any time no event of default exists, the Company may redeem all, but not less than all, of the Note outstanding in cash all, or any portion, of the Note at a 5% redemption premium to the greater of the face value and the equity value of the Company's common stock underlying the Note.

Table of Contents

The equity value of the Company's common stock underlying the Note is calculated using the greatest closing sale price of the Company's common stock on any trading day during the period commencing on the date immediately preceding such date the Company notifies the applicable holder of such redemption election and the date the Company makes the entire payment required.

The following is a rollforward of the senior convertible note balance (in thousands):

| | |
|---|---:|
| Balance, December 31, 2020 | $ - |
| Convertible debentures issued | 100,000 |
| Derivative liability | (21,580) |
| Original issue discount of 16% | (16,000) |
| Placement fees and issuance costs | (7,200) |
| Accretion and write-off of debt discount | 3,435 |
| Balance, net of unamortized debt discount of $41,345 - December 31, 2021 | 58,655 |
| Repayments and conversion | (14,550) |
| Accretion and write-off of debt discount | 16,996 |
| Balance, net of unamortized debt discount of $24,349 - December 31, 2022 | 61,101 |
| Repayments and conversion | (66,250) |
| Accretion and write-off of debt discount | 20,443 |
| Balance, net of unamortized debt discount of $3,906 - December 31, 2023 | 15,294 |
| Conversions | (900) |
| Accretion and write-off of debt discount | 2,351 |
| Balance, net of unamortized debt discount of $1,556 – December 31, 2024 | 16,745 |
| Repayments and conversions | (18,300) |
| Accretion and write-off of debt discount | 1,555 |
| Balance, net of unamortized debt discount of $0 – June 30, 2025 | $ - |

The Company recorded debt discount accretion of $0.02 million and $0.8 million for the three months ended June 30, 2025, and 2024, respectively. The Company recorded debt discount accretion of $0.2 million and $1.7 million for the six months ended June 30, 2025, and 2024, respectively.

**Derivative Liability**

The senior convertible note contains embedded derivatives representing certain conversion features, redemption rights, and contingent payments upon the occurrence of certain events of default. The Company determined that these embedded derivatives required bifurcation and separate valuation.

The Company utilizes a binomial lattice model to value its bifurcated derivatives included in the note. ASC 815 does not permit an issuer to account separately for individual derivative terms and features embedded in hybrid financial instruments that require bifurcation and liability classification as derivative financial instruments. Rather, such terms and features must be combined and fair-valued as a single compound embedded derivative. The Company selected a binomial lattice model to value the compound embedded derivative because it believes this technique is reflective of all significant assumptions that market participants would likely consider in negotiating the transfer of the note. Such assumptions include, among other inputs, stock price volatility, risk-free rates, credit risk assumptions, early redemption and conversion assumptions, and the potential for future adjustment of the conversion price due to triggering events.

24

Table of Contents

The following is a rollforward of the derivative liability balance (in thousands):

| | |
|---|---:|
| Balance, December 31, 2021 | $ 18,735 |
| Change in fair value 2022 | (18,480) |
| Balance, December 31, 2022 | 255 |
| Increase in derivative liability upon extinguishment of debt | 6,312 |
| Change in fair value 2023 | (6,548) |
| Balance, December 31, 2023 | 19 |
| Change in fair value 2024 | (15) |
| Balance, December 31, 2024 | 4 |
| Decrease in derivative liability upon extinguishment of debt | (4) |
| Balance, June 30, 2025 | $ - |

**Small Business Association CARES Act Loans**

On June 9, 2020, the Company entered into a 30-year loan agreement with the Small Business Association ("SBA") under the CARES Act in the amount of $ 149,900. The loan bears interest at 3.75% per annum and requires monthly principal and interest payments of $731 beginning June 9, 2021. Both the Chief Executive Officer and Chairman of the Company signed personal guarantees under this loan. As of June 30, 2025, the loan is not in default.

On May 8, 2020, Charge Savvy, a wholly-owned subsidiary of the Company, entered into a 27-year loan agreement with the SBA under its Economic Injury Disaster Loan ("EIDL") assistance program in the amount of $150,000. The loan bears interest at 3.75% per annum and required principal and interest payments of $731 beginning on May 8, 2021, which were subsequently deferred to November 8, 2022. On August 4, 2021, Charge Savvy was granted a loan increase in the amount of $350,000 on identical terms as the initial loan, for an aggregate loan amount of $500,000. Monthly principal and interest payments on the aggregate loan are $2,477 and began on November 8, 2022. Pursuant to the terms of Security Agreements executed in connection with this loan, the SBA was granted a security interest in all tangible and intangible personal property of Charge Savvy. As of June 30, 2025, the loan is not in default.

**10. Convertible Preferred Stock**

On July 31, 2023, the Company issued 6,000 shares of Series A Preferred Stock in exchange for $4.3 million of the outstanding principal balance of the 8% senior convertible note, currently due April 5, 2026 and $1.7 million of accrued interest pursuant to the First Exchange Agreement entered into with the investor in the senior convertible note on July 25, 2023. On November 29, 2023, the existing shares of Series A Preferred Stock issued to the investor were forfeited to the Company by the investor and the Company issued 55,000

shares of Series B Preferred Stock, along with a cash payment of $3.0 million, in exchange for $60.3 million of the outstanding principal balance of the senior convertible note pursuant to the Second Exchange Agreement entered into with the investor on November 27, 2023. On January 27, 2025, all shares of Series B Preferred Stock held by the investor were repurchased upon payment of the First Installment pursuant to the Repurchase Agreement entered into with the investor on January 23, 2025. Refer to Note 8, *Long-Term Debt*, for further information. The Series A Preferred Stock had a stated value of $1,000 per share and a fair value of approximately $1,111 per share at issuance, as determined by a valuation performed by third-party experts. The Series B Preferred Stock had a stated value of $1,000 per share and a fair value of approximately $1,339 per share at issuance, as determined by a valuation performed by third-party experts.

As of June 30, 2025, and December 31, 2024, preferred stock consisted of the following (in thousands, except number of shares):

| | June 30, 2025 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Preferred Shares Authorized | Preferred Shares Issued and Outstanding | Carrying Value | Liquidation Preference | Common Stock Issuable Upon Conversion |
| Series A | 15,000 | - | $ - | $ - | $ - |
| Series B | 55,000 | - | - | - | - |
| Undesignated preferred shares | 4,930,000 | - | - | - | - |
| Total Preferred Stock | 5,000,000 | - | $ - | $ - | $ - |

25

Table of Contents

| | December 31, 2024 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Preferred Shares Authorized | Preferred Shares Issued and Outstanding | Carrying Value | Liquidation Preference | Common Stock Issuable Upon Conversion |
| Series A | 15,000 | - | $ - | $ - | - |
| Series B | 55,000 | 55,000 | 73,631 | 63,250 | 17,684,888 |
| Undesignated preferred shares | 4,930,000 | - | - | - | - |
| Total Preferred Stock | 5,000,000 | 55,000 | $ 73,631 | $ 63,250 | 17,684,888 |

The holders of the Preferred Stock have the following rights and preferences:

*Voting* – The Preferred Stock has no voting power and the holders of Preferred Stock have no right to vote on any matter at any time, either as a separate series or class or together with any other series or class of share of capital stock.

*Dividends* – The holders of Preferred Stock are entitled to receive dividends when and as declared by the Board of Directors, from time to time, in its sole discretion. Such dividends are not cumulative. No such dividends have been declared to date.

*Liquidation* – In the event of the voluntary or involuntary liquidation, dissolution or winding up of the Company, the holders of Series B Preferred Stock shall be entitled to receive in cash out of the assets of the Company, prior and in preference to any distribution of the proceeds of such liquidation event to the holders of Series A Preferred Stock or common stock, an amount per share of Series B Preferred Stock equal to the greater of (A) 115% of the stated value of such share of Series B Preferred Stock plus all declared and unpaid dividends on such share of Series B Preferred Stock and (B) the amount per share such holder would receive if it converted such share of Series B Preferred Stock into common stock (at the Series B Alternate Conversion Price, as defined below, then in effect) immediately prior to the date of such payment. If at any time, there is more than one holder of the Series B Preferred Stock, and the proceeds thus distributed among the holders of the Series B Preferred Stock shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then the entire proceeds legally available for distribution shall be distributed ratably among the holders in proportion to the full preferential amount that each such holder is otherwise entitled to receive.

*Redemption* – Upon a change of control of the Company (as defined in the Company's "Series B Certificate of Designations"), the holders of Series B Preferred Stock may require the Company to exchange their shares of Series B Preferred Stock for consideration, in the form of the securities or other assets to which holders of shares of common stock are entitled to receive with respect to or in exchange for their shares of common stock in such change of control, equal to the greatest of (i) 115% of the stated value of such share of Series B Preferred Stock plus all declared and unpaid dividends on such share of Series B Preferred Stock, (ii) 115% of the greatest closing sale price of the number of shares of common stock into which such share of Series B Preferred Stock could be converted (at the Series B Alternate Conversion Price, as defined below, then in effect) during the period beginning on the date immediately preceding the earlier to occur of (a) the consummation of the applicable change of control and (b) the public announcement of such change of control and ending on the date such holder delivers notice to the Company of its election, and (iii) the aggregate cash consideration and the aggregate cash value of any non-cash consideration per share of common stock that would be paid to the holder upon consummation of such change of control if it converted all of its shares of Series B Preferred Stock into common stock at the conversion price then in effect.

*Conversion* – Each share of Series B Preferred Stock is convertible, at the option of the holder, at any time after the date of issuance of such share, into shares of common stock either (i) at the fixed conversion price then in effect, which initially is $3.11 (subject to standard antidilution adjustments and adjustments as a result of subsequent issuances of securities where the effective price of the common stock is less than the then current fixed conversion price) or (ii) at the Series B Alternate Conversion Price, as defined below. The Series B Certificate of Designations also provides that in the event of certain "Triggering Events," any holder may, at any time, convert any or all of such holder's Series B Preferred Stock at a conversion rate equal to the product of (i) the Series B Alternate Conversion Price and (ii) 115% of the stated value of the Series B Preferred Stock subject to such conversion. "Triggering Events" include, among others, (i) a failure to timely deliver shares of common stock, upon a conversion, (ii) a suspension of trading on the principal trading market or the failure to be traded or listed on the principal market for five days or more, (iii) the failure to pay any dividend to the holders of Series B Preferred Stock when required, (iv) the failure to remove restrictive legends when required, (v) the Company's default in payment of indebtedness in an aggregate amount of $2 million or more, (vi) proceedings for a bankruptcy, insolvency, reorganization or liquidation, which are not dismissed with 30 days, (vii) commencement of a voluntary bankruptcy proceeding, and (viii) final judgments against the Company for the payment of money in excess of $2 million. The "Series B Alternate Conversion Price" means the lower of (i) the applicable conversion price then in effect and (ii) the greater of (x) $0.62 and (y) 97.5% of the lowest volume weighted average price of the common stock during the five consecutive trading day period ending and including the trading day immediately preceding the delivery of the applicable conversion notice.

26

Table of Contents

**11. Income Taxes**

The Company recorded income tax expense of approximately $0.3 million and $0.2 million for the six months ended June 30, 2025 and 2024, respectively. We estimate our annual effective income tax rate to be 92.8% for calendar year 2025, which is different from the U.S. federal statutory rate, primarily due to the Company's full valuation allowance position.

As of June 30, 2025, we have no material unrecognized tax benefits and we expect no material unrecognized tax benefits for the next 12 months.

**12. Stock-Based Compensation**

*Equity Incentive Plans*

The Company adopted the 2023 Equity Incentive Plan ("2023 Plan") on November 2, 2023, which provides employees, directors, and consultants with opportunities to acquire the Company's shares, or to receive monetary payments based on the value of such shares. Management has determined that it is in the best interests of the Company to replace the 2020 Incentive and Nonstatutory Stock Option Plan, the 2021 Incentive and Nonstatutory Stock Option Plan, and the 2021 Restricted Stock Plan, with one plan, the 2023 Plan, pursuant to which the Company will be able to grant stock option awards, stock appreciation rights, restricted stock awards, restricted stock units, and other stock-based awards. The 2023 Plan provides for up to 5,098,262 shares of common stock. Grants made under the 2023 Plan will generally vest and become exercisable at various times from the grant dates. These awards will have such vesting or other provisions as may be established by the Board of Directors at the time of each award.

*Stock Option Activity*

A summary of stock option activity for the six months ended June 30, 2025, is as follows:

| | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding at December 31, 2024 | 583,974 | $ | 4.20 |
| Granted | - | | N/A |
| Exercised | - | | N/A |
| Cancelled/forfeited/expired | (17,620) | | 4.0 |
| Outstanding at June 30, 2025 | 566,354 | $ | 4.25 |
| Exercisable at June 30, 2025 | 390,354 | $ | 5.25 |

There were no stock options granted or exercised during the three months ended June 30, 2025, and 2024, respectively.

*Restricted Stock Activity*

A summary of RSA activity for the six months ended June 30, 2025 is as follows:

| | Number of Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Unvested at December 31, 2024 | 74,312 | $ | 1.82 |
| Granted | 19,536 | | 1.28 |
| Vested | (17,407) | | 1.42 |
| Forfeited | (11,355) | | 1.32 |
| Unvested at June 30, 2025 | 65,086 | $ | 1.85 |

Table of Contents

The total grant date fair value of RSAs that vested was $0.02 million and $0.3 million in the six months ended June 30, 2025, and 2024, respectively.

A summary of RSU activity for the six months ended June 30, 2025 is as follows:

| | Number of Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Unvested at December 31, 2024 | - | $ | - |
| Granted | 2,288,000 | | 0.85 |
| Vested | (471,747) | | 0.83 |
| Forfeited | (384,126) | | 0.90 |
| Unvested at June 30, 2025 | 1,432,127 | $ | 0.84 |

The total grant date fair value of RSUs that vested was $0.4 million for the six months ended June 30, 2025. There were no RSUs granted during the six months ended June 30, 2024.

**13. Operating Leases**

The Company leases office space under operating leases at four locations in the United States (California, Illinois, Massachusetts, and Florida). The Company had no finance lease obligations as of June 30, 2025.

The Company's operating lease expense totaled $0.3 million and $0.3 million for the three months ended June 30, 2025 and 2024, respectively. As of June 30, 2025, the weighted-average remaining lease term was 3.8 years and the weighted average discount rate was 12.0%.

Future minimum lease payments under our operating leases and reconciliation to lease liability as of June 30, 2025, are as follows (in thousands):

| Fiscal years: | | Amount |
|---|---|---|
| 2025 (Remainder) | $ | 394 |
| 2026 | | 968 |
| 2027 | | 1,004 |
| 2028 | | 1,041 |
| Thereafter | | - |
| Total | | 3,407 |

| | | |
|---|---|---|
| Less: present value discounts | | |
| Operating lease liability | $ | 2,750 |

## 14. Related Party Transactions

### PrivCo

The Company repurchased, in two separate repurchase transactions each consisting of 100,000 shares of common stock, an aggregate of 200,000 shares owned by PrivCo (an entity controlled by Messrs. Errez and Nisan). In October 2022, the Board unanimously ratified these two repurchase transactions between the Company and PrivCo. The Company repurchased 100,000 shares for a price per share of $55.90 (for total proceeds to PrivCo of $5,590,000) (the "First Repurchase") and 100,000 shares for a price per share of $8.20 (for total proceeds to PrivCo of $820,000) (the "Second Repurchase"). The First Repurchase was based on the closing price of the common stock on November 24, 2021 and took place over a number of months starting in February 2022 and ending in October 2022. The Second Repurchase was based on the closing price of the common stock on July 29, 2022 and took place in October 2022. The purpose of each of these transactions was to allow the Company to issue shares to new shareholders without increasing the Company's shares outstanding. As of June 30, 2025 and December 31, 2024, there were 11,733 and 11,733 shares available, respectively, of the 200,000 shares of common stock under the aforementioned transactions.

### Family Relationships

The Company employs two of our CEO's brothers, Dan and Liron Nusinovich, who are paid approximately $260,000 and $131,000 per year, respectively. There are no family relationships between any of other directors or executive officers and any other employees or directors or executive officers.

The Company did not pay any commissions to the related parties mentioned above for the six months ended June 30, 2025 and 2024, respectively.

28

Table of Contents

## 15. Commitments and Contingencies

From time-to-time, the Company is involved in legal proceedings. The Company records a liability for those legal proceedings when it determines it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated. The Company also discloses when it is reasonably possible that a material loss may be incurred, however, the amount cannot be reasonably estimated. From time to time, the Company may enter into discussions regarding settlement of these matters, and may enter into settlement agreements, if it believes settlement is in the best interest of the Company and its shareholders

The following is a summary of our current outstanding litigation. Note that references to GreenBox POS are for historical purposes. GreenBox POS changed its name to RYVYL Inc. on October 13, 2022.

- On November 8, 2022, the Company filed a complaint against its former Chief Operating Officer Vanessa Luna, Luna Consultant Group, LLC and Does 1 through 50 in San Diego Superior Court (the "Company Filing"). The Company alleged that Ms. Luna abused her position for additional compensation, failed to follow proper protocols and breached her fiduciary duties and duty of loyalty by secretly maintaining alternative employment. The action sought damages, including interest and costs of suit incurred. On November 10, 2022, Ms. Luna filed her own complaint against the Company and Fredi Nisan in San Diego Superior Court (the "Luna Filing"). Ms. Luna alleged that Mr. Nisan used contract negotiations to coerce her, that the Company improperly coded transactions and misled investors, and that when her concerns were reported to management, she was wrongfully terminated, resulting in a number of claims. Ms. Luna also alleged sexual misconduct on the part of Mr. Nisan. Ms. Luna sought damages including compensatory damages, unpaid wages (past and future), loss of wages and benefits (past and future), and other damages to be proven at trial. The Company and Mr. Nisan deny all allegations of the Luna Filing. In April 2023, Ms. Luna sought and was granted permission to add Coyni, Inc. as a defendant with regard to her claims. In addition, in August 2024, the Company and Mr. Nisan were granted leave to file a Second Amended Complaint to add additional claims against Ms. Luna, including securities fraud. After vigorously defending against all claims asserted by Ms. Luna and vigorously prosecuting its own claims against Ms. Luna, on October 17, 2024, the parties entered into a confidential settlement agreement. On February 4, 2025, the parties filed with the San Diego Superior Court Requests for Dismissal, dismissing their respective cases with prejudice. The request was rejected and resubmitted on April 29, 2025.

- On December 12, 2022, Jacqueline Dollar (aka Jacqueline Reynolds), former Chief Marketing Officer of the Company, filed a complaint against the Company, Fredi Nisan, and Does 1-20 in San Diego Superior Court. Ms. Dollar is alleging she was undercompensated compared to her male counterparts and retaliated against after raising concerns to management resulting in sex discrimination in violation of the California Fair Employment and Housing Act ("FEHA") and failure to prevent discrimination in violation of FEHA. Ms. Dollar is also claiming intentional infliction of emotional distress. Ms. Dollar is seeking an unspecified amount of damages related to, among other things, payment of past and future lost wages, stock issuances, bonuses and benefits, compensatory damages, and general, economic, non-economic, and special damages. As the Company cannot predict the outcome of the matter, the probability of an outcome cannot be determined. The Company intends to vigorously defend against all claims. The parties are currently in the discovery phase.

- As previously disclosed in the Company's 10-Q for the period ending March 31, 2025, as filed on May 20, 2025, since December 2022, the Company has been cooperating with an ongoing investigation by the SEC regarding possible violations of the federal securities laws. Following discussions with the Staff of the SEC, the Company made certain disclosures addressing the concerns regarding the Company's 2020 S-1 and subsequent reporting, which are contained in the Company's 10-Q for the period ending March 31, 2025 under Note 16, Commitments and Contingencies, Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations – Recent Developments, and under section Legal Proceedings.

  We have been informed that the disclosures sufficiently addressed the Staff's concerns. To resolve the potential charges arising from the SEC's investigation, the Company has consented, without admitting or denying any wrongdoing, to entry of a judgment permanently restraining and enjoining the Company from violating certain provisions of the federal securities laws. The judgment will not require the Company to pay a monetary penalty and will resolve the SEC's claims regarding these matters with respect to the Company.

- On February 1, 2023, a putative class action lawsuit titled Cullen v. RYVYL Inc. fka GreenBox POS, Inc., et al., Case No. 3:23-cv-00185-GPC-AGS, was filed in the United States District Court for the Southern District of California against several defendants, including the Company and certain of our current and former directors and officers (the "Cullen Defendants"). The complaint was filed on behalf of persons who purchased or otherwise acquired the Company's publicly traded securities between January 29, 2021 and January 20, 2023. The complaint alleged that the Cullen Defendants violated Sections 11, 12(a)(2), and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act by making false and/or misleading statements regarding the Company's financial controls, performance and prospects. On June 30, 2023, the plaintiff filed an amended complaint. On March 1, 2024, the Court issued an order granting in part and denying in part defendants' motions to dismiss, which included dismissing all Securities Act claims and narrowing the potential class period. The plaintiff filed a second amended complaint on April 30, 2024, which alleges claims against the Cullen Defendants under Exchange Act Sections 10(b) and 20(a) only and a class period of May 13, 2021 through January 20, 2023. The Company filed its motion to dismiss the second amended complaint on July 1, 2024. On October 21, 2024, the Court issued an order granting in part and denying in part defendants' motions to dismiss. The scope of the remaining claims is consistent with the Court's last motion to dismiss decision dated March 1, 2024. On November 12, 2024, Plaintiff filed a Third Amended Complaint, which asserts the same legal causes of action and proposed class period as the previous complaint. On February 28, 2025, the Parties executed a Memorandum of Understanding ("MOU") that reflects their agreement in principle to settle the claims asserted in this class action. On July 9, 2025, the Parties executed the Stipulation and Agreement of Settlement ("Stipulation of Settlement"). On July 15, 2025, Plaintiff filed its Unopposed Motion for Preliminary Approval of Class Action Settlement, which is scheduled for hearing on August 15, 2025. The Stipulation of Settlement provides for the full resolution and release of all claims against the Cullen Defendants in

exchange for $300,000 in cash (the "Cash Settlement Amount"), 700,000 freely tradable shares of the Company's common stock (the "Settlement Shares"), and an option that, together with the Cash Settlement Amount and Settlement Shares, requires that the combined value of the settlement consideration shall be no less than $1,000,000. There is no assurance, however, that the settlement will be completed and/or that the Court will approve it. The Cullen Defendants continue to deny any and all liability and allegations set forth in the pending Third Amended Complaint.

29

Table of Contents

- On June 22, 2023, a shareholder derivative complaint was filed in the United States District Court for the Southern District of California against certain of the Company's current and/or former officers and directors (the "Hertel Defendants"), Christy Hertel, derivatively on behalf of RYVYL Inc., f/k/a GreenBox POS v. Ben Errez et al., Case No. 3:23-CV-01165-GPC-SBC. On August 4, 2023, a second shareholder derivative complaint was filed in the United States District Court for the Southern District of California against the Hertel Defendants, Marcus Gazaway, derivatively on behalf of RYVYL Inc., f/k/a GreenBox POS v. Ben Errez et al., Case No. 3:23-CV-01425-LAB-BLM. Both derivative complaints generally allege that the Hertel Defendants failed to implement adequate internal controls that would prevent false and misleading financial information from being published by the Company and that controlling shareholders participated in overpayment misconduct resulting in violations of Sections 10(b), 14(a) and 20 of the Exchange Act and breached their fiduciary duties and, purportedly on behalf of the Company. On April 2, 2024, the Court granted the parties' joint motion for an order consolidating the Hertel and Gazaway cases under the caption In re RYVYL Inc. Derivative Litigation, Lead Case No. 3:23-CV-01165-GPC-SBC (S.D. Cal.). On May 6, 2024, the Court issued an order staying the action until after the final resolution of any motion to dismiss the securities class action detailed above. On May 1, 2024, a third nearly identical shareholder derivative complaint was filed in Clark County, Nevada by plaintiff Christina Brown, derivatively on behalf of RYVYL, Inc., v. Ben Errez et al., Case No. A-24-892382-C.

  The Complaints seeks damages and contribution from the Hertel Defendants and a direction that the Company and the Hertel Defendants take actions to reform and improve corporate governance and internal procedures to comply with applicable laws. The Hertel Defendants deny all allegations of liability and intend to vigorously defend against all claims. On May 8, 2025, all parties reached an agreement in principle to fully resolve and settle all claims alleged in the lawsuits. The pending settlement is subject to documentation by the parties and approval by the District Court. However, unless and until the settlement is approved, and given the uncertainty of litigation and the legal standards that must be met for success on the merits, the Company cannot predict the outcome of the cases at this time.

- On October 1, 2023, the Company filed a demand for arbitration against Sky Financial with the American Arbitration Association in San Diego, California (the "Arbitration"). In the Arbitration, the Company seeks to recover for breach of contract and Sky Financial's failure to perform its obligations On October 2, 2023, the Company filed a complaint against Sky Financial in San Diego Superior Court asserting the same claims asserted in the Arbitration, solely to toll any applicable statutes of limitations pending the Arbitration and, if necessary, provide jurisdiction for the court to compel arbitration. The action seeks damages, including interest and costs of suit incurred. The parties agreed to proceed in the Arbitration and to implement the steps needed to extend the current stay of the San Diego Superior Court action pending the Arbitration. Subsequently, the parties agreed to stay the Arbitration and attend mediation. A mediation was scheduled but then vacated by stipulation of the parties. The stay of the Arbitration has been lifted. A new third arbitrator was recently selected to the panel to replace an arbitrator who withdrew for personal reasons. A scheduling order has been issued. The parties plan to meet and discuss a discovery plan and other procedural matters before the next status conference.

- On June 25, 2024, J. Drew Byelick, a former Chief Financial Officer of the Company, filed a complaint against the Company in the United States District Court for the Southern District of California, Case No. '24CV1096 JLS MSB. Mr. Byelick alleged breach of contract, fraudulent inducement of employment, along with intentional misrepresentation and concealment. The Company moved to dismiss the complaint for failure to state a claim and for other violations of the federal rules of civil procedure. The Court granted that motion on December 20, 2024, but permitted Mr. Byelick to file an amended complaint. Mr. Byelick filed his first amended complaint on January 19, 2025, asserting the same core claims. The Company moved to dismiss the first amended complaint for similar reasons as its motion to dismiss the original complaint. The Court granted that motion, in part, on April 18, 2025, ruling that Mr. Byelick was incapable of pleading certain claims (and dismissing those claims) but adequately pled others for purposes of a motion to dismiss only. Mr. Byelick filed a motion for summary judgment, which the Company has opposed. The matter is set for hearing on September 5, 2025. The Company denies all allegations of liability and intends to vigorously defend against all claims. However, given the preliminary stage of the lawsuit, the uncertainty of litigation, and the legal standards that must be met for success on the merits, the Company cannot predict the outcome at this time or estimate a reasonably possible loss or range of loss that may result from this action.

30

Table of Contents

- On July 2, 2025, Plaintiff Kapcharge USA Inc. commenced a lawsuit against Defendants Ryvyl Inc., FFS Data Corporation, CML Management, LLC and Cynthia Lambert in San Diego Superior Court, Case No. 25CU035045C. This lawsuit stems from a dispute between Kapcharge on the one hand and FFS Data Corporation ("FFS"), and CML Management, LLC on the other hand, related to a payment processor agreement between Kapcharge and FFS. Kapcharge alleges causes of action for Conversion, Money Had and Received, Violation of Penal Code § 496, Restitution, Breach of Contract (against FFS, CML, and Lambert), and Unfair Competition in Violation of California Business and Professions Code § 17200 et seq. The Company denies all allegations of liability and intends to vigorously defend against all claims. However, given the preliminary stage of the lawsuit, the uncertainty of litigation, and the legal standards that must be met for success on the merits, the Company cannot predict the outcome at this time or estimate a reasonably possible loss or range of loss that may result from this action.

- On July 15, 2025, Plaintiff Rachael Mora filed a complaint against the Company, Fredi Nisan, and Does 1-20 in San Diego Superior Court. Ms. Mora is alleging sex discrimination and sexual favouritism in violation of the California Fair Employment and Housing Act ("FEHA"), and failure to prevent discrimination in violation of FEHA. Ms. Mora is also claiming retaliation and negligent supervision/negligent retention. Ms. Mora is seeking an unspecified amount of damages related to, among other things, payment of past and future lost wages, stock issuances, bonuses and benefits, compensatory damages, and general, economic, non-economic, and special damages. As the Company cannot predict the outcome of the matter, the probability of an outcome cannot be determined. The Company intends to vigorously defend against all claims.

**16. Segment Reporting**

Prior to June 1, 2025, the Company operated under two reportable segments, North America and International. As of June 1, 2025, the Company has completed the previously announced sale of its wholly owned subsidiary, Ryvyl EU, which comprised substantially all of the business previously reported under the Company's International segment. Following the sale of Ryvyl EU, the Company views its operations and manages its business as one operating segment. As such, refer to our condensed consolidated financial statements for the Company's results of its one operating segment.

**17. Subsequent Events**

On July 16, 2025, the Company announced the closing of its previously announced public offering of an aggregate of 15,384,615 shares of common stock (or prefunded warrants in lieu thereof) and warrants to purchase up to 15,384,615 shares of common stock, at a combined offering price of $0.39 per share and accompanying warrant. The Company received gross proceeds from the offering of approximately $6.0 million, before deducting placement agent fees and other estimated offering expenses payable by the Company.

31

Table of Contents

ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

Certain information included in this Quarterly Report on Form 10Q (this "Report") and other materials we have filed or may filed, as well as information included in our oral or written statements, contain "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act") and Section 21E of the Securities Exchange Act of 1934, as amended ("the Exchange Act"). These statements are often identified by the use of words such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "plan," "project," "will," "would" or the negative or plural of these words, or similar expressions or variations. Such forward-looking statements are subject to a number of risks, uncertainties, assumptions, and other factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by the forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those identified herein and in our other filings with the Securities and Exchange Commission (the "SEC"). You should not rely upon forward-looking statements as predictions of future events.

You should not place undue reliance on forward-looking statements. The cautionary statements set forth in this Report identify important matters or factors which you should consider in evaluating our forward-looking statements. These matters or factors include, among other things:

- Our ability to effectively execute our business plan;

- Our ability to manage our expansion, growth and operating expenses domestically;

- Our ability to comply with new regulations and compliance requirements that affect our business;

- Our ability to evaluate and measure our business, prospects and performance metrics;

- Our ability to compete and succeed in an evolving industry;

- Our ability to respond and adapt to rapid changes in technology;

- Risks in connection with completed or potential acquisitions, post-acquisition integrations, dispositions and other strategic growth opportunities and initiatives;

- Our need for, and ability to raise, additional capital;

- Our ability to maintain operations in the event our financial condition is negatively impacted as the result of litigation or actions of any governmental agencies against us or against any of our officers or directors;

- Our dependence on our proprietary technology, which we may not be able to protect; and

The foregoing list of important factors does not include all such factors, nor necessarily present them in order of importance. In addition, you should consult other disclosures made by us (such as in our other filings with the SEC or in our press releases) for other factors that may cause actual results to differ materially from those projected by us. For additional information regarding risk factors that could affect our results, see "Risk Factors" beginning on page 18 of our 2024 Annual Report and "Risk Factors" on page 42 of this Report.

32

Table of Contents

We intend the forward-looking statements to speak only as of the time of such statements and do not undertake or plan to update or revise such forward-looking statements as more information becomes available or to reflect changes in expectations, assumptions or results. We can give no assurance that such expectations or forward-looking statements will prove to be correct. An occurrence of, or any material adverse change in, one or more of the risk factors or risks and uncertainties referred to in this Report, could materially and adversely affect our results of operations, financial condition, liquidity, and future performance.

In this Report, unless the context otherwise requires, all references to "the Company," "we," "our," "us" and "PubCo" refer collectively to RYVYL Inc., a Nevada corporation, and its subsidiaries.

Unless the context otherwise requires, all references to "PrivCo" refer to GreenBox POS LLC, a limited liability company, formed in the state of Washington.

Our Management's Discussion and Analysis and Results of Operations contains not only statements that are historical facts, but also statements that are forward-looking. Forward-looking statements are, by their very nature, uncertain and risky. These risks and uncertainties include international, national and local general economic and market conditions; demographic changes; our ability to successfully make and integrate acquisitions; raw material costs and availability; new product development and introduction; existing government regulations and changes in, or the failure to comply with, government regulations; adverse publicity; competition; the loss of significant customers or suppliers; fluctuations and difficulty in forecasting operating results; changes in business strategy or development plans; business disruptions; the ability to attract and retain qualified personnel; the ability to protect technology; our ability to continue operating as a going concern; our ability to pay our outstanding debt arrangements; and other risks that might be detailed from time to time in our filings with the SEC.

Although the forward-looking statements in this Report reflect the good faith judgment of our management, such statements can only be based on facts and factors currently known by them. Consequently, and because forward-looking statements are inherently subject to risks and uncertainties, the actual results and outcomes may differ materially from the results and outcomes discussed in the forward-looking statements. You are urged to carefully review and consider the various disclosures made by us in this Report and in our other reports as we attempt to advise interested parties of the risks and factors that may affect our business, financial condition, results of operations and prospects.

**Going Concern**

Substantial doubt exists as to our ability to continue as a going concern based on the fact that we do not have adequate working capital to finance our day-to-day operations. As described in the Notes to the Financial Statements included in our 2024 Form 10-K and in this Report, respectively, for the years ended December 31, 2024, and 2023, and the three and six month periods ended June 30, 2025 and 2024, there is a substantial doubt about our ability to continue as a going concern. For the year ended December 31, 2024, we had a net loss of $26.8 million, and as of December 31, 2024, we had an accumulated deficit of $179.4 million. For the three months ended June 30, 2025, we had net income of $2.8 million, and as of June 30, 2025, we had an accumulated deficit of $190.6 million.

33

Table of Contents

In February 2024, the Company stopped processing credit card payments on its QuickCard platform because our processing partner's bank informed them that they no longer wished to process payments for cannabis merchants. QuickCard was our first-generation product and was designed to address the needs of previously all-cash businesses.

Although not limited to the cannabis industry, prior to discontinuing QuickCard, cannabis merchants made up a substantial majority of the platform's processing volume. The decline in revenues resulting from the discontinuation of QuickCard has adversely impacted the Company's liquidity. Also, until recently, the Company had relied on the repatriation of profits from its European subsidiaries to cover some of its critical operating expenses, which it is no longer able to do following the sale of its wholly owned subsidiary, Ryvyl EU, effective June 1, 2025. As a result, management has determined that its cash balance as of June 30, 2025, will not be sufficient to fund the Company's operations and capital needs for the next 12 months from the date of this Report and, unless we are able to raise additional capital, will only be sufficient to fund operations through approximately December 31, 2025. These conditions raise substantial doubt about our ability to continue as a going concern. See "*Risk Factors - Our financial situation creates doubt whether we will continue as a going concern*". The condensed consolidated financial statements do not include any adjustments that might be necessary if the Company is unable to continue as a going concern.

**Recent Developments**

*Factors and Trends Affecting our Business*

RYVYL Inc. is a fintech business that has historically focused on cloud-based payment processing for high-risk vertical markets, pharmaceutical products, adult content, eCommerce, and rural retail. At our revenue peak in the fourth quarter of 2023, we processed over 1 million cannabis transactions per month with over $12 million of revenue, or $48 million annualized, with a gross margin of approximately 40%. It was our most lucrative vertical market. Our other legacy business provides approximately $12 million of annual revenue in the U.S. If we recover to our late 2023 levels, management believes that annualized revenue would be approximately $60 million and would generate approximately $24 million of gross profits. In order to re-engage in this lucrative market, we are considering alternatives to credit card processing for this vertical, such as a digital wallet to wallet payment system where consumers are required to fund a digital wallet via ACH payments or utilize prepaid cards. The challenge of this method is that it is difficult to predict the time required for consumer adoption. However, management believes that the demand for processing cannabis payments is very strong and other payment processors continue to have difficulty with banking and compliance issues. We have access to over 1,500 cannabis merchants and numerous ISO agents who specialize in cannabis.

As a result of the sale of our European subsidiary, Ryvyl EU, the Company's management is actively pursuing steps to enhance its existing business plan (the "Enhanced Plan"). The Company is currently exploring opportunities to acquire entities with existing technology that is complementary to the Company's technology, including, pursuant to a business combination, with a view to acquire digital assets that the Company expects will support the Enhanced Plan. We are also considering adopting a Crypto Treasury Allocation policy. Management believes that this strategic pivot leverages our blockchain tokenization infrastructure and aligns with evolving market demands. Potential benefits include:

- Asset Appreciation: Crypto assets such as Bitcoin have historically outperformed traditional currencies.

- Investor Visibility: A modernized treasury approach may enhance investor sentiment and attract media and institutional investors.

- Strategic Differentiation: Establishing RYVYL as a forward-thinking innovator within fintech and crypto-payment ecosystems.

There are no assurances that the Enhanced Plan would result in a significant benefit to the Company. The terms of the Enhanced Plan may be contingent on certain conditions, including completion of a due diligence review and the negotiation of definitive transaction documents. In addition, the Enhanced Plan, particularly if it involves an acquisition, may be dependent upon the Company raising additional capital which would require shareholder approval of (i) the acquisition, (ii) a potential increase in the authorized amount of common stock of the Company, and (iii) a potential reverse split of the common stock of the Company.

In addition, as a result of the sale of Ryvyl EU, we have reduced expenses by reducing the number of our employees by approximately 42% since March 28, 2025 (the date of filing of our Annual Report on Form 10-K for the year ended December 31, 2024), terminating engineering projects intended primarily for our former European subsidiary, and by reducing legal expenses by reducing the number of law firms we engage and cancelling projects, overall reducing expenses by approximately $1.2 million per quarter, which are expected to significantly reduce our expenses beginning in the second half of 2025.

34

Table of Contents

**RESULTS OF OPERATIONS**

**Three Months Ended June 30, 2025 (Unaudited) Compared to Three Months June 30, 2024 (Unaudited):**
*(In thousands, except for percentages)*

| | Three Months Ended June 30, | | | | Change | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2025 | | 2024 | | | |
| | Amount | % of Revenue | Amount | % of Revenue | Amount | % |
| Revenue | $ 2,783 | 100.0% | $ 2,972 | 100.0% | $ (189) | (6.4)% |
| Cost of revenue | 1,564 | 56.2% | 1,846 | 62.1% | (282) | (15.3)% |
| Gross profit | 1,219 | 43.8% | 1,126 | 37.9% | 93 | 8.3% |
| | | | | | | |
| **Operating expenses:** | | | | | | |
| Advertising and marketing | 2 | 0.1% | 16 | 0.5% | (14) | (87.5)% |
| Research and development | 129 | 4.6% | 819 | 27.6% | (690) | (84.2)% |
| General and administrative | 1,351 | 48.6% | 1,204 | 40.5% | 147 | 12.2% |
| Payroll and payroll taxes | 497 | 17.9% | 2,170 | 73.0% | (1,673) | (77.1)% |
| Professional fees | 667 | 24.0% | 1,261 | 42.4% | (594) | (47.1)% |
| Stock compensation expense | 441 | 15.8% | 182 | 6.1% | 259 | 142.3% |
| Depreciation and amortization | 159 | 5.7% | 507 | 17.1% | (348) | (68.6)% |
| Impairment of goodwill | - | 0.0% | 6,675 | 224.6% | (6,675) | (100.0)% |
| Impairment of intangible assets | 1,088 | 39.1% | - | 0.0% | 1,088 | 100.0% |
| Restructuring charges | 171 | 6.1% | 1,636 | 55.0% | (1,465) | (89.5)% |
| Total operating expenses | 4,505 | 161.9% | 14,470 | 486.8% | (9,965) | (68.9)% |
| **Loss from operations** | (3,286) | (118.1)% | (13,344) | (448.9)% | 10,058 | (75.4)% |
| | | | | | | |
| **Other income (expense):** | | | | | | |
| Interest expense | (523) | (18.8)% | (125) | (4.2)% | (398) | 318.4% |
| Accretion of debt discount | (22) | (0.8)% | (797) | (26.8)% | 775 | (97.2)% |
| Changes in fair value of derivative liability | - | 0.0% | 14 | 0.5% | (14) | (100.0)% |
| Derecognition expense upon conversion of convertible debt | 176 | 6.3% | (68) | (2.3)% | 244 | (358.8)% |
| Other (expense) income | (21) | (0.8)% | 49 | 1.6% | (70) | (142.9)% |
| Total other (expense), net | (390) | (14.0)% | (927) | (31.2)% | 537 | (57.9)% |

Case 3:23-cv-00185-GPC-SBC   Document 116-9   Filed 11/13/25   PageID.3033   Page 23 of 32

| | | | | | | |
|---|---|---|---|---|---|---|
| Loss from continuing operations before income taxes | (3,676) | (132.1)% | (14,371) | (486.1)% | 10,595 | (74.2)% |
| Provision for income taxes | 164 | 5.9% | 177 | 6.0% | (13) | (7.3)% |
| Net loss from continuing operations | (3,840) | (138.0)% | (14,448) | (486.1)% | 10,608 | (73.4)% |
| (Loss) income from discontinued operations, net of tax | (4,568) | (164.2)% | 2,337 | 78.6% | (6,905) | (295.5)% |
| **Net loss** | $ (8,408) | (302.2)% | $ (12,111) | (407.5)% | $ 3,703 | (30.6)% |

Table of Contents

### Revenue

Consolidated revenue decreased $0.2 million, or 6.4%, to $2.8 million for the three months ended June 30, 2025, from $3.0 million for the three months ended June 30, 2024. The consolidated decrease in revenue was primarily driven by changes in transaction volume product mix. Total transaction volume increased from $152.6 million in the quarter ended June 30, 2024, to $256.8 million in the quarter ended June 30, 2025, and was primarily driven by an 86% increase, or $89.6 million, in banking transaction volume, which carries a much lower residual rate relative to acquiring transactions.

### Cost of Revenue

Consolidated cost of revenue decreased $0.3 million, or 15.3%, to $1.6 million for the three months ended June 30, 2025, from $1.9 million for the three months ended June 30, 2024. Cost of revenue primarily consists of various fees charged by payment processors, fees paid to ISOs, and fees paid to banks for banking transactions. The decrease in consolidated cost of revenue was primarily driven by the changes in processing volumes, as described above.

### Operating Expenses

Operating expenses decreased $10.0 million, or 68.9%, to $4.5 million for the three months ended June 30, 2025, from $14.5 million for the three months ended June 30, 2024. The decrease was primarily driven by decreases in research and development of $0.7 million, payroll and payroll taxes of $1.7 million, professional fees of $0.6 million, impairment of goodwill of $6.7 million, and restructuring charges of $1.5 million. These decreases were partially offset an increase in impairment of intangible assets of $1.1 million.

### Other Expense

Other expense decreased by $0.5 million, or 57.9%, to $0.4 million for the three months ended June 30, 2025, from $0.9 million for the three months ended June 30, 2024. The decrease was primarily driven by a decrease in accretion of debt discount of $0.8 million that was partially offset by an increase interest expense of $0.4 million.

Table of Contents

**Six Months Ended June 30, 2024 (Unaudited) Compared to Six Months June 30, 2023 (Unaudited):**
*(In thousands, except for percentages)*

| | Six Months Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | **2025** | | **2024** | | **Change** | |
| | Amount | % of Revenue | Amount | % of Revenue | Amount | % |
| Revenue | $ 5,552 | 100.0% | $ 12,646 | 100.0% | $ (7,094) | (56.1)% |
| Cost of revenue | 2,964 | 53.4% | 7,367 | 58.3% | (4,404) | (59.8)% |
| Gross profit | 2,589 | 46.6% | 5,280 | 41.7% | (2,690) | (51.0)% |
| **Operating expenses:** | | | | | | |
| Advertising and marketing | 5 | 0.1% | 33 | 0.3% | (28) | (84.8)% |
| Research and development | 578 | 10.4% | 2,212 | 17.5% | (1,634) | (73.9)% |
| General and administrative | 2,488 | 44.8% | 2,742 | 21.7% | (254) | (9.3)% |
| Payroll and payroll taxes | 3,120 | 56.2% | 5,074 | 40.1% | (1,954) | (38.5)% |
| Professional fees | 1,685 | 30.3% | 2,295 | 18.2% | (610) | (26.6)% |
| Stock compensation expense | 496 | 8.9% | 406 | 3.2% | 90 | 22.2% |
| Depreciation and amortization | 241 | 4.3% | 998 | 7.9% | (757) | (75.9)% |
| Impairment of goodwill | - | 0.0% | 6,675 | 52.8% | (6,675) | (100.0)% |
| Impairment of intangible assets | 1,088 | 19.6% | - | 0.0 | 1,088 | 100.0% |
| Restructuring charges | 574 | 10.3% | 1,636 | 12.9% | (1,062) | (64.9)% |
| Total operating expenses | 10,275 | 185.1% | 22,071 | 174.5% | (11,796) | (53.4)% |
| **Loss from operations** | (7,687) | (138.4)% | (16,792) | (132.8)% | 9,105 | (54.2)% |
| **Other income (expense):** | | | | | | |
| Interest expense | (1,752) | (31.6)% | (153) | (1.2)% | (1,599) | 1,045.1% |
| Accretion of debt discount | (150) | (2.7)% | (1,705) | (13.5)% | 1,555 | (91.2)% |
| Changes in fair value of derivative liability | - | 0.0% | 14 | 0.1% | (14) | (100.0)% |
| Derecognition expense on conversion of convertible debt | 176 | 3.2% | (69) | (0.5)% | 245 | (358.8)% |
| Other income | 26 | 0.5% | 99 | 0.8% | (73) | (73.7)% |
| Total other expense, net | (1,700) | (30.68)% | (1,814) | (14.3)% | 113 | (6.2)% |
| Loss from continuing operations before income taxes | (9,387) | (169.1)% | (18,606) | (147.1)% | 9,219 | (49.6)% |
| Provision for income taxes | 305 | 5.5% | 166 | 1.3% | 139 | 83.7% |
| Net loss from continuing operations | (9,692) | (174.6)% | (18,772) | (148.4)% | 9,080 | (48.4)% |
| (Loss) income from discontinued operations, net of tax | (1,472) | (26.5)% | 3,971 | 31.4% | (5,443) | (137.1)% |
| **Net loss** | $ (11,164) | (201.1)% | $ (14,801) | (117.0)% | $ 3,636 | (24.6)% |

Table of Contents

**Revenue**

Consolidated revenue decreased $7.1 million, or 56.1%, to $5.6 million for the six months ended June 30, 2025, from $12.6 million for the six months ended June 30, 2024. The consolidated decrease in revenue was primarily driven by changes in transaction volume product mix year-over-year. Total transaction volume increased from $391.6 million in the six months ended June 30, 2024, to $434.5 million in the six months ended June 30, 2025, which was driven by an increase of 302.3%, or $129.6 million, in banking transaction volume that was partially offset by a decrease of 202.3%, or $86.7 million, in acquiring and other transaction volume that is primarily attributable to the adverse impact associated with the previously disclosed QuickCard product transition during the first quarter of 2024.

**Cost of Revenue**

Consolidated cost of revenue decreased $4.4 million, or 59.8%, to $3.0 million for the six months ended June 30, 2025, from $7.4 million for the six months ended June 30, 2024. Cost of revenue primarily consists of various fees charged by payment processors, fees paid to ISOs, and fees paid to banks for banking transactions. The decrease in consolidated cost of revenue was primarily driven by the decrease in processing volumes, as noted above.

**Operating Expenses**

Operating expenses decreased $11.8 million, or 53.4%, to $10.3 million for the six months ended June 30, 2025, from $11.8 million for the six months ended June 30, 2024. The decrease was primarily driven by decreases in research and development of $1.6 million, payroll and payroll taxes of $2.0 million, professional fees of $0.6 million, depreciation and amortization of $0.8 million, impairment of goodwill of $6.7 million, and restructuring charges of $1.1 million. These decreases were partially offset an increase in impairment of intangible assets of $1.1 million.

**Other Expense**

Other expense increased $0.1 million, or 6.2%, to $1.7 million for the six months ended June 30, 2025, from $1.8 million for the six months ended June 30, 2024. The decrease was primarily driven by an increase in interest expense of $1.6 million that was more than offset by decreases in accretion of debt discount of $1.6 million and derecognition expense upon conversion of convertible debt of $0.2 million.

38

Table of Contents

**Liquidity and Capital Resources**

The Company's consolidated working capital at June 30, 2025 was negative $8.1 million, which included cash of $0.2 million and restricted cash of $14.7 million. Historically, the Company has financed its operations with proceeds from cash from operations, the sales of equity securities, and proceeds from its $100 million convertible note issued in November 2021. Our material liquidity needs principally relate to working capital requirements and research and development expenditures.

As further described in the section, Going Concern above, since the first quarter of 2024, the Company's liquidity has been adversely impacted by the decline in revenues related to the discontinuation of its QuickCard product. As also noted therein, until recently, the Company had relied on the repatriation of profits from its European subsidiaries to cover some of its critical operating expenses in North America, which it is no longer be able to do following the sale of its wholly owned subsidiary, Ryvyl EU, effective June 1, 2025. As a result, management has determined that its cash balance as of June 30, 2025, will not be sufficient to fund its operations and capital needs for the next 12 months from the date of this Report and, unless the Company is able to raise additional capital, will only be sufficient to fund operations through approximately December 31, 2025. The Company's ability to successfully address this liquidity shortfall is contingent upon the successful execution of management's intended plan over the next twelve months, which includes, but is not limited to, the following:

- raising additional capital over the next six months through a variety of means, including private and public equity offerings and debt financings. The Company recently executed a successful capital raise (see Note 17, Subsequent Events) and continues to be actively engaged in discussions with multiple parties for additional funding opportunities;

- continued execution of its accelerated business development efforts to drive volumes in diversified business verticals with the Company's other products, including the recently launched licensing of the Company's payments processing platform in certain niche high-risk business verticals; and

- continued implementation of cost control measures to more effectively manage spending and further right-sizing the organization, where appropriate.

Management has assessed that its intended plan described above, if successfully implemented, is appropriate and sufficient to address its liquidity shortfall and to provide funds to cover operations for the next 12 months from the date of the issuance of this Report. However, there can be no assurance that we will be successful in implementing our plan, that our projections of our future capital needs will prove accurate, or that any additional funding will be available on a timely manner, on favorable terms, or be sufficient to continue our operations.

*Cash Flow Activities*

The following table shows cash flows for the periods presented (in thousands):

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2025 | 2024 |
| Cash (used in) provided by operating activities | $ (3,146) | $ 2,695 |
| Cash used in investing activities | (76,263) | (645) |
| Cash provided by (used in) financing activities | 1,994 | (199) |
| Effects of exchange rates on cash and restricted cash | 365 | (9) |
| Net (decrease) increase in cash and restricted cash | $ (77,050) | $ 1,842 |

*Operating Activities* – For the six months ended June 30, 2025, and 2024, net cash used in operating activities was $3.1 million and net cash provided by operating activities was $2.7 million, respectively. The net cash used and provided by operating activities was primarily driven by the timing of settlement of assets and liabilities.

39

Table of Contents

*Investing Activities* – Net cash used in investing activities for the six months ended June 30, 2025, and 2024, was $76.3 million and $0.7 million, respectively. The net cash used in investing activities for the six months ended June 30, 2025 primarily relates to cash transferred to the purchaser in connection with the sale of Ryvyl EU. Net cash used in investing

activities for the six months ended June 30, 2024 was immaterial.

*Financing Activities* – Net cash provided by financing activities during the six months ended June 30, 2025 was $2.0 million and was primarily driven by proceeds from a short-term note payable obtained by the Company in connection with the January 2025 SPA, partially offset by the partial repayment of the 8% Senior Convertible Note. Net cash used in financing activities during the six months ended June 30, 2024 was negligible.

## Critical Accounting Estimates

We prepare our consolidated financial statements in accordance with accounting principles generally accepted in the U.S. ("GAAP"). GAAP requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. We base our estimates on historical experience, anticipated future trends, and other assumptions we believe to be reasonable under the circumstances. Because these estimates require significant judgment, our actual results may differ materially from our estimates.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are a smaller reporting company as defined by Rule 12b-2 of the Exchange Act and are not required to provide the information otherwise required under this Item.

## ITEM 4. CONTROLS AND PROCEDURES

*Evaluation of Disclosure Controls and Procedures*

Regulations under the Exchange Act require public companies to maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act. Disclosure controls and procedures include, without limitation, controls and other procedures that are designed to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is accumulated and timely communicated to management, including our Chief Executive Officer (our principal executive officer) and Chief Financial Officer (our principal financial officer), to allow timely decisions regarding required disclosure. Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Report. Based on their evaluation as of June 30, 2025, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at a reasonable assurance level as of such date.

*Changes in Internal Control Over Financial Reporting*

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rules 13a-15(e) and 15d-15(e) of the Exchange Act that occurred during the period covered by this Report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

40

Table of Contents

PART II - OTHER INFORMATION

## ITEM 1. LEGAL PROCEEDINGS

From time-to-time, the Company is involved in legal proceedings. The following is a summary of our current outstanding litigation. Note that references to GreenBox POS are for historical purposes. GreenBox POS changed its name to RYVYL Inc. on October 13, 2022.

- On November 8, 2022, the Company filed a complaint against its former Chief Operating Officer Vanessa Luna, Luna Consultant Group, LLC and Does 1 through 50 in San Diego Superior Court (the "Company Filing"). The Company alleged that Ms. Luna abused her position for additional compensation, failed to follow proper protocols and breached her fiduciary duties and duty of loyalty by secretly maintaining alternative employment. The action sought damages, including interest and costs of suit incurred. On November 10, 2022, Ms. Luna filed her own complaint against the Company and Fredi Nisan in San Diego Superior Court (the "Luna Filing"). Ms. Luna alleged that Mr. Nisan used contract negotiations to coerce her, that the Company improperly coded transactions and misled investors, and that when her concerns were reported to management, she was wrongfully terminated, resulting in a number of claims. Ms. Luna also alleged sexual misconduct on the part of Mr. Nisan. Ms. Luna sought damages including compensatory damages, unpaid wages (past and future), loss of wages and benefits (past and future), and other damages to be proven at trial. The Company and Mr. Nisan deny all allegations of the Luna Filing. In April 2023, Ms. Luna sought and was granted permission to add Coyni, Inc. as a defendant with regard to her claims. In addition, in August 2024, the Company and Mr. Nisan were granted leave to file a Second Amended Complaint to add additional claims against Ms. Luna, including securities fraud. After vigorously defending against all claims asserted by Ms. Luna and vigorously prosecuting its own claims against Ms. Luna, on October 17, 2024, the parties entered into a confidential settlement agreement. On February 4, 2025, the parties filed with the San Diego Superior Court Requests for Dismissal, dismissing their respective cases with prejudice. The request was rejected and resubmitted on April 29, 2025.

- On December 12, 2022, Jacqueline Dollar (aka Jacqueline Reynolds), former Chief Marketing Officer of the Company, filed a complaint against the Company, Fredi Nisan, and Does 1-20 in San Diego Superior Court. Ms. Dollar is alleging she was undercompensated compared to her male counterparts and retaliated against after raising concerns to management resulting in sex discrimination in violation of the California Fair Employment and Housing Act ("FEHA") and failure to prevent discrimination in violation of FEHA. Ms. Dollar is also claiming intentional infliction of emotional distress. Ms. Dollar is seeking an unspecified amount of damages related to, among other things, payment of past and future lost wages, stock issuances, bonuses and benefits, compensatory damages, and general, economic, non-economic, and special damages. As the Company cannot predict the outcome of the matter, the probability of an outcome cannot be determined. The Company intends to vigorously defend against all claims. The parties are currently in the discovery phase.

- As previously disclosed in the Company's 10-Q for the period ending March 31, 2025, as filed on May 20, 2025, since December 2022, the Company has been cooperating with an ongoing investigation by the SEC regarding possible violations of the federal securities laws. Following discussions with the Staff of the SEC, the Company made certain disclosures addressing the concerns regarding the Company's 2020 S-1 and subsequent reporting, which are contained in the Company's 10-Q for the period ending March 31, 2025 under Note 16, Commitments and Contingencies, Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations – Recent Developments, and under section Legal Proceedings.

  We have been informed that the disclosures sufficiently addressed the Staff's concerns. To resolve the potential charges arising from the SEC's investigation, the Company has consented, without admitting or denying any wrongdoing, to entry of a judgment permanently restraining and enjoining the Company from violating certain provisions of the federal securities laws. The judgment will not require the Company to pay a monetary penalty and will resolve the SEC's claims regarding these matters with respect to the Company.

41

Table of Contents

- On February 1, 2023, a putative class action lawsuit titled Cullen v. RYVYL Inc. fka GreenBox POS, Inc., et al., Case No. 3:23-cv-00185-GPC-AGS, was filed in the United States District Court for the Southern District of California against several defendants, including the Company and certain of our current and former directors and officers

(the "Cullen Defendants"). The complaint was filed on behalf of Defendants who purchased or otherwise acquired the Company's publicly traded securities between January 29, 2021 and January 20, 2023. The complaint alleged that the Cullen Defendants violated Sections 11, 12(a)(2), and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act by making false and/or misleading statements regarding the Company's financial controls, performance and prospects. On June 30, 2023, the plaintiff filed an amended complaint. On March 1, 2024, the Court issued an order granting in part and denying in part defendants' motions to dismiss, which included dismissing all Securities Act claims and narrowing the potential class period. The plaintiff filed a second amended complaint on April 30, 2024, which alleges claims against the Cullen Defendants under Exchange Act Sections 10(b) and 20(a) only and a class period of May 13, 2021 through January 20, 2023. The Company filed its motion to dismiss the second amended complaint on July 1, 2024. On October 21, 2024, the Court issued an order granting in part and denying in part defendants' motions to dismiss. The scope of the remaining claims is consistent with the Court's last motion to dismiss decision dated March 1, 2024. On November 12, 2024, Plaintiff filed a Third Amended Complaint, which asserts the same legal causes of action and proposed class period as the previous complaint. On February 28, 2025, the Parties executed a Memorandum of Understanding ("MOU") that reflects their agreement in principle to settle the claims asserted in this class action. On July 9, 2025, the Parties executed the Stipulation and Agreement of Settlement ("Stipulation of Settlement"). On July 15, 2025, Plaintiff filed its Unopposed Motion for Preliminary Approval of Class Action Settlement, which is scheduled for hearing on August 15, 2025. The Stipulation of Settlement provides for the full resolution and release of all claims against the Cullen Defendants in exchange for $300,000 in cash ("Cash Settlement Amount"), 700,000 freely tradable shares of the Company's common stock ("Settlement Shares"), and a put option that, together with the Cash Settlement Amount and Settlement Shares, requires that the combined value of the settlement consideration shall be no less than $1,000,000. There is no assurance, however, that the settlement will be completed and/or that the Court will approve it. The Cullen Defendants continue to deny any and all liability and allegations set forth in the pending Third Amended Complaint.

- On June 22, 2023, a shareholder derivative complaint was filed in the United States District Court for the Southern District of California against certain of the Company's current and/or former officers and directors (the "Hertel Defendants"), Christy Hertel, derivatively on behalf of RYVYL Inc., f/k/a GreenBox POS v. Ben Errez et al., Case No. 3:23-CV-01165-GPC-SBC. On August 4, 2023, a second shareholder derivative complaint was filed in the United States District Court for the Southern District of California against the Hertel Defendants, Marcus Gazaway, derivatively on behalf of RYVYL Inc., f/k/a GreenBox POS v. Ben Errez et al., Case No. 3:23-CV-01425-LAB-BLM. Both derivative complaints generally allege that the Hertel Defendants failed to implement adequate internal controls that would prevent false and misleading financial information from being published by the Company and that controlling shareholders participated in overpayment misconduct resulting in violations of Sections 10(b), 14(a) and 20 of the Exchange Act and breached their fiduciary duties and, purportedly on behalf of the Company. On April 2, 2024, the Court granted the parties' joint motion for an order consolidating the Hertel and Gazaway cases under the caption In re RYVYL Inc. Derivative Litigation, Lead Case No. 3:23-CV-01165-GPC-SBC (S.D. Cal.). On May 6, 2024, the Court issued an order staying the action until after the final resolution of any motion to dismiss the securities class action detailed above. On May 1, 2024, a third nearly identical shareholder derivative complaint was filed in Clark County, Nevada by plaintiff Christina Brown, derivatively on behalf of RYVYL, Inc., v. Ben Errez et al., Case No. A-24-892382-C.

  The Complaints seeks damages and contribution from the Hertel Defendants and a direction that the Company and the Hertel Defendants take actions to reform and improve corporate governance and internal procedures to comply with applicable laws. The Hertel Defendants deny all allegations of liability and intend to vigorously defend against all claims. On May 8, 2025, all parties reached an agreement in principle to fully resolve and settle all claims alleged in the lawsuits. The pending settlement is subject to documentation by the parties and approval by the District Court. However, unless and until the settlement is approved, and given the uncertainty of litigation and the legal standards that must be met for success on the merits, the Company cannot predict the outcome of the cases at this time.

- On October 1, 2023, the Company filed a demand for arbitration against Sky Financial with the American Arbitration Association in San Diego, California (the "Arbitration"). In the Arbitration, the Company seeks to recover for breach of contract and Sky Financial's failure to perform its obligations On October 2, 2023, the Company filed a complaint against Sky Financial in San Diego Superior Court asserting the same claims asserted in the Arbitration, solely to toll any applicable statutes of limitations pending the Arbitration and, if necessary, provide jurisdiction for the court to compel arbitration. The action seeks damages, including interest and costs of suit incurred. The parties agreed to proceed in the Arbitration and to implement the steps needed to extend the current stay of the San Diego Superior Court action pending the Arbitration. Subsequently, the parties agreed to stay the Arbitration and attend mediation. A mediation was scheduled but then vacated by stipulation of the parties. The stay of the Arbitration has been lifted. A new third arbitrator was recently selected to the panel to replace an arbitrator who withdrew for personal reasons. A scheduling order has been issued. The parties plan to meet and discuss a discovery plan and other procedural matters before the next status conference.

42

Table of Contents

- On June 25, 2024, J. Drew Byelick, a former Chief Financial Officer of the Company, filed a complaint against the Company in the United States District Court for the Southern District of California, Case No. '24CV1096 JLS MSB. Mr. Byelick alleged breach of contract, fraudulent inducement of employment, along with intentional misrepresentation and concealment. The Company moved to dismiss the complaint for failure to state a claim and for other violations of the federal rules of civil procedure. The Court granted that motion on December 20, 2024, but permitted Mr. Byelick to file an amended complaint. Mr. Byelick filed his first amended complaint on January 19, 2025, asserting the same core claims. The Company moved to dismiss the first amended complaint for similar reasons as its motion to dismiss the original complaint. The Court granted that motion, in part, on April 18, 2025, ruling that Mr. Byelick was incapable of pleading certain claims (and dismissing those claims) but adequately pled others for purposes of a motion to dismiss only. Mr. Byelick filed a motion for summary judgment, which the Company has opposed. The matter is set for hearing on September 5, 2025. The Company denies all allegations of liability and intends to vigorously defend against all claims. However, given the preliminary stage of the lawsuit, the uncertainty of litigation, and the legal standards that must be met for success on the merits, the Company cannot predict the outcome at this time or estimate a reasonably possible loss or range of loss that may result from this action.

- On July 2, 2025, Plaintiff Kapcharge USA Inc. commenced a lawsuit against Defendants Ryvyl Inc., FFS Data Corporation, CML Management, LLC and Cynthia Lambert in San Diego Superior Court, Case No. 25CU035045C. This lawsuit stems from a dispute between Kapcharge on the one hand and FFS Data Corporation ("FFS"), and CML Management, LLC on the other hand, related to a payment processor agreement between Kapcharge and FFS. Kapcharge alleges causes of action for Conversion, Money Had and Received, Violation of Penal Code § 496, Restitution, Breach of Contract (against FFS, CML, and Lambert), and Unfair Competition in Violation of California Business and Professions Code § 17200 et seq. The Company denies all allegations of liability and intends to vigorously defend against all claims. However, given the preliminary stage of the lawsuit, the uncertainty of litigation, and the legal standards that must be met for success on the merits, the Company cannot predict the outcome at this time or estimate a reasonably possible loss or range of loss that may result from this action.

- On July 15, 2025, Plaintiff Rachael Mora filed a complaint against the Company, Fredi Nisan, and Does 1-20 in San Diego Superior Court. Ms. Mora is alleging sex discrimination and sexual favouritism in violation of the California Fair Employment and Housing Act ("FEHA"), and failure to prevent discrimination in violation of FEHA. Ms. Mora is also claiming retaliation and negligent supervision/negligent retention. Ms. Mora is seeking an unspecified amount of damages related to, among other things, payment of past and future lost wages, stock issuances, bonuses and benefits, compensatory damages, and general, economic, non-economic, and special damages. As the Company cannot predict the outcome of the matter, the probability of an outcome cannot be determined. The Company intends to vigorously defend against all claims.

## ITEM 1A. RISK FACTORS

Other than the newly identified risk factors described below, there have been no material changes with respect to risk factors previously disclosed in the Company's 2024 Annual Report.

### *Our financial situation creates doubt whether we will continue as a going concern*

As described in the Notes to the Financial Statements included in our 2024 Form 10-K and in this Report, respectively, for the years ended December 31, 2024, and 2023, and the six month periods ended June 30, 2025 and 2024, there is a substantial doubt about our ability to continue as a going concern. For the year ended December 31, 2024, we had a net loss of $26.8 million, and as of December 31, 2024, we had an accumulated deficit of $179.4 million. For the three months ended June 30, 2025, we had net income of $2.8 million, and as of

June 30, 2025, we had an accumulated deficit of $190.6 million. Also, until recently, we had relied on the repatriation of profits from our foreign subsidiaries to cover some of our critical operating expenses, which we are no longer able to do following the sale of our wholly owned subsidiary, Ryvyl EU, effective June 1, 2025. As a result, management has determined that our cash balance as of June 30, 2025, will not be sufficient to fund our operations and capital needs for the next 12 months from the date of this Report and, unless we are able to raise additional capital, will only be sufficient to fund operations through approximately December 31, 2025. These conditions raise substantial doubt about our ability to continue as a going concern. There can be no assurances that we will be able to achieve a level of revenues adequate to generate sufficient cash flow from operations or additional financing through private placements, public offerings and/or bank financing necessary to support our working capital requirements. To the extent that funds generated from any private placements, public offerings and/or bank financing are insufficient, we will need to raise additional working capital. No assurance can be given that additional financing will be available, or if available, that we will be able to secure any such financing on acceptable terms. If adequate working capital is not available, we may be forced to discontinue operations.

43

Table of Contents

### *If we are not able to comply with the applicable continued listing requirements or standards of Nasdaq, our common stock could be delisted from Nasdaq*

Our common stock is currently listed on Nasdaq. In order to maintain that listing, we must satisfy minimum financial and other continued listing requirements and standards, including those regarding director independence and independent committee requirements, minimum stockholders' equity, minimum share price, and certain corporate governance requirements. There can be no assurances that we will be able to comply with the applicable listing standards of Nasdaq.

As disclosed in our Current Report on Form 8-K filed with the SEC on April 11, 2025, we received a written notification from the Staff on April 8, 2025 notifying us that we were not in compliance with the minimum stockholders' equity requirement of $2.5 million for continued listing on the Nasdaq Capital Market under Nasdaq Listing Rule 5550(b)(1). On May 21, 2025, the Company submitted a compliance plan to Nasdaq to regain compliance with Equity Rule (the "Compliance Plan"), and on May 23, 2025, the Company received a letter from Nasdaq (the "Nasdaq Extension Letter") stating that, based on the information presented in the Compliance Plan, Nasdaq has determined to grant the Company an extension to regain compliance with the Equity Rule. Pursuant to the terms of the Nasdaq Extension Letter, the Company is required to raise financing and provide sufficient evidence to Nasdaq, on or before October 6, 2025, that the Company believes it is in compliance with the Equity Rule.

There can be no assurances that the Company will be able to demonstrate compliance with the required terms in the Nasdaq Extension Letter required to regain compliance with the Nasdaq Listing Rules. If we fail to meet to regain compliance, our common stock may be delisted from the Nasdaq Capital Market.

On June 12, 2025, the "Company, received a second notice from Nasdaq notifying the Company that, because the closing bid price for its common stock has fallen below $1.00 per share for 30 consecutive business days, the Company no longer complies with the minimum bid price requirement for continued listing on the Nasdaq Global Market under Nasdaq Lising Rule 5550(a)(2) (the "Minimum Bid Price Requirement").

Nasdaq's notice has no immediate effect on the listing of the Company's Common Stock on the Nasdaq Capital Market and the common stock will continue to trade on The Nasdaq Capital Market under the symbol "RVYL" at this time. Pursuant to Nasdaq Listing Rule 5810(c)(3)(A), the Company has been provided an initial compliance period of 180 calendar days, or until December 9, 2025, to regain compliance with the Minimum Bid Price Requirement. To regain compliance, the closing bid price of the Company's common stock must meet or exceed $1.00 per share for a minimum of 10 consecutive business days prior to December 9, 2025; *provided, however*, pursuant to Nasdaq Listing Rule 5810 (c)(3)(H), Nasdaq may, in its discretion, require the Company to satisfy the Minimum Bid Price Requirement for a period in excess of ten consecutive business days, but generally not more than 20 consecutive business days, before determining that the Company has demonstrated an ability to maintain long-term compliance with the Minimum Bid Price Requirement.

If the Company does not regain compliance by December 9, 2025, the Company may be eligible for an additional grace period. To qualify, the Company would be required to meet the continued listing requirements for all other continuing listing standards for the Nasdaq Capital Market, with the exception of the minimum bid price requirement, including regaining compliance with the continuing listing standards mentioned above of which it is currently not in compliance, and provide written notice of its intention to cure the minimum bid price deficiency during the second compliance period. If the Company meets these requirements, the Nasdaq staff will grant an additional 180 calendar days for the Company to regain compliance with the Minimum Bid Price Requirement. If the Nasdaq staff determines that the Company will not be able to cure the deficiency, or if the Company is otherwise not eligible for such additional compliance period, Nasdaq will provide notice that the Company's common stock will be subject to delisting. The Company would have the right to appeal a determination to delist its common stock, and the common stock would remain listed on the Nasdaq Capital Market until the completion of the appeal process.

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

None.

44

Table of Contents

## ITEM 3. DEFAULTS UPON SENIOR SECURITIES

None.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

## ITEM 5. OTHER INFORMATION

### Trading Arrangements

During the quarterly period ended June 30, 2025, none of our directors or officers (as defined in Rule 16a-1(f) promulgated under the Exchange Act) adopted or terminated any "Rule 10b5-1 trading arrangement" or any "non-Rule 10b5-1 trading arrangement," as each term is defined in Item 408 of Regulation S-K.

## ITEM 6. EXHIBITS

| Exhibit Number | Exhibit Description | Reference | | Filed or Furnished | |
|---|---|---|---|---|---|
| | | Form | Exhibit | Filing Date | Herewith |
| 31.1 | Certification of Principal Executive Officer Pursuant to Exchange Act Rule 13a-14(a), As adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | X |
| 31.2 | Certification of Principal Financial Officer Pursuant to Exchange Act Rule 13a-14(a), As adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | X |
| 32.1* | Certification of Principal Executive Officer pursuant to 18 U.S.C. Section 1350, As adopted Pursuant to Section 906 of the Sarbanes-Oxley Act 2002 | | | | X |

| 32.2* | Certification of Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted Pursuant to Section 906 of the Sarbanes-Oxley Act 2002 | X |
|---|---|---|
| 101.INS | Inline XBRL Instance Document | X |
| 101.SCH | Inline XBRL Taxonomy Extension Schema | X |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase | X |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase | X |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase | X |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase | X |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) | |

\*   In accordance with SEC Release 33-8238, Exhibits 32.1 and 32.2 are being furnished and not filed.

45

Table of Contents

**SIGNATURES**

In accordance with the requirements of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**RYVYL INC.**
(Registrant)

| | | |
|---|---|---|
| Date: August 14, 2025 | By: | */s/ Fredi Nisan* |
| | | Fredi Nisan |
| | | Chief Executive Officer (Principal Executive Officer) |
| | | |
| Date: August 14, 2025 | By: | */s/ George Oliva* |
| | | George Oliva |
| | | Chief Financial Officer (Principal Financial Officer) |

46

Exhibit 31.1

**Certification of the Principal Executive Officer**
**Pursuant to Rule 13a-14(a) and Rule 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Fredi Nisan, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the period ended June 30, 2025 of RYVYL INC.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By:   */s/ Fredi Nisan*
_____
Fredi Nisan
Chief Executive Officer
(Principal Executive Officer)

Date: August 14, 2025

Exhibit 31.2

**Certification of the Principal Financial Officer**
**Pursuant to Rule 13a-14(a) and Rule 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, George Oliva, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q for the period ended June 30, 2025 of RYVYL INC.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By: */s/ George Oliva*
George Oliva
Chief Financial Officer
(Principal Financial Officer)

Date: August 14, 2025

**Exhibit 32.1**

**Certification of the Principal Executive Officer**
**Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report on Form 10-Q of RYVYL Inc. (the "Company") for the period ended June 30, 2025, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Fredi Nisan, the Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the period covered by the Report.

By:     */s/ Fredi Nisan*
Name:   Fredi Nisan
Title:  Chief Executive Officer
        (Principal Executive Officer)

Date: August 14, 2025

Exhibit 32.2

**Certification of the Principal Financial Officer**

**Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act 2002**

In connection with the Quarterly Report on Form 10-Q of RYVYL Inc. (the "Company") for the period ended June 30, 2025, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, George Oliva, the Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the period covered by the Report.

By:     */s/ George Oliva*
Name:   George Oliva
Title:  Chief Financial Officer
        (Principal Financial Officer)


Date: August 14, 2025